IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,     )
     )
        Plaintiff,    )
     )
     v.     )    C.A. No. 07-488-GMS
     )
TOWN OF SMYRNA, DAVID S.    )
HUGG, III, individually and   )
in his official capacity as   )
Town Manager of the Town of   )
Smyrna and VALERIE HERITAGE,  )
individually and in her    )
official capacity as     )
Administrative Clerk of the   )
Town of Smyrna,     )
     )
        Defendants.  )

## APPENDIX TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**AKIN & HERRON, P.A.**
Bruce C. Herron
Attorney I.D. No.: 2315
1500 Shallcross Avenue
Suite 1-A
Wilmington, Delaware 19806
(302) 427-6987
Attorney for Defendants

Dated: May 30, 2008

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Complaint | A-1 |
| Samuel J. Fox, III - Deposition Testimony | A-12 |
| James Markow - Deposition Testimony | A-40 |
| Gary Stulir - Deposition Testimony | A-44 |
| David S. Hugg, III - Deposition Testimony | A-47 |
| Catherine A. Fox - Deposition Testimony | A-57 |
| Valerie Lynn Heritage - Deposition Testimony | A-68 |
| Notes from Meeting on Friday, March 11, 2005 | A-73 |
| March 22, 2005 Affidavit of James Markow | A-84 |
| March 22, 2005 Affidavit of Gary Stulir | A-85 |
| June 9, 2005 Memo to Samuel Fox from David Hugg | A-86 |
| June 15, 2005 Memo from Cathy Fox to Alexis R. Fox | A-87 |
| June 23, 2005 Memo from David Hugg to Samuel Fox, Valerie Heritage and Aimee Masten | A-90 |
| August 3, 2005 Memo to David Hugg from Samuel Fox | A-91 |
| August 19, 2005 Memo to Samuel Fox from David Hugg | A-92 |
| August 19, 2005 Memo to David Hugg from Samuel Fox | A-93 |
| November 8, 2005 Memo to David Hugg from Samuel Fox | A-97 |
| January 4, 2006 Notice to Terminate Employment from Samuel Fox to David Hugg | A-100 |
| Affidavit of Janet Vinc | A-101 |

2007 AUG -7 PM 4: 02
FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Page 12 of 23  Received on 8/9/2007 12:15:59 PM [US Mountain Standard -

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,

    Plaintiff,

    v.

TOWN OF SMYRNA, DAVID S. HUGG,
III, individually and in his official capacity
as Town Manager of the Town of Smyrna,
and VALERIE HERITAGE, individually
and in her official capacity as Administrative
Clerk of the Town of Smyrna,

    Defendants.

C.A. No.    0 7 - 4 8 8

**COMPLAINT**

**TRIAL BY JURY DEMANDED**

1.    Plaintiff Samuel James Fox is a resident of the State of Delaware residing at 276 Sunrise Drive, Clayton, Delaware 19938.

2.    Defendant Town of Smyrna (hereinafter "Defendant Town") is a municipal entity, a political subdivision of the State of Delaware, an employer within the State of Delaware, within the jurisdictional coverage of Title VII of the Civil Rights Act, and within the jurisdictional coverage of the Age Discrimination in Employment Act.

3.    Defendant David S. Hugg, III, was at all times pertinent hereto, the Town Manager and employee of Defendant Town.

4.    Defendant Valerie Heritage, was at all times pertinent hereto, the Administrative Clerk in the Building Department and employee of Defendant Town.

5.    This Court has original jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343 and pursuant to 42 U.S.C. § 2000e-5(f)(3).

6.    This Court has pendent jurisdiction over Plaintiff's state law claims pursuant to

A-1

28 U.S.C. § 1367.

7.      Venue for all causes of action stated herein lies in the District of Delaware as the acts alleged as the bases for these claims took place within the boundaries of that District.

8.      Plaintiff is a Caucasian male, age fifty-five (55).

9.      Plaintiff began employment with Defendant the Town of Smyrna on or about July 3, 2000, as a Building Code Enforcement Officer.

10.     During the period of his employment, Plaintiff was never the subject of disciplinary action, nor was he ever counseled by Defendant Town or its agents until the time of the incidents leading to his employment's termination as set forth hereinbelow.

11.     Further, Plaintiff was promoted three times during his employment with Defendant Town, eventually achieving the positions of Capital Projects Coordinator and Manager of the Building and Inspection Department.

12.     At all times relevant hereto, Plaintiff performed the duties of his job position satisfactorily.

13.     In March of 2005, Ms. Jeri Dunn, Town Planner for Defendant Town, who worked in conjunction with Plaintiff in managing the Building & Inspection Department, was terminated for allegedly making defamatory comments about another employee of Defendant Town, Ms. Janet Vine. Ms. Vine was a younger female who was favored by Defendant Hugg. These allegations against Ms. Dunn were false, and were promoted by Defendant Hugg to secure for Ms. Vine an advancement under the new job title of Manager of Zoning and Planning Department, a position created for Ms. Vine by Defendant Hugg.

14.     During the course of events following this incident, Plaintiff made clear that such

A-2

types of comments of a similar nature were never made by him, nor directed toward any other employee of Defendant Town by him. Plaintiff went so far as to speak at a meeting of Defendant Town employees and encouraged anyone with information to the contrary to step forward so that a thorough investigation could be completed. No person claiming to have such alleged information came forward.

15.    Contrary to Defendant Town's internal investigatory procedures, Defendant Hugg allegedly recorded two statements from individuals alleging that Plaintiff made similar defamatory statements on March 22, 2005. These statements were given some time after Plaintiff had encouraged an open and full disclosure of information surrounding the incident, were not reported in anyway to Plaintiff, nor were they obtained in compliance with procedural guidelines. These statements were acquired by Defendant Hugg for pretextual reasons adverse to Plaintiff's employment interests. Moreover, after Plaintiff discovered the existence of these written statements in 2006, one of the employees who purportedly made such statement told Plaintiff that he had not made the statement.

16.    In January of 2006, Defendant Hugg sent an email regarding Plaintiff to a Town Councilman, falsely accusing Plaintiff of making sexual harassing comments. In April of 2006, the false statements obtained by Defendant Hugg were published on the Internet on a website oriented toward political issues regarding Defendant Town. These recorded and published statements were false and the fabrication of them was wanton and/or wilful. Only two people had access to these documents, both employees of Defendant Town, and could have given them to the individuals who maintain the website, namely Defendant Hugg and his secretary, Carol McKinney.

A-3

17.    In 2005, the Mayor and Town Council of Defendant Town recommended to Defendant Hugg, as Town Manager of Defendant Town, that Plaintiff be promoted to Assistant Town Manager. Ms. Vinc told Defendant Hugg that she would not work for Defendant Town if Plaintiff was promoted. Accordingly, Defendant Hugg refused to promote Plaintiff. Plaintiff subsequently learned that Ms. Vinc wanted the Assistant Town Manager position for herself.

18.    Plaintiff received his best performance review to date on May 15, 2005, from Defendant Town, through its agent Defendant Hugg.

19.    Shortly after this time, Defendant Heritage made false and malicious statements that Plaintiff was having an affair with a coemployee. These statements were false and baseless and when confronted Defendant Heritage admitted that the statements had been fabricated without justification. These statements were made maliciously by Defendant Heritage for pretextual reasons adverse to Plaintiff's employment interests.

20.    In addition to the slanderous statements made about Plaintiff, Defendant Heritage verbally assaulted Plaintiff during the workday at their place of employment with Defendant Town. Despite Plaintiff's complaint to Defendant Hugg, as Town Manager for Defendant Town, in regard to Defendant Heritage's behavior, Defendant Hugg refused to investigate these claims and refused to initiate disciplinary action against Defendant Heritage for her inappropriate and wrongful conduct.

21.    Subsequent to Defendant Hugg's reorganization and promotion of Ms. Vinc to the position of Manager of Zoning and Planning Department, some job responsibilities of the former Town Planner's position were not assigned to Ms. Vinc, but became Plaintiff's responsibilities. Given the additional work load placed upon Plaintiff, he repeatedly requested an assistant be

A-4

hired to aid him with his management and planning duties. In December of 2005, a meeting was held involving Defendant Hugg, as Town Manager of Defendant Town, in which it was decided that another person would be hired to assist Plaintiff with his planning duties and management of the Building and Inspection Department. Plaintiff, though having made requests repeatedly for assistance and action of this kind, was never informed by Defendant Hugg that such a personnel move was forthcoming and such hiring did not occur prior to Plaintiff's employment ending with Defendant Town.

22.    Due to Defendant Hugg's inaction regarding Plaintiff's repeated requests for assistance and the aforementioned untenable work environment cultivated by Defendant Town and its agents, Plaintiff was compelled to resign from employment on January 18, 2006. In short, during his employment with Defendant Town, Plaintiff suffered discrimination on the basis of his age and sex from Defendant Town's agents. Defendant Hugg favored a younger, female employee over Plaintiff, and falsely and maliciously accused both an older female employee, Ms. Dunn, and Plaintiff of making derogatory comments about that younger, female employee. In addition, Defendant Hugg denied a promotion to Plaintiff to the position of Assistant Town Manger due to Ms. Viric, herself, coveting it. Further, Defendant Hugg was engaged in a campaign to vilify and discredit Plaintiff beginning in March of 2005, with the collection of false statements, through April 2006, with the placement of these false statements on the Internet. Furthermore, it is apparent that Defendant Hugg created a hostile environment for Plaintiff, refusing to respond both to his requests for staffing assistance and to his complaints about the derogatory comments of Defendant Heritage.

23.    Plaintiff has received a Notice of Right to Sue for the above-mentioned allegations

A-5

from the U.S. Equal Employment Opportunity Commission.

24.    Plaintiff has timely filed this Complaint within ninety days of his receipt of the Notice of Right to Sue.

25.    The wrongful acts committed by Defendants, as stated hereinabove, were willful, wanton, and committed in bad faith.

## *COUNT I*

26.    Plaintiff restates and hereby incorporates by reference paragraphs 1 through 25 hereinabove.

27.    By committing the aforementioned acts, Defendant Town, acting by and through its agents, discriminated against Plaintiff on the basis of his sex by refusing to promote him to Assistant Town Manager, by harassing him, subjecting him to a hostile environment for pretextual reasons, refusing to respond adequately and appropriately to his complaints, and by treating Plaintiff differently than a similarly situated female employee in violation of 42 U.S.C. § 2000(e) et seq.

28.    As a direct result of the discriminatory and retaliatory conduct of Defendant Town, Plaintiff has suffered damages, including but not limited to, severe emotional distress, pain and suffering, mental anguish, humiliation, and lost wages.

WHEREFORE, Plaintiff demands judgment against Defendant Town for:

(a)    Back pay, including interest;

(b)    Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

A-6

(c)    Punitive damages;

(d)    Pre-judgment and post-judgment interest;

(e)    Attorney's fees;

(f)    Reinstatement, if feasible, or in the alternative, front pay;

(g)    Any other relief that this Court deems just.

## *COUNT II*

29.    Plaintiff restates and hereby incorporates by reference paragraphs 1 through 28 hereinabove.

30.    Defendants, acting under color of state law, have deprived Plaintiff of the rights afforded him under the United States Constitution and federal law, in violation of 42 U.S.C. § 1983. These rights include, but are not limited to, Plaintiff's rights to equal protection and due process of law regarding his employment relationship with Defendant Town, pursuant to the Fourteenth Amendment of the United States Constitution.

31.    Such violations of law happened in the context of a continuing, widespread, and persistent pattern of constitutional misconduct by the employees of said Defendants including discrimination on the basis of gender and deliberate indifference to or tacit authorization of such conduct by said Defendants' policy-making officials after notice to the officials of said misconduct.

WHEREFORE, Plaintiff demand judgment against Defendants, jointly and severally, for:

(a)    Back pay, including interest;

(b)    Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of

A-7

life, and all other non-pecuniary damages;

(c)    Punitive damages;

(d)    Pre-judgment and post-judgment interest;

(e)    Attorney's fees;

(f)    Reinstatement, if feasible, or in the alternative, front pay;

(g)    Any other relief that this Court deems just.

## COUNT III

32.    Plaintiff restates and hereby incorporates by reference paragraphs 1 through 31 hereinabove.

33.    By committing the aforementioned acts, Defendant Town, acting by and through its agents, discriminated against Plaintiff on the basis of his age by refusing to promote him to Assistant Town Manager, by harassing him, subjecting him to a hostile environment for pretextual reasons, refusing to respond adequately and appropriately to his complaints, retaliating against him, and by treating Plaintiff differently than a similarly situated younger employee in violation of 29 U.S.C. § 626 et seq.

34.    As a direct result of the discriminatory and retaliatory conduct of Defendant Town, Plaintiff has suffered damages, including but not limited to, severe emotional distress, pain and suffering, mental anguish, humiliation, and lost wages.

WHEREFORE, Plaintiff demands judgment against Defendant Town for:

(a)    Back pay, including interest;

(b)    Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of

A-8

life, and all other non-pecuniary damages;

(c)    Punitive damages;

(d)    Pre-judgment and post-judgment interest;

(e)    Attorney's fees;

(f)    Reinstatement, if feasible, or in the alternative, front pay;

(g)    Any other relief that this Court deems just.

## COUNT IV

35.    Plaintiff restates and hereby incorporates by reference paragraphs 1 through 34 hereinabove.

36.    By their actions as described hereinabove, including but not limited to, falsifying and manipulating employment records to justify Plaintiff's constructive discharge, Defendants have breached the covenants of good faith and fair dealing implied under Delaware Law.

37.    Defendants' actions in breaching the implied covenant of good faith and fair dealing were wilful and/or wanton.

38.    As a direct result of the wrongful conduct of Defendants and their agents, Plaintiff has suffered damages, including but not limited to, physical and emotional injury, pain and suffering, mental anguish, humiliation, and lost wages.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally.

(a)    Back pay, including interest;

(b)    Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

A-9

(c)    Punitive damages;

(d)    Pre-judgment and post-judgment interest;

(e)    Attorney's fees;

(f)    Reinstatement, if feasible, or in the alternative, front pay;

(g)    Any other relief that this Court deems just.

## *COUNT V*

39.    Plaintiff restates and hereby incorporates by reference paragraphs 1 through 38 hereinabove.

40.    Defendant Town's agents have made false oral statements regarding Plaintiff, including but not limited to, upon information and belief, statements as to Plaintiff's moral character and alleged inappropriate acts by Plaintiff.

41.    Defendant Town's agents have recorded and published false statements regarding Plaintiff, including but not limited to, upon information and belief, statements as to Plaintiff's moral character and alleged inappropriate acts by Plaintiff.

42.    Defendant Town's agents knew said statements to be false when they made, recorded, and published them.

43.    Defendant Town's agents have published said statements in an improper manner and for an improper purpose.

44.    Defendant Town's agents have made said statements with actual malice. Said statements of Defendant Town's agents maligned Plaintiff in his trade, business, profession, and reputation, and Defendant Town's agents made said statements with the intent so to malign Plaintiff.

A-10

45.   The defamatory oral and written statements of Defendant Town's agents regarding Plaintiff were intended to disgrace him, injure his reputation among his colleagues, malign him in his profession, and bring him into contempt and ridicule.

46.   The defamatory oral and written statements of Defendant Town's agents regarding Plaintiff constituted slander and libel per se.

47.   At all times pertinent to this matter, Defendants Hugg and Heritage, and Carol McKinney were acting as employees and agents of Defendant Town and were acting within the scope of their employment or agency relationship with Defendant Town.

WHEREFORE, Plaintiff demands judgment against Defendants for:

(a)   Back pay, including interest;

(b)   Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

(c)   Punitive damages;

(d)   Pre-judgment and post-judgment interest;

(e)   Attorney's fees;

(f)   Reinstatement, if feasible, or in the alternative, front pay;

(g)   Any other relief that this Court deems just.

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____
WILLIAM D. FLETCHER, JR.
Bar I.D. # 362

A-11

1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF DELAWARE

3   SAMUEL JAMES FOX, III,           :      C.A. No. 07-488
                                     :
4              Plaintiff,            :
                                     :          ORIGINAL
5         v.                         :
                                     :
6   TOWN OF SMYRNA, DAVID S. HUGG,   :
    III, individually and in his     :
7   official capacity as Town Manager:
    of the Town of Smyrna, and       :
8   VALERIE HERITAGE, individually   :
    and in her official capacity as  :
9   Administrative Clerk of the      :
    Town of Smyrna,                  :
10                                   :
                                     :
11             Defendants.           :
                    .. .. .. .. .. ..

12             Deposition of SAMUEL JAMES FOX, III, taken
    pursuant to notice, on Wednesday, January 9, 2008 at 1:00
13  p.m. at 414 S. State Street, Dover, Delaware, reported by
    Lorena J. Hartnett, a Registered Professional Reporter and
14  Notary Public.

15                  .. .. .. .. .. ..

16  APPEARANCES:

17             B. BRIAN BRITTINGHAM, ESQUIRE
               Schmittinger & Rodriguez
18             414 S. State St.
               Dover, DE  19901
19               Attorney for the Plaintiff

20             BRUCE HERRON, ESQUIRE
               Akin & Herron, P.A.
21             1500 Shallcross Avenue
               Suite 1A
22             Wilmington, DE  19806
                 Attorney for the Defendants

23

24                  A-12

5

1  Highway, Smyrna, Delaware, 19977.

2      Q    What is your position with Stover Builders?

3      A    A development coordinator.

4      Q    And what do you do in that position?

5      A    Basically work with engineers, architects,

6  state agency, governmental agencies, from basically

7  taking raw land and taking it through the process to

8  develop into subdivisions.  I also do the same thing for

9  commercial projects.

10     Q    How long have you been with Stover Builders?

11     A    It will be two years the 18th of January this

12 year.

13     Q    So your first day there was January 18 of '06?

14     A    Yes.

15     Q    And when you started at Stover Builders, were

16 you in the same position that you are in now?

17     A    Yes.

18     Q    Same title?

19     A    Yes.

20     Q    And your, according to the interrogatory

21 answers that you filed, your yearly salary in that

22 position is 62,000; is that correct?

23     A    Yes.

24     Q    And was that your yearly salary when you

A-13

6

1   started there?

2       A    Yes.

3       Q    Do you remember when you first had contact with

4   anyone at Stover Builders regarding possible employment

5   there?

6       A    Yes, after I left the town.

7       Q    Okay, it looks like you submitted your letter

8   to the town regarding a notice of termination in early

9   January of '06, so do you remember if you --

10      A    January of '06?  Oh, yes, I'm sorry, yes, my

11  last day with the town, I'm sorry, my last day with the

12  town was the 12th, and I had given my -- I believe that's

13  the last working day that I had.  Then I had some comp

14  time that I had to use, so I used the rest of that to the

15  18th was actually my final day, but I had, when I turned

16  my resignation in, that's when I had confirmed that I

17  would go to Stover Builders.  I'm sorry, I thought you

18  meant did I do that prior when I was still working for

19  the town prior to my resignation.  I'm sorry.

20      Q    So when you were still working for the town,

21  you had discussions with Stover Builders about possible

22  employment?

23      A    Yes, just before I left, shortly before I left.

24      Q    Do you remember who you spoke with at Stover

A - 14

7

1   Builders initially about possible employment there?

2        A    The owner, Jeff Stover, Jeffrey B. Stover.

3        Q    And is he the person who actually hired you?

4        A    Yes, he is the owner.

5        Q    What is the highest level of your education?

6        A    Just high school.

7        Q    Where did you go to high school?

8        A    Dover High School, graduated in 1970.  I did

9   take one semester at Del Tech in Georgetown for

10  architectural engineering, but my father got sick with

11  cancer and passed away, and I ended up going into the

12  family business, so I didn't continue my education.

13       Q    What was the family business?

14       A    Basically a waterman in the beginning, but my

15  uncle is in construction and I had done that during the

16  summertimes working, you know, summer break and

17  everything with Mitten Construction in Dover when I was

18  16 years old, so I have basically been doing construction

19  and that type of business since I was 16.

20       Q    Which leads right into my next question, which

21  is can you give me a brief summary of your employment

22  history from the time you graduated from high school up

23  through the time you were hired by the Town of Smyrna,

24  which I believe was 2000?

A-15

8

1      A    Yes, July 3rd of 2000.  Well, when I was 16, I

2  started working with Mitten Construction from Dover,

3  which is now out of business.  Not the one on Route 10

4  but over on College Road.  Mr. Mitten was killed in a

5  plane crash.  But I started there in the summertimes.

6         And then after graduation I started working

7  with my family on the water and worked also with my

8  uncle, who has a construction company, Johnson

9  Construction from Dover, worked on and off for him

10  different times of the year.

11         I worked with Wickes Lumber in contractor

12  sales.  I believe I started there in 1973, I think it

13  was, was there with them until '76.

14         Wow, you are asking a lot there, to go back a

15  little bit.

16         I worked for different, different people.  Down

17  to the beach, I moved down to the beach, I worked for

18  Devaw Construction down there building houses,

19  townhouses.  McMann Construction, who was a residential

20  builder.

21         I am trying to think.  My friend, Mike

22  McCarthy, his new company, Cedar Builders, but I can't

23  remember what his original company name was, I worked

24  with him.

A-16

9

1          And then I left the beach and came back in

2    1986, '88.  I came back in 1988 from the beach.  I had

3    moved down to the beach in '83.

4         Q    You came back to Dover?

5         A    Came back to Smyrna, I'm sorry, to Smyrna.

6    That's where my family was.  My sister had gotten sick

7    with cancer, and I just wanted to be close to home.

8          So I came back in 1988, continued basically my

9    water business during the summertime, commercial crabbing

10   during the summertime, and then I would build a custom

11   home during the fall and the winter, and that's pretty

12   much what I did all the way up until 2000 when I went to

13   work for the Town of Smyrna.

14        Q    Were you with a company right before you went

15   with the Town of Smyrna?

16        A    No, I was basically my own individual company

17   for 14 years.

18        Q    And the primary focus of that business was

19   custom home building?

20        A    Yes, I just basically did one house a year.  My

21   main occupation was working on the water at that time.

22   And then in the fall and wintertime I, you know, picked

23   up a house to build, and then the following spring I

24   would go back to the water.

4-17

13

1  codes, could be rental inspections was one of them, do

2  inspections for rentals to make sure they are code

3  compliant, safety, you know, things like that.

4        Handled any kind of nuisance type ordinances,

5  you know, trash, grass, you know, things like that, of

6  that nature.

7        And then also there was the building inspection

8  part where the building inspector or the assistant town

9  manager, who was my supervisor at the time, I mean could

10 take me out or ask me to do building inspections on

11 residential buildings and stuff, so it was kind of a wide

12 range of things from just your basic maintenance code to

13 building inspections.  It was quite a bit of different

14 things.

15     Q    And then you were promoted to building

16 inspector in 2002?

17     A    Yes, well, let me think here now.  The prior

18 building inspector had left, and the town did not have a

19 building inspector, and Mr. Jacobs was still there as

20 town manager.

21        Tom English left.  He left just before, in June

22 of 2000 before I got there, so the town didn't -- They

23 hired another lady, Kimberly Sisson, who was my

24 supervisor, as the assistant town manager.  She was away

A-18

14

1    when I was actually hired, so I didn't get to meet her

2    until she got back.

3            But they posted the position in the paper.  I

4    tested for it.  I was interviewed by Kimberly and also

5    Mr. Jacobs prior to his leaving the Town of Smyrna, and

6    Kimberly hired me based on my test results and my

7    experience in construction.

8            And I think that was '04, I think.  There is a

9    letter there in my stuff there that says -- I don't even

10   remember the exact date, but I believe it was April 5 or

11   April 6 of '04.  It's in the paperwork that we have.

12   Q    I think there is a memo, we will get to it

13   later, I think it's '02.  Does that make more sense?

14   A    Yeah, I started in 2000, so it's a year and a

15   half.  I'm sorry, I was thinking of something else, I'm

16   sorry, but yes, '02.

17   Q    So at the time, if my recollection of the

18   documents that we will get to later is accurate, at the

19   time you were hired, not hired, at the time you were

20   promoted, the town manager position was vacant, is that

21   correct, or there was a turn over there?

22   A    I think so.  I think Mike had left, and I

23   believe Chief Baldwin, Richard Baldwin, was acting town

24   manager at the time.

A-19

16

1      So you couldn't just read it out of the book.

2 At times you had to investigate with the local

3 municipality to find out if they had amended anything and

4 to make sure it's built according to what they want, so I

5 would work with architects or engineers, you know, to

6 make sure that it was code compliant.

7      Q    How long did you remain in that position as a

8 building inspector with the town?

9      A    Let's see.  Well, I know it was at least a

10 couple years, I guess.  I know that I was promoted to

11 capital projects coordinator from the building inspection

12 when they decided to separate, prior to them separating

13 the department into two pieces.

14      I worked with -- Kimberly had left.  She had

15 left and went with another company.  So I continued doing

16 the building inspections.  I am trying to think if we

17 even had another building inspector at that time.

18      I kind of did a couple jobs at one time.  I was

19 working with, as a capital projects coordinator, I worked

20 with all the departments, public works department,

21 electrical department.

22      We had a new substation that was being designed

23 then to be built.  I worked with the architects and

24 engineers on the design for the new police station, the

A-20

17

1   new public works building, downtown renovation work that

2   was proposed to be done, which was basically redoing all

3   the infrastructure downtown to help revitalize the

4   downtown area, esthetic wise and also utilities.

5            I worked with electrical engineer and design of

6   the -- I'm sorry, the electric line extensions, which

7   went out to all new subdivisions.

8            I worked with the engineers and architects in

9   making sure the subdivisions had easements in order to

10  place all these utilities and stuff before the

11  subdivision -- If some of the subdivisions weren't ready

12  to be recorded, then we would make sure it was on the

13  record plan.  If they had already been recorded, then we

14  tried to work with the owners or engineers to get the

15  developer to allow us to gain an easement on a, you know,

16  already approved subdivision.

17       Q    That was, what you just referred to, was in

18  your position as capital projects coordinator?

19       A    Yes.

20       Q    Do you remember when you were promoted to that

21  position?

22       A    Sometime, well, let's see, probably sometime

23  around the beginning of '05, I guess, somewhere around

24  there, I think.

A-21

1    Q    Who promoted you to that position?

2    A    I guess the town manager.  I mean I think, from

3  what I understand, was they went to -- The council, I

4  guess, approved an advance hire without having to put it

5  out for, you know, interviews and all that other stuff,

6  and then I was promoted.

7    Q    Was that Mr. Hugg at the time?

8    A    Yes, Mr. Hugg, yes.

9    Q    And then did you hold any other positions for

10  the town?

11    A    No, just continued my -- Well, after that --

12    Q    I mean after that.

13    A    Yeah, after that, shortly thereafter, since

14  Kimberly was gone, they divided the building department

15  into two sections.  One was the planning side and one was

16  the building side.

17        I took over the building side as the manager of

18  building inspections, and then Janet Vinc took over the

19  planning side as manager of planning and zoning.

20    Q    And was that considered a promotion or not for

21  you?

22    A    Well, it was a temporary position.  I guess,

23  from what I understand, Council decided to give it a

24  temporary trial period to see how it worked, since they

A-22

19

1   didn't have any kind of planning director or anything

2   like that, so it was a temporary job.

3        Q    Did you receive any increase in salary, do you

4   know?

5        A    Yes, I think I did, yes.

6        Q    And was that a position you held when you

7   submitted your notice of termination of employment?

8        A    No.

9        Q    What was the position that you held when you

10  left the town?

11       A    I went back -- Well, I resigned from the

12  manager of the building inspection department, because

13  the situation working in it that department was not very

14  friendly.

15            I had issues with one of the people that were

16  under me that accused me of having an affair with my

17  secretary, which I did not, and also she admitted in a

18  meeting between the town manager, myself, and my

19  secretary that she had no basis for that allegation and

20  apologized for it.

21            And then she, about a couple months later,

22  verbally attacked me in my office, and it just made it

23  unbearable to be in that department anymore, so I wrote a

24  letter of resignation to the town manager asking for a

A-23

36

1   coordinator, which basically worked with the businesses

2   in the Town of Smyrna in the downtown area, and went

3   directly to a management position, and I was there, and I

4   do remember making the comment that I had been there

5   around, I think at that time, close to five years.  I

6   worked from the bottom all the way to the manager's

7   position.

8       Q    Did you feel that you should have had her

9   position?

10      A    No.

11      Q    Okay, so your observation or your problem was

12  with her being put in that position --

13      A    Without experience, yes.  No, it didn't -- And

14  I believe, and I said it, I don't have any planning

15  experience, so why would I want that position?  My forte'

16  was the building side.  That's what I have done all my

17  whole life, so I had no interest in the planning

18  position.

19      Q    On the town's organizational chart, was

20  Ms. Vinc's position and your position, were they equal or

21  roughly equal?

22      A    Job duties were different, but I mean I guess

23  the positions were the same, I mean as far as stature in

24  the charts, I guess.

37

1    Q    You weren't her supervisor; she wasn't your

2  supervisor?

3    A    Oh, no, no, she was not.

4    Q    And you both answered to the town manager, I

5  suppose?

6    A    Yes, Mr. Hugg was our supervisor.

7        The next paragraph, I do remember telling Ms.

8  Dunn and my secretary, Ms. Masten, that if Janet needed

9  anything from us to answer her questions, give her what

10  she needed.  And here where it says that "to put her in

11  her place," I never said that.

12        I did say, and I told Janet this when she and I

13  had a meeting a day or two after this meeting, after this

14  meeting, that I would never do anything, that if she

15  needed any information from me, that I would help her in

16  any way and I would not deliberately trip her up, is what

17  I call it, do anything that would interfere with her

18  doing her job, and I told her this to her face in my

19  office a day or two after this meeting.

20        Also there is another thing in here that's

21  missing too.  And I don't know exactly -- And I don't

22  know exactly where it came within this meeting, but there

23  was -- I brought this up at that meeting about me being

24  promoted to the assistant town manager, and I was told by

A-25

45

1  back," I did not say that statement.  It is repulsive.

2      Q    And then in Fox 3, which is Mr. Stulir's

3  affidavit, did you make the statements that he attributes

4  to you in that affidavit?

5      A    Yeah, I know how Janet got her job.  She got

6  her job because she was Mr. Hugg's student at the

7  University of Delaware, and he brought her there.  I mean

8  that was widely known through the town, through Town

9  Hall.

10     Q    So Mr. Stulir's affidavit is accurate?

11     A    Except for that I was afraid of working with

12  her.  I wasn't afraid of working with her.  I was afraid

13  of what would happen at the end of the 60-day period if

14  she didn't do her job, you know, that I would be demoted.

15          But I never said that I wouldn't work with her.

16  I mean we do work with each other, we did work with each

17  other.

18     Q    But other than the statement that you said you

19  would not work with her, the affidavit is accurate?

20     A    I believe so.

21     Q    I am going to go back to Fox Exhibit 1.  I

22  think we are on page seven.

23     A    Okay.

24     Q    I think the third paragraph of page seven

A -26

49

1    the part where they spoke about calling Mr. Carter a pig,

2    but.

3        Q    It looks like the rest of that page is Mr. Hugg

4    talking about the incident with Ms. Dunn.

5        A    Uh-huh, oh, yeah, I think that's so.

6        Q    That even goes to the top of the next page,

7    page eight, page nine, I believe.

8            And then the first full paragraph of page nine

9    has several statements attributed to you.  Do you

10   remember making those statements?

11       A    I believe so.

12       Q    Going down a little bit again, "Mr. Fox says it

13   took him five years and she," meaning Ms. Vinc, "was

14   going right into management.  He said that is what he is

15   so upset about."

16       A    Yes, that's true.

17       Q    Did you say that?

18       A    Yes, sir.

19       Q    And the next sentence after that says, "Mr.

20   Hugg said that, considering everything that has been

21   discussed and the content of Mr. Fox's comments, he feels

22   that the matter has been resolved."  Do you remember Mr.

23   Hugg saying that?

24       A    Yes.

A-27

1    Q    A couple sentences down it says, "Mr. Fox said

2 he will accept the punishment that Mr. Hugg is going to

3 give him."  Do you remember making that statement?

4    A    No, but I may have.  I don't recall.  I do

5 remember the next one.  I do remember him saying that,

6 you know, that there would not be anything, you know,

7 that it was the end of it, that it was over with.  I mean

8 after we talked, we got up and shook hands and I went

9 back to work.

10    Q    And you were never disciplined for the comments

11 that you were alleged to have made in the Stulir and

12 Markow affidavits?

13    A    I never knew that they existed.

14    Q    I know you never knew that the affidavits

15 exhibited, but --

16    A    But, no, I was never disciplined verbally or

17 written in my personnel file or anything concerning this

18 meeting, no.

19    Q    That's what I was asking.

20    A    After that, I mean we just went back to work.

21 I never knew anything about it.  After that, it was done.

22 We just went to work.  It was over.  And if you look at

23 the next page, "Mr. Fox says he knows that Ms. Vinc was

24 Mr. Hugg's student."  And that's what I have always said,

A-28

64

1  vividly was because the day that Mr. Messick came to tell

2  me, I was very excited and, you know, that was my dream,

3  like I said, to go to assistant town manager and to one

4  day be the town manager of Smyrna.  I love that town.  I

5  ate, drank and slept Smyrna.  You know, my wife would

6  say, "Why don't you move your clothes to Town Hall,

7  because you are always there."  I attended every Council

8  meeting, sat on the planning Commission, attended most

9  all committee meetings, you know, I was there all the

10  time.

11          So when we were there, I said, "Janet, why did

12  you tell Mr. Hugg that you wouldn't work for me if I was

13  promoted to assistant town manager?"

14          And she says, "I didn't say that."  And I said,

15  "Janet, Mr. Hugg confirmed that you told him that at the

16  meeting when Jeri was fired," and then she started

17  crying, and she says, "I'm sorry, you know, I'm sorry."

18  You know, she kept crying.

19          I said, "Look, stop crying, it's over with now,

20  you know, but we are supposed to be friends.  Why would

21  you violate the confidence that I gave you as a friend?"

22  Because, you know, that's how I felt all three of us

23  were.  And she never really gave me an answer of why she

24  did it, but she admitted that she said it.

A-29

66

1    A    No, not her personally, no.

2    Q    Was anyone ever appointed to the position of

3  assistant town manager?

4    A    No, sir, they still don't have one.

5    Q    You talked about Councilman Messick telling you

6  that it was his intention that you be promoted to that

7  position?

8    A    Yes, he was the chairman of the personnel

9  committee at that time.

10    Q    He was on counsel and he was running for

11  reelection?

12    A    Yes, sir, but he didn't win.  But my

13  understanding through the mayor, Mayor Schaeffer, and

14  Mr. Pressley, that it was still their intention to

15  promote me to assistant town manager, but Mr. Hugg just

16  kept putting it off.  And that's what I was told by them.

17        So, but like again I have not seen anything in

18  writing and everything having to deal with someone's

19  employment was always held in executive session and

20  private.

21    Q    Alright, let's go to Paragraph 19 of the

22  complaint.

23    A    Uh-huh.

24    Q    And the first sentence says that, "Defendant

A-30

90

1  my letter.

2      Q    Can you tell me what happened during that

3  incident?

4      A    Yes, I came into work.  There was an

5  application for a demo permit that had been submitted

6  that was brought in that was given to me.  Valerie was

7  not in the office the day before when it came in.  It

8  came to me.

9          The next morning when I came in, Valerie was

10 already there.  I came up the steps, and I could hear

11 Janet and Valerie and Kim Cronin talking, and I couldn't

12 really make out what was being said, but it didn't sound

13 too pleasant, so I don't really know what everything was

14 said.

15         But when I got upstairs, I walked in my office

16 and I, you know, grabbed the application off my desk, and

17 I was heading through the door.  And, as I was going

18 through the door, she was coming to me.

19         And I said, "Oh, good," I said, "Come on in," I

20 said, "I have got this application for a demo permit I

21 want to give to you because it was brought in yesterday."

22         Well, I no sooner got that out of my mouth than

23 she just went off, to the point she was so close to me

24 that I backed and I sat down in my chair, because she

A-31

1    just kept coming and coming and coming and coming at me.

2            So I said, "Wait a minute."  I said, "What is

3    the matter with you?"  I said, "Sit down.  Sit down here

4    and tell me what's the matter with you."

5            And she was crying.  She was just like on the

6    verge of being hysterical.  And she, you know, I don't

7    really understand what caused her to act that way.  I

8    mean to this day I don't really know what happened that

9    made her go so hysterical over a building permit not

10   being date stamped.

11           The only thing that I can figure is that

12   something was said between the conversation that Janet

13   Vinc and Kim Cronin had with her prior to me coming

14   upstairs because, like I said, I could hear them talking

15   about something, and I could hear Janet above everybody,

16   but I couldn't quite make out what was said, but you

17   could tell that it was in not a very nice voice, not a

18   nice tone of voice, okay, so I could only assume that

19   that upset her about something.

20           So, you know, I tried to explain to her,

21   because Valerie was very meticulous in everything being

22   just so, and I tried to explain to her, "Valerie, this is

23   why I didn't put this through the process, because I

24   wanted you to see it because I know you like things done

A -32

92

1  a certain way."  Okay?

2        So I thought she was getting calmed down, and

3  then all of a sudden she stood up and got within inches

4  of my face and screamed at me all over again and told me

5  that I was no better than Steve Lee, who was the prior

6  planning director who left, just, you know, that's when

7  they split the department.

8        So at that point I politely told her, I said,

9  "Valerie, you need to leave my office and go calm

10  yourself down."  So she left, and she went out in her

11  office at her desk and sat there.

12        In the meantime, Aimee comes in and John

13  Bucalo, who is the code enforcement officer, that are

14  behind my office and heard all the shouting through the

15  walls, and came around, and John was in the hallway, but

16  Aimee came in the office wanting to know if I was okay,

17  because they heard what Valerie had done.

18    Q    Do you know -- Did they tell you if they heard

19  what you said and what Valerie said during that incident?

20    A    I didn't ask them.  I mean, you know, I'm sure

21  they can tell you.  But I said, "Yeah, I am fine," I

22  said, "but I am going to go find Mr. Hugg."

23        So when I left, I went downstairs looking for

24  Mr. Hugg, and he wasn't there in the Town Hall.  I don't

A-33

1  know, I mean I was home."  I told him what happened.  I

2  said, "This is not right, you know, what they did, or

3  what Valerie did and, you know, why didn't you call me?"

4           And he told me, he said, "Well, frankly, I was

5  mad at you."  That's what he said.  He said he was mad at

6  me, that he didn't feel I had the right to resign my

7  position as the manager of building inspections and then

8  move back down in the basement.

9           Which, you know, where you are working doesn't

10  really matter to me.  It's that I removed myself from,

11  you know, being around the people, because I didn't know

12  what to expect, so I just moved back downstairs.

13           Whenever anybody needed me, they knew where I

14  was, and I constantly kept track of them.  You know, we

15  had Nextel phones, you know, we were always talking to

16  each other.  I would go out on inspections and I would

17  meet with them, so, you know, where I was really didn't

18  matter as far as my job performance.  It only mattered

19  that I didn't have to feel so uncomfortable by being

20  around, you know, Valerie and all that other mess.

21     Q    Was there anything else about the discussion

22  with Mr. Hugg that day that you can recall?

23     A    I mean I apologized to him for being, you know,

24  so emotional about it, because, you know, but I guess --

A-34

1  Well, I mean that's how I am, you know.  I mean I know a

2  manager has to kind of like maybe be a little thick

3  skinned, and I am to a point, but what they did was very

4  hurtful to me, and I just didn't want to be around it

5  anymore, so I explained everything to him.

6          And I told him, I said, "Don't worry, I still

7  will do both jobs."  You know, I said, "I am not

8  relinquishing my responsibilities, because there is

9  nobody to do it, you know, and I am not going to put the

10 town in that position."

11         So, you know, I was very dedicated to the town,

12 and I would not do that, but I just -- I couldn't be

13 around it anymore.

14    Q    Did you continue to have any dealings with

15 Valerie Heritage after that?

16    A    No, I did not.  I didn't talk to her unless I

17 absolutely had to.  And, if I could send Aimee to do it,

18 I would send her to do it.  I did not talk to her unless

19 I absolutely had to.

20         MR. HERRON:  Let me show you another memo.

21    Let's have it marked as Fox Exhibit 11.

22                    (The reporter marked Fox Exhibit

23                    Number 11.)

24

A-35

126

1  BY MR. HERRON:

2      Q    What we have marked as Fox 14 is the January 4,

3  2006 letter from you to Mr. Hugg, which, as you say, is

4  your letter of resignation from town employment?

5      A    Uh-huh, yes.

6      Q    You sent this letter to Mr. Hugg on that date?

7      A    Yes.

8      Q    Were all the statements that you made in the

9  January 4, 2006 letter to Mr. Hugg accurate and truthful?

10     A    Yes.

11     Q    In the second paragraph it says that, it says,

12 "I feel that it is time for me to pursue other

13 opportunities."

14     A    Uh-huh.

15     Q    What other opportunities were you referring to?

16     A    Well, basically this was a polite letter to

17 terminate my employment with the town.  I had requested

18 an exit interview to give the personnel committee the

19 real reason why I left the town.

20     Q    Alright, well, before January 4, 2006 had you

21 had any contact with Stover Builders about a position

22 there?

23     A    Before January 6?

24     Q    Before January 4?

A-36

127

```
 1      A    Oh, yes, uh-huh.

 2      Q    Do you remember when you first spoke to Stover

 3  Builders about a position?

 4      A    The day before I turned in my letter.

 5      Q    So that would be January 3?

 6      A    Three, yeah.

 7      Q    2006?

 8      A    Uh-huh.

 9      Q    Had they offered you a position at that point?

10      A    Oh, I was out shopping with my wife, and Jeff

11  called me.  Of course, I had dealt with him all the time

12  throughout the town when I was in the building

13  department, and he called me on the phone and he said

14  that he would like to talk to me.

15          And I said okay, because I had heard he wanted

16  to get up with me about a project.  He said, "No, I want

17  to talk to you about that too, but I want to offer you a

18  job."

19          So I think it was the next day I, you know,

20  went to talk to him, and he offered me the job, we

21  discussed what my job duties would be and everything.

22  And, since I had not heard from Mr. Hugg concerning my

23  memo to him about what happened with Valerie, and knowing

24  that he had said in the December 20th meeting that he
```

A-37

1  would hire someone to fill Jeri's spot, I just said I

2  took the job.

3      Q    What was your yearly salary with the town when

4  you retired or when you left?

5      A    About 52,000, I think, but that included all my

6  benefits and everything, where now I have to pay for all

7  my benefits, so monetarily I am not really making -- You

8  know what I mean?  It looks more on paper, but it's not

9  actually in hand, because I have to pay for my health

10  care and a lot of other things that I had paid for with

11  the town, so I didn't really -- I am not really making

12  any more money.  Just it looks like it on paper.

13      Q    Was there ever a computation or do you know

14  what the value of your benefit package was with the town?

15      A    No, sir, I was never given anything like that.

16  I mean I know -- I mean I know health care is very

17  expensive.  I am not really sure what percentage the town

18  paid.

19          I mean my pay was very small, my portion was

20  very small taken out of my pay compared to what it is

21  right now.  I think I pay like, golly day, I think it's

22  close to 230 a week, I think, for my health insurance.

23  That's just mine.  That's not even the family plan.

24  That's just mine, so.                A-38

1    A    Yes, it was, my last day of employment.

2    Q    How long did that interview last?

3    A    Probably 45 minutes to an hour.

4    Q    Tell me what you recall about what you said at

5  that interview.

6    A    I told the committee that I felt that my

7  treatment upstairs, the Valerie Heritage incident,

8  nothing being done.

9        I recommended at that meeting that Valerie be

10  discharged again, as well as through my memo to Mr. Hugg

11  for her unprofessional conduct.

12        I told Mr. Hugg that I felt that the morale of

13  the town was very poor.  He disagreed with me, but that's

14  okay.

15        I also thanked Mr. Hugg for all the help that

16  he gave me, everything he taught me.

17        And I didn't want to leave the town.  But,

18  sorry, you would think after two years you would get over

19  it a little bit, but that I just felt that there was

20  changes that needed to be made, that they needed to get

21  rid of people that were driving good people away.

22        And there was questions from the members to Mr.

23  Hugg about these things.  He didn't really go in any

24  detail.  He never -- He never stated really what his

A-39

COPY                                                                    1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,              )
        Plaintiff,                  )
                                    )
            v.                      )   C.A. No.
                                    )   07-488 (GMS)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
individually and in his official    )
capacity as Town Manager of the     )
Town of Smyrna, and                 )
VALERIE HERITAGE, individually and )
in her official capacity as         )
Administrative Clerk of the         )
Town of Smyrna,                     )
        Defendants.                 )

          Deposition of **JAMES MARKOW**, taken
before Cheryl A. Anthony, Court Reporter, in the Smyrna
Town Hall, 27 South Market Street, Smyrna, Delaware, on
Tuesday, April 1, 2008, beginning at 10:00 a.m.

APPEARANCES:

        WILLIAM D. FLETCHER, JR., ESQUIRE
        SCHMITTINGER & RODRIGUEZ, P.A.
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        BRUCE HERRON, ESQUIRE
        AKIN & HERRON, P.A.
        1220 North Market Street
        Suite 300
        PO Box 25047
        Wilmington, Delaware  19899
        Attorney for Defendants.


**ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

A-40

Markow - Fletcher                                                  20

1          A.     I would assume so.  I didn't think anybody

2    would be eavesdropping.

3          Q.     And you didn't think anybody was going to go

4    out and start telling people what the three of you had

5    to say to one another, did you?

6          A.     To be honest, I really didn't care, because

7    I didn't think anything was inappropriate except for

8    that.

9          Q.     Okay.  All right.  Now, the last line states

10   that Jim said the way she got the job was laying on her

11   back.  And that was in quotes; that is, from the word

12   way to the word back.  And he added he didn't want to go

13   down with her.

14          All right.  The words in quotes, why are

15   they in quotes and nothing else is?

16          A.     Because I remember that verbatim.

17          Q.     So those words are verbatim, and the rest of

18   it is not?

19          A.     Correct.

20          Q.     Well, how did it come up that he made or

21   stated those words verbatim?  What was he saying?

22          A.     I know there was a heated exchange of

23   something, because upstairs was topsy-turvy.  He was

24   letting off steam, called us in there, and he was upset,

$A$ - 41

Markow - Fletcher                                    30

1    of it appeared on the blog?

2         A.    Everything -- okay.  I don't know about the

3    Carol McKinney part here.  But exactly what was said,

4    these quotes and my signature, my name was removed, but

5    my signature was there.

6         Q.    Okay.  Now, when you say your name was

7    removed, do you mean your name under the signature line?

8         A.    Correct.

9         Q.    But it was your signature?

10        A.    Oh, yeah.  Everybody knows my signature, if

11   I have ever signed anything.

12        Q.    Okay.  All right.  So that got you very

13   upset?

14        A.    Oh, yeah.

15        Q.    I assume you were upset, not only because it

16   identified you -- which this blog is designed really not

17   to identify people, I guess, isn't it?  I mean people

18   make all sorts of statements on it.

19        A.    It's anonymous, right.

20        Q.    It's anonymous.  But were you also upset

21   because you felt that this was a private statement that

22   you had been required to document and did your duty,

23   correct?

24        A.    Correct.

A-42

Markow – Fletcher                                31

1          Q.      And you thought that was the end of it, and

2     it wouldn't be out in the public?

3          A.      Correct.

4          Q.      And that is why you were upset, or that is

5     some of the reason you were upset?

6          A.      That is the reason I was upset.

7          Q.      So having seen that on this blog, this

8     NewsZap, what did you do?

9          A.      Okay.  I believe I talked to Gary.  I

10    believe we talked to Mr. Hugg.  And I think they were

11    trying to figure out how the paper left.  And it didn't

12    matter.  Within 10 or 15 minutes, it was off the blog.

13    So it seemed really quick that it was gone.

14         Q.      Okay.  Now, when you talked to Gary after

15    seeing it, what did you say?

16         A.      I don't know.

17         Q.      What did he say?

18         A.      I don't know.  I don't know.

19         Q.      Okay.  Fair enough.  Was his affidavit or

20    statement on the blog?

21         A.      No.

22         Q.      Just yours?

23         A.      Yeah.

24         Q.      And so after talking with Gary, did the two

A-43

COPY

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,               )
     Plaintiff,                     )
                                     )
           v.                     ) C.A. No.
                                     ) 07-488 (GMS)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
individually and in his official   )
capacity as Town Manager of the    )
Town of Smyrna, and                )
VALERIE HERITAGE, individually and )
in her official capacity as        )
Administrative Clerk of the        )
Town of Smyrna,                    )
     Defendants.                    )

           Deposition of **GARY STULIR**, taken
before Cheryl A. Anthony, Court Reporter, in the Smyrna
Town Hall, 27 South Market Street, Smyrna, Delaware, on
Tuesday, April 1, 2008, beginning at 10:45 a.m.

APPEARANCES:

     WILLIAM D. FLETCHER, JR., ESQUIRE
     and BRIAN BRITTINGHAM, ESQUIRE
     SCHMITTINGER & RODRIGUEZ, P.A.
     414 South State Street
     Dover, Delaware  19901
     Attorney for Plaintiff.

     BRUCE HERRON, ESQUIRE
     AKIN & HERRON, P.A.
     1220 North Market Street
     Suite 300
     PO Box 25047
     Wilmington, Delaware  19899
     Attorney for Defendants.

**ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302) 674-8884**

A-44

Stulir - Herron                                    42

1    that, because people don't always remember how many

2    hours they work for overtime purposes and stuff like

3    that.

4         Q.    And again, in regard to the comments made by

5    Mr. Fox on March 10, 2005, why did you believe it was

6    necessary to inform Mr. Hugg about those comments?

7         A.    If any department head, regardless of what

8    they actually said, was visibly upset and then on top of

9    that making the statement that he did, I would have gone

10   to my boss and said something to him and reported it.

11   If I hadn't seen him that night, I could have waited

12   until the next day.  I wouldn't have called him or

13   anything like that.

14        Q.    In response to Mr. Fletcher, I think you

15   said, in referring to Mr. Fox, it was quite clear he was

16   implying something.  What did you believe or what did

17   you take to be the implication of Mr. Fox's statements?

18        A.    To me, he was implying that she got the

19   position as more like what Mr. Markow was saying, that

20   she earned it by behavior that was unbecoming of a

21   professional, I guess you would --

22        Q.    Was there a sexual component to that?

23        A.    Yes.  To me, it seemed like he was making a

24   sexual connotation that she got it by doing something

A-45

1    that she shouldn't do.  But he didn't explicitly state

2    it.

3            Q.    But that was your understanding?

4            A.    That was the implication, though, yes.  He

5    later explained it that he was -- in the meeting, as the

6    notes reflect -- that he was upset that he might be

7    judged upon her performance, not independently based on

8    his own merit and performance.

9            Q.    And he also stated that in the discussion he

10   had with you on March 10th, more or less, is that

11   correct --

12           A.    Yes.

13           Q.    -- because you go on to talk about the

14   60-day interim period should not reflect on him?

15           A.    Yes.  But it seemed like there were two

16   separate components to it when he was discussing it with

17   me.  But it wasn't uncommon for him to come into the

18   office after hours, because at that time I was working

19   until 5:30, 6:00 almost every evening.  He would just

20   come and we would just talk about different things going

21   on.

22                 And if he was still employed by the town, I

23   probably still would.  I know I ran into him at Target

24   the other day, and I talked to him.  So I don't have any

A-46

COPY   1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,                )
        Plaintiff,                     )
                                       )
              v.                       )  C.A. No.
                                       )  07-488 (GMS)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
individually and in his official       )
capacity as Town Manager of the        )
Town of Smyrna, and                    )
VALERIE HERITAGE, individually and )
in her official capacity as            )
Administrative Clerk of the            )
Town of Smyrna,                        )
        Defendants.                    )

              Deposition of **DAVID S. HUGG, III**, taken
before Cheryl A. Anthony, Court Reporter, in the Smyrna
Town Hall, 27 South Market Street, Smyrna, Delaware, on
Tuesday, March 18, 2008, beginning at 1:00 p.m.

APPEARANCES:

        WILLIAM D. FLETCHER, JR., ESQUIRE
        and BRIAN BRITTINGHAM, ESQUIRE
        SCHMITTINGER & RODRIGUEZ, P.A.
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        BRUCE HERRON, ESQUIRE
        AKIN & HERRON, P.A.
        1220 North Market Street
        Suite 300
        PO Box 25047
        Wilmington, Delaware  19899
        Attorney for Defendants.

**ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE**

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302) 674-8884**

A-47

1    directly, no.

2          Q.     Okay.   Did anyone specifically come to you

3    before this meeting and tell you that they heard Mr. Fox

4    make inappropriate comments about Ms. Vinc?

5          A.     I don't -- I don't recall exactly what

6    the -- when the timing was.   I did have both Mr. Stulir

7    and Mr. Markow indicate to me that Mr. Fox had made

8    derogatory comments to them about Ms. Vinc.

9          Q.     All right.   There had been exhibits

10   prepared -- that I'm sure you are aware of -- by

11   Mr. Markow.   That is James Markow.   That is who you just

12   referred to, correct?

13         A.     Yes.

14         Q.     And Mr. Gary Stulir?

15         A.     Yes.

16         Q.     That is who you were just referring to?

17         A.     Yes.

18         Q.     Those exhibits reference to one meeting or

19   one discussion that occurred on Thursday evening,

20   March 10th.

21         A.     Correct, okay, immediately before this

22   meeting.

23         Q.     This would have been the day before this

24   meeting of March 11th.

A-48

1          A.    Correct.

2          Q.    Were you aware?  Had Markow and/or Stulir

3     brought this to your attention before the March 11th

4     meeting?

5          A.    They obviously brought it to my attention on

6     the 10th.  They both cornered me as I was leaving the

7     building that Thursday night and indicated that they

8     were very upset by an incident that had just recently

9     occurred.  They described it to me and --

10         Q.    And that was the reason that you --

11         A.    That was part of the reason --

12         Q.    That was one of the reasons --

13         A.    -- for calling the meeting.

14         Q.    For calling the meeting --

15         A.    Correct.

16         Q.    -- which occurred the next day?

17         A.    Correct.

18         Q.    So this meeting came about very quickly?

19         A.    Quickly thereafter, right.

20         Q.    All right.  In the meeting did either --

21    Let's see.  I'm sorry.  Mr. Markow does not appear to be

22    in attendance at the meeting, correct?

23         A.    Correct.

24         Q.    Okay.  Mr. Stulir does appear to be at the

A-49

1      A.    She never formally filed any kind of an

2   action.

3      Q.    All right.  Did she informally come to you

4   and do that?

5      A.    She did.  She indicated that she was

6   considering the possibility of taking some or bringing

7   some kind of an action.

8      Q.    And when did she bring that to your

9   attention?

10     A.    Sometime in this time period; I don't recall

11  specifically.

12     Q.    And did she have any information other than

13  what was in the two affidavits?

14     A.    If she did, she didn't share it with me at

15  that point in time.

16     Q.    Was her complaint beyond these affidavits --

17     A.    I don't know.

18     Q.    -- that she communicated to you?

19     A.    My understanding is she felt there was a

20  pattern of --

21     Q.    Harassment?

22     A.    -- harassment -- I think that is probably

23  the right word -- relating to this whole set of

24  incidents.

A-50

1    necessarily as, you know, representing of a pattern or

2    an intention to harass; that she really needed to -- but

3    if she felt she was harassed, then the procedures were

4    to file a formal complaint.

5          Q.    And then the Town would investigate?

6          A.    The Town would investigate, right.

7          Q.    And a formal complaint was never filed?

8          A.    No.

9          Q.    And there was never any investigation?

10         A.    No.

11         Q.    Now, when you received these two exhibits --

12   I'm sorry.  Let me back up for a moment.  You said these

13   two affidavits were developed because Ms. Vinc requested

14   that they be developed?

15         A.    I believe so.

16         Q.    Okay.  And then how does your executive

17   assistant get involved in developing these affidavits?

18         A.    Well, she would have been -- obviously,

19   she's the notary.  At least one of the parties, both

20   parties, maybe Ms. Vinc -- I'm not sure who -- requested

21   that they be signed and notarized.

22         Q.    Well, who would have typed them?

23         A.    I don't know who typed them.  I don't know.

24   I don't know whose typewriter -- I don't know.

1    you and complaining?

2         A.    Only, I believe, in general terms.  On the

3    confidentiality of Ms. Vinc, she had not filed a

4    complaint.  She had not --

5         Q.    So you didn't think it would be appropriate

6    at that time?

7         A.    Appropriate to sit down with him and discuss

8    in detail; just that she was upset about these comments,

9    that she, on the 11th, describes it as just conversation

10   among the guys.

11        Q.    What did you do with the two affidavits?

12        A.    I believe I put them in my desk and simply

13   left them there, pending whether Ms. Dunn was going to

14   come forward with any type of complaint.

15        Q.    Is there any time consideration for making

16   such complaints?

17        A.    I don't believe there is in the personnel

18   policy.

19        Q.    I understand that you have no control over

20   what an employee may decide to do regarding making a

21   formal complaint under the policies of the town --

22        A.    Correct.

23        Q.    -- or even making a complaint with a

24   different agency.

A-52

1          A.     Correct, correct.

2          Q.     But from your perspective, the information

3    that was contained in these affidavits had been

4    appropriately dealt with and had been resolved to your

5    satisfaction as of March 11th of '05, correct?

6          A.     Correct.  That's clearly reflected on the

7    last couple of pages of these minutes -- I guess they

8    are not numbered -- as it relates to my discussion with

9    Mr. Fox at the end of the meeting.

10         Q.     All right.  Do you want to read what you

11   have specifically --

12         A.     Well, looking at what the comments were -- I

13   guess about the third page in from the back -- Mr. Hugg

14   said that considering everything that has been

15   discussed, the context of Mr. Fox's comments, he feels

16   the matter has been resolved.  He added that he is

17   extremely disappointed that Mr. Stulir and Mr. Markow

18   independently came to him and wanted to talk.

19              He said he is extremely disappointed to the

20   point that he almost called Mr. Fox last night at home

21   to discuss it.  And then it goes on to reflect Mr. Fox

22   indicating that still that he feels there was some

23   special treatment of Ms. Vinc, to which I said Mr. Hugg

24   is sorry Mr. Fox feels that way.  And Mr. Fox says he

A-53

1   talks about date-stamping; is there not?

2        A.    I'm sure there is.

3        Q.    Okay.  Was there a time during Mr. Fox's

4   career with the Town of Smyrna that he was being

5   considered for assistant town manager?

6        A.    There was a time during Mr. Fox's career

7   that certain members of council believed he should be

8   the assistant town manager.

9        Q.    Does the Town have such a position?

10       A.    We have an unfilled, unbudgeted assistant

11  town manager position.  Mrs. Schlichting was the

12  assistant town manager.  Mr. Jacobs had been assistant

13  town manager before he became town manager.

14            When Ms. Schlichting left, it was my

15  recommendation to council, as part of the personnel

16  budget process, that we not fill the assistant town

17  manager position and, in fact, use the position and the

18  funds for other workers, municipal workers, and what

19  have you.  And it is still my position that the town

20  does not need an assistant town manager.

21            This budget year the town has suggested that

22  I need an assistant to the town manager, someone that

23  could take some of the administrative details and what

24  have you.  But my personal philosophy, since I have been

 1    here, is that, you know, I need worker bees more than --
 2    you know, people out taking care of electric lines, the
 3    water and sewer lines and parks -- - much more
 4    desperately.
 5            You know, I would like to have the luxury of
 6    an assistant town manager -- and you probably have it in
 7    those files.  I've been fairly consistent, very
 8    consistent throughout my career here saying:  No, we
 9    don't need an assistant town manager.  We need people to
10    do the job.
11            If it takes me 80 hours a week because we
12    don't have one, that is the price of that decision.  But
13    that's how I feel.
14        Q.    And do you recall about when the last
15    assistant town manager left?
16        A.    Kimberly Schlichting was the last assistant
17    town manager, and she left -- oh, gosh, she's been gone,
18    what?  Four years now?  I don't recall exactly when she
19    did leave.  She went to be the administrative vice
20    president at the municipal electric corporation.  That
21    was probably four years now.
22        Q.    And I take it after she left, there was no
23    interviewing for the position?
24        A.    No.  The position was simply -- she had a

A-55

1    dual assignment.  She was assistant town manager and

2    director of planning and inspections.  I opted after

3    that to hire a director of planning and inspections,

4    Mr. Lee, and use that position, because I thought that

5    was a better use of those resources than having someone

6    else in the chain of command.  The number of direct

7    reports just simply didn't, in my mind, justify having a

8    direct assistant.  So that title was of no use.

9        Q.    Did Ms. Vinc ever come to you and tell you

10   that if Mr. Fox became the assistant town manager, that

11   she would quit or would not work for him?

12       A.    She had indicated -- She indicated to me

13   that given their work, the nature of their work

14   relationship, that no, she would not stay if Mr. Fox was

15   the assistant town manager.

16       Q.    Did that have any bearing on whether or not

17   you would fill the position?

18       A.    No.  The decision was made strictly on a

19   management basis and an allocation of resources and

20   continues to be.

21       Q.    Did there come a time, while Mr. Fox was

22   employed by the Town of Smyrna, where there was

23   discussion at least by council as to whether or not he

24   needed another assistant for his department or section?

A-56

1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF DELAWARE

3   SAMUEL FOX,                    :        ORIGINAL

4                   Plaintiff,     :

5            vs.                   :    Civil Action
                                        No. 07-488
6   TOWN OF SMYRNA, DAVID S. HUGG, :
    III, individually and in his
7   official capacity as Town      :
    Manager of the Town of Smyrna,
8   and VALERIE HERITAGE,          :
    individually and in her
9   official capacity as           :
    Adminstrative Clerk of the
10  Town of Smyrna,                :

11                 Defendants.  :

12                   - - -

13              Deposition of CATHERINE A. FOX, taken

14  pursuant to notice in the law offices of

15  Schmittinger & Rodriguez, Suite 203, 220 Continental

16  Drive, Newark, Delaware, on Wednesday, February 6,

17  2008, at 2:27 p.m., before Lorraine B. Marino,

18  Registered Diplomate Reporter and Notary Public.

19                   - - -

20

21

22

23

24
                         A-57

7

1          Q.          What is her position with the town?

2          A.          I don't know the official title, but I

3    know she does the billing for the electric and I know

4    she does the -- I believe the payroll and is their

5    benefits coordinator.  So I don't know her exact

6    title.

7          Q.          So did you know Ms. Heritage in

8    school?

9          A.          I remember seeing Valerie in school.

10   I was a senior that year.  My sister was a freshman.

11   I believe Valerie was a freshman then as well, so I

12   think, you know, that was when.

13         Q.          Did you consider her to be a friend?

14         A.          I didn't.  I knew her from afar, not

15   to associate with in school.

16         Q.          How about after school?

17         A.          Coming in to visit my sister at the

18   Town Hall or to pay a utility bill, she worked in the

19   same office with my sister.  That's how I became

20   acquainted with Valerie.

21         Q.          Okay.  How did the first conversation

22   between you and Ms. Heritage regarding your husband

23   and Ms. Masten come about?

24         A.          I initiated the phone call to Valerie

                              A-58

9

1   me what you said during that initial phone call and

2   what Ms. Heritage said?

3          A.        Yes.  I had called Valerie and I

4   had -- I was curious about Aimee, so, you know, I told

5   Valerie that there were times when Aimee was calling

6   the house.  It had made me uncomfortable.  Could she

7   tell me a little bit about Aimee so I could get to

8   know her or know what to expect, you know.  I didn't

9   know, honestly know why she was calling the house.

10          And Aimee -- Valerie went on to say,

11   you know, that she started -- I said, "Well, how are

12   you girls getting along with Aimee?"  You know, I was

13   trying to feel her out to see if everything was okay

14   at work.

15          And Valerie, you know, I guess she was

16   not alone at the desk.  I guess Kim was beside her,

17   because I could hear another female in the background.

18   And, you know, I expressed me being uncomfortable

19   about the phone calls, and I wanted to know if

20   everything was okay at work.

21          And she had indicated that, you know,

22   there was some funny behavior going on at work, that

23   Aimee seemed to be in Jim's office a lot, that the

24   door was closed quite often, and that they, quite

4-59

11

1   the office and maybe get to know Aimee.  And so she

2   faxed me the birthdays.

3        Q.        Did either during the first or the

4   second call, do you remember if you asked Ms. Heritage

5   if there was anything going on between your husband

6   and Ms. Masten?

7        A.        That question came when I talked to

8   Valerie at home.  I called from my residence.

9        Q.        Okay.  So that question was not

10  posed --

11       A.        Not at work.

12       Q.        -- during the first two calls?

13       A.        I mean, I expressed my being

14  uncomfortable about the phone calls and basically, you

15  know, told her I was uncomfortable about Aimee calling

16  home, you know, calling after work hours, and asked

17  her if, you know, if there was anything, you know,

18  that I needed to be worried about.  And that's when

19  she said that there was a lot of, you know, silliness

20  going on between the two, like, you know, like what I

21  had just answered in the question.

22       Q.        All right.  And then there was a third

23  conversation?

24       A.        I called her at home.  And it was

A-60

1   after work hours.

2        Q.        Okay.  Do you know if it was the same

3   day?

4        A.        I honestly don't remember.

5        Q.        Okay.  Tell me what you recall about

6   the third conversation, what she said, as best you can

7   remember, and what you said.

8        A.        Okay.  On that call -- first, when I

9   initiated the call, you know, of course, she could

10  probably see who was calling if she had caller ID.

11  And she answered the phone, and I asked her if she was

12  comfortable talking to me a little more, and she said,

13  "Sure.  Anything I can do to help.  You know, I will

14  answer whatever I can answer."  So we talked, you

15  know.

16             And I went into more personal details

17  as to why I felt the way that I did.  And I told her

18  that in my previous marriage my husband had had an

19  affair with the secretary at his job and that there

20  were phone calls made to my residence by various

21  females.  I mean, she wasn't the only person my first

22  husband had had an affair with.  There were others.

23  And that I was very uncomfortable, you know.  It was

24  starting to bother me because it brought out all those

A-61

1  skeletons, you know, the secretary at the work, the

2  phone calls, you know, and that I felt that, you know,

3  that Jim loved me and, you know, maybe I am just

4  jumping the gun a little, but I am very uncomfortable.

5              She went on to say that people at the

6  office had noticed the behavior.  They would google

7  each other across the table if they were at a meeting.

8  She said they just didn't act very professional.  And

9  she said that others in the office had noticed it.

10             And then I went on to tell her that I

11  had hired a private investigator with my first

12  marriage and to find out who my husband was having

13  relations with and that the investigator had gone out

14  of town, so I had followed my husband and actually

15  caught him with the female that he was seeing, and an

16  altercation came.  I got beat up, so to speak, had to

17  go to the hospital, and it wasn't a nice situation.

18             And then she went on to say that, you

19  know, she, too, had a failed first marriage, that her

20  husband had had an affair as well.  And she didn't go

21  into too much detail but that she, you know,

22  understood why I was feeling the way that I did.

23             And then she indicated that they both

24  left at lunch around the same time, they both arrived

A-62

14

1    back at the office about the same time, you know.  If

2    I actually thought there was something going on, why

3    didn't I just go ahead and follow them like I did my

4    first spouse.

5         Q.        Okay.  And this was the third

6    conversation?

7         A.        The third conversation.

8         Q.        Anything else that you can remember

9    about what was said during the third conversation?

10        A.        I talked about my job.  I talked

11   about, you know, working.  I had been working

12   overtime, you know; that if anything was going on, I

13   certainly hoped that there wasn't.  We had two

14   children together.  You know, there was a lot at

15   stake.  No matter what, I loved Jim, and, you know, I

16   felt that he loved me, too; that maybe I am just

17   letting all my past emotions take control and, you

18   know.

19        Q.        What was her response, if you

20   remember?

21        A.        You know, that she felt really bad; if

22   there was anything she could do to help me.  And I

23   stressed to her please, whatever you do, can this

24   conversation be between the two of us, you know.  I

A-63

1  don't want anything started at Jim's work.  I don't

2  want to cause problems, and actually, I feel bad even

3  having this conversation.  And she promised me that

4  she wouldn't breathe a word to anybody.

5       Q.       Anything else about that third

6  conversation you can recall?

7       A.       Not that, no.

8       Q.       All right.  Was there a subsequent

9  conversation?

10      A.       The next morning I called her while

11 Jim was in the shower.

12      Q.       You called her at home?

13      A.       Yes.  And she answered the phone

14 again, and I apologized for calling her, and I told

15 her that I did a lot of thinking that night.  I didn't

16 sleep very well, and that I thought I had made a big

17 mistake even bothering her to begin with, and that if

18 she would please not say anything to anybody.  Maybe

19 Jim had nothing to do with this.  Maybe it was, you

20 know -- maybe Aimee had a crush on him or something.

21 But I just couldn't, you know -- that I was wrong.

22 Please, whatever you do, don't say anything to

23 anybody.  And she promised me she wouldn't.  And I

24 said, "I won't bother you again."

A-64


21

1       Q.      You sent that one also?

2       A.      Yes.

3       Q.      I believe those are the only two

4 emails in that exhibit from you.

5       A.      Yes.

6       Q.      Okay.  Let me refer you to the

7 June 15, 1:19 p.m. email --

8       A.      Okay.

9       Q.      -- which is the first page.

10      A.      The first one.

11      Q.      Let me find where I want to ask you

12 about.  The third paragraph there, the final sentence.

13 I believe you are quoting Ms. Heritage, and you say,

14 "She said you are probably right.  You can't assume

15 anything if there isn't any evidence."

16               Did she tell you that?  Do you see

17 where I am?

18      A.      I see -- no, I don't see.

19      Q.      That's the right paragraph.  It is the

20 next, the third sentence.  "She said you are probably

21 right.  You can't assume anything if there isn't any

22 evidence."

23      A.      Right.  I remember that.

24      Q.      You remember --

A-66

22

1    A.       I -- it has to be if I put it in my
2  email.

3    Q.       All right.  So that's what
4  Ms. Heritage said to you?

5    A.       Probably, if it is in my email.  It is
6  written documentation, yes.

7    Q.       Is that yes?

8    A.       Yes.

9    Q.       Let me just ask you, there are
10  portions of the emails blacked out.  Do you know who
11  blacked those out?

12    A.       Jim must have done that before he gave
13  the email to Mr. Hugg.

14    Q.       You didn't black --

15    A.       No, sir.

16    Q.       -- them out?  Okay.

17             Do you have any idea what those
18  blacked-out portions refer to?

19    A.       I don't remember.

20    Q.       Let me just refer you to one more
21  thing in that email.  This is the second paragraph,
22  about three-quarters of the way down.  The sentence
23  says, "She said they come back from lunch a lot of
24  times at the same time and the only way to find out if

A-67

 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,                    )
    Plaintiff,                        )
                          )
          v.                        ) C.A. No.
                          ) 07-488 (GMS)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
individually and in his official   )
capacity as Town Manager of the    )
Town of Smyrna, and                )
VALERIE HERITAGE, individually and )
in her official capacity as        )
Administrative Clerk of the        )
Town of Smyrna,                    )
    Defendants.                       )

        Deposition of **VALERIE LYNN HERITAGE**, taken
before Cheryl A. Anthony, Court Reporter, in the Smyrna
Town Hall, 27 South Market Street, Smyrna, Delaware, on
Tuesday, March 18, 2008, beginning at 10:00 a.m.

APPEARANCES:

      WILLIAM D. FLETCHER, JR., ESQUIRE
      and BRIAN BRITTINGHAM, ESQUIRE
      SCHMITTINGER & RODRIGUEZ, P.A.
      414 South State Street
      Dover, Delaware  19901
      Attorney for Plaintiff.

      BRUCE HERRON, ESQUIRE
      AKIN & HERRON, P.A.
      1220 North Market Street
      Suite 300
      PO Box 25047
      Wilmington, Delaware  19899
      Attorney for Defendants.

**ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302) 674-8884**

A-68

1          Q.     And it is dated 5/24/05.  Is that when you

2     sent it to her?

3          A.     That is correct.

4                 MR. FLETCHER:  And I'll just have a copy of

5     this marked as Exhibit 1 to your deposition.

6                 (Hugg Exhibit Number 1 was marked for

7     identification and attached to the record.)

8     BY MR. FLETCHER:

9          Q.     Did you ask anyone about whether or not it

10    would be appropriate to provide birth dates for

11    Mrs. Fox?

12         A.     I asked everyone in the office if they would

13    mind.

14         Q.     And I guess no one minded?

15         A.     No.

16         Q.     Okay.  And it was after you had learned that

17    no one had a problem with that is when you developed the

18    list and sent it to her?

19         A.     That is correct.

20         Q.     And apparently, during this second

21    conversation, Mrs. Fox asked you again confidentially if

22    you knew of anything between Mrs. Fox and Mrs. Masten,

23    correct?

24         A.     That is correct.

A-69

1    Q.    And your statement in this memo says:  I

2    told her that I had seen inappropriate looks.

3              What were the inappropriate looks that you

4    had seen between Mr. Fox and Mrs. Masten?

5    A.    Just that they were inappropriate, not of a

6    business nature, more of an adoring type nature.

7    Q.    Were there words exchanged at the time that

8    you observed these inappropriate looks?

9    A.    No, not that I was aware of.

10   Q.    All right.  None that you heard, anyway?

11   A.    Unh-unh.

12   Q.    No?

13   A.    Not that I'm aware of, no, sir.

14   Q.    Well, describe the inappropriate look for

15   me, please.

16   A.    It was more of an adoring nature, not of a

17   professional glance or look.  It was more of a caring

18   nature, I would say.

19   Q.    Where were they -- that is Mr. Fox and

20   Mrs.  Masten -- when you observed these looks?

21   A.    In the hallway, in her office, in his

22   office.

23   Q.    Were they standing there looking at one

24   another?  Were they passing one another?

A-70

1   between staff members?

2        A.    No, sir.

3        Q.    And you state in this memo, during this

4   second conversation you again told Mrs. Fox there was no

5   proof of anything going on; however, the appearance of

6   their actions was not appropriate.

7              And by that, do you mean the appearance of

8   Mr. Fox and Mrs. Masten's actions was not appropriate?

9        A.    At times.

10       Q.    At times.  And you told Mrs. Fox that?

11       A.    Yes, sir.

12       Q.    And were you not telling her that by stating

13  that these actions were not appropriate, you were

14  meaning they did not appear to you to be the type of

15  activities that you would expect in a business

16  relationship?

17       A.    That is correct.

18       Q.    Your memo then goes on to talk about a

19  conversation that happened in the evening of May 24,

20  2005.  Just to go back for a moment, the first two

21  conversations in this memo that we talked about were

22  caused during the workday.  Is that fair to say?

23       A.    That is correct, sir.

24       Q.    And they were communications that you were

A-71

1          A.     I raised my voice.  I would not go to the

2     point of saying that I was yelling at him, no.  And it

3     was the same as he raised his voice at me.  No, he did

4     not yell at me.

5          Q.     All right.  Have you had these types of

6     raised voice conversations before with Mr. Fox?

7          A.     No.

8          Q.     Do you raise your voice with your superiors

9     in other instances?

10         A.     No.

11         Q.     What was said by Mr. Fox then?

12         A.     Basically, that he did not like being

13    questioned, and it was his decision.  And I said that

14    that -- I believe I recall saying that that was okay,

15    but we need to know what procedure we are following with

16    these.

17         Q.     Okay.  Was anything else said?

18         A.     I don't recall.  I apologize.  It's been a

19    while since then.

20         Q.     Were you satisfied with his explanation?

21         A.     I wasn't happy, but he's the boss.

22         Q.     Did you express your unhappiness in any way,

23    physically or verbally?

24         A.     I cried.  A-72

<u>NOTES FROM MEETING ON FRIDAY, MARCH 11, 2005</u>

A meeting was held in the conference room of Smyrna Town Hall at 1:00 p.m. on Friday, March 11, 2005. Present were Town Manager David S. Hugg III, Councilwoman D. Sue Hensley, Manager of Accounting & Business Services Gary Stulir, S. James Fox, Jerilyn Dunn and Carol McKinney.

Mr. Hugg said he is conducting this meeting with great reluctance and a great deal of disappointment but this matter needs to be addressed. He noted that Mrs. Hensley is here as the Chairman of the Personnel Committee. Mr. Stulir is here as the Human Relations representative for the Town and Mrs. McKinney is here so that there is no question about what was talked about.

Mr. Hugg read a portion from the Town Charter which gives specific authorities to the Town Manager as follows: "…the Town manager shall be responsible for the hiring, supervision, discipline, lay-off and termination of all employees (other than those within the Police Department)…" .

Mr. Hugg said that he made the recommendation to appoint Jim Fox to the building & inspections side and Janet Vinc to the Planning & Zoning side of the Planning & Inspections Department. Council was aware of it and agreed with that action. He added that, quite frankly, whether you like that or don't like that, it is something you have to do anyway. This is an interim period so that we can figure out how to move forward. Mr. Hugg said he didn't ask anyone to like it, but does ask that you perform in a professional manner.

Mr. Hugg said he believes that almost all job descriptions now have the section stating: "Ability to interact with the public and other employees pleasantly, with courtesy and patience to foster an effective, efficient, professional

A-73

EXHIBIT

Fox 1

workplace" as a part of the Knowledge, Skills and Abilities. These qualities are added to a job description when we hire new employees. Mr. Hugg said he pulled a number of applications and all of them have these qualities included.

Mr. Hugg said the Town Personnel Policy is very clear that there are certain actions that will not be tolerated including, but not limited to, profane, obscene, insulting, inflammatory or intimidating comments that would belittle or embarrass other employees or the public.

Mr. Hugg said he has been advised from a number of employees directly and indirectly that there have been comments, sounds, etc. made regarding a member of the Town Council. Mr. Hugg added that the implication was that the Council member and he and another employee have an inappropriate relationship that resulted in that position. He said that a supervisor told him that Mr. Fox said he wouldn't work with someone that got their job in that way.

Mr. Fox said he said that he is disappointed that she has not earned that position.

Mr. Hugg said that Mr. Fox will have his opportunity. He said he has talked as recently as this afternoon to people upstairs who have heard these comments and they confirmed that they heard such behavior and comments and were upset about them. Mr. Hugg said that he will not tolerate anyone making these kinds of remarks where employees or anyone else who comes in here can hear them. Mr. Hugg said the Personnel Policy is very clear that "profane, obscene" remarks are grounds for immediate dismissal.

Mr. Hugg said he considers Ms. Dunn's comments describing a member of the Town Council as a pig in that category.

Mr. Hugg said that Mr. Fox having carried comments to Mr. Stulir and Mr. Markow that a Council member and a Council Member

and I have a relationship with an employee that is inappropriate is a fact that we will discuss later in this meeting. He added to Mr. Fox that if you feel there are inappropriate relationships, you should have come to me (Mr. Hugg) to discuss them. If you felt you had to go to someone else in charge, you could have gone to Mr. Stulir. However, to go to Mr. Stulir and discuss these feelings in the presence of Mr. Markow was totally inappropriate.

To Mrs. Dunn, Mr. Hugg said that she cannot and will not behave in a manner disrespectful to Ms. Vinc or to Mr. Carter, not in public and not where anyone else can hear those comments.

Mrs. Dunn asked what she was supposed to have said.

Mr. Hugg said that, when Mr. Carter walked through the other day, she was heard to say "Do I smell pig?". Then, when he left, she was heard to make a so-o-oey noise and say Oink Oink. He added that Ron Antonio heard her say "Don't you think it is a bid early in the morning to get a piece?". Mr. Hugg said those comments are grounds for dismissal.

Mrs. Dunn said she never said anything like that or that there was anything sexual.

Mr. Hugg said he has witnesses who will say otherwise. He said that Mrs. Dunn's attitude towards him, Ms. Vinc and Mr. Carter is very negative. It is unacceptable and it won't happen at the Town of Smyrna. He said he can bring them into this meeting. Mr. Hugg said Mrs. Dunn went out of her way to embarrass Steve Lee. He said she sent e-mails to him (Mr. Hugg) and others that should have gone to her supervisor.

Mrs. Dunn said Mr. Lee never came out of his office. Mr. Hugg said he forwarded the e-mails to Mr. Lee. He said he told Mrs. Dunn and he told Mr. Fox to go to Mr. Lee. Mr. Hugg said that, quite frankly, he will not tolerate these kinds of comments against someone else unless you have irrefutable facts.

A-75

He said he doesn't care if either of you like him or not. We are concerned about what is in the best interest of the Town of Smyrna. Mr. Hugg added that he doesn't believe Mrs. Dunn is committed to helping the Town of Smyrna move forward. He added that he sees her as a cancer in that department and as a very disruptive force.

Mr. Hugg said that, based on this information he has gotten from talking to Mr. Antonio, Ms. Heritage and Ms. Cronin, and the comments that were carried forward to Mr. Markow and Mr. Stulir, he is recommending to Council that Mrs. Dunn be terminated immediately. He offered her the opportunity to sign a letter of resignation.

Mrs. Dunn said "You have got it". She said sign the letter telling her so and mail it to her. Mrs. Dunn left the meeting at 1:10 p.m.

Mr. Hugg told Mr. Fox that he is extremely disappointed in him. He said that Mr. Stulir and Mr. Markow were disappointed by his comments. Mr. Hugg said they came to him separately and said that Mr. Fox had made these allegations about him and another employee. He said that, if Mr. Fox felt these things were taking place, he should have come to him (Mr. Hugg) and Mr. Stulir and done so as a manager. It was very inappropriate that he went to Mr. Stulir and Mr. Markow.

Mr. Fox said it was just a conversation with the guys.

Mr. Hugg said he was told that Mr. Fox said the reason another employee got her position was because he (Mr. Hugg) and her had something going on. He said that even between guys, that was inappropriate.

Mr. Fox said he has people telling him stuff like this all the time. He said his issue was that Mr. Hugg always hires people on their qualifications.

A-76

Mr. Hugg asked him what is your point?  Mr. Fox said she doesn't have any qualifications for the position.  Mr. Hugg said Ms. Vinc has a Masters Degree in Planning.  She also has had course work in land use, land use law, comprehensive planning, etc.

Mr. Fox said he told Ms. Dunn and Mrs. Masten yesterday that if Ms. Vinc comes to them with questions, answer them and put her in her place so that she can get her job done.  He added that he has never tried to trip anyone up.

Mrs. Hensley asked exactly what Mr. Fox said.

Mr. Fox said he didn't know.  He said it was Ms. Vinc getting the position because I felt that I have been here five years and have worked all through the job.  I know the zoning. I have worked in the Planning Department.

Mrs. Hensley said Mr. Fox felt that he should have gotten the position but it was given to Ms. Vinc.

Mr. Fox said he doesn't know why it was split.  He said he was asked to come and fill in.  He said he has never turned anyone down who needed help.  He said he knows that he believes in his heart that if Ms. Vinc said something, Mr. Hugg would believe her and not him (Mr. Fox).  He noted that she was Mr. Hugg's student.  She can manipulate.  Mr. Fox said she has done stuff to him.  He added that he knows he is cold to her because she pretends to be his friend.  He said he has told her things about wanting to be the assistant and someday the Town Manager. She ran right to Mr. Hugg and said she wouldn't work for me.

Mrs. Hensley said she doesn't have to.  She added that you don't have any friends at work when you are management.  If you want to be friends with everyone, it is a losing proposition. Mrs. Hensley said when you are a manager, you have to be their supervisor so you can't be their friend.

Mr. Fox said he is friends with everyone.

A-77

Mrs. Hensley said it is her understanding that Mr. Fox did talk to Mr. Stulir and Mr. Markow to see if they had a problem with it.

Mr. Fox said he did talk to them.  He is not denying that.

Mrs. Hensley asked why he went to Mr. Stulir and Mr. Markow.  She said he can always talk to Mr. Hugg or to her.

Mr. Fox said he appreciates that.  He said he is happy with his appointment and he will do the best he can.  He added that if Ms. Vinc fails the 60-day trial period, he is afraid that he will suffer also.   If she fails, he said he will be back down here in the basement.  He added that if he gets the department back running like it can, he should not be penalized.

Mr. Hugg said he wants the department to function.  He said he wants those two sections to get organized.  Mr. Hugg said this is an interim solution because he does not know how he wants to leave it.

Mrs. Hensley said this is another opportunity for Mr. Fox to grow into another increase.

Mr. Fox said he appreciates that.

Mr. Hugg said if Mr. Fox has any feeling that he doesn't have confidence in him, he is mistaken.  Mr. Hugg said he has gone out of his way to bring Mr. Fox into the CIP position and into finance meetings.  He said that sixty days from now, he thinks this will be a strong group.  He added that he doesn't want to overload Mr. Fox.  We have a lot coming up with State Planning, etc.  Ms. Vinc has also been told that she must perform to stay where she is.

Mr. Fox said when she ran to Mr. Hugg and said she wouldn't work for him, she pretended to be his friend.  That is not right.  He added that he has not done anything to her except be her friend.

A-78

Mr. Hugg said if he had any doubts, he wouldn't have appointed Mr. Fox or Ms. Vinc to those positions. Mr. Stulir and Mr. Markow were both upset about Mr. Fox's comments.

Mrs. Hensley asked what Mr. Fox actually said.

Mr. Stulir said he and Mr. Markow are often in the office after other employees have left for the day. Sometimes Mr. Fox stops by and we talk for a little bit, this time about the budget. He said Mr. Fox was asking about more vehicles for the department, the budget, etc. Mr. Stulir said he told Mr. Fox he needed to talk to Mr. Hugg. He said then Mr. Fox said that he knew how Ms. Vinc got that particular position and it really upset him that was the case, implying that it was in an inappropriate manner.

Mr. Fox said he has had so many people tell him that the job was promised to her by Temple Carter, that he would get her an administrative job for $50,000+ a year. Temple Carter said he would get her a new job and all that money.

Mrs. Hensley said she didn't know anything about that. She asked why Mr. Carter is not here today. Mr. Hugg said he didn't tell him about the meeting.

Mr. Stulir said he didn't say that Mr. Fox knew that Ms. Vinc was doing anything, just that she got the job in an inappropriate manner. The implication is that it is something of a sexual nature. He didn't say it was sexual, it was just the implication.

Mr. Fox said he was upset about taking over the department. He said he will do anything Mr. Hugg wants him to do. He added that what upset him is hearing this stuff from everybody, Ms. Dunn, people on the street, other people.

Mrs. Hensley said Mr. Fox should have gone to Mr. Hugg and asked him. She said he is going to have to start doing that. Submit all rumors and gossip and go right to the horses mouth.

A-79

7

Mr. Stulir said he can come to him as the HR person if he doesn't want to go to Mr. Hugg.

Mrs. Hensley said she has heard other comments about Ms. Vinc getting the job because she is cute and young and sexy. She said they were attributed to Mrs. Dunn.

Mr. Fox said he has never had it easy in his whole life. He said he works very hard here. He said he hears stuff like that and then it happens, what is he supposed to think.

Mr. Hugg said he could have come and asked about it.

Mr. Fox said there were times when Mr. Hugg got upset when we came to him. He said he hears stuff and he should be able to come to you but when Mr. Hugg tells me something, I never tell a soul.

Mr. Hugg said he appreciates that.

Mr. Fox said that proves that he is a worthwhile candidate for management. You have to have a level of confidence that everything you do is not going to be out on the street. He said Mr. Hugg can deal with him however he wants to.

Mr. Hugg said if he misunderstood, he apologizes. In the context of what is happening in the last few days, it confirms what others have been coming to him (Mr. Hugg) and Carol and talking about. When someone came to me and said she could not believe that Jeri did a pig call behind Temple Carter's back, Mr. Hugg said he was offended. Mr. Hugg said you have some areas where it is black and some areas where it is gray. There is a context in which things are appropriate and a context where they are not. Sometimes, he said he didn't have time to meet with every employee who had a problem. Sometimes, people need to work out their own problems. Mr. Hugg said he tries to get around and talk to everyone in every department. He added that he has tried to get everyone in the front office to work together. Mr. Hugg noted that he is only human and he will make

A-80

mistakes that people think are very dumb. He said he is really upset and offended that a person hired in a professional position would carry tales like this. He said he wouldn't accept this from a groundskeeper or any other employee. No employee should call a Council member a pig or comment about inappropriate behavior.

Mr. Fox said it was supposed to have come from Ms. Vinc to Ms. Dunn and from Mrs. Dunn to him. He said people told him that Mr. Hugg didn't want an assistant town manager which is the position he wanted. He said instead Mr. Hugg made him CIP. He said he always hoped he would be able to go all the way up to town manager. Mr. Fox said that then Ms. Vinc went and told Mr. Hugg what he said. Mr. Fox said he doesn't feel Ms. Vinc earned or deserves the job and then it happened.

Mrs. Hensley said that Ms. Vinc got no promotion and no more money.

Mr. Fox said it took him five years and she is going right into management. He said that is what he is so upset about.

Mr. Hugg said that, considering everything that has been discussed and the context of Mr. Fox's comments, he feels that the matter has been resolved. He added that he was extremely disappointed that Mr. Stulir and Mr. Markow independently came to him and wanted to talk. He said he was extremely disappointed to the point that he almost called Mr. Fox last night at home to discuss it.

Mr. Fox said he will accept the punishment that Mr. Hugg is going to give him.

Mr. Hugg said he will make a note that we had this discussion for the file. It was just an oral talk and that is the end of it.

Mr. Hugg asked Mr. Fox today to come to him if he has concerns and Mr. Hugg will make the time to talk to him. He

A-81

said it is very rare when he doesn't have time.    If it is serious enough, Mr. Hugg said he will make time.

Mr. Fox said he knows that Ms. Vinc was Mr. Hugg's student. He said he knows she got the job here.  Mr. Fox said he knows he didn't have a snowball's chance because Mr. Hugg will believe her over him every time.

Mr. Hugg said he is sorry Mr. Fox feels that way.

Mr. Fox said he knows now.  He said he was afraid of it and he is sorry.  He said Mr. Hugg's apology is accepted.

Mrs. Hensley asked if Mr. Fox is happy in his new role. Mr. Fox replied that he is.

Mr. Hugg said he is excited to get up with Mr. Fox next week and ride the Town to look at building projects and code enforcement needs.

Mrs. Hensley noted that she has a whole list of those.

Mr. Fox said he is glad this is all settled.

Mrs. Hensley said that Mr. Fox needs to learn to resolve issues out in the open.

Mr. Fox said he wanted to tell Mr. Hugg.

Mr. Hugg said he is sorry he had to take the action with Mrs. Dunn.

Mrs. Hensley asked if he agreed with the comments.

Mr. Fox said he never heard the comments.

Mrs. Hensley asked if he was upstairs.

Mr. Fox said he is always downstairs.  Today is the longest he has been upstairs since he moved to the basement six or eight months ago.

Mr. Hugg said he will write a note saying what we discussed.  It was a misunderstanding of interpretation.  He said he doesn't think Mr. Fox needs a reprimand but he hopes Mr. Fox understands why he was so upset.

A-82

Mr. Fox said he was upset too but that wasn't him talking about sexual matters.

Mr. Hugg said he looks forward to working with Mr. Fox. This matter is done. We have worked it out.

Mr. Fox said he has learned more working with Mr. Hugg than anyone else.

Mrs. Hensley said the more he learns, the more valuable Mr. Fox becomes. She added that, when he becomes a manger, you have to rise above these things. Look at this as a learning experience and just move on now. She added that we know he has the best interest of the Town at heart.

The meeting ended at 1:45 p.m.

ccm

A-83

**EXHIBIT**

*Fox 2*

Jim Fox, Gary Stulir and I were in Gary's office after work on Thursday evening, March 10th.

Jim Fox was upset because the duties of Planning & Inspections were divided between him and Janet Vinc.

Jim said that the "way she got the job was laying on her back" and he added that he didn't want to go down with her.


_____
James Markow


Sworn and subscribed before me this 22nd day of March, 2005.


Carol C. McKinney

Carol C. McKinney, Notary Public
CAROL C. McKINNEY
Notary Public - State of Delaware
My Comm. Expires Sept. 25, 2006


A-84

**EXHIBIT**

*Fox 3*

James Markow, Jim Fox and I were in my office at 5:00 p.m. or a little after on Thursday, March 10, 2005.

Jim Fox said that he knew how she (Janet Vinc) got her job and that really bothered him.  Jim said that he would not work with her (Janet) and that he was scared that this was a 60-day interim period and, if she messed up, it would reflect on his work.

Gary Stuhr

Sworn and subscribed before me this 22nd day of March, 2005.

Carol C. McKinney, Notary Public
**CAROL C. McKINNEY**
**Notary Public - State of Delaware**
**My Comm. Expires Sept. 25, 2006**

A-85

3

TO:        JIM FOX

FROM:      DAVID HUGG

DATE:      JUNE 9, 2005

SUBJ:      COMPLAINT RE: KIM CRONIN

Your memo regarding comments made by Kim Cronin is noted. The proper step is for the matter to be referred to her supervisor, Janet Vinc, for necessary action. I have talked to Janet and to Gary and Meloney about the incident. By copy of this memo I am asking that Janet meet with Kim and advise her that such comments are inappropriate and not acceptable. I am also requesting that Janet record the disciplinary action in writing as part of Kim's personnel file and make it clear to her that any further similar behavior may be grounds for suspension or dismissal. I do not believe the matter warrants a meeting with the chair of the Personnel Committee at this time.

I appreciate your consideration and willingness to check on Janet's phone and obtaining the 800 number so that a warranty repair/exchange can be made.

Cc:    Janet Vinc
       Gary Stulir
       Meloney Torres
       William Pressley



A-86

EXHIBIT

Fox 5
1-9-08    LH

## Jim Fox

**From:** Fox, Alexis R [alexis.r.fox@bankofamerica.com]
**Sent:** Wednesday, June 15, 2005 1:26 PM
**To:** Jfox@smyrnadelaware.com
**Subject:** FW: suspect: RE: suspect: Thank you

EXHIBIT

*Fox 4*
*1-9-08  LH*

Dad, here's another one.....

---

**From:** Fox Cathy (DOC) [mailto:Cathy.Fox@state.de.us]
**Sent:** Wednesday, June 15, 2005 1:19 PM
**To:** Fox, Alexis R
**Subject:** suspect: RE: suspect: Thank you

So like I said, I called in one day and asked what she thought of his new secretary and the conversation went from there, doors being closed for long periods of time, Aimee lingering in his office, lots of eye contact, she said their behavior was inappropriate at meetings. My heart raced and I was scared to death.

I said to her, this has to stop, I love my husband and I'm not going to compete with a 27 year old. She said, well those doors are closed a lot. I told her I couldn't always get a hold of him during lunch breaks and that I knew of two times he had lunch with her that he didn't tell me about until I questioned him. I was hurt because he hasn't taken me to the Wayside for lunch and Aimee has been there 2x's that I know of. She said they come back from lunch a lot of times at the same time and the only way to find out if there is something going on is to follow them. She said everyone upstairs is wondering just exactly what Aimee is doing as far as her work assignments are converned and that they all notice how her and Jim interact.

Then early one morning I called her at her house and told her I didn't think it was him pursuing Aimee, that maybe she was attracted to him. I told her he was such a good father and he and I have been through so much together. She said you are probably right, you can't assume anything if there isn't any evidence, but I feel so bad for you, if there is anything I can do, please let me know, I am your friend.

Your dad told me about the Jeri incident. He said there was a nasty rumor that made it's way back to Mr. Hug concerning something Jeri supposedly said about Janet and a counsel member and it lead to her being dismissed or being made to resign.



These 3 females are trouble and the Town Manager believes them. If your dad thinks for one minute Mr. Hug will side with him, he's wrong.

I'm very hurt that I would be prayed upon like this by some vindictive woman that I have done nothing to, to be treated in this manner. She could have just easily dismissed my phone call and say that my question was way out of line, instead she fed me some bait and I took it. I don't know Valerie very well and now I feel this whole thing wouldn't have gotten started if I didn't make that phone call. I'm taking the blame for this, I just hope it



6/15/2005

doesn't cost me my marriage. I love your dad so much and now I have hurt him because of my inability to TRUST him. Now, I have to live with that and to me, that's punishment enough.

-----Original Message-----
**From:** Fox, Alexis R [mailto:alexis.r.fox@bankofamerica.com]
**Sent:** Wednesday, June 15, 2005 12:44 PM
**To:** Fox Cathy (DOC)
**Subject:** RE: suspect: Thank you

Hey. Sorry, I have been so busy today. What I don't understand is, why Valerie would be telling you that she feels sorry for you and for you to call her if you need anything....and that Aimee and Dad were messing around??????? Who is she to say something like that to you?

Now, what happened with that lady Jerri? Who was trying to get her fired? I deleted the other email by mistake.

**From:** Fox Cathy (DOC) [mailto:Cathy.Fox@state.de.us]
**Sent:** Wednesday, June 15, 2005 9:41 AM
**To:** Fox, Alexis R
**Subject:** suspect: Thank you

Thanks for the scopes, when I called you yesterday, it was my first time using my cell phone. My spelling in my first email was a little off because I didn't take the time to proof it.

My sister colored my hair last night. She said she thinks the world of Jim and she is very sorry to hear about the stuff those girls are up to. She said that your dad wrote one of them up because she snitched her out to your dad. Mel said she wished I had talked to her instead of mentioning anything to Valerie upstairs. Mel said I have been there for so long, and I know who is making trouble and she could have warned me that it was all a lie.

The secretary Kim came up to Meloney real nasty about a cell phone issue last week (your dad takes care of all the town cell phones) and said "YOUR STUPID BROTHER-IN-LAW" doesn't know what he's doing, and something about her supervisor's phone (her supervisor Janet is the one who is competing with your dad and is part of the female threesome). Jim went to the Town Manager and demanded a disciplinary hearing for Kim and the Town Manager said no, a letter would be justified in her file.

My calling in and talking to Valerie fell right into their plan to try and destroy your dad, they probably got together and decided to release the rumor to get back at him for writing Kim up.

He doesn't know that Valerie is the one who fed me the crap about him and Aimee. I won't tell him because he won't tell me who talked to him.

I asked him to let it go and in time, they'll all three will get what's coming to them, it's Karma. I know, I've done wrong things in my life and I've been punished in some way shape or form and I think to myself, okay Cathy, you had that coming, take it and go on and learn from it, and don't repeat that mistake.

A-88

A-89

TO:       JIM FOX
             VALERIE HERITAGE
             AIMEE MASTEN

FROM:     DAVID S. HUGG III

DATE:     JUNE 23, 2005

SUBJ:     PERSONNEL MATTER

On Wednesday, June 15, Jim Fox came to me to report an incident involving telephone conversations and comments made by Valerie Heritage regarding a rumor of an inappropriate relationship between him and another staff member, Aimee Masten. Mr. Fox returned on Friday, June 17 with copies of edited emails between Cathy Fox, his wife, and Alexis Fox, his daughter, relating to the telephone conversations. His contention was that Valerie had no business making comments about any purportedly inappropriate behavior or any relationship between him and Mrs. Masten, and those comments had caused him considerable aggravation and difficulties with his wife.

On Monday, June 20, I met with Valerie Heritage and asked for her version of the events and her explanation of what transpired. Valerie provided me with a written response on Tuesday, June 21. On Tuesday, June 22, I met with all three parties together in an attempt to understand and resolve the matter.

From the information gathered it is clear that Mrs. Fox initiated the contact and called Valerie a number of times both in the office and at home. On each occasion she (Mrs. Fox) asked questions regarding the alleged relationship. Valerie repeatedly commented that there was no proof of anything going on and that Mrs. Fox should talk directly to Jim about the rumor. Valerie did admit that she made comments regarding possibly inappropriate behavior (closed doors, eye contact, going to lunch together), but she stated that she did so only at the prodding of Mrs. Fox and did not do so with any intent to cause harm or problems. Valerie apologized to Mr. Fox and Mrs. Masten for any harm she had caused.

My conclusion on this matter is that Valerie did not intentionally act to cause harm to either of the other parties, that she was involved due to actions of Mrs. Fox and did not initiate any of the calls, that she was put into an uncomfortable position regarding confidentiality and her dealings with Mr. Fox, and that she is truly contrite about the matter and her comments. Nevertheless, she exercised poor judgment in offering her feelings and comments and should have declined to discuss the matter with Mrs. Fox. The effect of that poor judgment was to cause both Mr. Fox and Mrs. Masten unnecessary anguish. Accordingly, I am placing a copy of this memo in Valerie's personnel file as a written reprimand in accordance with Section 38.2.3 of the Personnel Policy.

Any party may file a grievance regarding this decision to the Personnel Committee as provided for in Section 39 of the Personnel Policy.

CC:    William D. Pressley, Chair, Personnel Committee
       Meloney Torres, Personnel Officer

A-90

**EXHIBIT**

Fox 6
1-9-08    LH

# Memo



EXHIBIT

Fox 7
1-9-08          LH

Memo To:  Mr. David Hugg, Town Manager

Date:  August 3, 2005

From:  Jim Fox, Manager of Building & Inspections ⌐JF

Re:  Planner Position

With the increasing work load that I am experiencing due to the lack of supporting staff, I would like to discuss the filling of the vacant Planner position.  This position was filled earlier this year, and the budget accounts for the expenditure of this position, so this should not come as a burden to the town if it were filled.

With all of the current projects which I am responsible for, including the new P T Morgan project, only two (2) projects are inactive, that being the Police Station, and the Public Works/Electric Complex.  All of the other Capital Projects are moving forward as planned.  Besides my duties as the Capital Projects Coordinator, I have the added responsibilities of the Planning Director, and the vacant Planner position.  Aside from being responsible for the updating of the maps, and the zoning of properties, I am asked to handle all three (3) jobs.  This does not account for anything that Mayor and Council asks me to do, or other projects which you request me to handle.

With the properties from the north being annexed, and the lands already in town starting their preliminary engineering, not to mention the utility engineering that I will be responsible for in New Castle County, it will be impossible for me to handle all of the responsibilities unless I have help with all of the subdivisions and other duties which the Building & Inspection Department requires.

I would like to discuss this with you as soon as possible so it can go before the Personnel Committee if you agree.

A-91

CONFIDENTIAL

TO:         JIM FOX

FROM:       DAVID HUGG

DATE:       AUGUST 19, 2005

SUBJ:       YOUR MEMO REGARDING STAFFING

While I appreciate your request and the number of tasks you are now responsible for, I am not convinced that filling the Planner position is the appropriate action we need to take. It may be that your section would benefit from a plan reviewer or another code officer (an area that still seems to be lagging). A planner and a plan reviewer are two different skill sets and the latter might meet our needs better, given a reviewer's more likely technical training. I plan to discuss the possible change in classification with the Personnel Committee.

You mention the lack of support but I'm not convinced that Aimee is all that busy that she can not pick up more work. I've rarely observed her working very hard and in fact have been told that she works on Council minutes during the day at times – she is not to do so, she is paid separately for attending the meetings and doing minutes. On that subject, the minutes leave a lot to be desired – Council rejected them last Monday.

For clarification, you are not asked to be the planning director and I don't know why you are updating maps (zoning?) or handling zoning issues – maybe you can clarify what you mean.

I trust that Diane, Ron and John are performing their duties as required.



EXHIBIT

Fox  8
1-9-08   LH

A-92

# **Memo**



Memo To:  Mr. Hugg

    Date:  August 19, 2005

    From:  Jim Fox  *JF*

      Re:  Memo Regarding Staffing

I agree that the Planner position may not be the correct place to fill, but since it was already a created position I felt we could fill it.  It would make more sense to have a Plan Reviewer instead, which I believe we did talk about that some time ago but at that time we really needed another Building Inspector.

All I am looking for is someone that has knowledge of construction and development, so we could work together in order to maintain a good level of service to the developers and citizens. Diane has been great to work with.  She is doing a great job with plan reviews as well as inspections. I am very pleased with how she asks questions and how fast she picks things up.  Everyone that I have spoken to has nothing but good things to say about her and her knowledge of construction has been a valuable asset to the town.  I think she would make a great Plan Reviewer and someone that I feel could handle the day to day dealing with developers and engineers.

As far as the town needing another Code Enforcement Officer, we have three (3) now in our inspectors.  As part of their job duties they are also required to do code enforcement.  With Diane doing so many permits (which we are going to exceed last year) she has only been able to act as a backup to Ron.  Ron on the other hand has been doing all of the inspections which takes up most of his time and therefore leaves very little, if any time to do code enforcement.  John is out there every day and doing a good job so far.  He is still learning and I have much to teach him, but he will do fine.

A-93

Mr. Hugg
August 19, 2005
Page 2


If we added the Plan Reviewer and then hired another inspector, I believe we could cover the issues you are concerned about. I have been thinking of a way to break up the code enforcement issue by assigning districts to each inspector. Using the election district map as a guide, I could have each inspector cover an assigned district. Each Inspector would be responsible for their own area, as well as doing their assigned inspections.

John is studying for his certification as a Building Inspector now and I hope to have him certified in the next couple of months. I have received the study guides as well as the 2003 code text for all of the inspectors so they can get certified. The only problem is that their employment requires them to be certified within 18 months of hire. I would like to give them all three months from now so the town can have all of its inspectors certified by the first of the year. The town has only had one certified inspector in the last five years, and that is me. This is something that we desperately need.

I have also assigned more duties to Aimee so she can be more productive in this department. I have been working with her on the coding of invoices for payment, and also researching information for engineers and architects. She has also been doing the Public Works and Electrical Agreements as well as maintaining all of the subdivision binders as documents come in. She updates all of the files on the active projects that we have and sends correspondence to each developer and engineer letting them know what we need to approve their project. She continues to keep all of our Capital Projects in order while doing the extra duties I have given her. She wants to learn more and as time goes by I will give her more responsibilities.

As far as the minutes go, I know for a fact that she works on them at home because she takes my laptop to do them. We do review the minutes before they go to you and maybe that is what they have seen. I go over them, e-mail them to her, and she reviews my changes before they are e-mailed to you. I have made it clear to her that they can not be done here.

A-94

Mr. Hugg
August 19, 2005
Page 3

I will also speak to her about the minutes and their lack of
substance. It's hard to satisfy everyone's concerns about what
should be in the minutes and what should be left out. I will
speak to her about them and we will try harder to address the
issue.

To answer your final statement, I have never done any mapping or
handled any zoning issues unless it has to do with permitting.
I have always referred everyone with zoning questions to Janet
when they need to know any information concerning a parcel of
land. When I review permits and someone has a setback issue
which could result in a variance request, I always forward the
permit to Janet so she could contact them to see how they want
to proceed. I hope this will answer your concern.

So far I feel that everyone is doing a good job. I do have a
couple of concerns about Ron and Valerie. Ron seems to be very
timid when dealing with the supers in the field. Mainly, when
it comes to getting them to clean up their sites and making them
understand that he has the final word when dealing with our
ordinances and code issues. He does complete the task, but I
think he is uncomfortable doing it. I have spoken to him about
this and he has been coming in more asking me for guidance and
so far I have not had any complaints about how he does his job.
That bothers me a little because he can't be making everyone
happy. In his defense, he must handle people very well because
I have not heard anyone complain about him even before I was
asked to come up here. I will just keep an eye out and work
with him on those issues.

Valerie, I think, has a problem with the situation of how I
handle things. She second guesses me sometimes instead of just
following directions. I haven't said anything to her about it
but I'm sure the time will come. I know she made the statement
that she doesn't have to listen to me because I am not her boss,
and I guess she is technically correct, but while I am here I
feel she should do it my way until someone else is in charge. I
do however ask everyone for comments because I am not perfect.
I'm sure we will work through this.

A-95

Mr. Hugg
August 19, 2005
Page 4


Overall I think we have a good department and we are improving
every day.  I have enjoyed working up here and I believe that
this department is doing an outstanding job for the town.

A-96

# Memo

EXHIBIT

Fox    10
1-9-08   LH

Memo To:  Mr. David Hugg, Town Manager

Date:  November 8, 2005

From:  Jim Fox, Manager of Building & Inspections

Re:  Resignation as Manager of Building & Inspections

According to you, and then Councilman Temple Carter, it was requested that I be placed in my current position as Manager of Building & Inspections temporarily to try and get the Building Department back on track.  I believe that I have accomplished that request.  I hired a new Building Inspector who is doing very well, trained a new Code Enforcement Officer, and completed various other loose ends with the departure of Mr. Steve Lee when he resigned this past spring.  All of the current files are up to date and I know of no issues that are outstanding.

Today, November 7, 2005, I was subjected to the unacceptable actions of the Administrative Clerk, Valerie Heritage, when she proceeded to yell at me when I had not brought forward a building permit for the demolition of a house in the Simons Corner Shopping Center. I tried to explain to her the reason for me withholding the permit, but she was very angry because it did not have a date stamp on it when it came in last Thursday.  I also tried to tell her about the house being vandalized making it impossible for pictures to be taken documenting the house for our records since I overheard Janet Vinc make the comment about the pictures that I sent her last Friday as being unacceptable. I cannot be responsible for someone vandalizing property in town.  Janet has known for many months that all of the dwellings on that property were being demolished, yet she waits until the last minute and something like this happens. If you recall, I told you what happened and that I sent the pictures that the Project Manager had sent to me to Janet so she could sign off on the permit. Valerie told me that as early as last week the Project Manager had told her that he was going to move into the

A-97
10

house.    That seems strange to me since Ken and I have been in
contact about this house for months, and Dave Canterra told me
that they were glad they removed the tenant from it so they
could get rid of it.    I'm really not sure where that story came
from since it was never mentioned to me until today.

I tried to calm Valerie down by explaining that the reason I
held onto the permit was because she was not here and I knew how
particular she was and I wanted it to be right.    She did not
except my explanation and began yelling at me again.    At that
point she told me that I was no better than Mr. Lee when he held
this position previously.    At that point I asked her to leave my
office and to calm down.    The more I sat there, the more upset I
became because I am in no way like Steve Lee and I felt that the
gentlemanly thing for me to do was to leave.    I immediately went
downstairs to look for you but you were not in.    I then went to
Melony Torres and told her that I was going home, and if you
wanted to talk to me you could each me there.

Nevertheless, I feel that I have always tried to do a good job
while I was in that position even though there were constant
discussions about me and the way I did things.    I thought that
when you were in a supervisory position you could make changes
when you thought they would be in the best interest of the town.
Valerie always second guessed me and never liked the fact that I
was her supervisor. She had made a remark a while back that she
did not have to listen to me since I was not her boss, and she
is right.   My position there is only a temporary one.

With that being said, I will be resigning as the Manager of
Building & Inspections and going back downstairs where I can
fulfill by duties as the Capital Project Coordinator. This is
the position I am being paid to do, and I will not be
responsible for any further duties of the Building Department.

I also want to let you know that the Planning Commission agenda
was not posted by Janet Vinc on Tuesday before she left on her
trip. None of the properties for the re-zonings, nor the
properties coming before the Commission for variances had been
posted either. I only discovered this when I asked for a copy of
the agenda from Kim Cronin so I could make sure she had every
thing for the packets since they go out early this week.    Kim
did say that the postings did go in the paper and that the
abutting property owners were notified.   I suggested to Kim that
she do the placards and have someone post the properties anyway.
I did ask her to check with Carol to make sure the properties
needed posting before she went to all of the trouble.    Carol

A-98

verified what I had told her so she made up the placards and the properties were posted.  I was not trying to stick my nose where it didn't belong. I was just trying to help Janet.

I used to work in a department where we all watched out for each other, but that is not the way things are now.  Everyone believes that someone is out to get them for one reason or another.  I cannot work in an atmosphere where distrust is so rampant.  If it were up to me, Valerie would be let go for her unprofessional behavior towards a fellow employee.  I found her attitude towards me today to be disgraceful and very upsetting. My resignation becomes effective immediately and I will be removing my things from my office and relocating back downstairs.  I have no appointments at this time except a preconstruction meeting Wednesday which I will not be attending since there are no electrical easements needed for the Capital Projects.

Thank you very much for the opportunity you gave me to work in the Building Department.

A-99

Samuel J. Fox III
9 White Rabbit Dr.
Smyrna, DE 19977

January 4, 2006

Mr. David S. Hugg
Town Manager, Town of Smyrna
27 S. market St. Plaza
Smyrna, DE 19977

Re: Notice to Terminate Employment

Dear Mr. Hugg:

Please accept this letter as my notice to terminate my employment with the Town of Smyrna. I have spent the last five and one half years working for the town and it's citizens, and I have enjoyed my time here immensely.

My decision to leave the town has been one of the most difficult decisions I have ever had to make, but I feel that it is time for me to pursue other opportunities. During my tenure with the town, I have gotten to know a great many people, and I will miss them a lot. I hope that I have served the citizens well and wish nothing but the best for the town in the upcoming year.

I have scheduled my departure from the town for Thursday, January 12, 2006. I will be in my office until then finishing up on projects and getting as many projects recorded as I can so the next person will not have to figure out where those projects stand. I will put a status report in each remaining file and have them up to date by the time I leave. Aimee knows where every thing is so she will be able to help with the completion of the projects still not recorded. I would like to use the remainder of my comp time on Friday the 13th, Monday, Tuesday, and Wednesday of next week to correspond with the payroll schedule.

Sincerely,

Samuel J. Fox III

**EXHIBIT**

Fox 14
1-9-08

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMUEL JAMES FOX, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-488-GMS |
| | ) | |
| TOWN OF SMYRNA, DAVID S. | ) | |
| HUGG, III, individually and | ) | |
| in his official capacity as | ) | |
| Town Manager of the Town of | ) | |
| Smyrna and VALERIE HERITAGE, | ) | |
| individually and in her | ) | |
| official capacity as | ) | |
| Administrative Clerk of the | ) | |
| Town of Smyrna, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF JANET VINC

BE IT REMEMBERED on this _28_ day of May, 2008, Janet Vinc, did appear before me, a Notary Public, and did depose and say the following:

1.    I have been an employee of the Town of Smyrna since 2003.

2.    My current position is Manager of Planning and Zoning. I was promoted to this position in February, 2005.  My yearly salary as the Planning and Zoning Manager in 2005 was approximately $37,800.

3.    I graduated from the University of Delaware in 1998 with a B.A. in History.  I have been enrolled in a graduate

1

A-101

program at the University of Delaware since 2001.  My areas of concentration in this course of study are Historic Preservation and Planning.  I expect to receive a Master's Degree in Urban Affairs and Public Policy in 2008.

_____
Janet Vinc

**SWORN TO AND SUBSCRIBED BEFORE ME**, a Notary Public, on the day and year aforesaid.

_____
Notary Public

BRUCE C. HERRON
Attorney At Law
Notary Public, State of Delaware
My Commission Has No Expiration Date
29 Del.C. §4323(a)(3)

H:\tmw5\data\files\Docs\3651.056\AFF\11186.wpd

2

A-102