IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMUEL JAMES FOX, III, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | C.A. No. 07-488-GMS |
| | * | |
| TOWN OF SMYRNA, DAVID S. | * | |
| HUGG, III, individually and in his official | * | |
| capacity as Town Manager of the Town | * | |
| of Smyrna, and VALERIA HERITAGE, | * | |
| individually and in her official capacity | * | |
| as Administrative Clerk of the Town of | * | |
| Smyrna, | * | |
| | * | |
| Defendants. | * | |

## <u>PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

SCHMITTINGER & RODRIGUEZ, P.A.
William D. Fletcher, Jr.
Bar I.D. #362
Noel E. Primos
Bar I.D. #3124
B. Brian Brittingham
Bar I.D. #4966
414 S. State Street
P.O. Box 497
Dover, DE 19901
(302) 674-0140
Attorneys for Plaintiff

DATED:  6/30/08

## TABLE OF CONTENTS

PAGE

TABLE OF CITATIONS………………………………………………………….    ii

NATURE OF THE PROCEEDINGS………………………………………….    1

SUMMARY OF ARGUMENT………………………………………………....    2

STATEMENT OF FACTS…………………………………………………….....    3

ARGUMENT………………………………………………………………….    6

I.    SUMMARY JUDGMENT STANDARD OF REVIEW………...    12

II.    PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT
DECISION AS A RESULT OF HIS AGE AND/OR SEX……...    13

III.    PLAINTIFF'S CLAIMS PURSUANT TO 42 U.S.C. §2000(e)
AND 29 U.S.C. §626 ARE SUPPORTED BY EVIDENCE
OF RECORD SHOWING DISCRIMINATION BASED ON
AGE AND SEX………………………………………………….    16

IV.    HERITAGE'S STATEMENTS WERE DEFAMATORY
AND SHE IS NOT ENTITLED TO JUDGMENT AS A
MATTER OF LAW…………………………………………….....    18

V.    PLAINTIFF HAS SUFFERED SPECIAL DAMAGES AS
A RESULT OF HERITAGE'S STATEMENTS………………....    20

VI.    DEFENDANT BREACHED THE COVENANT OF GOOD FAITH
AND FAIR DEALING IMPLIED UNDER DELAWARE LAW...    21

VII.    DEFENDANTS DID NOT MOVE FOR SUMMARY
JUDGMENT AS TO PLAINTIFF'S CLAIMS PURSUANT TO
42 U.S.C. §1983 UNDER COUNT II OF THE COMPLAINT…..    24

CONCLUSION………………………………………………………………...    27

ATTACHMENT A - Engquist v. Oregon Dept. of Agriculture, 2008 U.S. LEXIS 4705

ATTACHMENT B - Drainer v. O'Donnell, 1995 Del. Super. LEXIS 229

# TABLE OF AUTHORITIES

CASES

Bickling v. Kent General Hospital, Inc.
     872 F.Supp. 1299 (D.Del. 1994)……………………………………………… 18

Bishop v. Wood,
     426 U.S. 341 (1976). ………………………………………………………… 12

Byrd v. May Dep't. Stores Co.,
     457 F.Supp.2d 516 (D.Del. 2006)…………………….………………………... 13

Celotex Corp. v. Catrett,
     477 U.S. 317 (1986)…………………………………………………………… 12

Cifarelli v. Village of Babylon,
     93 F.3d 47 (2d Cir. 1996)……………………………………………………… 12

Drainer v. O'Donnell,
     1995 Del. Super. LEXIS 229…………………………………………………… 20

DuPont v. Pressman,
     679 A.2d 436 (Del. 1996)……………………………………………………… 23

Engquist v. Oregon Dept. of Agriculture,
     2008 U.S. LEXIS 4705………………………………………………………… 18

Kidd v. MBNA Am. Bank, N.A.,
     224 F.Supp.2d 807 (D.Del. 2002)…………………………………………… 14

McDonnell Douglas Corp. v. Green,
     411 U.S. 792 (1973)…………………………………………………………... 13

Spence v. Funk,
     396 A.2d 967 (D.Del. 1978)…………………………………………………… 20

United States v. Diebold,
     369 U.S. 654 (1962)…………………………………………………………... 1

## STATUTES

Fed.R.Civ.P. 56(c)………………………………………………………………. 12

29 U.S.C. § 626…………………………………………………………………. 1

42 U.S.C. § 1983………………………………………………………………... 1, 24

42 U.S.C. § 2000(e)……………………………………………………………... 1

## NATURE OF THE PROCEEDINGS

Plaintiff, Samuel J. Fox, III, filed a Complaint in the United States District Court for the District of Delaware on August 7, 2007, alleging that Defendants, the Town of Smyrna ("Town"), Town Manager David S. Hugg, III ("Hugg"), and Town Administrative Clerk Valeria Heritage ("Heritage") discriminated against Plaintiff while he was employed by the Town. (Complaint B-1)[1]. Plaintiff alleged discrimination in violation of 42 U.S.C. §§ 1983, 2000(e) and 29 U.S.C. § 626, in addition to State law claims for defamation and breach of the implied covenant of good faith and fair dealing. On August 30, 2007, Defendants filed an Answer to Plaintiff's Complaint. (Answer B-157).

Pursuant to the Court's Scheduling Order, discovery was conducted and is now complete.  Defendants moved for summary judgment on May 30, 2008.  Plaintiff respectfully submits his Answering Brief in Opposition to Defendants' Motion for Summary Judgment.

---

[1] References to the Appendix to Plaintiff's Answering Brief in Opposition to Defendants' Motion for Summary Judgment are presented as "B- ."

## SUMMARY OF ARGUMENT

I.    SUMMARY JUDGMENT STANDARD OF REVIEW

II.   PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT DECISION
      AS A RESULT OF HIS AGE AND/OR SEX

III.  PLAINTIFF'S CLAIMS PURSUANT TO 42 U.S.C. §2000(e) AND 29
      U.S.C. §626 ARE SUPPORTED BY EVIDENCE OF RECORD
      SHOWING DISCRIMINATION BASED ON AGE AND SEX

IV.   HERITAGE'S STATEMENTS WERE DEFAMATORY AND SHE IS
      NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW

V.    PLAINTIFF HAS SUFFERED SPECIAL DAMAGES AS A RESULT
      OF HERITAGE'S STATEMENTS

VI.   DEFENDANT BREACHED THE COVENANT OF GOOD FAITH AND
      FAIR DEALING IMPLIED UNDER DELAWARE LAW

VII.  DEFENDANTS DID NOT MOVE FOR SUMMARY
      JUDGMENT AS TO PLAINTIFF'S CLAIMS PURSUANT TO 42 U.S.C.
      §1983 UNDER COUNT II OF THE COMPLAINT

## STATEMENT OF FACTS

Plaintiff, Samuel James (Jim) Fox, III ("Fox"), was employed by the Town of Smyrna beginning in July, 2000. (Complaint B-1). Fox held several positions prior to holding the position of Manger of Buildings and Inspections. (Fox. Dep. B14-20). In addition, Town employee Janet Vinc ("Vinc"), a graduate student at the time of appointment, was named Manager of Planning and Zoning by Town Manager David Hugg ("Hugg"). (Fox. Dep. B-19). To date, Vinc has still yet to complete her graduate studies. (Affidavit of Vinc B-69). At all times relevant, Hugg was the final decision maker as to hiring, firing and disciplinary actions for Town employees. (Hugg. Dep. B-72). Prior to her employment with Town, Vinc was a student of Hugg's at the University of Delaware. (Hugg Dep. B-73). When hired by Hugg, Vinc had very little, if any, practical employment experience. (Hugg Dep. B-73-74, 77-78). At all times relevant, Vinc was the only fulltime Town employee in a permanent position who was a former student of Hugg's. (Hugg Dep. B-75-77). Due to her lack of experience, subsequent placement in a position of authority and her personal relationship with Hugg, Fox was concerned with the hiring and promotion of Vinc as it related to merit and fairness. (Hugg Dep. B-79-80).

During Fox's employment, there was an incident that arose between former Town employee Jeri Dunn ("Dunn") and Vinc. (Hugg Dep. B-81-82). Allegedly, Dunn made inappropriate comments about Vinc, including questioning her capabilities to perform her requisite tasks. Id. At Hugg's request, Fox attended a meeting to address this issue on March 11, 2005. (Fox Dep. B-21). The existing minutes of this meeting are not complete, true or accurate. (Fox Dep. B-22-23). At this meeting, Fox expressed his

3

disappointment that Vinc had not meritoriously earned her position. (Fox Dep. B-24). Also at this meeting vague allegations were made against Fox, alleging he made inappropriate comments about Vinc. (Fox Dep. B-25-27). In response, Fox asked that anyone with information of the sort to come forward, to which no one did. Id.

On March 10, 2005, a conversation took place in the office of Town employee Gary Stulir ("Stulir") between Fox, Stulir and Town employee James Markow ("Markow"). (Affidavit of Gary Stulir B-107). This conversation took place after the Town's normal working hours of 8:00 A.M – 4:30 P.M. and was not considered part of the workday or work duties (Stulir Dep. B-109; Markow Dep. B-134-135). During this discussion, Fox expressed his concern with the possible effect Vinc's work performance might have on him. In fact, Fox's main concern was that Vinc had quickly advanced from a relatively minor position (downtown coordinator) directly to a management position (Manager of Planning and Zoning). (Fox Dep. B-28-29). Fox's concern was limited to Vinc's work performance and in no manner made any derogatory remarks about Vinc. (Fox Dep. B-30-32). When Fox stated that he knew how Vinc had obtained her job, it was solely in reference to her prior relationship with Hugg as a student of his. Id. In response to the conversation, Stulir told Hugg about what had transpired when he saw him later that evening at the University of Delaware. (Stulir Dep. B-110). Markow never approached Hugg directly about this incident. (Markow Dep. B-128-130). Hugg has contradictorily testified that both Stulir and Markow "corned me as I was leaving the building that Thursday night and indicated that they were very upset by an incident that had just recently occurred." (Hugg Dep. B-83, 84-86). Hugg further testified that they "came to my office." The record does not support Hugg's contentions in this regard. A

meeting to address this matter was held the next day, March 11, 2005. (Hugg Dep. B-85-86; Stulir Dep. B-111-113). At the meeting concerning Vinc, Hugg directed the Town Personnel Chairman and several other witnesses to be present, in addition to recordation of the meeting. (Fox Dep. B-37-41, 63-66). Fox was questioned at the meeting as to any implication he may have been attempting to make with his statements to Stulir and Markow. (Stulir Dep. B-111-113). Fox denied making any derogatory comments about Vinc, a claim that was not disputed despite Stulir's presence. (Hugg Dep. B-87-88; McKinney Dep. B-146-147). Fox explained at the meeting that his comments were born by concern regarding Vinc's lack of work experience, her on the job performance and the possible effect this would have on his own position and economic wellbeing that was the catalyst for his concerns. (Fox Dep. B-25-27). In reference to any statement as to how Vinc got her job, Fox explained he was merely referring to Vinc's personal relationship with Hugg and her status as a former student of his. (Fox Dep. B-30-32). At the close of this meeting, Hugg apologized to Fox for any misunderstanding and Fox believed the matter to be closed. (Fox Dep. B-33-35). Fox was never disciplined for this alleged incident. Id. Hugg too was satisfied that the matter had been resolved and that no further action need be taken. (Hugg Dep. B-88-89). Stulir, who was present at the meeting, also believed the matter to be concluded. (Stulir Dep. B-111-113).

On March 22, 2005, approximately twelve days after the above meeting took place, Hugg directed Stulir and Markow to prepare affidavits to memorialize the alleged conversation with Fox. (Stulir Dep. B-114-115; Markow Dep. B-128-130; McKinney Dep. B-148; Stulir Affidavit B-107; Markow Affidavit B-156). Both Stulir and Markow testified that Vinc did not request of them nor were they aware in any manner of her

involvement in requesting said affidavits. (Stulir Dep. B-116-117, 125-126; Markow Dep. B-136-137). Hugg contradictorily testified that Vinc directly requested Stulir and Markow to prepare their respective affidavits. (Hugg Dep. B-89-90). The record does not support Hugg's contentions in this regard. Hugg informed neither Stulir nor Markow as to the purpose, need or intentions of obtaining these statements under oath. (Stulir Dep. B-114-115; Markow Dep. B-131-132). Both men believed the documentation to be in accordance with Town policy and that it was to be placed in Fox's personnel file as part of an investigation of the incident. (Stulir Dep. B-114-115, 122-124; Markow Dep. B-136, 140-143; Excerpts of Town Policy Manual B-167-169). However, contrary to Town policy, Hugg did not submit the prepared affidavits to Human Resources. (Stulir Dep. B-114-115, 122-124; Excerpts of Town Policy Manual B-167-169). Under Town policy, allegations of sexual harassment require investigation into the statement and the parties to the matter are required to be notified of the existence of any materials collected in furtherance thereof. (Fox Dep. B-58-59; Excerpts of Town Policy Manual B-167-169). Hugg never brought the affidavits to Fox's attention and, rather then place them with the appropriate department, Human Resources, Hugg kept the affidavits in his desk. (Hugg Dep. B-91-93; McKinney Dep. B-149). The only person known to possess these affidavits was Hugg. (Hugg Dep. B-97; McKinney Dep. B-150). His desk is kept under lock and key. (Hugg Dep. B-97-98). The record, and indeed Hugg's own testimony, does not support Hugg's contradictory statement that he put the affidavits in Fox's personnel file. (Hugg Dep. B-97). Hugg never disclosed that he personally held onto the affidavits in his desk, or that they may have been lost. (McKinney Dep. B-155; Markow Dep. B-144).

Shortly after Fox resigned from the Town, Hugg in direct response to an inquiry by a Town council member used the affidavits in a threatening manner against Fox's personal and business interests. (Hugg Dep. B-94-96 ; Hugg 1/30/06 email B-170). In doing so, Hugg used the terms "sexist and derogatory" in reference to Fox. Id. After Fox's employment with Town ended, and during his campaign for city office, Markow's affidavit appeared on an internet website that dealt with Smyrna politics. (Markow Dep. B-138-140; McKinney Dep. B-151; Stulir Dep. B-117-118). In addition, other personnel documents of Fox's from his employment with Town have disappeared from his personnel file and appeared on the same website. (McKinney Dep. B-153-154; Stulir B-118-119; Hugg Dep. B-98-100). This was not the type of information that was obtainable by a fellow employee or the public about a Town employee. (Hugg Dep. B-101). Hugg did not take any meaningful action to investigate the improper disclosure and publishing of these sensitive personnel documents. (McKinney Dep. B-151-152; Stulir Dep. B-120-122).

On two separate occasions, Fox brought concerns to Hugg regarding fellow Town employee Valerie Heritage ("Heritage"). The first concerned Heritage making defamatory statements to Fox's wife, Cathy Fox ("C. Fox"). (Fox Dep. B-37-41). On May 24, 2005, C. Fox called Town Hall and spoke to Fox's then secretary, Heritage. (Heritage Dep. B-174). Heritage and C. Fox did not have a preexisting social relationship and did not speak as close friends would. (Heritage Dep. B-172-174; C. Fox Dep. B-185). On occasion when C. Fox would call into Town Hall, Heritage would merely pass on her call to Fox. Id. C. Fox telephoned that day to see if the flower arraignments she had sent in for the Town employees had been received well. (C. Fox

Dep. B-185-186). At this time, C. Fox had yet to been formally introduced to Fox's new direct assistant, Amiee Masten ("Masten"). (C. Fox Dep. B-185-186; Heritage Dep. B-175). During this phone call, C. Fox asked Heritage how things were working out in the office with Fox's new direct assistant, Masten. (C. Fox. Dep. B-192-193, 196). Heritage volunteered that she felt the behavior between Fox and Masten was "inappropriate." (C. Fox Dep. B-186-188, 194-196). She specifically referenced Masten being in Fox's office a lot, sometimes with the door closed, and that she felt there was more socializing between the two then productivity. Id. C. Fox called back later that day to obtain birthdates of office personnel so that she could send baked goods in with Fox for his coworkers. (C. Fox Dep. B-188). Based upon Heritage's earlier comments, C. Fox felt compelled to call Heritage at her residence later that evening, at which time C. Fox shared personal life experiences. (C. Fox Dep. B-195). Despite her testimony that she had no knowledge of any inappropriate relationship or conduct between Fox and Masten, Heritage insinuated to C. Fox that something indecent was going on between the two. (Heritage Dep. B-176; C. Fox Dep. B-189-190).

Fox was made aware of Heritage's comments to his wife and requested that Hugg investigate the matter. (Fox Dep. B-37-41). Given the grave and similar nature to alleged defamatory comments made about fellow Town employee Vinc, Fox requested a similar type meeting/hearing, including but not limited to, attendance by the Town Personnel Chairman, witness and recordation of the meeting. Hugg refused this request and instead an informal meeting was held that solely consisted of the parties involved (Heritage, Fox, Masten) and Hugg as mediator. (Fox Dep. B-63-66). At this hearing, Heritage admitted that she had no basis for making the allegations to C. Fox that Fox and

Masten were having an affair. (Fox Dep. B-43-44). In response to this, Fox and Masten requested that Heritage be terminated for her slanderous and unbecoming behavior. Hugg took no discipline against Heritage outside of a "counsel". (Heritage Dep. B-177-178). This incident has severely affected Fox's marriage, damaged him professionally and personally and led to mental health issues. (Fox Dep. B-40-41, 61-62).

The second incident regarding Heritage and Fox occurred on November 8, 2005. Fox Dep. B-45-47). On this day, Heritage verbally assaulted Fox in an unprofessional and outrageous manner. (Heritage Dep. B-179-181; Fox Dep. B-45-47). Following the verbal confrontation, Fox sent Hugg a memo regarding the incident. (Fox 11/8/05 Memo B-164). Despite his "resignation" from Manager of Building & Inspections as stated in this memo, Fox continued to fulfill all duties associated with that post. (Fox Dep. B-55). Hugg did not address the matter until three day after Heritage verbally assaulted Fox and it was Fox that had to initiate contact with Hugg. (Fox Dep. B-67-68). Hugg was fully aware of the unprofessional, harassing behavior exhibited by Heritage and directed toward Fox. (Fox Dep. B-56-57; Hugg Dep. B-105-106). Hugg did not discipline Heritage for this incident. (Heritage Dep. B-182; Fox Dep. B-56-57, 67-68).

While employed with Town, Fox was considered a viable candidate for the Assistant Town Manager position and the Town Council supported his appointment as such. (Hugg Dep. B-102-103; Fox Dep. B-36). Word of Fox being considered for the Asst. Town Manger position reached Vinc, who affirmatively stated to Hugg that she would no longer work for the Town if Fox in fact was promoted. (Hugg Dep. B-104; Fox Dep. B-42, 60). As the final decision maker as to hiring, Hugg made the decision not to promote Fox to Asst. Town Manager. (Hugg Dep. B-72).

During the course of his employment, Fox filled several positions and handled multiple job duties. (Fox Dep. B-48-54). Due to his heavy workload, Fox requested that Hugg fill a planner position to help ease his burden. Id. In fact, money had already been budgeted to fill such position by the Town Council, but Hugg did nothing to address Fox's concern. Id. Prompted by the Town's Mayor and Council Hugg indicated in December of 2005, approximately three weeks prior to Fox's termination of his employment with Town, that he would in fact hire the help Fox previously requested. (Fox Dep. B-198-199). At this time, Hugg was directed by Town Council to inform Fox of the impending hiring. Id. Hugg never informed Fox. Id. Despite Defendants' assertions, Fox never made salary an issue in regard to his employment with Town. (Fox Dep. B-205).

Fox resigned his employment with the Town on January 18, 2006, due to an untenable and harassing work environment cultivated by the Town. (Complaint B-1). Complaints by Fox to Hugg, including the issues with Heritage, were handled in a much different manner than for fellow employee Vinc. (Fox Dep. B-63-66). In addition, Fox felt the office environment was negatively skewed toward him because Vinc wanted to be Asst. Town Manager.

Hugg was aware of her desire and Vinc had made it abundantly clear that she would not work under Fox if he was promoted to the same position. (Fox Dep. B-42; Hugg Dep. B-104). Prior to his resignation, Fox requested a meeting with Hugg and the Town Personnel Committee to discuss the unbearable work environment created by the above and the lack of meaningful resolution to concerns he brought forth. (Fox Dep. B-20-21). Hugg did not grant Fox's request to hold this meeting. Id. The untenable work

environment cultivated by Hugg and Town was a direct result of Fox being subject to accusations of infidelity with a coworker, verbal assault by a coworker, threat of coworker quitting if Fox was promoted, preferential treatment given to a younger, female and former student of Hugg's, lack of support from Hugg in regard to Fox's burdensome workload and the lack of remediation by Hugg despite Fox's repeated requests. (Fox Dep. B-201-204, 60). Upon termination of his employment, Fox conducted an exit interview in which he attributed his resignation to the inaction of Hugg and Town to his harassment by Heritage and the lack of support from Hugg in regard to filling the requested planning position. (Fox Dep. B-201-202). When questioned why he never informed Fox that the position was to be filled at the request of the Town Council, Hugg did not provide a reason and refused to answer. Id. Fox submitted a letter of resignation on January 4, 2006. (Fox Ltr. 1/4/06 B-165). This letter does not encompass the entirety of Fox's issues and concerns with his employment with Town. (Fox Dep. B-206-207). Fox fully expressed the above at his exit interview, a meeting that Hugg took the minutes for but did not provide to Fox upon request. Id. Rather, the letter was merely an attempt by Fox to politely terminate his employment formally and sought not to engender any further bad will. (Fox Dep. B-200).

## **ARGUMENT**

I.      SUMMARY JUDGMENT STANDARD OF REVIEW.

A court may enter summary judgment only if there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). In making this determination, the court is to view all facts in the light most favorable to the non-moving party. United States v. Diebold, 369 U.S. 654, 655 (1962). For purposes of the motion, the non-moving party's version of the facts must be accepted, and all disputed matters must be resolved in his or her favor. Bishop v. Wood, 426 U.S. 341 (1976).

The party moving for summary judgment has the burden of identifying evidence demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-moving party's version of the facts must be accepted, and all disputed facts resolved in his or her favor. Bishop v. Wood, 426 U.S. 341 (1976). In determining whether summary judgment is appropriate, the court resolves all ambiguities and draws all reasonable inferences against the moving party. Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

Plaintiff has raised several genuine issues of material fact that remain unresolved at this stage of the case. Plaintiff will address Defendant's arguments in the order they were presented in Defendant's Brief.

II.    PLAINTIFF SUFFERED AN ADVERSE EMPLOYMENT
DECISION AS A RESULT OF HIS AGE AND/OR SEX

Age and sex discrimination claims are both analyzed under the "McDonnell Douglas" standard, which refers to <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under this standard, the Plaintiff bears the initial burden of showing a *prima facie* case of discrimination. <u>Id</u>. at 802. The burden then shifts to the Defendant/Employer to articulate a legitimate, non-discriminatory reason for the adverse employment action taken against the Plaintiff. <u>Id</u>. The Plaintiff must then show that the Defendant/Employer's stated reason for the adverse employment action was pre-textual. <u>Id</u>. at 804.

The elements of a *prima facie* case under the McDonnell Douglas standard is as follows: In order to state a *prima facie* case of sex or age discrimination, a plaintiff must show (1) that he or she is a member of a protected class; (2) that he or she suffered some form of adverse employment action; and (3) that this action occurred under circumstances giving rise to an inference of unlawful discrimination, such as might occur when a similarly-situated person not in a protected class is treated more favorably. <u>Byrd v. May Dep't. Stores Co.</u>, 457 F.Supp.2d 516, 520 (D.Del. 2006).

Defendant is claiming that the Plaintiff, Fox, is unable to establish his *prima facie* case because he cannot show that he suffered an adverse employment action. However, Fox did suffer an adverse employment action in several instances. During his employment with Town, Fox aspired to the Assistant Town Manager position. While Defendant will argue that no one was ever placed in this position during Fox's employment, the facts construed in a light most favorable to Plaintiff exhibit an apparent

13

and consistent desire by Town actors, including the Town Council and Mayor, to fill this position. Plaintiff Fox was the preferred choice to fill this position. Only after Plaintiff's coworker Vinc expressed her disgust with Plaintiff obtaining this position and her unwillingness to work under Plaintiff if promoted, did Hugg make the ultimate decision that the position was to remain unfilled. Moreover, it is an argument of convenience for Hugg to say now that the Town never needed an Assistant Town Manager. The denial of a promotion certainly qualifies as an adverse employment action. Kidd v. MBNA Am. Bank, N.A., 224 F.Supp.2d 807 (D.Del. 2002), aff'd, 2004 U.S.App. LEXIS 5694 (3d Cir.). Further, Hugg sent an email to Town Council member Pressley indicating that Fox was unfit for the position because of alleged inappropriate statements and/or alleged sexual harassment. This is contrary to Hugg's own representation to Fox and others that the matter regarding Fox's alleged comments as to Vinc was settled and that it was a mere misunderstanding.

Hugg also sent correspondence to Council members discouraging them from filling the Assistant Town Manager position in general. This could be construed as an adverse employment decision against Fox, particularly as Hugg believed that some Council members favored putting Fox into the position, and given Hugg's own personal interest not to dilute his authority within the Town by filling the Assistant Town Manager position. When viewed in a light most favorable to Plaintiff, Hugg's act certainly can be characterized as an action on Hugg's part to prevent Fox from being considered for the Assistant Town Manager position.

Plaintiff also suffered an adverse employment action when his requests for additional support staff, in the form of a planner position, went unheeded. While

employed by Town, Plaintiff performed a multitude of tasks that led to a heavier workload then just that of the Manager of Buildings & Inspections.    Along with Plaintiff's request for additional help, Town Council budgeted monies for such a hire. Shortly before Plaintiff resigned his employment, the Town's Mayor and Council directed Hugg to inform Plaintiff that the position he had requested would be filled. Despite this directive, Hugg never informed Plaintiff of the impending hire and when prompted to explain his inaction in this regard Hugg refused to provide reasoning. When viewed in a light most favorable to Plaintiff, Hugg's act can be characterized as an action on Hugg's part to prevent Fox from having the necessary support and resources to fulfill his job duties and ensure optimal job performance

Plaintiff suffered an adverse employment action through the inadequate manner Hugg addressed Plaintiff's concerns with Heritage's conduct.  The record evidences that in investigating Plaintiff's claims, Hugg did not handle the matters in the same manner that he handled the younger, female, similarly situated Vinc.  Rather, despite Plaintiff's multiple requests that his complaints be given the same level of redress, Hugg refused to conduct investigatory hearings/meetings with the Town Personnel Chairman and third-party witnesses present.  Further, Hugg did not seek to record the private, behind closed doors hearings/meetings that he did conduct.   While the individual, Dunn, that had allegedly made unbecoming remarks about Vinc was terminated for her complained of behavior, Heritage was not disciplined in any meaningful form for similarly unbecoming and defamatory acts toward Plaintiff. When viewed in a light most favorable to Plaintiff, Hugg's acts can be characterized as an action on Hugg's part to deny Fox from having equal redress as his colleague Vinc.

III.    PLAINTIFF'S CLAIMS PURSUANT TO 42 U.S.C. §2000(e)
AND 29 U.S.C. §626 ARE SUPPORTED BY EVIDENCE OF
RECORD SHOWING DISCRIMINATION BASED ON AGE
AND SEX

Defendant argues that any adverse employment decision against Plaintiff did not

occur under circumstances giving rise to an inference of age or sex discrimination.

However, construing the facts in a light most favorable to Fox, it is reasonable to

conclude that Hugg desired to place Vinc in the Assistant Town Manager position, or in

the alternative, desired to keep Plaintiff from the same position to appease Vinc.  The

record shows that Vinc was wholly against Plaintiff obtaining the position of Assistant

Town Manger.  Further, Vinc was open about her unwillingness to work under Plaintiff if

he achieved the same.  Plaintiff himself testified that he felt it was Hugg's prerogative to

advance Vinc's career over his.  Plaintiff's beliefs in this regard are supported by Hugg's

actions that show he was motivated by his desire and/or tendency to favor younger and

female employees.  This desire had already been demonstrated by his awarding Vinc the

Planning and Zoning Manager position, a position equivalent in status to Fox's position,

when she did not have sufficient qualifications and experience for the position.  In fact,

Vinc has yet to complete her graduate education that supposedly made her "qualified" for

the position.

Hugg also showed his favoritism toward female employees by failing to discipline

Heritage appropriately for her slanderous comments.  The discipline against her should

have been more severe than simply a written reprimand and/or verbal "counseling."

Rather, Heritage suffered no adverse employment consequence for her acts and Plaintiff

as a result was left to suffer in a hostile and untenable work environment that created

16

daily anxiety.  When Plaintiff was accused of making slanderous comments about fellow employee Vinc, a formal hearing complete with witnesses and the Town Personnel Director was held.  Hugg went so far as to obtain affidavits from Plaintiff's accusers after the fact, despite his assertions that the matter was settled and required no further action. In contrast, no formal hearing/meeting was conducted when Plaintiff presented Hugg with evidence that Heritage was accusing him of having an affair with a fellow employee. Nor were any official statements taken from Plaintiff or his wife to preserve their claims. When viewed in a light most favorable to Plaintiff, Hugg's acts in these regards show that the adverse employment decisions directed toward Plaintiff occurred under circumstances giving rise to an inference of age or sex discrimination.

IV.   HERITAGE'S STATEMENTS WERE DEFAMATORY AND
      SHE IS NOT ENTITLED TO JUDGMENT AS A MATTER OF
      LAW

Defendants' assertions that expressions of opinion are protected under the First

Amendment are misleading and inaccurate.   To the contrary, statements by public

employees about non-public matters are not protected by the First Amendment with

respect to actions taken against them by their public employers.  As the United States

Supreme Court recently stated, "The First Amendment protects public-employee's speech

only when it falls within the core of First Amendment protection -- speech on matters of

public concern." Engquist v. Oregon Dept. of Agriculture, 2008 U.S. LEXIS 4705 at *15

(attached)(citing Connick v. Myers, 461 U.S. 138 (1983).  Moreover, whether Heritage's

statement might have been protected by the First Amendment from actions by her

employer -- and clearly they would not have because they are not matters of public

concern -- has nothing to do with whether Fox may pursue a defamation claim against

her.

In order to pursue a slander claim, a Plaintiff must show that (1) the Defendant

made a false and defamatory oral communication concerning the Plaintiff; (2) the

Defendant published that communication to a third party; (3) the third party understood

the defamatory nature of the communication; (4) the Defendant is culpable for the

publication; and (5) the Plaintiff suffered injury. Bickling v. Kent General Hospital, Inc.,

872 F.Supp. 1299, 1307 (D.Del. 1994) (elements of defamation claim in Delaware).

Here, the issue is whether Heritage made false and defamatory communications regarding

Fox to Fox's wife, and whether Fox suffered injury resulting from that communication.

Moreover, Heritage did not simply express non-factual "opinions" to Fox's wife.  Rather,

18

she talked specifically about "inappropriate looks," frequent closed-door meetings, taking lunch together, a fondness and/or adoration between the two and ogling at each other across the table." The issue is whether the activity actually occurred. As Fox denies that it occurred, and Heritage herself testified that she had no basis for making the insinuations she expressed to Fox's wife, there is a genuine issue of material fact regarding whether Heritage made false statements about Fox.

It is undisputed that Heritage published the defamatory statements to Plaintiff's wife and that Plaintiff's wife understood the defamatory nature of Heritage's conduct. Plaintiff's wife, upon hearing Heritage insinuate her husband was having an affair, went so far as to seek further clarification by calling Heritage at her residence, in addition to sharing intimate personal experiences with Heritage in an attempt to explain her adverse reaction to Heritage's comments. As the publisher of information that she knew to be inaccurate, misleading and defamatory, Heritage is culpable for her conduct. Plaintiff has suffered injury as a result of Heritage's actions. His marriage has materially and perhaps irrevocably suffered. Plaintiff has had to seek treatment for mental health issues as a result of the anxiety and stress Heritage's comments have caused. Additionally, Plaintiff is a member of the business community of the Town of Smyrna. In such a place as Smyrna, a small town where rumors run rampant when broadcasted, it is a matter of record that the context of Heritage's comments reached well beyond the ears of Plaintiff's wife and the Town Hall, extending out into the general township at large. This has caused Plaintiff to suffer injury to both his personal and professional reputation due to the immoral implications of Heritage's defamation.

V.    PLAINTIFF HAS SUFFERED SPECIAL DAMAGES AS A
RESULT OF HERITAGE'S STATEMENTS

Defendant argues that Fox may not proceed on his slander claim because he has not alleged/suffered any special damages.   "There are four categories of slander, commonly called slander per se, which are actionable without proof of special damages. In broad terms, these are statements which:  (1) malign one in a trade, business or profession, (2) impute a crime, (3) imply that one has a loathsome disease, or (4) impute unchastity to a woman."  Spence v. Funk, 396 A.2d 967, 970 (D.Del. 1978).  When viewed in a light most favorable to Plaintiff, Heritage's statements maligned Plaintiff in his trade, business, or profession, because she was alleging that he was having an extramarital affair with a subordinate employee.  This type of defamation carries with it the implication of immoral and indecent character.  As such, Plaintiff's trade, business, or professional reputation was sullied by statements that were intended to bring his character and his professional reputation into disrepute.

While no Delaware case law explicitly expands the "unchastity" element to the male gender, there is one Delaware decision that quotes the fourth element, without comment, as "unchastity, or serious sexual misconduct" rather than unchastity by a woman.  Drainer v. O'Donnell, 1995 Del. Super. LEXIS 229 (attached).  Plaintiff encourages the Court to adopt this characterization, as applying the fourth element only to a woman's alleged unchastity would itself be discriminatory on the basis of gender.

VI.    DEFENDANT BREACHED THE COVENANT OF GOOD
FAITH AND FAIR DEALING IMPLIED UNDER DELAWARE
LAW

Defendants argue that Plaintiff should not survive summary judgment on his breach of the covenant claims because he has not shown the conduct of the employer constituted "an aspect of fraud, deceit or misrepresentation." In doing so, Defendants overlook the surreptitious actions of Town Manager Hugg. In regard to Plaintiff's desire for additional help to ease his heavy workload, the Town Council and Mayor saw fit to acquiesce to his request, and in addition to budgeting for such a position, went so far as to instruct Hugg explicitly to inform Plaintiff of the impending hire. This instruction to inform Plaintiff occurred approximately three weeks prior to Plaintiff's resignation, but Hugg never disclosed this material information to Plaintiff. In fact, when questioned why he failed to do so at Plaintiff's exit interview, Hugg did not provide any reasoning and flatly refused to answer the inquiry. Hugg's actions in this regard, when viewed in a light most favorable to Plaintiff, evidence an aspect of fraud, deceit or misrepresentation.

Hugg acted in a surreptitious manner when investigating the alleged statements of Fox regarding Vinc. In contrast to investigation of similar conduct complained of by Plaintiff regarding Heritage, Hugg conducted a full-scale formal hearing complete with Town Personnel Director, witnesses and recordation of the hearing. At the conclusion of this hearing, Hugg went on record as saying the matter was concluded and no further action was warranted. This representation by Hugg was not only conveyed to Plaintiff, but also to others present, including Stulir and McKinney.

However, Hugg did not put the matter to rest and instead, twelve days after the hearing, without Plaintiff's knowledge, directed Stulir and Markow to sign affidavits

21

imputing defamatory remarks to Plaintiff. The record shows that neither Stulir, Markow or McKinney were approached by Vinc to compose these affidavits, nor were they aware of any involvement by Vinc in initiating the obtaining of these affidavits. As such, Hugg's contradictory testimony that the affidavits were drafted at Vinc's direct insistence is false and diminishes his credibility. Hugg obtained these affidavits under the guise that they were being compiled pursuant to town policy and would be placed in Plaintiff's personnel file. Rather, these affidavits remained in the sole possession of Hugg, locked in his desk drawer, and were never given to Human Resources for personnel purposes. It is not a coincidence that whenever the brandishing of these affidavits served Hugg they became published.

Hugg first disclosed the existence of these affidavits in an email to Town Council in which he disparaged Plaintiff's character and falsely stated that Plaintiff had made inappropriate statements about another employee. The purpose of this communication on Hugg's behalf was to dissuade the Town Council and Mayor from seeking the appointment of Plaintiff to Assistant Town Manager. An affidavit was again published when Plaintiff was running for Town office, a position that would have placed him as a superior of Hugg. It is Plaintiff's contention that Hugg placed or allowed this affidavit to be placed on a website about Town of Smyrna in an effort to discredit Plaintiff and prevent him from achieving such status. Under Town policy, the gathering of these affidavits was to be disclosed to Plaintiff as a material party to the investigation and they were to be placed in his personnel file. (Excerpts of Town Policy Manual B-167-169). Neither of these acts occurred, and instead Hugg surreptitiously obtained the affidavits and hid their existence until such time as he saw fit for his own means.

22

In <u>DuPont v. Pressman</u>, 679 A.2d 436 (Del. 1996), the Court held that an employee had stated a claim for breach of the covenant where the employee's supervisor had created false grounds and manufactured a record to establish a fictitious basis for termination. Similarly, in this case, Hugg maligned Fox so that the Town Council would not consider him for the Assistant Town Manager position and further maligned Plaintiff to prevent him from becoming a member of Town Council after Plaintiff had resigned his position with the Town. Hugg's acts in this regard, when viewed in a light most favorable to Plaintiff, evidence an aspect of fraud, deceit or misrepresentation and show that Defendant breached the covenant of good faith and fair dealing implied under Delaware law.

VII.    DEFENDANTS DID NOT MOVE FOR SUMMARY
JUDGMENT AS TO PLAINTIFF'S CLAIMS PURSUANT TO
42 U.S.C. §1983 UNDER COUNT II OF THE COMPLAINT

Defendants wholly failed to address Count II of Plaintiff's Complaint in their Opening Brief. As such, Defendants have waived their right to move for summary judgment against Plaintiff on this Count. However, Plaintiff will briefly address the merits of this claim. 42 U.S.C. § 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any right, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .
>
> 42 U.S.C. § 1983.

Interestingly, Defendants do not request summary judgment on Plaintiff's Section 1983 claims against his supervisor, the Town Manager, Hugg. It is clear that Hugg was acting under color of state law in his decisions and omissions that created a hostile and untenable working environment for Plaintiff, which led to his constructive discharge. The focus of Plaintiff's complaints of discrimination encompasses Defendants' inadequate responses to Plaintiff's complaints about his work environment and inappropriate acts of his fellow coworkers. Hugg's handling of Plaintiff's concerns was under color of state law because it was connected to his position as Town Manager.

Plaintiff suffered a denial of due process in regard to the handling of allegations he made inappropriate remarks about fellow employee Vinc. Despite Hugg's contentions

24

that the matter was resolved following the March 11, 2005, meeting, Hugg then unilaterally and surreptitiously obtained affidavits from Plaintiff's accusers. In doing so, Hugg violated town policy requiring a fair and transparent investigation. Hugg did not seek to investigate the matter in an impartial manner, he did not disclose the existence of the affidavits to Plaintiff per Town policy, and he kept the affidavits in his personal possession rather then place them in Plaintiff's personnel file per Town policy. (Excerpts of Town Policy Manual B-167-169). In doing so, Hugg denied Plaintiff's due process by denying him an opportunity to respond. This denial was both a substantive and procedural denial of due process as it affected Plaintiff's property, privacy and liberty interests. Hugg's denial of Plaintiff's due process continued even after Plaintiff's employment with the Town was terminated. The information in the affidavits was wrongfully obtained, kept secret while Plaintiff worked for the Town and remained in Hugg's sole control and possession. When Plaintiff was running for Town Council, Hugg again used these documents in a disparaging manner in an attempt to prevent Plaintiff from obtaining appointment to office by allowing the documents to be posted on an internet website frequented by Town citizens. In addition, Hugg's actions themselves may be considered a violation of Plaintiff's civil rights in that they were motivated by his gender and constructively deprived him of his rights to employment. The record evidences Hugg favored female employees, highlighted by the disparate treatment Plaintiff received both as accuser and accused when compared to similarly situated female employees Vinc and Heritage under similar circumstances.

Construing the facts in a light most favorable to Plaintiff, the only reasonable inference is that Hugg was acting under color of state law when he took affirmative steps

to deny Plaintiff his due process rights.  Therefore, there is sufficient evidence in the record to preclude summary judgment on Plaintiff's Section 1983 claims against Hugg.

## **CONCLUSION**

For the foregoing reasons, Plaintiff Samuel James (Jim) Fox, III, respectfully requests that summary judgment be denied on all counts.

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____
William D. Fletcher, Jr.
Bar I.D. #362
Noel E. Primos
Bar I.D. #3124
B. Brian Brittingham
Bar I.D. #4966
414 S. State Street
P.O. Box 497
Dover, DE 19901
(302) 674-0140
Attorneys for Plaintiff

DATED:  6/30/08

# ATTACHMENT A

LexisNexis® *Total Research System*    Switch Client | Preferences | Sign Off | [?] Help

My Lexis™ \ Search \ Research Tasks \ Get a Document \ *Shepard's®* \ Alerts \ Total Litigator \ Transactional Advisor \ Counsel Selector \ Dossier | History | ⏻

Source: Legal > Cases - U.S > **U.S. Supreme Court Cases, Lawyers' Edition** [i]
Terms: "First Amendment" and employ! and date after January 1, 2008 (Edit Search | Suggest Terms for My Search)
Focus: **"First Amendment"** (Exit FOCUS™)

⟵ Select for FOCUS™ or Delivery
☐

*2008 U.S. LEXIS 4705, \*; 76 U.S.L.W. 4367*

⬇ View Available Briefs and Other Documents Related to this Case

ANUP ENGQUIST, PETITIONER v. OREGON DEPARTMENT OF AGRICULTURE ET AL.

No. 07-474

SUPREME COURT OF THE UNITED STATES

2008 U.S. LEXIS 4705; 76 U.S.L.W. 4367

April 21, 2008, Argued
June 9, 2008, Decided

**NOTICE:**

The LEXIS pagination of this document is subject to change pending release of the final published version.

**PRIOR HISTORY: [\*1]**
ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.
Engquist v. Or. Dep't of Agric., 478 F.3d 985, 2007 U.S. App. LEXIS 2787 (9th Cir. Or., 2007)

**DISPOSITION:** Affirmed.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Petitioner Oregon public employee filed suit against respondent Oregon Department of Agriculture, her supervisor, and a co-worker asserting, inter alia, a so-called "class-of-one" claim under the Equal Protection Clause. The United States Court of Appeals for the Ninth Circuit reversed a jury's verdict and award for the employee on the class-of-one claim. Certiorari was granted to resolve a disagreement in the lower courts over such claims.

**OVERVIEW:** What seems to have been significant in previous class-of-one cases was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. Other forms of state action, however, by their nature involved discretionary decisionmaking based on a vast array of subjective, individualized assessments. Employment decisions were quite often subjective and individualized. Recognition of a class-of-one theory of equal protection in the public employment context was contrary to the concept of at-will employment; the Constitution did not require repudiating the at-will doctrine. Recognizing the sort of claim the employee was pressing could have jeopardized the delicate balance governments have struck between the rights of public employees and the government's legitimate purpose in promoting efficiency and integrity in the discharge of official duties, and in maintaining proper discipline in the public service. Government offices could not function if every employment decision became a constitutional matter and ratifying a class-of-one theory in the context of public employment would have impermissibly constitutionalized the employee grievance.

**OUTCOME:** The judgment of the Court of Appeals was affirmed. 6-3 Decision; 1 Dissent.

**CORE TERMS:** equal protection claims, class-of-one, employment context, rational basis, classification, equal protection, similarly situated, subjective, at-will, employment decision, individualized, personnel, village, public employee, differential treatment, discretionary, public employers, treated differently, plurality opinion, irrational, sovereign, treating, ticket, public-employment, membership, easement, sex, national origin, state employees, state action

**LEXISNEXIS® HEADNOTES**                                                ⊟ **Hide**

Constitutional Law > Equal Protection > Scope of Protection 🔖
*HN1* ⬆ It is well settled that the Equal Protection Clause protects persons, not groups, and that the Clause's protections apply to administrative as well as legislative acts. It is equally well settled that states do not escape the strictures of the Equal Protection Clause in their role as employers. More Like This Headnote

Constitutional Law > Equal Protection > Scope of Protection 
HN2± The class-of-one theory of equal protection does not apply in the public employment context.  More Like This Headnote

Governments > State & Territorial Governments > Claims By & Against 
Labor & Employment Law > Employer Liability > General Overview 
HN3± There is a crucial difference, with respect to constitutional analysis, between the government exercising the power to regulate or license, as lawmaker, and the government acting as proprietor, to manage its internal operation. This distinction has been particularly clear in the review of state action in the context of public employment. Thus, the government as employer indeed has far broader powers than does the government as sovereign. The extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible. The government has a legitimate interest in promoting efficiency and integrity in the discharge of official duties, and in maintaining proper discipline in the public service. The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. Given the common-sense realization that government offices could not function if every employment decision became a constitutional matter, constitutional review of government employment decisions must rest on different principles than review of restraints imposed by the government as sovereign.  More Like This Headnote

Governments > State & Territorial Governments > Employees & Officials 
HN4± Government has significantly greater leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large.  More Like This Headnote

Governments > State & Territorial Governments > Employees & Officials 
Labor & Employment Law > Employer Liability > General Overview 
HN5± United States Supreme Court precedent in the public-employee context establishes two main principles: First, although government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context. Second, in striking the appropriate balance, courts consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer.  More Like This Headnote

Constitutional Law > Equal Protection > Scope of Protection 
HN6± Equal protection jurisprudence has typically been concerned with governmental classifications that affect some groups of citizens differently than others. Equal protection emphasizes disparity in treatment by a state between classes of individuals whose situations are arguably indistinguishable. The basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes. Plaintiffs in such cases generally allege that they have been arbitrarily classified as members of an identifiable group.  More Like This Headnote

Constitutional Law > Equal Protection > Scope of Protection 
HN7± An equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called "class of one."  More Like This Headnote

Constitutional Law > Equal Protection > Level of Review 
Constitutional Law > Equal Protection > Scope of Protection 
HN8± The Fourteenth Amendment requires that all persons subjected to legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed. When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being treated alike, under like circumstances and conditions. Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a rational basis for the difference in treatment.  More Like This Headnote

Constitutional Law > Equal Protection > Scope of Protection 
Governments > State & Territorial Governments > Employees & Officials 
HN9± The class-of-one theory of equal protection--which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review--is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.  More Like This Headnote

Constitutional Law > Equal Protection > Scope of Protection 
Governments > State & Territorial Governments > Employees & Officials 
HN10± The Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently.  More Like This Headnote

Governments > State & Territorial Governments > Employees & Officials 

Labor & Employment Law > Employment Relationships > At-Will Employment > Public Employees 🔲
HN11⊕Government employment, in the absence of legislation, can be revoked at the will of the appointing officer. The basic principle of at-will employment is that an employee may be terminated for a good reason, bad reason, or no reason at all. The very concept of wrongful discharge implies some sort of statutory or contractual standard that modifies the traditional common-law rule that a contract of employment is terminable by either party at will. Thus, the United States Supreme Court has never held that it is a violation of the Constitution for a government employer to discharge an employee based on substantively incorrect information. An at-will government employee generally has no claim based on the Constitution at all. More Like This Headnote

Constitutional Law > Equal Protection > Scope of Protection 🔲
Labor & Employment Law > Employment Relationships > At-Will Employment > Public Employees 🔲
HN12⊕State employers cannot take personnel actions that would independently violate the Constitution. But recognition of a class-of-one theory of equal protection in the public employment context--that is, a claim that a state treated an employee differently from others for a bad reason, or for no reason at all--is simply contrary to the concept of at-will employment. The Constitution does not require repudiating that familiar doctrine. More Like This Headnote

Constitutional Law > Equal Protection > Scope of Protection 🔲
Labor & Employment Law > Employment Relationships > At-Will Employment > Public Employees 🔲
HN13⊕Congress and all the states have, for the most part, replaced at-will employment with various statutory schemes protecting public employees from discharge for impermissible reasons. For example, under 5 U.S.C.S. § 2302(b)(10) a supervisor of covered federal employee may not discriminate on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others. But a government's decision to limit the ability of public employers to fire at will is an act of legislative grace, not constitutional mandate. More Like This Headnote

Labor & Employment Law > Employment Relationships > At-Will Employment > Public Employees 🔲
HN14⊕Government offices could not function if every employment decision became a constitutional matter. More Like This Headnote

Administrative Law > Judicial Review > Reviewability > General Overview 🔲
Governments > State & Territorial Governments > Employees & Officials 🔲
HN15⊕The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. More Like This Headnote

**⏷Available Briefs and Other Documents Related to this Case:**

Go To Supreme Court Brief(s)
Go To Supreme Court Transcript

**SYLLABUS**

Petitioner Engquist, an Oregon public employee, filed suit against respondents -- her agency, her supervisor, and a co-worker -- asserting, inter alia, claims under the Equal Protection Clause: She alleged she had been discriminated against based on her race, sex, and national origin, and she also brought a so-called "class-of-one" claim, alleging that she was fired not because she was a member of an identified class (unlike her race, sex, and national origin claims), but simply for arbitrary, vindictive, and malicious reasons. The jury rejected the class-membership equal protection claims, but found for Engquist on her class-of-one claim. The Ninth Circuit reversed in relevant part. Although recognizing that this Court had upheld a class-of-one equal protection challenge to state legislative and regulatory action in *Village of Willowbrook* v. *Olech,* 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060, the court below emphasized that this Court has routinely afforded government greater leeway when it acts as employer rather than regulator. The Court concluded that extending the class-of-one theory to the public-employment **[*2]** context would lead to undue judicial interference in state employment practices and invalidate public at-will employment.

*Held:* The class-of-one theory of equal protection does not apply in the public employment context. Pp. 4-16.

(a) There is a crucial difference between the government exercising "the power to regulate or license, as lawmaker," and acting "as proprietor, to manage [its] internal operation." *Cafeteria & Restaurant Workers* v. *McElroy,* 367 U.S. 886, 896, 81 S. Ct. 1743, 6 L. Ed. 2d 1230. Thus, in the public-employment context, the Court has recognized that government has significantly greater leeway in its dealings with citizen employees than it does in bringing its sovereign power to bear on citizens at large. See, *e.g., O'Connor* v. *Ortega,* 480 U.S. 709, 721-722, 107 S. Ct. 1492, 94 L. Ed. 2d 714. The relevant precedent establishes two main principles: First, government employees do not lose their constitutional rights when they go to work, but those rights must be balanced against the realities of the employment context. See, *e.g., id.,* at 721, 107 S. Ct. 1492, 94 L. Ed. 2d 714. Second, in striking the appropriate balance, the Court considers whether the claimed employee right implicates the relevant constitutional provision's basic concerns, or whether the right can more readily **[*3]** give way to the requirements of the government as employer. See, *e.g., Connick* v. *Myers,* 461 U.S. 138, 103 S. Ct. 1684, 75 L. Ed. 2d 708. Pp. 4-8.

(b) The Court's equal protection jurisprudence has typically been concerned with governmental classifications that "affect some groups of citizens differently than others." *McGowan* v. *Maryland,* 366 U.S. 420, 425, 81 S. Ct. 1101, 6 L. Ed. 2d 393. *Olech* did recognize that a class-of-one equal protection claim can in some circumstances be sustained. Its recognition of that theory, however, was not so

much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an application of that principle to the facts in that case: The government singled Olech out with regard to its regulation of property, and the cases upon which the Court relied concerned property assessment and taxation schemes that were applied in a singular way to particular citizens. What seems to have been significant in *Olech* and the cited cases was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. This differential treatment raised a concern of arbitrary classification, and therefore required that the State provide **[*4]** a rational basis for it. There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases treating like individuals differently is an accepted consequence of the discretion granted to governmental officials. This principle applies most clearly in the employment context, where decisions are often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify. Unlike the context of arm's-length regulation, such as in *Olech*, treating seemingly similarly situated individuals differently in the employment context is par for the course. It is no proper challenge to what in its nature is a subjective and individualized decision that it was subjective and individualized. That the Court has never found the Equal Protection Clause implicated in this area is not surprising, given the historical understanding of the at-will nature of government employment. See, *e.g.*, *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U.S. 886, 896, 81 S. Ct. 1743, 6 L. Ed. 2d 1230. Recognition of a claim that the State treated an employee differently from others for a bad reason, or **[*5]** for no reason at all, is simply contrary to the at-will concept. The Constitution does not require repudiating that familiar doctrine. Finally, the Court is guided, as in the past, by the "common-sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick, supra,* at 143, 103 S. Ct. 1684, 75 L. Ed. 2d 708. If class-of-one claims were recognized in the employment context, any personnel action in which a wronged employee can conjure up a claim of differential treatment would suddenly become the basis for a federal constitutional claim. The Equal Protection Clause does not require "[t]his displacement of managerial discretion by judicial supervision." *Garcetti* v. *Ceballos*, 547 U.S. 410, 423, 126 S. Ct. 1951, 164 L. Ed. 2d 689. Pp. 8-16.

478 F.3d 985, affirmed.

**JUDGES:** ROBERTS ⌄, C. J., delivered the opinion of the Court, in which SCALIA ⌄, KENNEDY ⌄, THOMAS ⌄, BREYER ⌄, and ALITO ⌄, JJ., joined. STEVENS ⌄, J., filed a dissenting opinion, in which SOUTER ⌄ and GINSBURG ⌄, JJ., joined.

**OPINION BY:** ROBERTS ⌄

**OPINION**

CHIEF JUSTICE ROBERTS ⌄ delivered the opinion of the Court.

The question in this case is whether a public employee can state a claim under the Equal Protection Clause by alleging that she was arbitrarily treated differently from other **[*6]** similarly situated employees, with no assertion that the different treatment was based on the employee's membership in any particular class. We hold that such a "class-of-one" theory of equal protection has no place in the public employment context.

I

Anup Engquist, the petitioner in this case, was hired in 1992 by Norma Corristan to be an international food standard specialist for the Export Service Center (ESC), a laboratory within the Oregon Department of Agriculture (ODA). During the course of her employment, Engquist experienced repeated problems with Joseph Hyatt, another ODA employee, complaining to Corristan that he had made false statements about her and otherwise made her life difficult. Corristan responded by directing Hyatt to attend diversity and anger management training.

In 2001, John Szczepanski, an assistant director of ODA, assumed responsibility over ESC, supervising Corristan, Hyatt, and Engquist. Szczepanski told a client that he could not "control" Engquist, and that Engquist and Corristan "would be gotten rid of." When Engquist and Hyatt both applied for a vacant managerial post within ESC, Szczepanski chose Hyatt despite Engquist's greater experience in the relevant **[*7]** field. Later that year, during a round of across-the-board budget cuts in Oregon, Szczepanski eliminated Corristan's position. Finally, on January 31, 2002, Engquist was informed that her position was being eliminated because of reorganization. Engquist's collective-bargaining agreement gave her the opportunity either to "bump" to another position at her level, or to take a demotion. She was found unqualified for the only other position at her level and declined a demotion, and was therefore effectively laid off.

Engquist subsequently brought suit in the United States District Court for the District of Oregon against ODA, Szczepanski, and Hyatt, all respondents here, alleging violations of federal antidiscrimination statutes, the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and state law. As to Engquist's equal protection claim, she alleged that the defendants discriminated against her on the basis of her race, sex, and national origin. She also brought what is known as a "class-of-one" equal protection claim, alleging that she was fired not because she was a member of an identified class (unlike her race, sex, and national origin claims), but simply for "arbitrary, **[*8]** vindictive, and malicious reasons." App. 10.

The District Court granted the respondents' motion for summary judgment as to some of Engquist's claims, but allowed others to go forward, including each of the equal protection claims. As relevant to this case, the District Court found Engquist's class-of-one equal protection claim legally viable, deciding that the class-of-one theory was fully applicable in the employment context. Civ. No. 02-1637-AS, 2004 U.S. Dist. LEXIS 18844 (D. Ore., Sept. 14, 2004), App. 58, 2004 WL 2066748, *5. The court held that Engquist could succeed on that theory if she could prove "that she was singled out as a result of animosity on the part of Hyatt and Szczepanski" -- *i.e.*, "that their actions were spiteful efforts to punish her for reasons unrelated to any legitimate state objective" -- and if she could

demonstrate, on the basis of that animosity, that "she was treated differently than others who were similarly situated." *Ibid.*

The jury rejected Engquist's claims of discrimination for membership in a suspect class -- her race, sex, and national origin claims -- but found in her favor on the class-of-one claim. Specifically, the jury found that Hyatt and Szczepanski "intentionally treat[ed] **[*9]** [Engquist] differently than others similarly situated with respect to the denial of her promotion, termination of her employment, or denial of bumping rights without any rational basis and solely for arbitrary, vindictive or malicious reasons." App. to Pet. for Cert. 3-4. The jury also found for Engquist on several of her other claims, and awarded her $ 175,000 in compensatory damages and $ 250,000 in punitive damages.

The Court of Appeals reversed in relevant part. It recognized that this Court had upheld a class-of-one equal protection challenge to state legislative and regulatory action in *Village of Willowbrook v. Olech*, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) (*per curiam*). 478 F.3d 985, 992-993 (CA9 2007). The court below also acknowledged that other Circuits had applied *Olech* in the public employment context, *id.*, at 993 (citing cases), but it disagreed with those courts on the ground that our cases have routinely afforded government greater leeway when it acts as employer rather than regulator, *id.*, at 993-996. The court concluded that extending the class-of-one theory of equal protection to the public employment context would lead to undue judicial interference in state employment practices and **[*10]** "completely invalidate the practice of public at-will employment." *Id.*, at 995. The court accordingly held that the class-of-one theory is "inapplicable to decisions made by public employers with regard to their employees." *Id.*, at 996.

Judge Reinhardt dissented, "agree[ing] with the other circuits that the class-of-one theory of equal protection is applicable to public employment decisions." *Id.*, at 1010. We granted certiorari to resolve this disagreement in the lower courts, 552 U.S. , 128 S. Ct. 977, 169 L. Ed. 2d 800 (2008), and now affirm.

II

Engquist argues that the Equal Protection Clause forbids public employers from irrationally treating one employee differently from others similarly situated, regardless of whether the different treatment is based on the employee's membership in a particular class. She reasons that in *Olech, supra*, we recognized in the regulatory context a similar class-of-one theory of equal protection, Brief for Petitioner 14-15; that the Equal Protection Clause protects individuals, not classes, *id.*, at 15-17; that the Clause proscribes "discrimination arising not only from a legislative act but also from the conduct of an administrative official," *id.*, at 17; and that the Constitution applies **[*11]** to the State not only when it acts as regulator, but also when it acts as employer, *id.*, at 23-29. Thus, Engquist concludes that class-of-one claims can be brought against public employers just as against any other state actors, *id.*, at 29-32, and that differential treatment of government employees -- even when not based on membership in a class or group -- violates the Equal Protection Clause unless supported by a rational basis, *id.*, at 32, 39-45.

We do not quarrel with the premises of Engquist's argument. *HN1* It is well settled that the Equal Protection Clause "protect[s] persons, not groups," *Adarand Constructors v. Pena*, 515 U.S. 200, 227, 115 S. Ct. 2097, 132 L. Ed. 2d 158 (1995) (emphasis omitted), and that the Clause's protections apply to administrative as well as legislative acts, see, *e.g.*, *Raymond v. Chicago Union Traction Co.*, 207 U.S. 20, 35-36, 28 S. Ct. 7, 52 L. Ed. 78 (1907). It is equally well settled that States do not escape the strictures of the Equal Protection Clause in their role as employers. See, *e.g.*, *New York City Transit Authority v. Beazer*, 440 U.S. 568, 99 S. Ct. 1355, 59 L. Ed. 2d 587 (1979); *Harrah Independent School Dist. v. Martin*, 440 U.S. 194, 99 S. Ct. 1062, 59 L. Ed. 2d 248 (1979) (*per curiam*); *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S. Ct. 2562, 49 L. Ed. 2d 520 (1976) (*per curiam*). We **[*12]** do not, however, agree that Engquist's conclusion follows from these premises. Our traditional view of the core concern of the Equal Protection Clause as a shield against arbitrary classifications, combined with unique considerations applicable when the government acts as employer as opposed to sovereign, lead us to conclude that *HN2* the class-of-one theory of equal protection does not apply in the public employment context.

A

We have long held the view that *HN3* there is a crucial difference, with respect to constitutional analysis, between the government exercising "the power to regulate or license, as lawmaker," and the government acting "as proprietor, to manage [its] internal operation." *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 896, 81 S. Ct. 1743, 6 L. Ed. 2d 1230 (1961). This distinction has been particularly clear in our review of state action in the context of public employment. Thus, "the government as employer indeed has far broader powers than does the government as sovereign." *Waters v. Churchill*, 511 U.S. 661, 671, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994) (plurality opinion). "[T]he extra power the government has in this area comes from the nature of the government's mission as employer. Government agencies are charged by law with **[*13]** doing particular tasks. Agencies hire employees to help do those tasks as effectively and efficiently as possible." *Id.*, at 674-675, 114 S. Ct. 1878, 128 L. Ed. 2d 686. See also *Connick v. Myers*, 461 U.S. 138, 150-151, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) (explaining that the government has a legitimate interest "in 'promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service'" (quoting *Ex parte Curtis*, 106 U.S. 371, 373, 1 S. Ct. 381, 27 L. Ed. 232 (1882) (alterations in original))). "The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters, supra*, at 675, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (plurality opinion). Given the "common-sense realization that government offices could not function if every employment decision became a constitutional matter," *Connick, supra*, at 143, 103 S. Ct. 1684, 75 L. Ed. 2d 708, "constitutional review of government employment decisions must rest on different principles than review of . . . restraints imposed by the government as sovereign," *Waters, supra*, at 674, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (plurality opinion).

In light of these basic principles, we have often recognized that *HN4* government has significantly greater **[*14]** leeway in its dealings with citizen employees than it does when it brings its sovereign power to bear on citizens at large. Thus, for example, we

have held that the Fourth Amendment does not require public employers to obtain warrants before conducting a search of an employee's office. _O'Connor v. Ortega_, 480 U.S. 709, 721-722, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (1987) (plurality opinion). See also _id._, at 732, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (SCALIA, J., concurring in judgment). Although we recognized that the "legitimate privacy interests of public employees in the private objects they bring to the workplace may be substantial," we found that "[a]gainst these privacy interests . . . must be balanced the realities of the workplace, which strongly suggest that a warrant requirement would be unworkable." _Id._, at 721, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (plurality opinion). We have also found that the Due Process Clause does not protect a public employee from discharge, even when such discharge was mistaken or unreasonable. See _Bishop_ v. _Wood_, 426 U.S. 341, 350, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976) ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions").

Our public-employee speech cases are particularly instructive. In _Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty._, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968), [*15] we explained that, in analyzing a claim that a public employee was deprived of **First Amendment** rights by her employer, we must seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

We analyzed the contours of this balance more fully in _Connick v. Myers, supra._ We explained that the **First Amendment** protects public-employee speech only when it falls within the core of **First Amendment** protection -- speech on matters of public concern. We recognized that the "'**First Amendment** does not protect speech and assembly only to the extent it can be characterized as political,'" and that the government therefore could not generally prohibit or punish, in its capacity as sovereign, speech on the ground that it does not touch upon matters of public concern, _id._, at 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (quoting _United Mine Workers v. Illinois State Bar Ass'n_, 389 U.S. 217, 223, 88 S. Ct. 353, 19 L. Ed. 2d 426 (1967)). But "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should [*16] enjoy wide latitude in managing their offices." _Connick_, 461 U.S., at 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708 . As we explained, "absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." _Id._, at 147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (citing _Bishop, supra_, at 349-350, 96 S. Ct. 2074, 48 L. Ed. 2d 684).

HN5 Our precedent in the public-employee context therefore establishes two main principles: First, although government employees do not lose their constitutional rights when they accept their positions, those rights must be balanced against the realities of the employment context. Second, in striking the appropriate balance, we consider whether the asserted employee right implicates the basic concerns of the relevant constitutional provision, or whether the claimed right can more readily give way to the requirements of the government as employer. With these principles in mind, we come to the question whether a class-of-one theory of equal protection is cognizable in the public employment context.

B

Our HN6 equal protection jurisprudence has typically been concerned with governmental classifications that "affect some groups of citizens differently [*17] than others." _McGowan_ v. _Maryland_, 366 U.S. 420, 425, 81 S. Ct. 1101, 6 L. Ed. 2d 393 (1961). See, e.g., _Ross v. Moffitt_, 417 U.S. 600, 609, 94 S. Ct. 2437, 41 L. Ed. 2d 341 (1974) ("'Equal Protection' . . . emphasizes disparity in treatment by a State between classes of individuals whose situations are arguably indistinguishable"); _San Antonio Independent School Dist. v. Rodriguez_, 411 U.S. 1, 60, 93 S. Ct. 1278, 36 L. Ed. 2d 16 (1973) (Stewart, J., concurring) ("[T]he basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes"). Plaintiffs in such cases generally allege that they have been arbitrarily classified as members of an "identifiable group." _Personnel Administrator of Mass._ v. _Feeney_, 442 U.S. 256, 279, 99 S. Ct. 2282, 60 L. Ed. 2d 870 (1979).

Engquist correctly argues, however, that we recognized in _Olech_ that HN7 an equal protection claim can in some circumstances be sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out as a so-called "class of one." In _Olech_, a property owner had asked the village of Willowbrook to connect her property to the municipal water supply. Although the village had required only a 15-foot easement from [*18] other property owners seeking access to the water supply, the village conditioned Olech's connection on a grant of a 33-foot easement. Olech sued the village, claiming that the village's requirement of an easement 18 feet longer than the norm violated the Equal Protection Clause. Although Olech had not alleged that the village had discriminated against her based on membership in an identifiable class, we held that her complaint stated a valid claim under the Equal Protection Clause because it alleged that she had "been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S., at 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (citing _Sioux City Bridge Co._ v. _Dakota County_, 260 U.S. 441, 43 S. Ct. 190, 67 L. Ed. 340 (1923), and _Allegheny Pittsburgh Coal Co._ v. _Commission of Webster Cty._, 488 U.S. 336, 109 S. Ct. 633, 102 L. Ed. 2d 688 (1989)).

Recognition of the class-of-one theory of equal protection on the facts in _Olech_ was not so much a departure from the principle that the Equal Protection Clause is concerned with arbitrary government classification, as it was an application of that principle. That case involved the government's regulation of property. Similarly, the cases upon which the Court in _Olech_ [*19] relied concerned property assessment and taxation schemes. See _Allegheny Pittsburgh, supra; Sioux City Bridge, supra._ We expect such legislative or regulatory classifications to apply "without respect to persons," to borrow a phrase from the judicial oath. See 28 U.S.C. § 453. As we explained long ago, HN8 the Fourteenth Amendment "requires that all persons subjected to . . . legislation shall be treated alike, under like circumstances and conditions, both in the privileges conferred and in the liabilities imposed." _Hayes_ v. _Missouri_, 120 U.S. 68, 71-72, 7 S. Ct. 350, 30 L. Ed. 578 (1887). When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to assure that all persons subject to legislation or regulation are indeed being "treated alike, under like circumstances and conditions." Thus, when it appears that an individual is being singled out by the government, the specter of arbitrary classification is fairly raised, and the Equal Protection Clause requires a "rational basis for the

difference in treatment." _Olech, 528 U.S., at 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060_.

What seems to have been significant in _Olech_ and the cases on which it relied **[*20]** was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in _Olech_ that the zoning board was exercising discretionary authority based on subjective, individualized determinations -- at least not with regard to easement length, however typical such determinations may be as a general zoning matter. See _id., at 565, 120 S. Ct. 1073, 145 L. Ed. 2d 1060_ (BREYER, J., concurring in result). Rather, the complaint alleged that the board consistently required only a 15-foot easement, but subjected Olech to a 33-foot easement. This differential treatment raised a concern of arbitrary classification, and we therefore required that the State provide a rational basis for it.

In _Allegheny Pittsburgh,_ cited by the _Olech_ Court, the applicable standard was market value, but the county departed from that standard in basing some assessments on quite dated purchase prices. Again, there was no suggestion that the "dramatic differences in valuation" for similar property parcels, _488 U.S., at 341, 109 S. Ct. 633, 102 L. Ed. 2d 688_ , were based on subjective considerations of the sort on which appraisers often rely, see _id., at 338-342, 345, 109 S. Ct. 633, 102 L. Ed. 2d 688_ . _Sioux City Bridge,_ also cited in _Olech,_ was the same **[*21]** sort of case, recognizing an equal protection claim when one taxpayer's property was assessed at 100 percent of its value, while all other property was assessed at 55 percent, without regard to articulated differences in the properties. See _260 U.S., at 445-447, 43 S. Ct. 190, 67 L. Ed. 340_ .

There are some forms of state action, however, which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

Suppose, for example, that a traffic officer is stationed on a busy highway where people often drive above the speed limit, and there is no basis upon which to distinguish them. If the officer gives only one of those people a ticket, it may be good English to say that the officer has created a class of people **[*22]** that did not get speeding tickets, and a "class of one" that did. But assuming that it is in the nature of the particular government activity that not all speeders can be stopped and ticketed, complaining that one has been singled out for no reason does not invoke the fear of improper government classification. Such a complaint, rather, challenges the legitimacy of the underlying action itself -- the decision to ticket speeders under such circumstances. Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action. It is no proper challenge to what in its nature is a subjective, individualized decision that it was subjective and individualized.

This principle applies most clearly in the employment context, for employment decisions are quite often subjective and individualized, resting on a wide array of **[*23]** factors that are difficult to articulate and quantify. As Engquist herself points out, "[u]nlike the zoning official, the public employer often must take into account the individual personalities and interpersonal relationships of employees in the workplace. The close relationship between the employer and employee, and the varied needs and interests involved in the employment context, mean that considerations such as concerns over personality conflicts that would be unreasonable as grounds for 'arm's-length' government decisions (_e.g.,_ zoning, licensing) may well justify different treatment of a public employee." Brief for Petitioner 48. Unlike the context of arm's-length regulation, such as in _Olech,_ treating seemingly similarly situated individuals differently in the employment context is par for the course.

Thus, _HN9_ the class-of-one theory of equal protection -- which presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review -- is simply a poor fit in the public employment context. To treat employees differently is not to classify them in a way that raises equal protection **[*24]** concerns. Rather, it is simply to exercise the broad discretion that typically characterizes the employer-employee relationship. A challenge that one has been treated individually in this context, instead of like everyone else, is a challenge to the underlying nature of the government action.

Of course, that is not to say that the Equal Protection Clause, like other constitutional provisions, does not apply to public employers. Indeed, our cases make clear that _HN10_ the Equal Protection Clause is implicated when the government makes class-based decisions in the employment context, treating distinct groups of individuals categorically differently. See, _e.g., Beazer, 440 U.S., at 593, 99 S. Ct. 1355, 59 L. Ed. 2d 587_ (upholding city's exclusion of methadone users from employment under rational-basis review); _Martin, 440 U.S., at 199-201, 99 S. Ct. 1062, 59 L. Ed. 2d 248_ (classification between teachers who had complied with a continuing-education requirement and those who had not is rational and does not violate the Equal Protection Clause); _Murgia, 427 U.S., at 314-317, 96 S. Ct. 2562, 49 L. Ed. 2d 520_ (upholding a mandatory retirement age -- a classification based on age -- under rational-basis review). The dissent's broad statement that we "except[t] state employees from the Fourteenth Amendment's **[*25]** protection against unequal and irrational treatment at the hands of the State," _post,_ at 2 (opinion of STEVENS, J.), is thus plainly not correct. But we have never found the Equal Protection Clause implicated in the specific circumstance where, as here, government employers are alleged to have made an individualized, subjective personnel decision in a seemingly arbitrary or irrational manner.

This is not surprising, given the historical understanding of the nature of government employment. We long ago recognized the "settled principle that _HN11_ government employment, in the absence of legislation, can be revoked at the will of the appointing officer." _McElroy, 367 U.S., at 896, 81 S. Ct. 1743, 6 L. Ed. 2d 1230_ . The basic principle of at-will employment is that an employee may be terminated for a "'good reason, bad reason, or no reason at all.'" Reply Brief for Petitioner 27. See _Andrews_ v. _Louisville & Nashville R. Co., 406 U.S. 320, 324, 92 S. Ct. 1562, 32 L. Ed. 2d 95 (1972)_ ("[T]he very concept of 'wrongful discharge' implies some

sort of statutory or contractual standard that modifies the traditional common-law rule that a contract of employment is terminable by either party at will"). Thus, "[w]e have never held that it is a violation of the Constitution **[\*26]** for a government employer to discharge an employee based on substantively incorrect information." _Waters_, 511 U.S., at 679, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (plurality opinion). See also _Connick_, 461 U.S., at 146-147, 103 S. Ct. 1684, 75 L. Ed. 2d 708 ("[O]rdinary dismissals from government service . . . are not subject to judicial review even if the reasons for the dismissal are alleged to be mistaken or unreasonable" (citing _Board of Regents of State Colleges_ v. _Roth_, 408 U.S. 564, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972); _Perry_ v. _Sindermann_, 408 U.S. 593, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972); and _Bishop_, 426 U.S. 341, 96 S. Ct. 2074, 48 L. Ed. 2d 684)). "And an all government employee . . . generally has no claim based on the Constitution at all." _Waters, supra_, at 679, 114 S. Ct. 1878 381, 128 L. Ed. 686 (plurality opinion). See, e.g., _Bishop, supra_, at 349-350, 96 S. Ct. 2074, 48 L. Ed. 2d 684.

**HN12** State employers cannot, of course, take personnel actions that would independently violate the Constitution. See _supra_, at 5-8, 93 S. Ct. 1278, 36 L. Ed. 16. But recognition of a class-of-one theory of equal protection in the public employment context -- that is, a claim that the State treated an employee differently from others for a bad reason, or for no reason at all -- is simply contrary to the concept of at-will employment. The Constitution does not require repudiating that familiar doctrine.

To be sure, **HN13** Congress and all the States have, for the **[\*27]** most part, replaced at-will employment with various statutory schemes protecting public employees from discharge for impermissible reasons. See, e.g., 5 U.S.C. § 2302(b)(10) (2006 ed.) (supervisor of covered federal employee may not "discriminate . . . on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others"). See also Brief for United States as _Amicus Curiae_ 20-21. But a government's decision to limit the ability of public employers to fire at will is an act of legislative grace, not constitutional mandate.

Indeed, recognizing the sort of claim Engquist presses could jeopardize the delicate balance governments have struck between the rights of public employees and "the government's legitimate purpose in 'promot[ing] efficiency and integrity in the discharge of official duties, and [in] maintain[ing] proper discipline in the public service.'" _Connick, supra_, at 151, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (quoting _Ex parte Curtis_, 106 U.S., at 373, 1 S. Ct. 381, 27 L. Ed. 232; alterations in original). Thus, for example, although most federal employees are covered by the Civil Service Reform Act of 1978, Pub. L. 95-454, Congress has specifically excluded some groups of employees **[\*28]** from its protection, see, e.g., 5 U.S.C. § 2302(a)(2)(C) (2006 ed.) (excluding from coverage, _inter alia_, the Federal Bureau of Investigation, the Central Intelligence Agency, and the Defense Intelligence Agency). Were we to find that the Equal Protection subjects the Government to equal protection review for every allegedly arbitrary employment action, we will have undone Congress's (and the States') careful work.

In concluding that the class-of-one theory of equal protection has no application in the public employment context -- and that is all we decide -- we are guided, as in the past, by the "common-sense realization that **HN14** government offices could not function if every employment decision became a constitutional matter." _Connick, supra_, at 143, 103 S. Ct. 1684, 75 L. Ed. 2d 708. If, as Engquist suggests, plaintiffs need not claim discrimination on the basis of membership in some class or group, but rather may argue only that they were treated by their employers worse than other employees similarly situated, any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim. Indeed, an allegation of arbitrary differential **[\*29]** treatment could be made in nearly every instance of an assertedly wrongful employment action -- not only hiring and firing decisions, but any personnel action, such as promotion, salary, or work assignments -- on the theory that other employees were not treated wrongfully. See 478 F.3d at 995. On Engquist's view, every one of these employment decisions by a government employer would become the basis for an equal protection complaint.

Engquist assures us that accepting her view would not pose too much of a practical problem. Specifically, Engquist argues that a plaintiff in a class-of-one employment case would have to prove that the government's differential treatment was intentional, that the plaintiff was treated differently from other similarly situated persons, and that the unequal treatment was not rationally related to a legitimate government purpose. Brief for Petitioner 36-39. And because a "governmental employment decision is . . . rational whenever the discrimination relates to a legitimate governmental interest," it is in practice "difficult for plaintiffs to show that the government has failed to meet this standard." _Id._, at 41, 93 S. Ct. 1278, 36 L. Ed. 16. JUSTICE STEVENS makes a similar argument, stating **[\*30]** "that all but a handful [of class-of-one complaints] are dismissed well in advance of trial." _Post_, at 7.

We agree that, even if we accepted Engquist's claim, it would be difficult for a plaintiff to show that an employment decision is arbitrary. But this submission is beside the point. The practical problem with allowing class-of-one claims to go forward in this context is not that it will be too easy for plaintiffs to prevail, but that governments will be forced to defend a multitude of such claims in the first place, and courts will be obliged to sort through them in a search for the proverbial needle in a haystack. The Equal Protection Clause does not require "[t]his displacement of managerial discretion by judicial supervision." _Garcetti_ v. _Ceballos_, 547 U.S. 410, 423, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006).

In short, ratifying a class-of-one theory of equal protection in the context of public employment would impermissibly "constitutionalize the employee grievance." _Connick_, 461 U.S., at 154, 103 S. Ct. 1684, 75 L. Ed. 2d 708. **HN15** "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." _Bishop, supra_, at 349, 96 S. Ct. 2074, 48 L. Ed. 2d 684. Public employees typically have a variety of protections **[\*31]** from just the sort of personnel actions about which Engquist complains, but the Equal Protection Clause is not one of them.

The judgment of the Court of Appeals is affirmed.

_It is so ordered._

**DISSENT BY:** STEVENS ▾

**DISSENT**

JUSTICE STEVENS, with whom JUSTICE SOUTER and JUSTICE GINSBURG join, dissenting.

Congress has provided a judicial remedy for individuals whose federal constitutional rights are violated by state action, 42 U.S.C. § 1983. [1] In prior cases, we have refused to craft *new* remedies for the violation of constitutional rights of federal employees, Bush v. Lucas, 462 U.S. 367, 103 S. Ct. 2404, 76 L. Ed. 2d 648 (1983), or for the nonconstitutional claims of state employees, Bishop v. Wood, 426 U.S. 341, 96 S. Ct. 2074, 48 L. Ed. 2d 684 (1976). But refusal to give effect to the congressionally mandated remedy embodied in § 1983 would be impermissible. To avoid this result, the Court today concludes that Engquist suffered no constitutional violation at all, and that there was thus no harm to be remedied. In so holding, the Court -- as it did in Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006) -- carves a novel exception out of state employees' constitutional rights. In Garcetti, the Court created a new substantive rule excepting a category of speech by state employees from the **[*32]** protection of the **First Amendment**. Today, the Court creates a new substantive rule excepting state employees from the **Fourteenth Amendment's** protection against unequal and irrational treatment at the hands of the State. Even if some surgery were truly necessary to prevent governments from being forced to defend a multitude of equal protection "class of one" claims, the Court should use a scalpel rather than a meat-axe.

**FOOTNOTES**

[1] Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

I

Our decision in Village of Willowbrook v. Olech, 528 U.S. 562, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 (2000) *(per curiam),* applied a rule that had been an accepted part of our equal protection jurisprudence for decades: Unless state action that intentionally singles out an individual, or a class of individuals, **[*33]** for adverse treatment is supported by some rational justification, it violates the Fourteenth Amendment's command that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

Our opinion in Olech emphasized that the legal issue would have been the same whether the class consisted of one or five members, because "the number of individuals in a class is immaterial for equal protection analysis." Id., at 564, 120 S. Ct. 1073, 145 L. Ed. 2d 1060, n. The outcome of that case was not determined by the size of the disadvantaged class, and the majority does not -- indeed cannot -- dispute the settled principle that the Equal Protection Clause protects persons, not groups. See ante, at 4-5.

Nor did the outcome in Olech turn on the fact that the Village was discriminating against a property owner rather than an employee. The majority does not dispute that the strictures of the Equal Protection Clause apply to the States in their role as employers as well as regulators. See ante, at 5. And indeed, we have made clear that "the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and other provisions of the Federal Constitution afford protection to employees who serve the government **[*34]** as well as to those who are served by them, and § 1983 provides a cause of action for all citizens injured by an abridgment of those protections." Collins v. Harker Heights, 503 U.S. 115, 119-120, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992).

Rather, the outcome of Olech was dictated solely by the absence of a rational basis for the discrimination. As we explained:

"Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. In so doing, we have explained that '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.'

"[Olech's] complaint also alleged that the Village's demand was 'irrational and wholly arbitrary' . . . . These allegations, quite apart from the Village's subjective motivation, are sufficient to state a claim for relief under traditional equal protection analysis." 528 U.S., at 564, 565, 120 S. Ct. 1073, 145 L. Ed. 2d 1060 **[*35]** (some internal quotation marks and citations omitted).

Here, as in Olech, Engquist alleged that the State's actions were arbitrary and irrational. In response, the State offered no explanation whatsoever for its decisions; it did not claim that Engquist was a subpar worker, or even that her personality made her a poor fit in the workplace or that her colleagues simply did not enjoy working with her. In fact, the State explicitly *disclaimed* the existence of any workplace or performance-based rationale. [2] See, e.g., Reply Brief for Petitioner 17, 19. The jury proceeded to find that the respondents intentionally treated Engquist "differently than others similarly situated with respect to the . . . termination of her employment . . . without any rational basis and solely for arbitrary, vindictive or malicious reasons." App. to Pet. for Cert. 3-4. The jury's verdict thus established that there was no rational basis for either treating Engquist differently from other employees or for the

termination of her employment. The State does not dispute this finding. Under our reasoning in *Olech,* the absence of any justification for the discrimination sufficed to establish the constitutional violation.  **[*36]**

---

**FOOTNOTES**

2 But for this disclaimer, the lower court could have dismissed the claim if it discerned "any reasonably conceivable state of facts that could provide a rational basis for the [State's actions]," even one not put forth by the State. *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S. Ct. 2096, 124 L. Ed. 2d 211 (1993). The disclaimer, however, negated that possibility.

---

The majority nonetheless concludes, based on "unique considerations applicable when the government acts as employer," that the "class of one" theory of equal protection is not applicable in the public employment context. *Ante,* at 5. Its conclusion is based upon speculation about inapt hypothetical cases, and an incorrect evaluation of the importance of the government's interest in preserving a regime of "at will" employment. Its reasoning is flawed on both counts.

    II

The majority asserts that public-employment decisions should be carved out of our equal protection jurisprudence because employment decisions (as opposed to, for example, zoning decisions) are inherently discretionary. I agree that employers must be free to exercise discretionary authority. But there is a clear distinction between an exercise of discretion and an arbitrary decision. **[*37]** A discretionary decision represents a choice of one among two or more rational alternatives. See 1 H. Hart & A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law 162 (Tent. ed. 1958) (defining discretion as "the power to choose between two or more courses of action each of which is thought of as permissible"). The choice may be mistaken or unwise without being irrational. If the arguments favoring each alternative are closely balanced, the need to make a choice may justify using a coin toss as a tie breaker. Moreover, the Equal Protection Clause proscribes arbitrary decisions -- decisions unsupported by any rational basis -- not unwise ones. Accordingly, a discretionary decision with any "reasonably conceivable" rational justification will not support an equal protection claim; only a truly arbitrary one will. There is therefore no need to create an exception for the public-employment context in order to prevent these discretionary decisions from giving rise equal protection claims.

The hypothetical situations posited by the majority do not prove otherwise. The hypothetical traffic officer described in the Court's opinion, *ante,* at 11, had a rational basis **[*38]** for giving a ticket to *every* speeder passing him on the highway. His inability to arrest every driver in sight provides an adequate justification for making a random choice from a group of equally guilty and equally accessible violators. As such, the Court is quite correct in stating that "allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action." *Ibid.* If there were no justification for the arrest, there would be no need to invoke the Equal Protection Clause because the officer's conduct would violate the Fourth Amendment. But as noted, a random choice among rational alternatives does not violate the Equal Protection Clause.

A comparable hypothetical decision in the employment context (*e.g.,* a supervisor who is required to eliminate one position due to an involuntary reduction-in-force and who chooses to terminate one of several equally culpable employees) also differs from the instant case insofar as it assumes the existence of a rational basis for the individual decision. The fact that a supervisor might not be **[*39]** able to explain why he terminated one employee rather than another will not give rise to an equal protection claim so long as there was a rational basis for the termination itself and for the decision to terminate just one, rather than all, of the culpable employees.

Instead of using a scalpel to confine so-called "class of one" claims to cases involving a complete absence of any conceivable rational basis for the adverse action and the differential treatment of the plaintiff, the Court adopts an unnecessarily broad rule that tolerates arbitrary and irrational decisions in the employment context.

    III

The majority's decision also rests on the premise that "[t]he Constitution does not require repudiating th[e] familiar doctrine" of at-will employment. *Ante,* at 14. In the 1890's that doctrine applied broadly to government employment, see *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 29 N.E. 517 (1892), but for many years now "'the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.'" *Keyishian v. Board of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 605-606, 87 S. Ct. 675, 17 L. Ed. 2d 629 (1967). Indeed, recent **[*40]** constitutional decisions and statutory enactments have all but nullified the significance of the doctrine. See, *e.g., Elrod v. Burns,* 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976); *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990); see also 5 U.S.C. § 2302(b)(10) (2006 ed.) (supervisor of covered federal employee may not "discriminate . . . on the basis of conduct which does not adversely affect the performance of the employee or applicant or the performance of others"). Accordingly, preserving the remnants of "at-will" employment provides a feeble justification for creating a broad exception to a well-established category of constitutional protections. 3

---

**FOOTNOTES**

3 Moreover, equal protection scrutiny is not incompatible with at-will employment since courts applying rational-basis scrutiny are able to rely on any *conceivable* reason for government action, and the government therefore need not explain its actual reason for terminating or disciplining the employee.

---

IV

Presumably the concern that actually motivates today's decision is fear that governments will be forced to defend against a multitude of "class of one" claims unless the Court wields its meat-axe forthwith. Experience demonstrates, however, that these claims **[*41]** are brought infrequently, [4] that the vast majority of such claims are asserted in complaints advancing other claims as well, and that all but a handful are dismissed well in advance of trial. Experience also demonstrates that there are in fact rare cases in which a petty tyrant has misused governmental power. Proof that such misuse was arbitrary because unsupported by any conceivable rational basis should suffice to establish a violation of the Equal Protection Clause without requiring its victim also to prove that the tyrant was motivated by a particular variety of class-based animus. When the allegations of a complaint plainly identify "the proverbial needle in a haystack," *ante,* at 16, a federal court should not misconstrue the Constitution in order to make it even easier to dismiss unmeritorious claims.

---

**FOOTNOTES**

[4] Prior to the Ninth Circuit's decision this case, "class of one" claims arising in the public-employment context were permitted by every court that was presented with one. Yet there have been only approximately 150 cases -- both in the district courts and the courts of appeals -- addressing such claims since *Olech.*

---

\* \* \*

In sum, there is no compelling reason to carve arbitrary public-employment **[*42]** decisions out of the well-established category of equal protection violations when the familiar rational review standard can sufficiently limit these claims to only wholly unjustified employment actions. Accordingly, I respectfully dissent.

---

Source: Legal > Cases - U.S. > **U.S. Supreme Court Cases, Lawyers' Edition** 
Terms: "First Amendment" and employ! and date after January 1, 2008 (Edit Search | Suggest Terms for My Search)
Focus: **First Amendment** (Exit FOCUS™)
View: Full
Date/Time: Wednesday, June 18, 2008 - 11:52 AM EDT

\* Signal Legend:
⊜ - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◈ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
❶ - Citation information available
\* Click on any *Shepard's* signal to *Shepardize®* that case.

---

LexisNexis®   About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# ATTACHMENT B

1 of 1 DOCUMENT

**DENISE DRAINER, Plaintiff, v. FRANK O'DONNELL (Dismissed) WILLIAM GARRETT, TICOR TITLE INSURANCE COMPANY, AND RICHARD YERGER, Defendants.**

**C.A. No. 94C-08-062**

**SUPERIOR COURT OF DELAWARE, NEW CASTLE**

*1995 Del. Super. LEXIS 229*

**February 24, 1995, Submitted
May 30, 1995, Decided**

**SUBSEQUENT HISTORY:** [*1] Released for Publication by the Court June 7, 1995.

**DISPOSITION:** GRANTED IN PART, DENIED IN PART.

**COUNSEL:** Michael P. Maguire, Esq., Wilmington, DE. Attorney for Plaintiff.

Benton J. Mathis, Jr., Esq. of Drew, Eckl and Farnham, Atlanta, Ga. Attorney for Defendants Richard Yerger and Ticor Insurance Company.

Dale R. Dube, Esq., of Bayard, Handelman and Murdoch, P.A., Wilmington, DE. Attorney for Defendants Richard Yerger and Ticor Insurance Company.

Ransford B. Palmer, Jr., Esq., Christiana Executive Campus, Newark, DE. Attorney for Defendant William Garrett.

**JUDGES:** Haile Alford, J.

**OPINION BY:** Haile Alford

**OPINION**

**OPINION AND ORDER**

UPON DEFENDANTS' MOTIONS TO DISMISS.

ALFORD, J.

Defendants William Garrett (hereinafter "Garrett"), Richard Yerger (hereinafter "Yerger"), and Ticor Title Insurance Company (hereinafter "Ticor"), (hereinafter collectively referred to as "Defendants"), all move separately to dismiss the complaint of Denise Drainer (hereinafter "Drainer") pursuant to Superior Court Civil Rule 12(b) alleging, *inter alia,* (i) lack of subject matter jurisdiction; and (ii) failure to state a claim for which relief may be granted. This is the Court's decision on Defendants' [*2] motions to dismiss.

**BACKGROUND**

Drainer worked at the law firm of O'Donnell and Garrett in Wilmington, Delaware, for approximately two and one-half years. Drainer worked almost exclusively for Garrett as a legal secretary. At the time, Yerger was president of Ticor, which provided title insurance for some of the law firm's clients.

Drainer, a married woman, alleges in her complaint that, on or about August 16, 1993, Yerger circulated a story asserting Drainer had traveled with him earlier that month to the Bahamas for a vacation. He allegedly stated that while on vacation, Drainer's "breasts had become

sunburned and that he had taken nude pictures of her on the beach." Drainer categorically denies accompanying Yerger on vacation. Drainer further alleges that she was confronted about the story a few days later by another secretary at the law firm, as well as by two Ticor employees.

According to Drainer's complaint, she reported the situation to Garrett immediately upon hearing the rumor; and Garrett failed to properly address the problem. Therefore, she tendered her resignation in September, 1993.

On August 5, 1994, Drainer filed a civil complaint alleging "harassment" against [*3] Garrett and his partner Frank O'Donnell, [1] Yerger and Ticor. The complaint further alleges mental distress and physical injury resulting from the "harassment". Drainer demands compensatory damages, including approximately $ 8,000 in lost wages from Defendants, and punitive damages against Yerger and Ticor.

> 1  Frank O'Donnell was dismissed by stipulation on December 22, 1994.

Garrett filed a motion to dismiss the complaint on September 26, 1994, while Yerger and Ticor filed their respective motions to dismiss the complaint on November 17, 1994. On December 6, 1994, Drainer amended her complaint to include allegations of slander *per se.*

## STANDARD – MOTION TO DISMISS

The Court will not dismiss a complaint unless the allegations fail to articulate a claim under any reasonably conceivable set of circumstances susceptible of proof under the complaint." *Browne v. Robb, Del. Supr., 583 A.2d 949, 950 (1990); Spence v. Funk, Del. Supr., 396 A.2d 967, 968 (1978); Towe v. Justis Bros., Inc., Del.* [*4] *Super., 290 A.2d 657, 658 (1972).* In assessing the complaint, the Court must accept all

of its allegations as true. *Spence v. Funk, 396 A.2d at 968;* Q-Tone Broadcasting, Co. v. Musicradio of Maryland, Inc., Del. Super., C.A. No. 93C-09-021, Silverman, J. (August 22, 1994). The Delaware Supreme Court has held that a complaint may not be dismissed unless "it is clearly without merit, which may be either be a matter of law or of fact." *Diamond State Tel. Co. v. University of Delaware, Del. Supr., 269 A.2d 52, 58 (1970).*

## SEXUAL HARASSMENT

Hostile work environment-type sexual harassment has been recognized by the federal courts as a form of employment discrimination. *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); Powell v. Las Vegas Hilton Corp., 841 F.Supp. 1024, 1028 (D. Nev. 1992); Lehmann v. Toys ' R' Us, Inc., 132 N.J. 587, 626 A.2d 445, 454 (N.J. 1993).* Verbal conduct of a sexual nature made because of an employee's sex, which is so pervasive or severe that it creates an intimidating or hostile work environment, has been defined as an example of hostile work environment sexual harassment. *Meritor Savings Bank,* [*5] *477 U.S. at 65-66.* It has been held that an employer may be liable for sexual harassment of its employees by non-employees. *Powell v. Las Vegas Hilton Corp., 841 F.Supp. 1024.*

The Delaware Legislature has adopted an employment discrimination statute almost identical to the federal statute. [2] *19 Del.C. § 711; Cannon v. State of Delaware, 523 F.Supp. 341 (D. Del. 1981).* Delaware has not recognized a common law cause of action for employment discrimination, including sexual harassment. *Wright v. ICI Americas Inc., 813 F.Supp. 1083, 1091 (D.Del. 1993); Chalawsky v. Sun Refining and Marketing Co., Inc., 733 F.Supp. 791, 799 (D.Del. 1990); Brett v. Berkowitz, Del. Super., C.A. No. 91C-12-251, Lee,*

J. (April 13, 1995), Mem. Op. at 8-10.

2      Delaware's Employment Discrimination Statute provides in pertinent part:

It is an unlawful employment practice to "hire, discharge ... or otherwise to discriminate against any individual" due to "race, marital status, color, age, religion, sex or national origin". *19 Del.C. § 711(a)(1).*

[*6] Delaware's employment discrimination statute outlines specific procedures that must be followed to assert an employment discrimination claim. Judicial review is only available after a Delaware Department of Labor Review Board (hereinafter "Board") hearing. *Wright v. ICI, 813 F.Supp. at 1090-1091, citing 19 Del.C. § 712.* Drainer's claim never went beyond the initial stages. In any event, had Drainer appealed an unfavorable decision of the Board, the Court of Chancery would have had jurisdiction. [3] Thus, the Court does not have subject matter jurisdiction over this or any sexual harassment claim. *Wright v. ICI Americas, 813 F.Supp. at 1090-1091, n.11.*

3      *19 Del.C. § 712(h)* provides, in pertinent part:

Any party, other than a member of the Department, respondent or intervenor "aggrieved by an order of the review board . . . may obtain judicial review, and the review board may obtain an order of the Court of Chancery for enforcement of its order. The proceeding for review or enforcement is initiated by filing a petition in the Court of Chancery . . . within 30 days after a copy of the order of the review board is received, unless the Department is the petitioner."

[*7] **SLANDER**

A defamatory statement is one that tends to damage another's reputation in the entire community. *Spence v. Funk, 396 A.2d at 969;* Q-Tone Broadcasting Co., *supra,* at 3. Slander, or oral defamation, is typically not actionable without proof of specific monetary injury, or special damages, unless the defamation rises to the level of slander *per se.* [4] Id. One who slanderously "imputes serious sexual misconduct to another" may be liable without proof of special harm. *Restatement (Second) of Torts, § 574* (1976). The function of the court is to determine whether the statement is capable of carrying a defamatory meaning. Whether the statement was understood in a defamatory manner by its recipient is a question for the jury. Ronald RE v. Horstmann, Del. Super., CA. No. 83C-FE-82, Poppiti, J. (August 11, 1987); *MacDonough v. A. S. Beck Shoe Corporation, Del. Super., 40 Del. 318, 10 A.2d 510, 513 (1939).*

4      Delaware has recognized the following four categories of slander *per se:* defamation that imputes to another (i) a crime; (ii) a loathsome disease; (iii) misconduct affecting one's business, trade or profession; and (iv) unchastity, or serious sexual misconduct., *Spence v. Funk, 396 A.2d at 969, n.1.*

[*8] Drainer alleges that the aforementioned statement by Yerger imputes unchastity to her, in that the statement implies that she, a married woman, accompanied Yerger on a vacation and was involved in a sexual relationship with him. Yerger argues that the alleged statement was not defamatory because a defamatory meaning can only be derived when said statement is expanded by innuendo. The

Court finds that Yerger's statement implies serious sexual misconduct on Drainer's part, and is therefore capable of carrying a defamatory meaning that is slanderous *per se.*

Yerger next argues that the alleged statement expressed opinion rather than fact, and is therefore not actionable. The Court finds this argument to be totally without merit.

### EMOTIONAL DISTRESS

To establish a cause of action for intentional infliction of emotional distress, a plaintiff must allege that, as a result of a defendant's extreme and outrageous conduct, he or she suffered severe emotional distress. The plaintiff need not allege accompanying bodily harm. *Cummings v. Pinder, Del. Supr.,* 574 A.2d 843, 845 (1990); Brett v. Berkowitz, Del. Super., C.A. No. 91C-12-251, Lee, J. (April 13, 1995), Mem. Op. at [*9] 10. However, when the gravamen or significant portion of a complaint "sounds in defamation", no independent action for intentional infliction of emotional distress will lie. *Barker v. Huang, Del. Super.,* 610 A.2d 1341, 1350-51 (1992). The rationale for this rule is to preclude one from reviving a defective defamation claim by pleading it as a claim for intentional infliction of emotional distress. Id. Therefore, Drainer may not simultaneously allege slander and intentional infliction of emotional distress.

Negligent infliction of emotional distress has been defined as outrage, resulting from the negligence of another, suffered by a person within the immediate zone of danger of the negligent act. *Robb v. Pennsylvania Railroad, Del. Supr.,* 58 Del. 454, 210 A.2d 709, 714-715 (1965); *G. D. Searle & Co., Del. Super.,* 484 A.2d 527, 531 (1984). Physical injury resulting from the emotional distress is required. Id. Drainer's allegations of "sleeplessness and nausea" caused by

emotional distress resulting from Yerger's alleged rumor sufficiently allege negligent infliction of emotional distress.

### WORKMEN'S COMPENSATION

Garrett argues that Drainer's claims are barred [*10] by Delaware's Workmen's Compensation Act (hereinafter the "Act"), *19 Del.C. § 2301-2397.* The Act provides the exclusive remedy for employees suffering personal injury arising out of and in the course of employment. *19 Del.C. § 2304; Battista v. Chrysler Corp., Del. Super.,* 454 A.2d 286, 289 (Del. Super. 1982). *Mental trauma has been held to be compensable under the Act. Ramey v. Delaware Materials, Inc., Del. Supr.,* 399 A.2d 205 1979); *Battista v. Chrysler Corp.,* 454 A.2d at 289. In Battista, the employee's claim was for intentional infliction of emotional distress. However, the Court finds that it makes no difference whether mental trauma is caused by negligent or intentional infliction of emotional distress. Therefore, Drainer's claims against Garrett for intentional and negligent infliction of emotional distress are barred by the Act.

Harm resulting from defamation has been held to be an injury to reputation, and not a personal injury within the meaning of the Act. *Mergenthaler v. Asbestos Corp. of America, Del. Supr.,* 480 A.2d 647, 650 (1984); *Battista v. Chrysler,* 454 A.2d at 289. Thus, Drainer's claim for slander is not barred.

### RESPONDEAT [*11] SUPERIOR

Ticor argues that Drainer's complaint fails to state a cause of action against it based on respondeat superior in that the complaint as amended merely alleges that Yerger made the statements while he was employed by Ticor. Ticor argues that the allegations made are insufficient to support a claim for employer

liability. In response, Drainer argues that the issue must be decided by a jury armed with the knowledge of Yerger's job responsibilities.

An employer will be liable for the tortious acts of an employee under respondeat superior if those acts are performed within the scope of employment. Conduct is within the scope of employment if it (i) is of the type the employee was hired to perform; (ii) takes place "within the authorized time and space limits"; and (iii) is at least partially motivated by a purpose to serve the employer. *Wilson v. Joma, Inc., Del. Supr., 537 A.2d 187, 189 (1988); Draper v. Olivere Paving & Construction Co., Del. Supr., 54 Del. 433, 181 A.2d 565, 570 (1962),* citing the *Restatement, Second, Agency § 228.* The question of whether conduct is within the scope of employment is generally a question for the jury, unless the facts are so [*12] clear that they must be decided as a matter of law. *Draper, 181 A.2d at 569.* In the instant case, viewing Drainer's allegations in the light most favorable to her, the complaint fails to allege conduct on Yerger's part that could be deemed to be within the scope of employment. Therefore, the Court finds that Drainer failed to state an actionable claim against Ticor.

**CONCLUSION**

For the aforementioned reasons, Ticor's motion to dismiss is **GRANTED;** Defendants' motions to dismiss the sexual harassment claims are **GRANTED;** and Garrett's motion to dismiss the negligent infliction of emotional distress claim is **GRANTED.**

As to Drainer's claim for negligent infliction of emotional distress, Yerger's motion to dismiss is **DENIED.** Defendants' motions to dismiss the slander and intentional infliction of emotional distress claims are **GRANTED IN PART AND DENIED IN PART**, in that Drainer must amend her complaint in order to elect either slander or intentional infliction of emotional distress.

**IT IS SO ORDERED.**

Haile Alford

J.

## CERTIFICATE OF SERVICE

I hereby certify that I have caused copies of the following:

### ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

to be served upon:

      Bruce C. Herron, Esq.
      Akin & Herron, P.A.
      1500 Shallcross Avenue
      Suite 1-A
      Wilmington, DE 19806

by e-filing and mailing copies to the address shown above, postage prepaid on
_____6 - 30 - 08_____.

          SCHMITTINGER & RODRIGUEZ, P.A.

          BY: _____
              William D. Fletcher, Jr.
              Bar I.D. # 362
              Noel E. Primos
              Bar I.D. # 3124
              B. Brian Brittingham
              Bar I.D. # 4966
              414 S. State Street
              P.O. Box 497
              Dover, DE 19903-0497
              (302) 674-0140
              Attorneys for Plaintiff

DATED: 6/30/08