IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMUEL JAMES FOX, III, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | C.A. No. 07-488-GMS |
| | * | |
| TOWN OF SMYRNA, DAVID S. | * | |
| HUGG, III, individually and in his official | * | |
| capacity as Town Manager of the Town | * | |
| of Smyrna, and VALERIA HERITAGE, | * | |
| individually and in her official capacity | * | |
| as Administrative Clerk of the Town of | * | |
| Smyrna, | * | |
| | * | |
| Defendants. | * | |

## APPENDIX TO PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SCHMITTINGER & RODRIGUEZ, P.A.
William D. Fletcher, Jr.
Bar I.D. #362
Noel E. Primos
Bar I.D. #3124
B. Brian Brittingham
Bar I.D. #4966
414 S. State Street
P.O. Box 497
Dover, DE 19901
(302) 674-0140
Attorneys for Plaintiff

DATED: 6/30/08

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Plaintiff's Complaint | B-1 |
| Samuel J. Fox, III – Deposition Testimony | B-13 |
| Affidavit of Janet Vinc | B-69 |
| David S. Hugg, III – Deposition Testimony | B-71 |
| Affidavit of Gary Stulir | B-107 |
| Gary Stulir – Deposition Testimony | B-108 |
| James Markow – Deposition Testimony | B-127 |
| Carol C. McKinney – Deposition Testimony | B-145 |
| Affidavit of James Markow | B-156 |
| Defendants' Answer | B-157 |
| November 8, 2005, Memo to David Hugg from Samuel (Jim) Fox | B-164 |
| January 4, 2006, Letter to David Hugg from Samuel (Jim) Fox | B-165 |
| Excerpts of Town Policy Manual | B-167 |
| January 30, 2006, Email to William Pressley from David Hugg | B-170 |
| Valerie Lynn Heritage – Deposition Testimony | B-171 |
| Catherine A. Fox – Deposition Testimony | B-183 |
| Samuel J. Fox, III – Deposition Testimony | B-197 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,          &ast;    C.A. No.    0 7 - 4 8 8
&ast;
Plaintiff,          &ast;
&ast;
v.          &ast;    **COMPLAINT**
&ast;
TOWN OF SMYRNA, DAVID S. HUGG,  &ast;    **TRIAL BY JURY DEMANDED**
III, individually and in his official capacity    &ast;
as Town Manager of the Town of Smyrna,    &ast;
and VALERIE HERITAGE, individually    &ast;
and in her official capacity as Administrative &ast;
Clerk of the Town of Smyrna,    &ast;
&ast;
Defendants.          &ast;

1.    Plaintiff Samuel James Fox is a resident of the State of Delaware residing at 276 Sunrise Drive, Clayton, Delaware 19938.

2.    Defendant Town of Smyrna (hereinafter "Defendant Town") is a municipal entity, a political subdivision of the State of Delaware, an employer within the State of Delaware, within the jurisdictional coverage of Title VII of the Civil Rights Act, and within the jurisdictional coverage of the Age Discrimination in Employment Act.

3.    Defendant David S. Hugg, III, was at all times pertinent hereto, the Town Manager and employee of Defendant Town.

4.    Defendant Valerie Heritage, was at all times pertinent hereto, the Administrative Clerk in the Building Department and employee of Defendant Town.

5.    This Court has original jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343 and pursuant to 42 U.S.C. § 2000e-5(f)(3).

6.    This Court has pendent jurisdiction over Plaintiff's state law claims pursuant to

B-1

28 U.S.C. § 1367.

7.      Venue for all causes of action stated herein lies in the District of Delaware as the acts alleged as the bases for these claims took place within the boundaries of that District.

8.      Plaintiff is a Caucasian male, age fifty-five (55).

9.      Plaintiff began employment with Defendant the Town of Smyrna on or about July 3, 2000, as a Building Code Enforcement Officer.

10.     During the period of his employment, Plaintiff was never the subject of disciplinary action, nor was he ever counseled by Defendant Town or its agents until the time of the incidents leading to his employment's termination as set forth hereinbelow.

11.     Further, Plaintiff was promoted three times during his employment with Defendant Town, eventually achieving the positions of Capital Projects Coordinator and Manager of the Building and Inspection Department.

12.     At all times relevant hereto, Plaintiff performed the duties of his job position satisfactorily.

13.     In March of 2005, Ms. Jeri Dunn, Town Planner for Defendant Town, who worked in conjunction with Plaintiff in managing the Building & Inspection Department, was terminated for allegedly making defamatory comments about another employee of Defendant Town, Ms. Janet Vinc.  Ms. Vinc was a younger female who was favored by Defendant Hugg. These allegations against Ms. Dunn were false, and were promoted by Defendant Hugg to secure for Ms. Vinc an advancement under the new job title of Manager of Zoning and Planning Department, a position created for Ms. Vinc by Defendant Hugg.

14.     During the course of events following this incident, Plaintiff made clear that such

B-2

types of comments of a similar nature were never made by him, nor directed toward any other employee of Defendant Town by him. Plaintiff went so far as to speak at a meeting of Defendant Town employees and encouraged anyone with information to the contrary to step forward so that a thorough investigation could be completed. No person claiming to have such alleged information came forward.

15.    Contrary to Defendant Town's internal investigatory procedures, Defendant Hugg allegedly recorded two statements from individuals alleging that Plaintiff made similar defamatory statements on March 22, 2005. These statements were given some time after Plaintiff had encouraged an open and full disclosure of information surrounding the incident, were not reported in anyway to Plaintiff, nor were they obtained in compliance with procedural guidelines. These statements were acquired by Defendant Hugg for pretextual reasons adverse to Plaintiff's employment interests. Moreover, after Plaintiff discovered the existence of these written statements in 2006, one of the employees who purportedly made such statement told Plaintiff that he had not made the statement.

16.    In January of 2006, Defendant Hugg sent an email regarding Plaintiff to a Town Councilman, falsely accusing Plaintiff of making sexual harassing comments. In April of 2006, the false statements obtained by Defendant Hugg were published on the Internet on a website oriented toward political issues regarding Defendant Town. These recorded and published statements were false and the fabrication of them was wanton and/or wilful. Only two people had access to these documents, both employees of Defendant Town, and could have given them to the individuals who maintain the website, namely Defendant Hugg and his secretary, Carol McKinney.

B-3

17.     In 2005, the Mayor and Town Council of Defendant Town recommended to Defendant Hugg, as Town Manager of Defendant Town, that Plaintiff be promoted to Assistant Town Manager. Ms. Vinc told Defendant Hugg that she would not work for Defendant Town if Plaintiff was promoted. Accordingly, Defendant Hugg refused to promote Plaintiff. Plaintiff subsequently learned that Ms. Vinc wanted the Assistant Town Manager position for herself.

18.     Plaintiff received his best performance review to date on May 15, 2005, from Defendant Town, through its agent Defendant Hugg.

19.     Shortly after this time, Defendant Heritage made false and malicious statements that Plaintiff was having an affair with a coemployee. These statements were false and baseless and when confronted Defendant Heritage admitted that the statements had been fabricated without justification.     These statements were made maliciously by Defendant Heritage for pretextual reasons adverse to Plaintiff's employment interests.

20.     In addition to the slanderous statements made about Plaintiff, Defendant Heritage verbally assaulted Plaintiff during the workday at their place of employment with Defendant Town. Despite Plaintiff's complaint to Defendant Hugg, as Town Manager for Defendant Town, in regard to Defendant Heritage's behavior, Defendant Hugg refused to investigate these claims and refused to initiate disciplinary action against Defendant Heritage for her inappropriate and wrongful conduct.

21.     Subsequent to Defendant Hugg's reorganization and promotion of Ms. Vinc to the position of Manager of Zoning and Planning Department, some job responsibilities of the former Town Planner's position were not assigned to Ms. Vinc, but became Plaintiff's responsibilities. Given the additional work load placed upon Plaintiff, he repeatedly requested an assistant be

B-4

hired to aid him with his management and planning duties. In December of 2005, a meeting was held involving Defendant Hugg, as Town Manager of Defendant Town, in which it was decided that another person would be hired to assist Plaintiff with his planning duties and management of the Building and Inspection Department. Plaintiff, though having made requests repeatedly for assistance and action of this kind, was never informed by Defendant Hugg that such a personnel move was forthcoming and such hiring did not occur prior to Plaintiff's employment ending with Defendant Town.

22.     Due to Defendant Hugg's inaction regarding Plaintiff's repeated requests for assistance and the aforementioned untenable work environment cultivated by Defendant Town and its agents, Plaintiff was compelled to resign from employment on January 18, 2006. In short, during his employment with Defendant Town, Plaintiff suffered discrimination on the basis of his age and sex from Defendant Town's agents. Defendant Hugg favored a younger, female employee over Plaintiff, and falsely and maliciously accused both an older female employee, Ms. Dunn, and Plaintiff of making derogatory comments about that younger, female employee. In addition, Defendant Hugg denied a promotion to Plaintiff to the position of Assistant Town Manger due to Ms. Vinc, herself, coveting it. Further, Defendant Hugg was engaged in a campaign to vilify and discredit Plaintiff beginning in March of 2005, with the collection of false statements, through April 2006, with the placement of these false statements on the Internet. Furthermore, it is apparent that Defendant Hugg created a hostile environment for Plaintiff, refusing to respond both to his requests for staffing assistance and to his complaints about the derogatory comments of Defendant Heritage.

23.     Plaintiff has received a Notice of Right to Sue for the above-mentioned allegations

B-5

from the U.S. Equal Employment Opportunity Commission.

24.     Plaintiff has timely filed this Complaint within ninety days of his receipt of the Notice of Right to Sue.

25.     The wrongful acts committed by Defendants, as stated hereinabove, were willful, wanton, and committed in bad faith.

### *COUNT I*

26.     Plaintiff restates and hereby incorporates by reference paragraphs 1 through 25 hereinabove.

27.     By committing the aforementioned acts, Defendant Town, acting by and through its agents, discriminated against Plaintiff on the basis of his sex by refusing to promote him to Assistant Town Manager, by harassing him, subjecting him to a hostile environment for pretextual reasons, refusing to respond adequately and appropriately to his complaints, and by treating Plaintiff differently than a similarly situated female employee in violation of 42 U.S.C. § 2000(e) et seq.

28.     As a direct result of the discriminatory and retaliatory conduct of Defendant Town, Plaintiff has suffered damages, including but not limited to, severe emotional distress, pain and suffering, mental anguish, humiliation, and lost wages.

WHEREFORE, Plaintiff demands judgment against Defendant Town for:

(a)     Back pay, including interest;

(b)     Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

B-6

(c)     Punitive damages;

(d)     Pre-judgment and post-judgment interest;

(e)     Attorney's fees;

(f)     Reinstatement, if feasible, or in the alternative, front pay;

(g)     Any other relief that this Court deems just.

### *COUNT II*

29.     Plaintiff restates and hereby incorporates by reference paragraphs 1 through 28 hereinabove.

30.     Defendants, acting under color of state law, have deprived Plaintiff of the rights afforded him under the United States Constitution and federal law, in violation of 42 U.S.C. § 1983. These rights include, but are not limited to, Plaintiff's rights to equal protection and due process of law regarding his employment relationship with Defendant Town, pursuant to the Fourteenth Amendment of the United States Constitution.

31.     Such violations of law happened in the context of a continuing, widespread, and persistent pattern of constitutional misconduct by the employees of said Defendants including discrimination on the basis of gender and deliberate indifference to or tacit authorization of such conduct by said Defendants' policy-making officials after notice to the officials of said misconduct.

WHEREFORE, Plaintiff demand judgment against Defendants, jointly and severally, for:

(a)     Back pay, including interest;

(b)     Compensatory damages, including damages for emotional and physical

        pain and suffering, inconvenience, mental anguish, loss of enjoyment of

B- 7

life, and all other non-pecuniary damages;

(c)    Punitive damages;

(d)    Pre-judgment and post-judgment interest;

(e)    Attorney's fees;

(f)    Reinstatement, if feasible, or in the alternative, front pay;

(g)    Any other relief that this Court deems just.

## COUNT III

32.    Plaintiff restates and hereby incorporates by reference paragraphs 1 through 31 hereinabove.

33.    By committing the aforementioned acts, Defendant Town, acting by and through its agents, discriminated against Plaintiff on the basis of his age by refusing to promote him to Assistant Town Manager, by harassing him, subjecting him to a hostile environment for pretextual reasons, refusing to respond adequately and appropriately to his complaints, retaliating against him, and by treating Plaintiff differently than a similarly situated younger employee in violation of 29 U.S.C. § 626 et seq.

34.    As a direct result of the discriminatory and retaliatory conduct of Defendant Town, Plaintiff has suffered damages, including but not limited to, severe emotional distress, pain and suffering, mental anguish, humiliation, and lost wages.

WHEREFORE, Plaintiff demands judgment against Defendant Town for:

(a)    Back pay, including interest;

(b)    Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of

B-8

life, and all other non-pecuniary damages;

    (c)    Punitive damages;

    (d)    Pre-judgment and post-judgment interest;

    (e)    Attorney's fees;

    (f)    Reinstatement, if feasible, or in the alternative, front pay;

    (g)    Any other relief that this Court deems just.

### *COUNT IV*

35.    Plaintiff restates and hereby incorporates by reference paragraphs 1 through 34 hereinabove.

36.    By their actions as described hereinabove, including but not limited to, falsifying and manipulating employment records to justify Plaintiff's constructive discharge, Defendants have breached the covenants of good faith and fair dealing implied under Delaware Law.

37.    Defendants' actions in breaching the implied covenant of good faith and fair dealing were wilful and/or wanton.

38.    As a direct result of the wrongful conduct of Defendants and their agents, Plaintiff has suffered damages, including but not limited to, physical and emotional injury, pain and suffering, mental anguish, humiliation, and lost wages.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally,

    (a)    Back pay, including interest;

    (b)    Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

B-9

(c)    Punitive damages;

(d)    Pre-judgment and post-judgment interest;

(e)    Attorney's fees;

(f)    Reinstatement, if feasible, or in the alternative, front pay;

(g)    Any other relief that this Court deems just.

### *COUNT V*

39.    Plaintiff restates and hereby incorporates by reference paragraphs 1 through 38 hereinabove.

40.    Defendant Town's agents have made false oral statements regarding Plaintiff, including but not limited to, upon information and belief, statements as to Plaintiff's moral character and alleged inappropriate acts by Plaintiff.

41.    Defendant Town's agents have recorded and published false statements regarding Plaintiff, including but not limited to, upon information and belief, statements as to Plaintiff's moral character and alleged inappropriate acts by Plaintiff.

42.    Defendant Town's agents knew said statements to be false when they made, recorded, and published them.

43.    Defendant Town's agents have published said statements in an improper manner and for an improper purpose.

44.    Defendant Town's agents have made said statements with actual malice. Said statements of Defendant Town's agents maligned Plaintiff in his trade, business, profession, and reputation, and Defendant Town's agents made said statements with the intent so to malign Plaintiff.

B-10

45.    The defamatory oral and written statements of Defendant Town's agents regarding Plaintiff were intended to disgrace him, injure his reputation among his colleagues, malign him in his profession, and bring him into contempt and ridicule.

46.    The defamatory oral and written statements of Defendant Town's agents regarding Plaintiff constituted slander and libel per se.

47.    At all times pertinent to this matter, Defendants Hugg and Heritage, and Carol McKinney were acting as employees and agents of Defendant Town and were acting within the scope of their employment or agency relationship with Defendant Town.

WHEREFORE, Plaintiff demands judgment against Defendants for:

(a)    Back pay, including interest;

(b)    Compensatory damages, including damages for emotional and physical pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and all other non-pecuniary damages;

(c)    Punitive damages;

(d)    Pre-judgment and post-judgment interest;

(e)    Attorney's fees;

(f)    Reinstatement, if feasible, or in the alternative, front pay;

(g)    Any other relief that this Court deems just.

SCHMITTINGER & RODRIGUEZ, P.A.

BY: _____

WILLIAM D. FLETCHER, JR.

Bar I.D. # 362

B-11

BY: _____

     NOEL E. PRIMOS
     Bar I.D. #3124

BY: _____

     B. BRIAN BRITTINGHAM
     Bar I.D. #4966
     414 S. State Street
     P.O. Box 497
     Dover, DE 19903
     (302) 674-0140
     Attorneys for Plaintiff

B-12

1

1               IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3  SAMUEL JAMES FOX, III,       :   C.A. No. 07-488

                        :

4        Plaintiff,     :

                        :

5        v.          :

                        :

6  TOWN OF SMYRNA, DAVID S. HUGG,  :

  III, individually and in his   :

7  official capacity as Town Manager:

  of the Town of Smyrna, and    :

8  VALERIE HERITAGE, individually   :

  and in her official capacity as  :

9  Administrative Clerk of the     :

  Town of Smyrna,            :

10                         :

         Defendants.    :

11          .. .. .. .. .. ..

12       Deposition of SAMUEL JAMES FOX, III, taken

  pursuant to notice, on Wednesday, January 9, 2008 at 1:00

13  p.m. at 414 S. State Street, Dover, Delaware, reported by

  Lorena J. Hartnett, a Registered Professional Reporter and

14  Notary Public.

15           .. .. .. .. .. ..

16  APPEARANCES:

17         B. BRIAN BRITTINGHAM, ESQUIRE

          Schmittinger & Rodriguez

18         414 S. State St.

         Dover, DE  19901

19          Attorney for the Plaintiff

20         BRUCE HERRON, ESQUIRE

         Akin & Herron, P.A.

21         1500 Shallcross Avenue

         Suite 1A

22         Wilmington, DE  19806

          Attorney for the Defendants

23

24

13

1   codes, could be rental inspections was one of them, do

2   inspections for rentals to make sure they are code

3   compliant, safety, you know, things like that.

4        Handled any kind of nuisance type ordinances,

5   you know, trash, grass, you know, things like that, of

6   that nature.

7        And then also there was the building inspection

8   part where the building inspector or the assistant town

9   manager, who was my supervisor at the time, I mean could

10  take me out or ask me to do building inspections on

11  residential buildings and stuff, so it was kind of a wide

12  range of things from just your basic maintenance code to

13  building inspections.  It was quite a bit of different

14  things.

15       Q    And then you were promoted to building

16  inspector in 2002?

17       A    Yes, well, let me think here now.  The prior

18  building inspector had left, and the town did not have a

19  building inspector, and Mr. Jacobs was still there as

20  town manager.

21       Tom English left.  He left just before, in June

22  of 2000 before I got there, so the town didn't -- They

23  hired another lady, Kimberly Sisson, who was my

24  supervisor, as the assistant town manager.  She was away

14

1    when I was actually hired, so I didn't get to meet her

2    until she got back.

3         But they posted the position in the paper.  I

4    tested for it.  I was interviewed by Kimberly and also

5    Mr. Jacobs prior to his leaving the Town of Smyrna, and

6    Kimberly hired me based on my test results and my

7    experience in construction.

8         And I think that was '04, I think.  There is a

9    letter there in my stuff there that says -- I don't even

10   remember the exact date, but I believe it was April 5 or

11   April 6 of '04.  It's in the paperwork that we have.

12   Q    I think there is a memo, we will get to it

13   later, I think it's '02.  Does that make more sense?

14   A    Yeah, I started in 2000, so it's a year and a

15   half.  I'm sorry, I was thinking of something else, I'm

16   sorry, but yes, '02.

17   Q    So at the time, if my recollection of the

18   documents that we will get to later is accurate, at the

19   time you were hired, not hired, at the time you were

20   promoted, the town manager position was vacant, is that

21   correct, or there was a turn over there?

22   A    I think so.  I think Mike had left, and I

23   believe Chief Baldwin, Richard Baldwin, was acting town

24   manager at the time.

15

1    Q    Now, the building inspector position, I know

2    you mentioned this earlier, did that require that you

3    obtain additional certifications?

4    A    Well, I took a test for the position first, did

5    a drawing, did my written test and everything.  I don't

6    remember -- There was something, I know, in the job

7    description where you had to gain certain certifications.

8    I believe it was in like 18 months after hire.

9    Q    And did, as far as you remember, did you obtain

10   those certifications?

11   A    I don't know if it was right at the 18 months,

12   but I think it was somewhere close.

13   Q    What were the duties of a building inspector?

14   A    Basically inspect all residential and

15   commercial structures for compliance with the building

16   code in the Town of Smyrna.

17        I worked with engineers, you know, like in the

18   design stages, sometimes for to make sure that when they

19   designed a building, if there was any questions of what

20   the town required, because in some municipalities, not

21   everybody has the same -- In other words, if you have an

22   IBC code now, a building code, international building

23   code, you can amend certain ordinances to fit your

24   particular area.

1          So you couldn't just read it out of the book.

2   At times you had to investigate with the local

3   municipality to find out if they had amended anything and

4   to make sure it's built according to what they want, so I

5   would work with architects or engineers, you know, to

6   make sure that it was code compliant.

7          Q    How long did you remain in that position as a

8   building inspector with the town?

9          A    Let's see.  Well, I know it was at least a

10  couple years, I guess.  I know that I was promoted to

11  capital projects coordinator from the building inspection

12  when they decided to separate, prior to them separating

13  the department into two pieces.

14          I worked with -- Kimberly had left.  She had

15  left and went with another company.  So I continued doing

16  the building inspections.  I am trying to think if we

17  even had another building inspector at that time.

18          I kind of did a couple jobs at one time.  I was

19  working with, as a capital projects coordinator, I worked

20  with all the departments, public works department,

21  electrical department.

22          We had a new substation that was being designed

23  then to be built.  I worked with the architects and

24  engineers on the design for the new police station, the

17

1    new public works building, downtown renovation work that

2    was proposed to be done, which was basically redoing all

3    the infrastructure downtown to help revitalize the

4    downtown area, esthetic wise and also utilities.

5          I worked with electrical engineer and design of

6    the -- I'm sorry, the electric line extensions, which

7    went out to all new subdivisions.

8          I worked with the engineers and architects in

9    making sure the subdivisions had easements in order to

10   place all these utilities and stuff before the

11   subdivision -- If some of the subdivisions weren't ready

12   to be recorded, then we would make sure it was on the

13   record plan.  If they had already been recorded, then we

14   tried to work with the owners or engineers to get the

15   developer to allow us to gain an easement on a, you know,

16   already approved subdivision.

17        Q    That was, what you just referred to, was in

18   your position as capital projects coordinator?

19        A    Yes.

20        Q    Do you remember when you were promoted to that

21   position?

22        A    Sometime, well, let's see, probably sometime

23   around the beginning of '05, I guess, somewhere around

24   there, I think.

18

1    Q    Who promoted you to that position?

2    A    I guess the town manager.  I mean I think, from

3  what I understand, was they went to -- The council, I

4  guess, approved an advance hire without having to put it

5  out for, you know, interviews and all that other stuff,

6  and then I was promoted.

7    Q    Was that Mr. Hugg at the time?

8    A    Yes, Mr. Hugg, yes.

9    Q    And then did you hold any other positions for

10  the town?

11    A    No, just continued my -- Well, after that --

12    Q    I mean after that.

13    A    Yeah, after that, shortly thereafter, since

14  Kimberly was gone, they divided the building department

15  into two sections.  One was the planning side and one was

16  the building side.

17        I took over the building side as the manager of

18  building inspections, and then Janet Vinc took over the

19  planning side as manager of planning and zoning.

20    Q    And was that considered a promotion or not for

21  you?

22    A    Well, it was a temporary position.  I guess,

23  from what I understand, Council decided to give it a

24  temporary trial period to see how it worked, since they

19

1   didn't have any kind of planning director or anything

2   like that, so it was a temporary job.

3        Q    Did you receive any increase in salary, do you

4   know?

5        A    Yes, I think I did, yes.

6        Q    And was that a position you held when you

7   submitted your notice of termination of employment?

8        A    No.

9        Q    What was the position that you held when you

10  left the town?

11       A    I went back -- Well, I resigned from the

12  manager of the building inspection department, because

13  the situation working in it that department was not very

14  friendly.

15            I had issues with one of the people that were

16  under me that accused me of having an affair with my

17  secretary, which I did not, and also she admitted in a

18  meeting between the town manager, myself, and my

19  secretary that she had no basis for that allegation and

20  apologized for it.

21            And then she, about a couple months later,

22  verbally attacked me in my office, and it just made it

23  unbearable to be in that department anymore, so I wrote a

24  letter of resignation to the town manager asking for a

24

1    really know.

2         Q    Now, the Paragraph 18 says that again Ms. Dunn

3    was terminated for making allegedly defamatory comments?

4         A    Yes.

5         Q    Do you recall attending a meeting at town hall,

6    I believe March 11 of '05, when that subject was

7    discussed?

8         A    Yes, sir, I do.

9         Q    Alright, and Mr. Hugg, Sue Hensley, Gary

10   Stulir, Jerilyn Dunn, and Carol McKinney were present; is

11   that correct?

12        A    Yes.

13        Q    Was there anybody else present?

14        A    Yes, Chief Richard Baldwin.

15        Q    Anyone else?

16        A    No, I don't think so.

17        Q    Who asked you to attend that meeting?

18        A    Mr. Hugg.

19        Q    What was your understanding of the purpose of

20   the meeting?

21        A    I did not know.  I had no idea.  They just said

22   Mr. Hugg needs to see you downstairs, and I went

23   downstairs.

24        Q    Let me show you a document that we have

25

1  produced in discovery that I would like to get marked as

2  Fox 1.

3                    (The reporter marked Fox Exhibit

4                    Number 1.)

5  BY MR. HERRON:

6      Q    The title of this document is notes from

7  meeting on Friday, March 11, 2005.

8      A    Yes.

9      Q    Have you ever seen this document before?

10     A    Yes, I have.

11     Q    Had you ever seen this document before you

12 filed this lawsuit?

13     A    No, sir.  I requested the minutes from this

14 meeting in 2006.  I had a letter sent to me back from the

15 town manager saying that it was not required to be

16 preserved and that it was in shorthand, and my assumption

17 was that it was destroyed and did not exist, so I

18 couldn't get it because I was told that there wasn't any

19 minutes to the meeting.  And that letter, a copy of that

20 letter was given to my attorney.

21     Q    Would you agree with me that this document

22 appears to be a transcription of what was said at the

23 meeting, appears to be intended as that, anyway?

24     A    Parts of it, but there are parts that are

26

1    missing.

2        Q    That's what I am going to ask you about.

3        A    Okay.

4        Q    What I would like you to do is review the

5    document and tell me if there is anything in there, in

6    the document which you believe is inaccurate?

7        A    Uh-huh.

8        Q    And I don't mean statements in there that are

9    inaccurate, but inaccurate in the sense of what was in

10   there wasn't said at the meeting, if you know what I

11   mean.  Is that confusing?

12           MR. BRITTINGHAM:  I am going to object to

13       the form.  It's a very broad question.  If you

14       could be more specific, perhaps go paragraph by

15       paragraph with Mr. Fox.  We are talking five,

16       six pages here.

17           MR. HERRON:  It is.  It is.  But let me

18       ask if you can read it over first.

19           THE WITNESS:  Well, I had read it before.

20   BY MR. HERRON:

21       Q    Okay.  What I am trying to determine is if you

22   feel there is anything in here that is contained in these

23   minutes that was not said at the meeting or was

24   inaccurately transcribed.

29

1  statement at the meeting?

2      A    No, I do not.  I do remember the next one where

3  I said I was disappointed that she did not earn her

4  position.

5      Q    Who is that?

6      A    Ms. Vinc, I'm sorry, yes.  And then Mr. Hugg

7  said that I had my opportunity, and then I guess he -- I

8  do not know who Mr. Hugg is speaking to in the next

9  paragraph, because he does not mention my name, other

10  than saying that I will have my opportunity.

11         The comments and everything that supposedly he

12  stated he is hearing from other people could not have

13  come from me, because I didn't say them, so I am assuming

14  maybe he was referring to Ms. Dunn.

15         In the next paragraph he said he considers

16  Ms. Dunn's comments describing a member of town council

17  as a pig in that category, so I would infer that he was

18  talking to Ms. Dunn and not me.

19      Q    And then the next paragraph he refers to, the

20  last paragraph on the bottom?

21      A    That, I do not, because he is inferring that I

22  made the same comments about a member of Council and

23  himself having a relationship with an employee, which

24  would have been Janet Vinc.  I did not say that.

32

1   Mr. Hugg actually saying specific names, and this, I

2   will -- This is where I do not believe this is accurate.

3          When he was talking about firing Jeri, I do not

4   ever remember hearing Mr. Antonio, Ms. Heritage, or

5   Ms. Cronin's name ever being mentioned, nor did they ever

6   mention Mr. Markow or Mr. Stulir, because Mr. Markow and

7   Mr. Stulir that I know, that I can recollect, never

8   talked to Jeri, unless she did it and I didn't know about

9   it, and maybe she did.  I don't know.  I don't know if

10  that was directed at me or if it was directed at her.

11     Q    And now you are referring to the first full

12  paragraph on page four?

13     A    Yes, he is recommending to Council that Ms.

14  Dunn be terminated immediately.  He offered her the

15  opportunity to sign a letter of resignation.

16         I do remember that.  Ms. Dunn said, "You have

17  got it."  I do remember that.  She left the meeting.  I

18  do remember her leaving.

19     Q    It appears that the discussion turned to you?

20     A    Yes.

21     Q    Do you remember that?

22     A    Yes, I do, and at that point when it started on

23  me, I asked Mr. Hugg to bring anyone down that said that

24  I had any, anything to do with this type of conduct, that

33

1    I felt that it was inappropriate and unprofessional and

2    that, if he had anybody that said I did those things, to

3    get them downstairs right now so it could be addressed.

4    That is missing from these minutes.

5        Q    What about three quarters of the way down it

6    says, "Mr. Fox said it was just a conversation with the

7    guys." Do you remember making that statement?

8        A    No, sir, I did not. I did not have a

9    conversation specifically about anybody. The night in

10   question when all of this is supposed to have come up

11   about these allegations of what I supposedly said, we

12   three were in the same room together and I was concerned

13   about Janet's performance and how it would affect me if,

14   with this interim period, if she didn't do her job, then,

15   you know, would I be demoted, basically demoted.

16            And even though there was really no monetary

17   gain in my promotion, you know, only, how should I say

18   it, position only, no monetary gain, that I would be

19   demoted back down to capital projects coordinator, which

20   that's the position I held prior to that.

21            So I did not make any derogatory remarks about

22   Janet Vinc other than I was very concerned and I was, you

23   know, worried about my own position.

24       Q    Do you remember making the comments attributed

34

1   to you there at the bottom of the page, of page four?

2       A    "Mr. Fox said he has people telling him stuff

3   like this all the time.  He said his issue was that Mr.

4   Hugg always hires people on their qualifications."

5           I, let's see, okay, "Mr. Hugg said he was told

6   that Mr. Fox said the reason another employee got her

7   position was because Mr. Hugg and her had something going

8   on."

9       Q    Do you remember Mr. Hugg saying that at the

10  meeting?

11      A    He may have.  I don't know.  "He said that even

12  between guys that was inappropriate."

13          That's what I was saying, I did not go to them

14  and specifically talk about anybody.  I mean he may have

15  said it, in some of this, he may have said -- I don't

16  remember every single word.  I was very upset over this,

17  to be accused of such things to begin with.  I just was

18  very taken aback by the whole meeting.

19          However, it says, "Mr. Fox says he has people

20  telling him stuff like this all the time."  Yes, I had

21  heard rumors about different things, but I didn't believe

22  them.  You know, you don't know unless you actually see,

23  and I don't spread rumors.

24          "He said that Mr. Hugg always hires people on

35

1   their qualifications," and he said, "His issue was that

2   Mr. Hugg always hires people on their qualifications."  I

3   may have heard it.  I don't know.

4       Q    Go to page five, top paragraph, page five.  Do

5   you recall that conversation?

6       A    Yes, and at that point that is where I listed

7   all of my qualifications from the beginning of where I

8   started as a teenager in construction and went all the

9   way through to my working with the Town of Smyrna.  That

10  is not in the minutes.

11          I did tell Mr. Hugg that I felt that, at the

12  meeting, that I felt that degrees were great, that, you

13  know, people, you know, they earn degrees, and that's

14  good, but that field experience is just as important as

15  any degree, that if you don't know what you are looking

16  for through field experience, you can't learn that in a

17  book.  You know, you can only learn so much from a book.

18  You have to actually be able to do it.

19          You have to not only be able to see a problem.

20  You have to be able to know how to correct a problem, and

21  without field experience and knowledge of construction,

22  you won't be able to do that.

23          Her qualifications, and what I meant in her

24  qualifications was that she went from a downtown

B-28

36

1  coordinator, which basically worked with the businesses

2  in the Town of Smyrna in the downtown area, and went

3  directly to a management position, and I was there, and I

4  do remember making the comment that I had been there

5  around, I think at that time, close to five years.  I

6  worked from the bottom all the way to the manager's

7  position.

8      Q    Did you feel that you should have had her

9  position?

10      A    No.

11      Q    Okay, so your observation or your problem was

12  with her being put in that position --

13      A    Without experience, yes.  No, it didn't -- And

14  I believe, and I said it, I don't have any planning

15  experience, so why would I want that position?  My forte'

16  was the building side.  That's what I have done all my

17  whole life, so I had no interest in the planning

18  position.

19      Q    On the town's organizational chart, was

20  Ms. Vinc's position and your position, were they equal or

21  roughly equal?

22      A    Job duties were different, but I mean I guess

23  the positions were the same, I mean as far as stature in

24  the charts, I guess.

44

1    conversation with you on Thursday evening, March 10,

2    which again was discussed in the -- which appears to be

3    one of the subjects discussed at the March 11, 2005

4    meeting.

5        A    No, sir, these, none --

6        Q    Let me ask you first.

7        A    Okay.

8        Q    Let me ask you a question.

9        A    Okay.

10       Q    First, Exhibit 2, which is Mr. Markow's

11   affidavit, is that affidavit accurate?

12       A    No, sir.

13       Q    Okay.  What do you recall about the

14   conversation with Mr. Stulir and Mr. Markow on Thursday

15   evening, March 10, if anything?

16       A    Just what I had said before, that we went in

17   and I was just talking to him about daily stuff like we

18   always do, and I told him I was worried about how Janet's

19   performance would affect me and about being demoted.

20           At no time did I ever say anything derogatory

21   about Janet, so that remark in James's statement, I did

22   not say that.

23       Q    That remark is?

24       A    "The way she got her job was laying on her

45

1   back," I did not say that statement.  It is repulsive.

2        Q    And then in Fox 3, which is Mr. Stulir's

3   affidavit, did you make the statements that he attributes

4   to you in that affidavit?

5        A    Yeah, I know how Janet got her job.  She got

6   her job because she was Mr. Hugg's student at the

7   University of Delaware, and he brought her there.  I mean

8   that was widely known through the town, through Town

9   Hall.

10       Q    So Mr. Stulir's affidavit is accurate?

11       A    Except for that I was afraid of working with

12  her.  I wasn't afraid of working with her.  I was afraid

13  of what would happen at the end of the 60-day period if

14  she didn't do her job, you know, that I would be demoted.

15            But I never said that I wouldn't work with her.

16  I mean we do work with each other, we did work with each

17  other.

18       Q    But other than the statement that you said you

19  would not work with her, the affidavit is accurate?

20       A    I believe so.

21       Q    I am going to go back to Fox Exhibit 1.  I

22  think we are on page seven.

23       A    Okay.

24       Q    I think the third paragraph of page seven

46

1  refers to comments attributed to Mr. Stulir at the

2  meeting.  Do you remember him making the comments that

3  are reflected in the third paragraph there?

4      A    I don't remember -- We did talk about stuff,

5  and I remember me wanting to get another truck for the

6  department.

7          We did talk about budget issues a lot.  Gary

8  would have to talk to Mr. Hugg about it, I remember that.

9          And that's where I was saying, he said that

10  "Mr. Fox said he knew how Ms. Vinc got her particular

11  position and it really upset him."  That was the case.

12  Implying that it was an inappropriate manner, well, I

13  didn't say anything inappropriate at all.

14          I said what I had said before, that I was

15  concerned about her being able to do her job and that I

16  basically didn't want to be demoted if she didn't do her

17  job.  And I did know how she got her job.  It's because

18  Mr. Hugg brought her there because she was his student.

19      Q    What about the next paragraph which has a

20  comment that's attributed to you which begins with

21  "Mr. Fox said he has had so many people tell him --"

22      A    Yes, I did hear that.

23      Q    "-- that the job was promised to her by Temple

24  Carter."

48

1  recall that.

2          I do remember the statement by Ms. Hensley.  I

3  do recall the next one.  I remember the confidential --

4  Where he said, "He hears stuff and he should be able to

5  come to you, but when Mr. Hugg tells me something, I

6  never tell anyone."

7          And that's true, I didn't, because I felt that

8  when you are in management, that private things should

9  stay private and, you know, you don't go around talking

10 to people.  You know, you have to have a level of

11 confidence that everything you do is not going to be out

12 in the street.  I did say that.

13         I do not recall saying that Mr. Hugg can deal

14 with me however he wants to.  I don't recall that,

15 because at the time I did not feel that I had done

16 anything wrong.

17         I do remember Mr. Hugg apologizing to me for

18 this misunderstanding, so obviously he must have believed

19 what I said, because why would you apologize if you

20 didn't.

21    Q    It says in here, it says -- I mean it says in

22 here, "He said that, if he misunderstood, he apologizes."

23 Do you recall him saying that, or do you recall --

24    A    Yes, yes, he apologized to me.  I don't recall

1  the part where they spoke about calling Mr. Carter a pig,

2  but.

3       Q    It looks like the rest of that page is Mr. Hugg

4  talking about the incident with Ms. Dunn.

5       A    Uh-huh, oh, yeah, I think that's so.

6       Q    That even goes to the top of the next page,

7  page eight, page nine, I believe.

8            And then the first full paragraph of page nine

9  has several statements attributed to you.  Do you

10 remember making those statements?

11      A    I believe so.

12      Q    Going down a little bit again, "Mr. Fox says it

13 took him five years and she," meaning Ms. Vinc, "was

14 going right into management.  He said that is what he is

15 so upset about."

16      A    Yes, that's true.

17      Q    Did you say that?

18      A    Yes, sir.

19      Q    And the next sentence after that says, "Mr.

20 Hugg said that, considering everything that has been

21 discussed and the content of Mr. Fox's comments, he feels

22 that the matter has been resolved."  Do you remember Mr.

23 Hugg saying that?

24      A    Yes.

1    Q    A couple sentences down it says, "Mr. Fox said

2  he will accept the punishment that Mr. Hugg is going to

3  give him."  Do you remember making that statement?

4    A    No, but I may have.  I don't recall.  I do

5  remember the next one.  I do remember him saying that,

6  you know, that there would not be anything, you know,

7  that it was the end of it, that it was over with.  I mean

8  after we talked, we got up and shook hands and I went

9  back to work.

10   Q    And you were never disciplined for the comments

11 that you were alleged to have made in the Stulir and

12 Markow affidavits?

13   A    I never knew that they existed.

14   Q    I know you never knew that the affidavits

15 exhibited, but --

16   A    But, no, I was never disciplined verbally or

17 written in my personnel file or anything concerning this

18 meeting, no.

19   Q    That's what I was asking.

20   A    After that, I mean we just went back to work.

21 I never knew anything about it.  After that, it was done.

22 We just went to work.  It was over.  And if you look at

23 the next page, "Mr. Fox says he knows that Ms. Vinc was

24 Mr. Hugg's student."  And that's what I have always said,

61

1   called anyone.

2        Q    Let's go to Paragraph 17 of the complaint.

3        A    Oh, you missed a couple.

4        Q    We are going to go back.  We are going to head

5   back.  Honest with you.

6        A    Okay, good.

7        Q    Paragraph 17 says that, "In 2005 the Mayor and

8   Town Council recommended to Defendant Hugg that Plaintiff

9   be promoted to assistant town manager."

10       A    Yes.

11       Q    Do you know when in 2005 that recommendation

12  occurred?

13       A    It would have been before the election of

14  Nelson Messick, because Councilman Messick came to me and

15  told me that if he was elected, that he would make sure

16  that I was promoted to the assistant town manager

17  position.

18            And I had heard that from other Council

19  members, as well, the mayor, Councilman William Pressley,

20  that they wanted me to be the assistant town manager but

21  Mr. Hugg kept saying that he didn't want one, he didn't

22  need one.

23       Q    Are you aware of any documents which refer to

24  that recommendation?

67

1    Heritage made false and malicious statements that

2    plaintiff was having an affair with a co-employee."

3         A    Yes.

4         Q    Do you know when these statements were made?

5         A    Yeah, I mean I don't know the exact date.   We

6    have an e-mail between my wife and my daughter.

7              MR. HERRON:   Let me show you the e-mail.

8              THE WITNESS:   Okay.

9              MR. HERRON:   Why don't we get this marked

10       as Fox Exhibit 4.

11                        (The reporter marked Fox Exhibit

12                        Number 4.)

13   BY MR. HERRON:

14        Q    What I have handed you and what has been marked

15   as Fox Exhibit 4 is a series of e-mails.   I believe they

16   are all dated June 15, 2005.

17        A    These, I think, they were sent to me from my

18   daughter, because I had no idea that Valerie had even

19   said any of these things until my daughter inadvertently

20   had told me about it, because she thought that my wife

21   and I had already discussed all this, and I didn't know

22   what she was talking about.

23             So when I confronted my wife about it, I said,

24   "What are you talking about?   What is all this you are

1    talking about?"  That's when she told me that her and

2    Valerie had conversations about Aimee and I and what

3    Valerie had said to her.

4            And I thought, I mean just, you know, around

5    the house there, I thought that -- I knew my wife was

6    bothered by something.  I really didn't know what.

7            And then she confronted me after she found out

8    that Alexis, my daughter, had given me these e-mails.

9    When I confronted her she said that she thought that

10   Aimee and I were having an affair.

11           Well, I thought she was going to tell me that

12   she was, because I had no idea that this was coming.  I

13   didn't know what it was.  I had no knowledge of this, and

14   I said, "What are you talking about?"  And that's when

15   she told me that Valerie Heritage had told her, my wife,

16   that Aimee and I were having an affair.  And I said,

17   "Well, it's not true."  I said there was no way.

18           So that's when I guess my daughter sent me

19   these e-mails, so I knew exactly what was said between my

20   wife and my daughter because, like I said, I thought that

21   she had already -- My daughter thought that my wife had

22   already talked to me about this issue, so she didn't know

23   that I didn't know, so it was a bombshell to me.  We were

24   out at lunch one day, and that's when she dropped it on

1  me, so immediately I said, "Well, I have got to find out

2  what this is, because this is not right, this is not

3  true."

4         So after discussing this with my wife, I took

5  one of the e-mails, and I really don't know which one it

6  was, you know, I don't remember which one, but I took it

7  to Mr. Hugg and said, "This is what Valerie has said

8  about Aimee and I."

9         And he called a meeting.  I am not sure if it

10  was the same day or the next day.  I don't really

11  remember, but he called a meeting present where Aimee

12  Masten, my secretary, myself, Valerie Heritage, and just

13  him.

14         I requested that the personnel chairman be

15  there, because that's who was there with Jeri Dunn.  This

16  meeting was entirely different than her meeting, no

17  recorder minutes, no personnel chairman, no witnesses

18  other than just Valerie and Aimee and myself and Mr.

19  Hugg.

20         At that meeting Valerie admitted that she had

21  no basis for her allegations.  And when I asked her, you

22  know, "Why did you do this," she gave no reason for it.

23         When I first started working for the town as

24  code enforcement officer, Valerie and I worked together,

70

 1   because she kept a lot of the records, files and stuff on

 2   code enforcement issues, rental inspection files, a lot

 3   of different data that we kept track of and all, so we

 4   worked together.  She was basically the first friend that

 5   I had when I went to work for the Town of Smyrna.

 6            When I was her supervisor, whenever she needed

 7   time off to be with her granddaughter, who she is raising

 8   by herself, take her to the doctor, the child is sick and

 9   she needs to stay home with her, whatever, I never once

10   ever refused her.

11            Up until the time this happened, I don't think

12   we ever had a cross word with each other, and then this

13   happened.

14            And, to be perfectly honest with you, it has

15   basically just about cost me my marriage, because even to

16   this day, up until about a month or so ago, I wasn't even

17   able to talk to my wife about how much it hurt me.

18            I mean we had been together for about 17, 16,

19   17 years at that time, and not once did I ever give my

20   wife any indication or anything to think about me not

21   being faithful to her.

22            And for Valerie to make the comments that she

23   made and lead my wife on to believe that that's what I

24   was doing was very hurtful, and she had no reason for

71

1  doing it, because it didn't happen.

2          And I mean to this day it's very, very

3  upsetting.  And I will be honest with you, and I told

4  this to Brian the other day, my wife and I, we might

5  still not make it because of this, and we have two

6  children.

7      Q    Alright, the first e-mail on the first page of

8  Fox Exhibit 4 is just the one-sentence transmission from

9  your daughter to you; is that correct?

10     A    I'm sorry, what's that now?  Am I not looking

11 at it right?

12     Q    Right at the top there it says transmission

13 from your daughter to you.

14     A    Oh, yes, this was what she sent me, because I

15 didn't know what she was talking about, and she said that

16 she had e-mails between her and Kathy discussing this, so

17 she sent them to me, yes, so I would know exactly what

18 was said.

19     Q    Alright, and so the -- and what she sent you

20 was an e-mail from Cathy Fox, your wife, to Alexis Fox,

21 your daughter?

22     A    My daughter, my daughter, yes.

23     Q    And that's Wednesday, June 15 at 1:19 p.m. that

24 e-mail was sent?

84

1     Q     What?

2     A     The conditions that I was working under.

3     Q     Do you believe that those three individuals had

4  a plan to destroy you?

5     A     Based on everything I know now, I believe they

6  did.

7     Q     And in what sense do you think they wanted to

8  destroy you?

9     A     Because of the things that Janet wanted to be

10  assistant town manager, I just felt that if I wasn't

11  there, it wouldn't be any competition.

12     Q     I believe earlier you referred to a meeting

13  with Mr. Hugg, Valerie Heritage, and Aimee Masten.

14     A     Yes, as my assistant.

15     Q     Let me show you, or let me get a memo marked as

16  Fox 6.

17                    (The reporter marked Fox Exhibit

18                     Number 6.)

19  BY MR. HERRON:

20     Q     And this is, what has been marked as Fox 6, is

21  a memo from Mr. Hugg to -- It's a June 23, 2005 memo from

22  Mr. Hugg to Jim Fox, Valerie Heritage and Aimee Masten

23  regarding a personnel matter.

24     A     Yes.

87

1    And my wife did not prod her for this information.

2            But she admitted in this meeting that she had

3    no basis for those allegations, but it's not in this

4    memo.

5        Q    Well, what allegations did she admit to?

6        A    That we were having an affair.

7        Q    Okay, so it's your testimony that at this

8    meeting on June 23, 2005, Valerie said, Valerie admitted

9    that she told your wife that you and Aimee were having an

10   affair?

11       A    Yes, sir, see did.

12       Q    Okay, so it wasn't -- Would you agree with me

13   there is nothing in this memo that indicates that Valerie

14   said that you and Aimee were having an affair?

15       A    Nothing in this memo, no.

16       Q    And this memo indicates that Valerie admitted

17   that she made comments regarding possibly inappropriate

18   behavior; correct?

19       A    Yeah, it says that, but she said -- And because

20   I asked her, I said, "Valerie," you know, she is sitting

21   there and she is crying, I mean, you know, we are very

22   upset about this whole thing, and I said, "Valerie, why

23   would you say that?  You know, you were my first friend

24   here.  What have I ever done to you to make you do this?

1  I mean whenever you wanted off, you had off, whenever you

2  needed to stay home with your granddaughter, you were

3  there.  You know, I never denied you anything.  Why would

4  you do this to me?"  And she just didn't have an answer.

5         Aimee wanted her to be fired for what she did.

6  We felt that Mr. Hugg, since he fired Jeri Dunn for

7  supposedly saying something, and here you have

8  Ms. Heritage admitting that she said a lie and accused us

9  of having an affair, nothing was done to her, absolutely

10 nothing.

11    Q    Did you receive this memo from Mr. Hugg in June

12 of 2005?

13    A    I mean it looks like it, yeah, uh-huh.

14    Q    Did you ask Mr. Hugg, after you received the

15 memo, why there was nothing in the memo which indicated

16 that Valerie said that you and Aimee were having an

17 affair?

18    A    Because --

19    Q    No, I am asking whether you said that, so

20 that's a yes or no.

21    A    Oh, no, I did not talk to him about this after

22 that.

23    Q    Did you ever file a grievance regarding this

24 incident and Mr. Hugg's decision to issue a written

90

1    my letter.

2        Q    Can you tell me what happened during that

3    incident?

4        A    Yes, I came into work.  There was an

5    application for a demo permit that had been submitted

6    that was brought in that was given to me.  Valerie was

7    not in the office the day before when it came in.  It

8    came to me.

9            The next morning when I came in, Valerie was

10   already there.  I came up the steps, and I could hear

11   Janet and Valerie and Kim Cronin talking, and I couldn't

12   really make out what was being said, but it didn't sound

13   too pleasant, so I don't really know what everything was

14   said.

15           But when I got upstairs, I walked in my office

16   and I, you know, grabbed the application off my desk, and

17   I was heading through the door.  And, as I was going

18   through the door, she was coming to me.

19           And I said, "Oh, good," I said, "Come on in," I

20   said, "I have got this application for a demo permit I

21   want to give to you because it was brought in yesterday."

22           Well, I no sooner got that out of my mouth than

23   she just went off, to the point she was so close to me

24   that I backed and I sat down in my chair, because she

1    just kept coming and coming and coming and coming at me.

2            So I said, "Wait a minute."  I said, "What is

3    the matter with you?"  I said, "Sit down.  Sit down here

4    and tell me what's the matter with you."

5            And she was crying.  She was just like on the

6    verge of being hysterical.  And she, you know, I don't

7    really understand what caused her to act that way.  I

8    mean to this day I don't really know what happened that

9    made her go so hysterical over a building permit not

10   being date stamped.

11           The only thing that I can figure is that

12   something was said between the conversation that Janet

13   Vinc and Kim Cronin had with her prior to me coming

14   upstairs because, like I said, I could hear them talking

15   about something, and I could hear Janet above everybody,

16   but I couldn't quite make out what was said, but you

17   could tell that it was in not a very nice voice, not a

18   nice tone of voice, okay, so I could only assume that

19   that upset her about something.

20           So, you know, I tried to explain to her,

21   because Valerie was very meticulous in everything being

22   just so, and I tried to explain to her, "Valerie, this is

23   why I didn't put this through the process, because I

24   wanted you to see it because I know you like things done

1    a certain way."  Okay?

2           So I thought she was getting calmed down, and

3    then all of a sudden she stood up and got within inches

4    of my face and screamed at me all over again and told me

5    that I was no better than Steve Lee, who was the prior

6    planning director who left, just, you know, that's when

7    they split the department.

8           So at that point I politely told her, I said,

9    "Valerie, you need to leave my office and go calm

10   yourself down."  So she left, and she went out in her

11   office at her desk and sat there.

12          In the meantime, Aimee comes in and John

13   Bucalo, who is the code enforcement officer, that are

14   behind my office and heard all the shouting through the

15   walls, and came around, and John was in the hallway, but

16   Aimee came in the office wanting to know if I was okay,

17   because they heard what Valerie had done.

18   Q    Do you know -- Did they tell you if they heard

19   what you said and what Valerie said during that incident?

20   A    I didn't ask them.  I mean, you know, I'm sure

21   they can tell you.  But I said, "Yeah, I am fine," I

22   said, "but I am going to go find Mr. Hugg."

23          So when I left, I went downstairs looking for

24   Mr. Hugg, and he wasn't there in the Town Hall.  I don't

94

1      Q     And I'm going to come back to that.  I skipped

2  ahead of myself with one of these exhibits.  We will come

3  back to that.

4      A     Okay.

5      Q     Let me show you a memo to Mr. Hugg from you

6  dated August 3, 2005 that I would like to have marked as

7  Fox 7.  Do you recognize that memo?

8                        (The reporter marked Fox Exhibit

9                        Number 7.)

10     A     Yes, uh-huh.

11     Q     And is it fair to characterize this memo as a

12 request from you to Mr. Hugg as a request for assistance?

13     A      Yes, to fill the planner position that Jeri

14 Dunn had filled.  This was, let's see, it was March,

15 yeah, probably about three months, yeah.

16           This was after Jeri had left and I was doing

17 the capital projects coordinator position plus running

18 the manager, as the manager of the building inspection

19 department, which I was in charge of, you know, the

20 building inspectors, code enforcement officer.

21           And I had requested that Mr. Hugg fill the

22 position again because, you know, it was already -- it

23 was already there.  And I was doing part of, part of the

24 planning director's job.

95

1          If, in other words, if the department was run

2     by one person, I was doing part of his job, and, of

3     course, Janet was doing a lot of it too, which was like

4     she was in charge of all the zoning, like updating maps,

5     comprehensive maps, zoning maps, she did all of the when

6     people would come in and request for variances.  Any

7     zoning issue, you know, she would do that, certificate of

8     zoning compliance forms.  The zoning part was hers, so I

9     didn't do that part.

10          But the part of the planning director's job

11     description, there was a lot of things that I did do,

12     so -- And I don't know -- Yes, so I wanted to fill that

13     position to take some of the workload off of me to get

14     someone in Jeri's spot to do the stuff that I was picking

15     up.

16     Q     Do you know whether or not before this memo,

17     this August 3, 2005 memo, you made any prior requests for

18     assistance to Mr. Hugg to --

19     A     Yeah, I think I sent him two other requests.

20     It was either -- I don't know whether it was before or

21     after, but I think I wrote him a total of three memos

22     requesting help.  I believe it was three.  I think we

23     have those.

24     Q     Alright.

96

1      A    I'm sorry, we discussed -- Because he sent me

2  back an answer, I believe to this one, where --

3      Q    Let me show you that.

4      A    And that might be the other thing that we are

5  talking about.

6          MR. HERRON:  Why don't we get this marked

7      as Fox 8?

8                    (The reporter marked Fox Exhibit

9                    Number 8.)

10 BY MR. HERRON:

11     Q    What we have had marked as Fox 8 is an

12 August 19, 2005 memo to you from Mr. Hugg which appears

13 to be a reply to your August 3, 2005 memo.

14     A    Uh-huh.

15     Q    Is that correct?

16     A    Uh-huh.

17     Q    Yes?

18     A    Yes, I believe so.

19     Q    And in Mr. Hugg's memo he said that he wasn't

20 convinced that the filling of the planner position was

21 the appropriate action but that he thought your section

22 would benefit or could benefit from a plan reviewer or

23 another code officer; is that correct?

24     A    Well, we needed a plan reviewer.  We didn't

97

1    need a code enforcement officer.  We did need a plan

2    reviewer, but the plan reviewer would not take off any of

3    the added responsibilities that I was doing.  They are

4    just two different animals, you know, they don't --

5        Q    Let me ask you do you recall receiving this

6    memo?

7        A    Yes.

8            MR. HERRON:  And then it looks like

9        there is one more memo in this series.  We will

10       have this marked as Fox Exhibit 9.

11                    (The reporter marked Fox Exhibit

12                    Number 9.)

13   BY MR. HERRON:

14       Q    What I have had marked as Fox Exhibit 9 appears

15   to be a memo to Mr. Hugg from you replying to Mr. Hugg's

16   August 19, 2005 memo, and this memo is also dated

17   August 19, 2005.  Is that correct?

18       A    Uh-huh.

19       Q    Yes?

20       A    Yes, I'm sorry, yes.

21       Q    And that's a memo that you sent to Mr. Hugg?

22       A    Yes.

23       Q    And you agreed with Mr. Hugg that your section

24   would benefit from a plan reviewer?

98

1    A    Yes, it would.  I mean we were understaffed.

2  See, basically, the way that it was done before is the

3  actual building inspector, like when I was the building

4  inspector, I would do all plan reviews, as well as the

5  permitting, you know, the logs, keeping on track of

6  everything, but we were going from a town where we were

7  getting like 70 some houses a year to 300, so we were

8  understaffed for the amount of work that, workload that

9  we had coming in.

10        So a building inspector that would have 20

11  houses sitting there, he would never get out to go

12  inspect if we didn't have somebody doing something, so we

13  were understaffed as far as that goes, but I still had no

14  one to work with me that could work with developers and

15  everything else.

16        I still felt that, you know, we still needed to

17  fill the planner position, because it was already a

18  budgeted position, you didn't have to create it, you

19  didn't have to go back to the finance committee or the

20  personnel committee to create the position.  It was

21  already there.  It would not have been a hardship to the

22  town, because the money had already been budgeted for the

23  position, so I still wanted it filled, but I would take

24  anyone I could get, because in other levels of service I

99

1   was understaffed.

2        Q    Okay, after August 19, 2005 were there any

3   efforts made, that you know of, to hire a plan reviewer?

4        A    Nuh-uh, not while I was there.  I temporarily

5   put Diane Eisenbrey as a plan reviewer per se.  She was

6   listed as a building inspector on the staffing chart, but

7   because of her construction experience, I had her doing

8   plan reviews.

9             Because I was a certified building inspector,

10  so I could do inspections if the other building

11  inspectors couldn't get to it, so I was kind of like a

12  fill-in if we needed somebody, which I did.  Although,

13  let me take that back, I did all the commercial

14  inspections.  I am only speaking of residential

15  inspections as a fill-in.  I did all commercial

16  inspections, as well as being the manager of the

17  department, as well as being the capital projects

18  coordinator.

19            That's what I was referring to in this other

20  memo of having basically three jobs.  I was doing

21  everything I was supposed to do and an accumulation of

22  other parts of other jobs.

23       Q    After the August 19, 2005 exchange of memos,

24  did you have any further discussions with Mr. Hugg about

100

1   a need for additional help in your department?

2        A    I mean not in writing.  I mean, you know, we

3   discussed different things at different times.  You know,

4   I mean at that time, you know, everything was back to

5   normal and, you know, we were just doing our day's work,

6   and I saw him all the time and, you know, I mean I was in

7   his office.  Like when I come in the door the first thing

8   in the morning, I would just go right in and we would

9   talk about daily stuff and all that.

10           MR. HERRON:  Alright.  Why don't we take

11       about a five-minute break and then we will come

12       back.

13                    (A recess was taken.)

14  BY MR. HERRON:

15       Q    Let's go back to the November 7, 2005 incident

16  with Ms. Heritage that we just spoke to, you spoke about

17  a few moments ago.  I am going to be showing you a

18  November 8, 2005 memo from you to Mr. Hugg that we will

19  mark as Fox Exhibit 10.

20                    (The reporter marked Fox Exhibit

21                    Number 10.)

22  BY MR. HERRON:

23       Q    Do you recognize that memo?

24       A    Yes.

104

1    tell them that, you know, about how I felt.  I just said

2    that, you know, I am not going to be the manager anymore,

3    I have moved down here, I said, but I will continue to do

4    the duties.  If you need me for anything, if you need my

5    help, I will still be involved in the daily activities of

6    the building department.  And I was, and I was until the

7    day I left.

8         Q    What position did you believe you were going

9    back to?

10        A    My original position as capital projects

11   coordinator because I was never, you know, they never

12   said you were no -- Because it was a temporary position,

13   they never did away with that slot in the staffing chart.

14   I held the two positions, because I continued to do the

15   job of the capital projects coordinator, as well as the

16   manager of the building inspections department.

17        If I had left the capital projects coordinator

18   job and solely did the building and I resigned, I am out

19   of a job, but I was doing both jobs, so I just regained

20   my title back as capital projects coordinator.  That's

21   what I resigned from as the manager, back to my capital,

22   and I kept doing the job.  I kept doing both jobs the

23   whole time.

24        Q    That's what I was going to ask you, after

109

1    writing to him, which I think in the personnel manual,

2    and I don't have my manual with me, but I can tell you

3    that I believe he is to basically conduct a meeting, you

4    know, to investigate everything and try to get it all

5    worked out, but he did not do it.  He wouldn't go any

6    farther.  And I don't know if it's in this.

7        Q    I was going to ask you, was there something in

8    addition to the November 8, 2005 memo, which is Fox 10,

9    if you know?

10       A    What's that now?  I'm sorry.

11       Q    My question was, was there -- Well, let me ask

12   you this:  Did you file a grievance regarding the Valerie

13   Heritage November 2005 incident?

14       A    Did I file a grievance?  Well --

15       Q    Or do you consider the November 8, 2005 memo to

16   have been the grievance?

17       A    Yes, to address it.  "If it were up to me," on

18   the last page, "If it were up to me, Valerie would be let

19   go for her unprofessional behavior towards a fellow

20   employee.  I found her attitude towards me today to be

21   disgraceful and very upsetting."

22       Q    Other than the November 8, 2005 memo, which is

23   Fox 10, did you submit anything else in writing to Mr.

24   Hugg or to the town regarding the November 7, 2005

110

1  incident with Valerie Heritage?

2      A    No, I just -- The town manager was notified in

3  this letter today, November 7, '05.  I was subjected to

4  an unacceptable action by an administrative clerk,

5  Valerie Heritage, when she proceeded to yell at me,"

6  blah, blah, blah, and he did nothing.

7          And I do not believe -- And up to the time I

8  left in January, there was not a copy of any disciplinary

9  letter to Valerie for what she did in this incident.

10 Nothing happened.  Nothing.

11     Q    As far as you know?

12     A    As far as I know, but the personnel policy

13 requires that if there was any investigation or anything

14 concerning, you know, this, that I should have had a copy

15 of everything, and I didn't get anything, so I assume

16 that nothing was done.

17     Q    Let me refer you to Paragraph 21 of the

18 complaint.  The third sentence there says that, "In

19 December of 2005 a meeting was held involving Defendant

20 Hugg, as town manager, in which it was decided that

21 another person would be hired to assist Plaintiff with

22 his planning duties and management of the Building

23 Inspection Department."

24     A    Uh-huh, that was when -- What's the date on

1          So I talked to Terry about it, and I asked him

2    about it.  He said he didn't know anything about any

3    statements that were taken.  He did tell me that he could

4    not give me any kind of legal advice, which I told him I

5    understood because, you know, he explained to me that I

6    didn't have any rights as an employee because I was gone.

7          I have known Terry for years, worked with him

8    when I was building inspector in the Town of Bethany, so

9    I felt he was telling me, you know, the right stuff.

10          And I told him then, I said, "Terry, I felt

11    that this may be some kind of a way to cause a

12    controversy, because all I am running is a positive

13    campaign."

14          I never brought up any negative stuff between

15    the mayor and my opponent, Mr. Mullen, or anything.  I

16    was dealing strictly with the issues of the town.  And,

17    you know, not knowing that they were even true, why would

18    I even address anything like that?

19          So Terry said, well, he said that, you know,

20    "If you don't know they are true, if you bring it out in

21    the open, then all you are going to do is take it away

22    from your positive campaign."  I said, "I know."

23          So he said, "You have to decide whether you

24    want to do that."  And I said, "No, I am not going to.  I

120

1  know it's not true, I didn't say it, I don't know that

2  they exist." And I told him, "Well, besides, after

3  seeing this e-mail, I reviewed the town personnel policy,

4  and the personnel policy under sexual harassment required

5  the town manager to conduct an investigation into these

6  statements."

7       Now, keep in mind that these statements were

8  taken ten days or eleven days after the meeting where

9  Jeri Dunn was fired where we basically put this to rest.

10       Mr. Hugg, under the town personnel policy, he

11  was required to notify me that he had these statements

12  and conduct an interview, an investigation and everything

13  and, you know, get this straightened out.

14       Okay, so not knowing that they existed, I just

15  disregarded it as a way to try to create a controversy,

16  so I just ignored it.

17       And I had absolutely no idea that they existed

18  until -- Well, actually, I only knew one of them existed,

19  was when James Markow's popped up on the Internet three

20  days before the election. And, even then, I didn't

21  question it, because I didn't know if it was really true

22  until I talked to James, but that's when James said that

23  he didn't say what was on that statement.

24       Q    And the second sentence in Paragraph 16 of the

134

1    A    Yes.

2    Q    Is that right?

3    A    Yes, sir, it very well was.

4    Q    In what way would you characterize it as

5    unbearable?  Why do you believe it was unbearable?

6    A    Well, because of Valerie Heritage, what she did

7    to me, accusing me of an affair, verbally attacking me.

8    The actions of Kim Cronin, Janet Vinc's assistant.  Janet

9    Vinc threatening to quit the town if I was promoted to

10    assistant town manager.

11         Just a lot of things that happened by people

12    that I worked with that made it unbearable to be there,

13    not knowing what they would do to me at another time that

14    could cost me my job, could create a great hardship to my

15    family.

16    Q    Did Mr. Hugg ever indicate to you at anytime

17    that your job was in jeopardy?

18    A    No, sir, he did not.

19    Q    Let me go to Paragraph 28 of the complaint,

20    which talks about damages that you allege that you have

21    suffered in this case.

22         Can you tell me -- Can you describe for me the

23    severe emotional distress that is referred to in

24    Paragraph 28 of the complaint that you attribute to the

135

1  defendant's conduct?

2      A    Well --

3          MR. BRITTINGHAM:  I am going to object to

4      the mischaracterization, to form.  Nowhere in

5      the complaint does it state severe.

6          MR. HERRON:  Well, let me just point out

7      to the Paragraph 28 it does, in fact, refer to

8      severe.

9          MR. BRITTINGHAM:  I apologize.

10         THE WITNESS:  Do you want me to still

11     answer?

12         MR. HERRON:  Yes.

13     A    Okay, well, first off I think that, number one,

14 because of what Valerie did, my wife and I may not make

15 it.  Our relationship, since she did what she did about

16 the alleged affair, has created a very hard and very

17 unhappy relationship between us.

18         I don't try to -- I don't make my wife pay for

19 what she said.  I am not mean to her or anything like

20 that, but emotionally to be accused of that after I had

21 given her 18 years, about 18 years at that time, I was

22 very hurt by it.  We don't really talk anymore about

23 things.  We -- It's just not the same.  Our marriage is

24 not the same.

136

1      I feel that I have been personally and also

2  professionally damaged because of what they did.  You

3  know, I have always been a person that always wanted to

4  help people.  That's all I ever wanted to do.  I loved my

5  job because I was able to help people.  Now it's not the

6  same.

7      You know, you kind of look at something like

8  that where you all of a sudden now you are worried about

9  what somebody is going to do to you, are they going to

10  stick me in the back, where before I never gave it a

11  second thought.

12      I had to go to a doctor for depression.  I am

13  still very depressed over my job, and I did my very best

14  not to get too emotional a little while ago, but it

15  didn't work.

16      I went to a doctor.  I started taking medicine

17  and everything, but my wife said that it made me like I

18  was impervious to everything, you know, like I had no

19  emotion about anything, so she asked me if I would stop

20  taking it.

21      But I still am very emotional about everything

22  that happens.  I just feel that what they did to me was

23  wrong, and I just can't put it behind me.

24      Q    Is that Dr. Rosal?

169

1      A      That he wanted me to be promoted to the

2   assistant town manager and that he would, if he was

3   reelected, that he would do all he could to make sure I

4   got that job.

5      Q      At that point in time did she indicate her

6   desire to be employed in that position?

7      A      Not then, no.

8      Q      Did that occur prior to Jeri Dunn's dismissal

9   or following Jeri Dunn's dismissal?

10     A      Jeri Dunn told me after she had left that Janet

11  had made that comment to her just after I had confided in

12  her.

13     Q      Okay, regarding the unfortunate situation

14  surrounding Ms. Valerie Heritage and the allegations that

15  you were having an improper relationship with your

16  secretary, did, in fact, Ms. Heritage admit to, admit to

17  falsely stating to your wife that you were having an

18  affair during the meeting held between you, Mr. Hugg,

19  your secretary, and Ms. Heritage?

20     A      Yes, she did.

21     Q      Do you know who initiated the conversation

22  between your wife and Valerie Heritage regarding the

23  alleged affair?

24     A      I believe Valerie Heritage did.

B-63

1      Q    And what leads you to believe that?

2      A    Just through conversation with my wife after we

3   started discussing the issue, she basically just called

4   in and wanted to know, you know, where I was and just to

5   talk to me, and I guess she knew I had a secretary, and I

6   guess in general conversation, you know, Cathy was just,

7   you know, finding out how I was making out with the

8   secretary, and that's how all this started.

9           So she was not prodding, you know, she was not

10  asking anything as far as was there anything going on.

11  She just wanted to know about my secretary.

12     Q    Did your wife ever tell you affirmatively that

13  Ms. Heritage brought up the idea of an affair or the

14  accusation of an affair unilaterally or on her own

15  without your wife prodding her?

16     A    Yes, she brought it up.

17     Q    At the hearing that was held for Ms. Heritage

18  regarding the alleged allegations surrounding you and

19  your secretary that Mr. Hugg conducted, were there any

20  other witnesses to that meeting?

21     A    No.

22          MR. HERRON:  Objection to the form.

23          MR. BRITTINGHAM:  Certainly.

24          MR. HERRON:  The only reason I am

1        objecting is you said hearing, and I don't

2        believe there was a hearing.

3            MR. BRITTINGHAM:  Certainly.  Let me

4        rephrase.

5    BY MR. BRITTINGHAM:

6        Q    At the meeting held between yourself, your

7    secretary at the time, Ms. Heritage, and Mr. Hugg, were

8    there any other participants or witnesses present?

9        A    No.

10       Q    Was that meeting recorded in any way, whether

11   in written form, in audio form, or any such recording

12   made?

13       A    No.

14       Q    You have made reference today several times to

15   the personnel policy or basically the procedure of the

16   Town of Smyrna.  I will refer to it in general in their

17   guidelines.  What, in fact, is your interpretation of how

18   that meeting should have been conducted?

19       A    That meeting should have been conducted the

20   same way Jeri Dunn's meeting was conducted, with the

21   chairman of the personnel committee, have a recorder

22   present to, you know, take the minutes of the meeting.  I

23   mean this is a very serious allegation, a very serious

24   issue.

1     Q    Did you ever ask Mr. Hugg why he did not

2  conduct this meeting under the formal procedure

3  guidelines?

4     A    No, I did not.  I don't tell him how to do his

5  job.

6     Q    Did Mr. Hugg ever offer any explanation as to

7  why it wasn't being done under the formal guidelines?

8     A    No, he did not.

9     Q    You stated that you did not talk to Mr. Hugg

10  after the meeting or the memo that he sent regarding the

11  meeting.  Is that true?

12     A    Yes, concerning that issue.  I mean I talked to

13  him about a lot of stuff.

14     Q    Concerning that issue?

15     A    Yes.

16     Q    And why was that?

17     A    Because I just didn't want to talk about it

18  anymore.  It was terrible and very hurtful and, you know,

19  I would have hoped that he would have done the right

20  thing and, you know, did what he was supposed to do as a

21  manager.

22     Q    You also stated that you did not file a

23  grievance, as outlined in Mr. Hugg's memo, that was an

24  option for you following the meeting.  Is that correct?

174

1  that correct?

2      A    I left very shortly after she left my office.

3  I went down to try to find Mr. Hugg to tell him what

4  happened.

5      Q    When you were unable to find Mr. Hugg, as you

6  have testified, did you, in fact, leave a message of

7  where you could be contacted?

8      A    Yes, I did.  I left it with Meloney Torres and

9  Gary Stulir.

10     Q    Were you available for the remainder of that

11 day to discuss this incident, had Mr. Hugg attempted to

12 do so?

13     A    I never left the house.

14     Q    Is that a yes?

15     A    Yes, I'm sorry, yes.

16     Q    When did Mr. Hugg first contact you regarding

17 this incident?

18     A    Two or three days later.

19     Q    And how did he contact you?

20     A    He didn't.  I saw him coming in and, you know,

21 I went to his office.

22     Q    And what transpired?

23     A    We just discussed the issue, you know, about

24 what she did, and my resignation letter, and I told him

1 | that, you know, I didn't understand why he didn't call

2 | me, and that, you know, I may have been a little

3 | emotional in my resignation letter but I felt that he

4 | needed to do something.

5 |     Q    Did Mr. Hugg offer any explanation to you for

6 | why he did not call you?

7 |     A    No, he did not.  He just said he was mad at me.

8 |     Q    Did he offer any explanation for you why he had

9 | yet to contact you three days after the incident?

10 |     A    No.

11 |     Q    Did you request that Valerie Heritage be

12 | formally disciplined for her actions on the day in

13 | question?

14 |     A    Yes.

15 |     Q    To your knowledge, was any disciplinary action

16 | ever taken against Valerie Heritage?

17 |     A    No.

18 |     Q    Do you know why that is?

19 |     A    No, I do not.

20 |     Q    Again, we have also -- We talked about the

21 | personnel manual a couple times here today.  Is that

22 | something that is updated on a yearly basis, semi-yearly

23 | basis?  Is there any rhyme or reason to how that is

24 | compiled or updated, or is it not updated?

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SAMUEL JAMES FOX, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-488-GMS |
| | ) | |
| TOWN OF SMYRNA, DAVID S. | ) | |
| HUGG, III, individually and | ) | |
| in his official capacity as | ) | |
| Town Manager of the Town of | ) | |
| Smyrna and VALERIE HERITAGE, | ) | |
| individually and in her | ) | |
| official capacity as | ) | |
| Administrative Clerk of the | ) | |
| Town of Smyrna, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF JANET VINC

BE IT REMEMBERED on this _28_ day of May, 2008, Janet Vinc,
did appear before me, a Notary Public, and did depose and say the
following:

1.    I have been an employee of the Town of Smyrna since
2003.

2.    My current position is Manager of Planning and Zoning.
I was promoted to this position in February, 2005.  My yearly
salary as the Planning and Zoning Manager in 2005 was
approximately $37,500.

3.    I graduated from the University of Delaware in 1998
with a B.A. in History.  I have been enrolled in a graduate

1

B-69   A-101

program at the University of Delaware since 2001.   My areas of concentration in this course of study are Historic Preservation and Planning.   I expect to receive a Master's Degree in Urban Affairs and Public Policy in 2008.


_Janet Vinc_
Janet Vinc


**SWORN TO AND SUBSCRIBED BEFORE ME**, a Notary Public, on the day and year aforesaid.

_Bruce C. Herron_
Notary Public

BRUCE C. HERRON
Attorney At Law
Notary Public, State of Delaware
My Commission Has No Expiration Date
29 Del.C. §4323(a)(3)

H:\tmw5\data\files\Docs\3651.056\AFF\11186.wpd

2

B-70

ORIGINAL[1]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,              )
        Plaintiff,                  )
                                    )
            v.                      ) C.A. No.
                                    ) 07-488 (GMS)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
individually and in his official    )
capacity as Town Manager of the     )
Town of Smyrna, and                 )
VALERIE HERITAGE, individually and )
in her official capacity as         )
Administrative Clerk of the         )
Town of Smyrna,                     )
        Defendants.                 )

            Deposition of **DAVID S. HUGG, III**, taken
before Cheryl A. Anthony, Court Reporter, in the Smyrna
Town Hall, 27 South Market Street, Smyrna, Delaware, on
Tuesday, March 18, 2008, beginning at 1:00 p.m.

APPEARANCES:

        WILLIAM D. FLETCHER, JR., ESQUIRE
        and BRIAN BRITTINGHAM, ESQUIRE
        SCHMITTINGER & RODRIGUEZ, P.A.
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        BRUCE HERRON, ESQUIRE
        AKIN & HERRON, P.A.
        1220 North Market Street
        Suite 300
        PO Box 25047
        Wilmington, Delaware  19899
        Attorney for Defendants.

    **ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B-71

1   separate one, yes.

2        Q.   Okay.  Between 2002 and today, excluding the

3   chief of police and the police department, are you the

4   final decision-maker as to hiring, firing, and the

5   discipline of town staff?

6        A.   Essentially.

7        Q.   If you can explain that, then --

8        A.   Well, there are some provisions where

9   certain disciplinary or dismissal actions have to go to

10  the town council, but for all general purposes, yes.

11       Q.   What type of actions would have to go

12  through town council?

13       A.   Typically, if someone was found guilty of a

14  crime or something of that nature, and I believe there

15  are some other provisions in the personnel policy.  I

16  can't cite them, but --

17       Q.   That would be in the employee handbook?

18       A.   That would be in the employee handbook,

19  right.

20       Q.   What is your educational background?

21       A.   I have a master's in urban and regional

22  planning and a bachelor's in marketing and economics.

23       Q.   When did you receive your master's in urban

24  planning?

B-72

1    referring to, whose name I can't think of at the moment,

2    who didn't work out.

3         Q.    So would it be fair to say that the last

4    person to have held either of these positions for any

5    significant amount of time was Janet Vinc?

6         A.    Correct.

7         Q.    And apparently, Ms. Vinc was a student of

8    yours --

9         A.    Correct.

10        Q.    -- at the University of Delaware?

11        A.    Correct.

12        Q.    Do you remember what years those were?

13        A.    They were sometime in the mid 1990s, but I

14   don't recall which class she was in.

15        Q.    Do you remember how she performed in those

16   classes?

17        A.    She was a very good student.

18        Q.    Did she get As?

19        A.    I'm sure she did.

20        Q.    Did she have any special assignments or

21   anything like that that stick out in your mind as a

22   student?

23        A.    No, not --

24        Q.    Was she, from your understanding, a person

1    who was basically a student before she began to work

2    with the Town of Smyrna?

3         A.    My understanding is that she had had some

4    prior experience working in historic preservation when

5    she went to graduate school.  I don't remember that for

6    sure.  But typically, my graduate students have had some

7    work experience.

8         Q.    Do you know if it was more than a year or

9    two?

10        A.    I don't remember now, not off the top of my

11   head.

12        Q.    Who decided to hire Ms. Vinc for the Town of

13   Smyrna?

14        A.    I did.

15        Q.    Over the course of time that you have been

16   town manager, besides Ms. Vinc, have you hired any of

17   your other former students?

18        A.    Yes, I have.

19        Q.    And who are they?

20        A.    I hired a German student.  I know you are

21   going to ask me his name.  Wait a minute.  I can tell

22   you what it is.  I wrote down the correct -- His name

23   was Thomas Wuerzer, W-U-E-R-Z-E-R, or something close to

24   that.  He was a graduate student of mine a few years

B-74

1    ago.  I hired him as a summer intern.  I subsequently

2    hired him in a full-time planning position prior to his

3    going on to get a Ph.D.

4         Q.    So did he have his master's when you hired

5    him as a summer intern?

6         A.    He was completing his master's.

7         Q.    What work did he do as a summer intern?

8         A.    He developed our geographic information

9    system, which is what he also did when he worked for us

10   for the balance of the next year.

11        Q.    Okay.  And so his total employment

12   experience was one summer internship and then one year

13   thereafter?

14        A.    The better part of a year, probably -- he

15   actually probably worked for us for about a year.

16        Q.    Including the internship?

17        A.    Including the internship.  He came at the

18   beginning of the summer, and he left at the end of the

19   following summer to go to the University of Cincinnati.

20        Q.    Any other of your students that you have

21   hired?

22        A.    Have I hired anyone else directly or

23   indirectly?  We have hired some students indirectly

24   through the Center of Historic Architecture and Design

B-75

1    at the University of Delaware to do research work for

2    us.  I think it was the only two that I have actually

3    employed directly.  We had a couple of interns from the

4    program who were my students at previous times, as well,

5    summer interns.

6         Q.    Okay.  Would you agree a summer intern is a

7    limited part-time position?

8         A.    It's a limited term position.  It's a

9    full-time position.

10        Q.    For the summer?

11        A.    For the summer, for ten weeks; but it is

12   40 hours a week.

13        Q.    Okay.  And it sounds as if -- and you please

14   correct me if I am wrong -- that Ms. Vinc would qualify

15   as the only student of yours that has worked for the

16   Town of Smyrna while you have been town manager for more

17   than a year's period of time?

18        A.    She's the only one who is still here.

19        Q.    Well --

20        A.    Mr. Wuerzer -- well --

21        Q.    I'm sorry.

22        A.    Yeah.  Mr. Wuerzer worked for us for a year.

23   He determined that he wanted to go to graduate school.

24   He was here as a full-time employee, but he was only

B-76

1    here for a year.

2        Q.    So Ms. Vinc would have been the only student

3    of yours --

4        A.    Correct.

5        Q.    -- who worked for the Town of Smyrna while

6    you were the town manager for more than a year's time?

7        A.    Correct.

8        Q.    And Mr. Wuerzer would have been the only

9    other student of yours who was hired --

10       A.    Wuerzer.

11       Q.    I'm sorry?

12       A.    Thomas Wuerzer.

13       Q.    Thomas.

14       A.    Yes.

15       Q.    He would have been the only other student

16   that worked full-time --

17       A.    For the Town of Smyrna.

18       Q.    -- for the Town of Smyrna?

19       A.    Correct, in a permanent position, because

20   there were some interns who worked ten-month cycles

21   during the summer on planning projects who were students

22   of mine previously.

23       Q.    Were you aware that there were issues about

24   the lack of hands-on experience that Ms. Vinc presented

1  when she was hired to do the planning and zoning

2  manager's position?

3      A.    She certainly was relatively new to the

4  position.  You know, she had been working with planning

5  and zoning matters during her employment and clearly met

6  the minimum qualifications.  She does have a master's

7  degree in planning.

8      Q.    Were others interviewed for that position?

9      A.    Oh, I think they would have been.

10     Q.    And I'm talking about the planning and

11 zoning position.

12     A.    Manager, I don't recall who we interviewed.

13 I don't recall how that whole process was handled.  I

14 think we simply restructured the department.

15     Q.    Okay.  So you did not advertise the

16 position?

17     A.    I don't recall.

18     Q.    Do you have any recollection of advertising

19 it?

20     A.    I believe that the two positions were

21 created by a reorganization authorized by council

22 without advertising either position.  It was technically

23 vacant in the sense that there was no --

24     Q.    Okay.  And because of the way it came about,

B-78

22

```
 1        Q.    Was there any actual recording of the
 2   meeting?
 3        A.    No.
 4        Q.    Were any of the participants given any type
 5   of agenda or information as to what the meeting would
 6   concern before appearing at the meeting?
 7        A.    They were advised that we were going to talk
 8   about the planning and inspections department and some
 9   of the issues that seemed to be going on in that area.
10        Q.    How were they advised?  In writing?
11        A.    Probably verbally, although they may have
12   gotten something from me in the way of an e-mail.  I
13   don't know if I can find it.
14        Q.    Did they get any more specific than what you
15   have just described for me?
16        A.    No, no.
17        Q.    In reading the minutes or the notes of this
18   meeting, it would appear that a lot of time was spent on
19   Ms. Vinc and the relationship she had or how others were
20   reacting to her employment.
21        A.    Correct.
22        Q.    So what brought about the need to have this
23   meeting, from your perspective?
24        A.    From my perspective, the fact that Mr. Fox
```

B-79

1   or someone else was meeting with the members of

2   personnel committee, council people, complaining about

3   what he believed to be unfairness in the appointment of

4   Ms. Vinc and about how he was unhappy.

5        Q.   And Mr. Fox had been meeting with who?

6        A.   My understanding is he had talked with

7   Councilwoman Hensley and Councilman Pressley, although I

8   don't know that for sure.  But that is my understanding.

9        Q.   So someone --

10       A.   I had been advised that --

11       Q.   Someone told you that?

12       A.   Right.  I had been advised that.  And

13   Ms. Hensley was clearly concerned about what had been

14   going on in planning and inspections, and we talked

15   about it.

16       Q.   All right.  Did Ms. Hensley tell you Fox had

17   been to see her?

18       A.   I very much believe -- but I can't tell you

19   for sure that -- did she say yes, he came.  My

20   recollection is that she implied or indicated that he

21   had talked to her.  I can't confirm that by saying yes,

22   I specifically remember those words.

23       Q.   All right.  How about Mr. Pressley?  Do you

24   know whether or not he ever told you?

B-80

1   denied making those comments.

2        A.    She did, in fact, deny making them.

3        Q.    Were there people at this hearing that

4   stated that they actually heard these comments?

5        A.    This is not the -- if I'm correct, this is

6   not the specific meeting.  Is this the meeting at which

7   Ms. Dunn was offered the opportunity to -- I'm sorry.

8   Rephrase your question.  I'm looking for something.

9        Q.    That's fine.

10            MR. FLETCHER:  Can you read back, please?

11            (The last question was read.)

12            THE WITNESS:  No.

13   BY MR. FLETCHER:

14        Q.    Did you ever hear Ms. Dunn make any

15   inappropriate comments about Ms. Vinc?

16        A.    I heard Ms. Dunn make inappropriate

17   comments.

18        Q.    I understand that.  But as to Ms. Vinc?

19        A.    As to Ms. Vinc, I believe so.

20        Q.    You believe you have heard them?

21        A.    I did, and I also heard her make

22   inappropriate comments about her supervisor, Mr. Lee,

23   and --

24        Q.    What comments did you hear Ms. Dunn make?

1       A.     I recall Ms. Dunn making comments about --

2    to the effect that, you know, Janet doesn't know what

3    she's doing or questioning her authority.

4       Q.     In what context would you have heard that?

5    I mean were you just walking down the hallway?

6       A.     Or she came into my office, and she made

7    comments --

8       Q.     She may have told you that directly to you

9    in the office?

10      A.     I believe so.

11      Q.     Did you explore that with her?

12      A.     I discussed it with her, mentioned to her

13   that everybody upstairs needed to learn to work

14   together, and it wasn't appropriate for her or other

15   employees to be judging whether someone was or was not

16   qualified.

17      Q.     Did you get into any specifics?

18      A.     I don't believe so.

19      Q.     Did she come into your office or did she

20   have conversations with you on more than one occasion

21   about Ms. Vinc?

22      A.     I think so.  I can't recall, but yes, more

23   than once.

24      Q.     And do you recall what the substance of any

B-82

1      A.    Correct.

2      Q.    Were you aware?  Had Markow and/or Stulir

3  brought this to your attention before the March 11th

4  meeting?

5      A.    They obviously brought it to my attention on

6  the 10th.  They both cornered me as I was leaving the

7  building that Thursday night and indicated that they

8  were very upset by an incident that had just recently

9  occurred.  They described it to me and --

10     Q.    And that was the reason that you --

11     A.    That was part of the reason --

12     Q.    That was one of the reasons --

13     A.    -- for calling the meeting.

14     Q.    For calling the meeting --

15     A.    Correct.

16     Q.    -- which occurred the next day?

17     A.    Correct.

18     Q.    So this meeting came about very quickly?

19     A.    Quickly thereafter, right.

20     Q.    All right.  In the meeting did either --

21  Let's see.  I'm sorry.  Mr. Markow does not appear to be

22  in attendance at the meeting, correct?

23     A.    Correct.

24     Q.    Okay.  Mr. Stulir does appear to be at the

B-83

1    this thing?

2                    MR. HERRON:  Affidavit.

3                    THE WITNESS:  Affidavit.  They are obviously

4    at the same meeting.  They obviously were in discussion

5    with Mr. Fox.  And while on the surface this doesn't say

6    one thing or another, this is certainly an implication

7    that he knew how Janet got her job.

8    BY MR. FLETCHER:

9         Q.    Is that your understanding of how you viewed

10   things at the time of this March 11th meeting?

11        A.    I viewed things on March 11th in part based

12   on what these two individuals told me.

13        Q.    Right.  Okay.

14        A.    And it was -- you know, they came to me to

15   tell me specifically what had happened, and they were

16   bothered by that.

17        Q.    All right.  I guess right now I'm just

18   trying to find out.  You would agree that Mr. Stulir's

19   affidavit is different from Mr. Markow's, and it does

20   not contain a statement that Ms. Vinc got her job laying

21   on her back or anything similar to that, does it?

22        A.    It is clear language.

23        Q.    I'm sorry, Mr. --

24        A.    Mr. Stulir's language is clear.

B- 84

34

1    Q.    Right.  And it doesn't say anything that I

2    just recited?

3    A.    It says what it says.  You can interpret it

4    however you feel.

5    Q.    Okay.

6    A.    But no, I'm not answering that.

7    Q.    So were you interpreting it that it was

8    inappropriate, that it was an innuendo that she had

9    gotten a job in a fashion --

10   A.    Yes.

11   Q.    -- that was not professional?

12   A.    Yes.

13   Q.    All right.

14   A.    Based on what they told me and the context

15   of these two statements.

16   Q.    All right.  Let me go to my question on

17   Mr. Stulir.  Based on what he told you, did Mr. Stulir

18   tell you or make reference to words similar that are

19   found in Markow's affidavit about how she got the job?

20   A.    Mr. Stulir and Mr. Markow were in a meeting

21   with Mr. Fox, or Mr. Fox stopped into the office.  I'm

22   not sure exactly how they all ended up together.  But

23   Mr. Stulir and Mr. Markow came to my office and said,

24   in so many words, we are very upset by what Jim just

1    said.  We don't think it is appropriate.  He made

2    suggestions and innuendos that there was some kind of

3    sexual or other involvement that resulted in Janet

4    getting her position.  That's what they said.  And then

5    Mr. Markow said -- his words were that she got her job

6    on her back.

7         Q.    Did they come to you together?

8         A.    They came to me together.

9         Q.    And did they both relate to you what each

10   heard, or did one just say what they heard?

11        A.    No.  They both told me what they heard.

12        Q.    Okay.  Can you explain to me why

13   Mr. Stulir's affidavit doesn't contain such inflammatory

14   language?

15        A.    You will have to ask Mr. Stulir.

16        Q.    But you don't know why?

17        A.    I don't know, right.

18        Q.    But anyway, you took it from both of these

19   gentlemen that they were telling you that Mr. Fox had

20   just told them or just made statements that were highly

21   inappropriate as it relates to how Ms. Vinc was hired by

22   the Town of Smyrna?

23        A.    That's correct.

24        Q.    And you knew that at the time of this

1   meeting on March 11th of '05?

2       A.    Correct.

3       Q.    And that was one of the things that was

4   discussed?

5       A.    That was one of the things that brought this

6   matter to a head, that and Ms. Dunn's comments, public

7   comments regarding a member of council and comments that

8   I had gotten indirectly from others, people that worked

9   upstairs.

10      Q.    All right.  Now, having all of that

11  information -- and as I mentioned, Mr. Markow, whose

12  affidavit is more inflammatory, he was not there at the

13  meeting?

14      A.    Right.  He would not be there.  He has no

15  reason to be at this meeting.

16      Q.    I'm just stating a fact.  He was not there?

17      A.    That is correct.

18      Q.    And it appears from the minutes that Mr. Fox

19  denies making any sexual innuendo about Ms. Vinc's

20  employment with the Town.  Would you agree with that?

21      A.    That Mr. Fox denied making those statements?

22      Q.    Yes.

23      A.    He did.

24      Q.    And Mr. Stulir was the only one that was

1   there.  Did he speak up and say, oh, no, he did make

2   those statements, the inflammatory type that are not in

3   his affidavit?

4          A.    No, I don't believe so.

5          Q.    Okay.  Is it fair to say, though, that as a

6   result of this meeting on March 11th and who was there

7   and who said what, whether it's in the minutes or not,

8   you felt, as a result of that meeting, that whatever had

9   happened before March 11th regarding Ms. Vinc had been

10  resolved to your satisfaction that there was no need to

11  take any disciplinary action against anyone, except

12  perhaps Ms. Dunn, who removed herself from the meeting

13  before anything could be done?  Is that fair to say?

14         A.    At the conclusion of this meeting, I was

15  satisfied that Mr. Fox and I, in the presence of the

16  council member who was present, had resolved the matter,

17  that there was no further need to take disciplinary

18  action against Mr. Fox or anyone else associated with

19  what was going on.  It was a trying time for all of

20  them.  Each of them was picking up different duties than

21  they had had previously.

22              You know, I believe we had cleared up the

23  issues.  Ms. Dunn was gone.  Ms. Dunn had clearly been a

24  participant in the lack of harmony and the commentary

1    that was going on upstairs.  I think I made it clear on

2    the record that that was not going to be tolerated.  And

3    I believed we had put the matter to rest, and that is

4    what I say in these minutes in the end.

5          Q.    Okay.  Having done that, can you tell me why

6    these affidavits then were prepared 11 days after this

7    meeting that had put all of this to rest?

8          A.    It's my understanding -- and you'll have to

9    ask her directly.  It's my understanding that, in fact,

10   Ms. Vinc went to these two individuals about this

11   matter, because I believe she was considering a sexual

12   harassment charge on her own, resulting from what she

13   had understood Mr. Fox did say.

14               You would have to ask her on her own.  I

15   don't know that.  I'm simply telling you that is the

16   basis which I received -- under which I received that

17   they had asked for specifically in that context.

18         Q.    First of all, who delivered them to you?

19         A.    I got them from Carol McKinney, who signed

20   them.

21         Q.    Who is Carol McKinney?

22         A.    Carol McKinney is my executive assistant.

23         Q.    And she brought them to you and said that

24   these were dropped off because Ms. Vinc had --

1  necessarily as, you know, representing of a pattern or

2  an intention to harass; that she really needed to -- but

3  if she felt she was harassed, then the procedures were

4  to file a formal complaint.

5     Q.    And then the Town would investigate?

6     A.    The Town would investigate, right.

7     Q.    And a formal complaint was never filed?

8     A.    No.

9     Q.    And there was never any investigation?

10    A.    No.

11    Q.    Now, when you received these two exhibits --

12 I'm sorry.  Let me back up for a moment.  You said these

13 two affidavits were developed because Ms. Vinc requested

14 that they be developed?

15    A.    I believe so.

16    Q.    Okay.  And then how does your executive

17 assistant get involved in developing these affidavits?

18    A.    Well, she would have been -- obviously,

19 she's the notary.  At least one of the parties, both

20 parties, maybe Ms. Vinc -- I'm not sure who -- requested

21 that they be signed and notarized.

22    Q.    Well, who would have typed them?

23    A.    I don't know who typed them.  I don't know.

24 I don't know whose typewriter -- I don't know.

B-90

1    of this matter and her feelings that she had been

2    harassed and, you know, what were the proper procedures

3    to move forward.

4         Q.    Now, as a result of that meeting and having

5    received the affidavits, did you inform Mr. Fox of any

6    of this?

7         A.    I had mentioned to Mr. Fox -- and it's in

8    the records of March 11th -- when both of these

9    gentlemen had come to me that evening, that I had

10   received verbally at that point the comments made by

11   Mr. Stulir or made to Mr. Stulir and Mr. Markow.  And it

12   was clearly in here, indicated to Mr. Fox, that I was

13   upset by those comments and that he should have come to

14   me and clearly not to Mr. Markow, because Mr. Markow is

15   not in the human resources chain of command.  Mr. Stulir

16   is, among his duties, the head of the personnel

17   functions, so that may have been proper.

18        Q.    Okay.  I appreciate that answer.  But I'm

19   looking beyond March 11th and those minutes, because you

20   didn't get the affidavits until at least March 22nd,

21   based on the notarization?

22        A.    Correct.

23        Q.    And so I guess what I'm asking is did you

24   bring these affidavits to Mr. Fox's attention after you

1  received them?

2          A.    I don't really -- I don't recall.

3          Q.    Do you have any recollection of bringing

4  them to his attention?

5          A.    I believe I discussed them with him.  But I

6  don't know whether I actually showed them to him.  I

7  don't believe I did.  I really do not recall.

8          Q.    You say you believe you discussed the

9  affidavits?

10         A.    I recall discussing with Mr. Fox, after

11 this, March 11th, the concerns that had been raised by

12 Ms. Vinc.

13         Q.    But did you tell him that you had two

14 affidavits?

15         A.    I don't recall.  I don't think so.  I don't

16 believe I did.

17         Q.    All right.

18         A.    Because at that point, they were part of

19 what Ms. Vinc was considering.

20         Q.    Making a claim on --

21         A.    Right.

22         Q.    -- or filing a complaint about?

23         A.    Right.

24         Q.    Did you talk to him about Ms. Vinc coming to

46

1   you and complaining?

2       A.    Only, I believe, in general terms.  On the

3   confidentiality of Ms. Vinc, she had not filed a

4   complaint.  She had not --

5       Q.    So you didn't think it would be appropriate

6   at that time?

7       A.    Appropriate to sit down with him and discuss

8   in detail; just that she was upset about these comments,

9   that she, on the 11th, describes it as just conversation

10  among the guys.

11      Q.    What did you do with the two affidavits?

12      A.    I believe I put them in my desk and simply

13  left them there, pending whether Ms. Dunn was going to

14  come forward with any type of complaint.

15      Q.    Is there any time consideration for making

16  such complaints?

17      A.    I don't believe there is in the personnel

18  policy.

19      Q.    I understand that you have no control over

20  what an employee may decide to do regarding making a

21  formal complaint under the policies of the town --

22      A.    Correct.

23      Q.    -- or even making a complaint with a

24  different agency.

B-93

1  mean that type of personality.

2       Q.    But she made no other types of complaints

3  that would raise issues of discrimination?

4       A.    Correct.  And to be very honest, to the best

5  of my recollection and feeling, once Ms. Dunn had left

6  and the positions had started to evolve into two kind of

7  functions, I think a lot of that what we'll call sexual

8  tension, if you will, a lot of that sort of background

9  dissipated.  It didn't mean the two of them liked each

10 other any more or less or got along any better or less,

11 but it seemed to be the end of that thread.

12      Q.    I may have missed it.  But it doesn't appear

13 as if Mr. Pressley was at the March 11th of '05 --

14      A.    Mr. Pressley was not.  Mr. Pressley was not

15 a member of the personnel committee at that time.

16 Ms. Hensley was.  So it would have been inappropriate

17 for him to have been there as a councilperson.

18      Q.    All right.  Now, it looks as though we are a

19 good ten months subsequent to the March meeting, when

20 you get this e-mail in late January of '06.  Is that

21 fair to say?

22      A.    I'm sorry.  I was --

23      Q.    We are at ten months.  We are more than ten

24 months after the March 11, '05 meeting --

B-94

```
 1        A.    Correct.

 2        Q.    -- when you get this e-mail from

 3   Mr. Pressley on or about January 30th --

 4        A.    Correct.

 5        Q.    -- of '06, correct?

 6        A.    Correct.

 7        Q.    And it's at that time that you advised

 8   Mr. Pressley that there are signed statements regarding

 9   his comments.  Did you send copies of those affidavits

10   to Mr. Pressley?

11        A.    I don't believe I did.  I don't think I did.

12   I think I simply advised him that -- in so many words,

13   what I was trying to suggest to Mr. Pressley was to, you

14   know, leave this matter alone.  You are being fed

15   information that is being intended to question

16   Ms. Vinc's performance or attendance or whatever.  And

17   you know, you really don't need to get involved.  If you

18   need to -- There is a more serious issue here that I

19   think has gone away or is going away, and let's -- I

20   mean don't take a communication that may be coming by a

21   friendship or whatever.

22        Q.    But I guess since the matter had been

23   resolved to your satisfaction on March 11th, I wonder,

24   why do you call Mr. Fox's actions sexist and derogatory?
```

B-95

1        A.      Probably venting a little bit.

2               MR. HERRON:  Let me object to the form of

3   the question.  I don't think you referred to his actions

4   as sexist.  It's his comments.

5               THE WITNESS:  His comments, right; not his

6   actions.  And I do believe in that time period, even ten

7   months later, Janet was still undecided.  Janet Vinc was

8   still undecided whether she would take any action or

9   not.  She had not taken any action.  And I pretty much

10  believed that at that point, she was comfortable to let

11  things go on.

12              But obviously, somebody was still

13  questioning her performance and her attendance and what

14  have you.  So even though I felt the matter, this

15  matter, had largely been resolved, there was still some

16  background tension here.

17  BY MR. FLETCHER:

18      Q.      Okay.  But she didn't come to you at any

19  time after the March incident, except for what you have

20  already identified?

21      A.      Except for what I have already identified.

22  And she may have come to me -- She may have talked to me

23  again in April.  But basically, in that time period,

24  when she first raised the question about whether or not

1   A.  I'm sure Ms. Vinc had a copy of them and

2 there may have been other people that had a copy of

3 them.

4   Q.  Do you know if Ms. Vinc had a copy of them?

5   A.  No.  I mean since I got them from her, I

6 would suspect she kept a copy of them.

7   Q.  And that is a perfectly logical deduction.

8   A.  Yes.

9   Q.  But I just wanted to know if you have any

10 actual knowledge of that.

11   A.  No.  I don't know who else would have had

12 copies or who she may have given copies to.

13   Q.  So the only person that you know had them

14 was yourself?

15   A.  Correct.

16   Q.  Okay.  Others may have had them.  Certainly,

17 it could have been Ms. Vinc.

18   A.  Right.

19   Q.  Can you think of anyone else that may have

20 had them?

21   A.  No.  I don't want to speculate.

22   Q.  All right.  Now, as far as yours, is your

23 drawer kept under lock and key?

24   A.  The vast majority of the time, my desk is

```
 1   locked.
 2           Q.     Is that even when you are there?
 3           A.     That's a good question; probably not.
 4           Q.     Okay.  So if you were there during the
 5   workday, it's probably unlocked.  But you lock it before
 6   you leave?
 7           A.     Generally, I lock it when I leave.  And
 8   generally, it's in a drawer where I keep other, quote,
 9   personal or somewhat other confidential items.  And I
10   don't know of any evidence that anybody ever went in
11   that drawer for any purpose or would know what was in
12   that drawer.
13           Q.     When did you first learn or at least have
14   the information about these affidavits getting on the
15   internet?
16           A.     Probably -- I believe it was sometime in
17   March.  It was during the election period.
18           Q.     And how did you learn of it?
19           A.     I think somebody said:  Have you seen the
20   internet today?
21           Q.     Who was that somebody?
22           A.     You know, at that time there was so much
23   going on in the blog, it was almost the first thing you
24   do in the morning.  Did we make the blog today?  Did we
```

B-98

1 | make the State News today?  It's --

2 |       Q.    All right.  So you can't recall who told

3 | you.  But once they told you, did you see the internet

4 | today, what happened?

5 |       A.    I remember going on the internet and seeing

6 | at least a reference.  I remember seeing some comment

7 | about, you had better check on Mr. Fox, blah, blah,

8 | blah, and a reference to derogatory sexual or sexist

9 | statements.  I don't recall that I ever saw either of

10 | the actual documents.

11 |       Q.    Okay.  Did you interview or question anyone

12 | at the Town --

13 |       A.    No.

14 |       Q.    -- as to if they knew how that got out

15 | there?

16 |       A.    No, I did not.

17 |       Q.    A copy of that blog, did you print it out?

18 | Did anyone ever print it out?

19 |       A.    I didn't print it out.

20 |       Q.    Do you know of anyone at the Town that did?

21 |       A.    I don't know of anyone that did, but --

22 |       Q.    Did you talk to Carol McKinney about it as

23 | to whether or not she may have --

24 |       A.    I never asked her specifically one way or

1 | the other.

2 |     Q.    Apparently, around the same time, a

3 | memorandum from the Town got onto the internet. I'm

4 | going to show you a memorandum that is to Kimberly

5 | Schlichting --

6 |     A.    Schlichting.

7 |     Q.    -- from Mayor Mark Schaeffer, March 5th of

8 | '02.  Have you seen that before?

9 |     A.    Yes, I have.

10 |     Q.    And did you learn that this got onto the

11 | internet?

12 |     A.    I was aware that that also got on the

13 | internet.

14 |     Q.    Okay. Do you know who --

15 |     A.    Actually, I believe that there were two

16 | memos relating to that that were on the internet.

17 | Actually, I believe there were two memos relating to

18 | that that were on the internet. I have my suspicions.

19 | But no, I do not know who put them on.

20 |     Q.    I understand they are suspicions. But who

21 | might you suspect?

22 |     A.    A former employee of the Town.

23 |     Q.    A male or female?

24 |     A.    A male.

1    the purpose of embarrassing Jim.

2        Q.    I would just like to have that marked as the

3    next numbered exhibit to your deposition.

4        A.    Sure.

5             (Hugg Exhibit Number 4 was marked for

6    identification and attached to the record.)

7    BY MR. FLETCHER:

8        Q.    The content of the '02 memo, dealing with

9    how Mr. -- well, it speaks for itself, but dealing with

10   him and becoming a building inspector -- is that the

11   type of information that employees could request of

12   other employees in the Town?

13       A.    They shouldn't be.  They wouldn't be today.

14   Would they have been in '02?  Perhaps.  And in fact,

15   although I have no way of knowing, I mean that could

16   have been a way to announce that Mr. Fox was coming on

17   board or being promoted as building inspector.

18             Now, I have no way of knowing that.  But I

19   believe, in the context of what was going on here, that

20   Chief Baldwin was the acting town manager, that

21   Ms. Schlichting had been interviewing people for the

22   position of building inspector -- that is documented in

23   Jim's personnel file -- and that she made him the offer.

24   And for whatever reason, the chief failed to act in his

B-101

1    talks about date-stamping; is there not?

2         A.    I'm sure there is.

3         Q.    Okay.  Was there a time during Mr. Fox's

4    career with the Town of Smyrna that he was being

5    considered for assistant town manager?

6         A.    There was a time during Mr. Fox's career

7    that certain members of council believed he should be

8    the assistant town manager.

9         Q.    Does the Town have such a position?

10        A.    We have an unfilled, unbudgeted assistant

11   town manager position.  Mrs. Schlichting was the

12   assistant town manager.  Mr. Jacobs had been assistant

13   town manager before he became town manager.

14            When Ms. Schlichting left, it was my

15   recommendation to council, as part of the personnel

16   budget process, that we not fill the assistant town

17   manager position and, in fact, use the position and the

18   funds for other workers, municipal workers, and what

19   have you.  And it is still my position that the town

20   does not need an assistant town manager.

21            This budget year the town has suggested that

22   I need an assistant to the town manager, someone that

23   could take some of the administrative details and what

24   have you.  But my personal philosophy, since I have been

B-102

1    here, is that, you know, I need worker bees more than --
2    you know, people out taking care of electric lines, the
3    water and sewer lines and parks -- - much more
4    desperately.
5            You know, I would like to have the luxury of
6    an assistant town manager -- and you probably have it in
7    those files.  I've been fairly consistent, very
8    consistent throughout my career here saying:  No, we
9    don't need an assistant town manager.  We need people to
10   do the job.
11           If it takes me 80 hours a week because we
12   don't have one, that is the price of that decision.  But
13   that's how I feel.
14       Q.    And do you recall about when the last
15   assistant town manager left?
16       A.    Kimberly Schlichting was the last assistant
17   town manager, and she left -- oh, gosh, she's been gone,
18   what?  Four years now?  I don't recall exactly when she
19   did leave.  She went to be the administrative vice
20   president at the municipal electric corporation.  That
21   was probably four years now.
22       Q.    And I take it after she left, there was no
23   interviewing for the position?
24       A.    No.  The position was simply -- she had a

1    dual assignment.  She was assistant town manager and

2    director of planning and inspections.  I opted after

3    that to hire a director of planning and inspections,

4    Mr. Lee, and use that position, because I thought that

5    was a better use of those resources than having someone

6    else in the chain of command.  The number of direct

7    reports just simply didn't, in my mind, justify having a

8    direct assistant.  So that title was of no use.

9         Q.    Did Ms. Vinc ever come to you and tell you

10   that if Mr. Fox became the assistant town manager, that

11   she would quit or would not work for him?

12        A.    She had indicated -- She indicated to me

13   that given their work, the nature of their work

14   relationship, that no, she would not stay if Mr. Fox was

15   the assistant town manager.

16        Q.    Did that have any bearing on whether or not

17   you would fill the position?

18        A.    No.  The decision was made strictly on a

19   management basis and an allocation of resources and

20   continues to be.

21        Q.    Did there come a time, while Mr. Fox was

22   employed by the Town of Smyrna, where there was

23   discussion at least by council as to whether or not he

24   needed another assistant for his department or section?

B-104

1   rationale for that is that we had a house torn down that

2   later they claimed had three dwelling units in it.  And

3   by the time, of course, it is laying on the ground in

4   rubble, there is no way to know for sure.

5       Q.    And who is responsible for getting the

6   photographs taken?

7       A.    It's my understanding that if it is a code

8   matter, the code enforcement officer is responsible.  If

9   it's a demolition permit matter, I believe Ms. Vinc does

10  the demolition permit documentation or has someone do it

11  under her direction.

12      Q.    On this particular incident that you are

13  aware of, how did you become aware of it?  What do you

14  know about it?

15      A.    I became aware of it, I think, because both

16  of them, Mr. Fox and Ms. Heritage, came to me separately

17  complaining about the other one and their -- whatever

18  you want to call it -- their having not complied or

19  whatever.  So they both came to me and brought this to

20  my attention.  I don't recall much of the details of it,

21  other than I know there was a question about whether

22  photographs were taken or not.

23      Q.    Did Mr. Fox explain to you why he made the

24  decision he did?

1    A.    He probably did.   What I remember of it is

2    him coming down to me and telling me that Ms. Heritage,

3    in his terms, came flying into his office screaming and

4    hollering about him not doing something he was required

5    to do.   And I subsequently remember Ms. Heritage coming

6    down to my office and, you know, telling me essentially

7    the flip side of that, that she advised Mr. Fox that

8    photographs were needed and they weren't taken and he,

9    in essence, saying:   It's my decision, you know, go

10   away.

11              I'm speculating on what the words were.   But

12   that is kind of the sense I remember, that the two of

13   them simply had a fairly significant falling out --

14        Q.    Over that matter?

15        A.    -- over that matter.

16        Q.    Well, given the hierarchy of the town's

17   positions that we are dealing with, would you agree that

18   Ms. Heritage is not in a management position?

19        A.    She's not in a management position.

20        Q.    And Mr. Fox is?

21        A.    Correct.

22        Q.    And would you also agree, to some extent,

23   there is some discretion for managers to make decisions

24   that each case may dictate that it may be a little

James Markow, Jim Fox and I were in my office at 5:00 p.m. or a little after on Thursday, March 10, 2005.

Jim Fox said that he knew how she (Janet Vinc) got her job and that really bothered him.  Jim said that he would not work with her (Janet) and that he was scared that this was a 60-day interim period and, if she messed up, it would reflect on his work.

Gary Stula

_____
Gary Stular

Sworn and subscribed before me this 22nd day of March, 2005.

Carol C. McKinney

_____
Carol C. McKinney, Notary Public
**CAROL C. McKINNEY**
**Notary Public - State of Delaware**
**My Comm. Expires Sept. 25, 2006**

B- 107

ORIGINAL 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,   )
  Plaintiff,     )
           )
    v.      ) C.A. No.
          ) 07-488 (GMS)
TOWN OF SMYRNA, DAVID S. HUGG, III, )
individually and in his official )
capacity as Town Manager of the )
Town of Smyrna, and     )
VALERIE HERITAGE, individually and )
in her official capacity as  )
Administrative Clerk of the  )
Town of Smyrna,      )
  Defendants.     )

    Deposition of **GARY STULIR**, taken
before Cheryl A. Anthony, Court Reporter, in the Smyrna
Town Hall, 27 South Market Street, Smyrna, Delaware, on
Tuesday, April 1, 2008, beginning at 10:45 a.m.

APPEARANCES:

   WILLIAM D. FLETCHER, JR., ESQUIRE
   and BRIAN BRITTINGHAM, ESQUIRE
   SCHMITTINGER & RODRIGUEZ, P.A.
   414 South State Street
   Dover, Delaware  19901
   Attorney for Plaintiff.

   BRUCE HERRON, ESQUIRE
   AKIN & HERRON, P.A.
   1220 North Market Street
   Suite 300
   PO Box 25047
   Wilmington, Delaware  19899
   Attorney for Defendants.

**ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B-108

Stulir - Herron                                    7

1    sorry.

2         A.    -- human resources and payables.  She's in

3    charge of both of those.  She was not in office at that

4    time, no.

5         Q.    This statement indicates that it occurred

6    around 5:00 p.m.?

7         A.    Yes.

8         Q.    And that is after the normal scheduled

9    workday; would you agree?

10        A.    Yes.  That is correct.

11        Q.    And would you characterize this conversation

12   as a work-related conversation or just a couple of

13   people getting together and talking?  Did it have to do

14   with any work projects or any accounting issues or any

15   planning and zoning issues?

16        A.    I don't see how you could draw that

17   conclusion.  I mean this is -- I mean it is what it is.

18   I'm not going to characterize it.

19        Q.    Well, I guess what I'm asking is did you

20   consider it part of your work duties, this conversation?

21        A.    No.  I was on the clock.

22        Q.    Pardon?

23        A.    I was on the clock, but I'm a salaried

24   employee.

B-109

Stulir - Herron                                      8

1      Q.      Right.  So it doesn't matter?

2      A.      Right.

3      Q.      Okay.  Now, you and Mr. Markow and Jim Fox,

4  were you the only participants in this conversation, or

5  was anyone else there?

6      A.      It's my recollection we were the only three

7  people even in that area.

8      Q.      Okay.  After the conversation between the

9  three of you occurred, what did you do that related to

10  that conversation, if anything?

11      A.      I had college that evening up at U of D.  So

12  I was sort of running late, because I usually leave like

13  around 5:30 to get to Newark.  So I basically left the

14  building and went to class.

15      Q.      Now, when, if ever, did you bring up this

16  conversation of March 10th, as set forth in your

17  affidavit with anyone else related to the Town of

18  Smyrna?

19      A.      When I got to the college, I ran into Dave,

20  Dave Hugg.

21      Q.      How was it that he was at college?

22      A.      He was teaching a class at the same time.

23      Q.      Did your class happen to be in the same

24  building that he was teaching in?

B-110

1        A.      Right in this room, yes, it was.

2        Q.      Now, during that meeting, did anyone accuse

3    Mr. Fox of making the statement that appears in

4    Mr. Markow's affidavit regarding Ms. Vinc?

5        A.      I remember him being questioned further on

6    what he was implying about her.

7        Q.      But the implication is something that you

8    could draw from your statement?

9        A.      Yes.

10       Q.      Would you agree?

11       A.      Yes.

12       Q.      And you had already told Mr. Hugg basically

13   what was in the affidavit the night before?

14       A.      Uh-huh.

15       Q.      Yes?

16       A.      Yes.  That is correct, yes.

17       Q.      So what I'm asking is did anybody come out

18   and say or accuse him of saying to anyone that he had

19   actually said that Ms. Vinc, the way she had gotten the

20   job was laying on her back?

21       A.      I don't recall that statement.

22       Q.      Being made?

23       A.      If it's in the notes, I would say yes.  But

24   I have never looked at the notes.

B-111

1        Q.      And I'm not suggesting that they are in the

2   notes.  I don't mean to suggest that.  I'm just asking

3   from your recollection.

4        A.      I don't recall someone stating that, no.

5        Q.      Okay.  As a result of that meeting, whatever

6   the import of Mr. Fox's statements were, would you agree

7   that the issue had been resolved?

8        A.      In my mind, yes.  I mean he wasn't written

9   up, as far as I know, or anything like that.  So nothing

10  appeared in his personnel record.

11       Q.      Okay.

12       A.      So I mean essentially nothing happened to

13  him.

14       Q.      And because of your HR duties, would you

15  normally know if there was going to be an issue?

16       A.      I would have saw someone getting -- Dave

17  getting a report notice from Meloney.  And I would have

18  seen it generally because I'm in the office generally

19  all the time.  But I wouldn't make a habit of rifling

20  through personnel files.  I have access to them, but I

21  generally never go through them.

22       Q.      I was just wondering.  I wasn't trying to

23  indicate you were looking at anything you weren't

24  supposed to look at.  I just wanted to know as part of

B- 112

1    your HR duties, would part of that information get to

2    you?  That's all what I meant.

3         A.    Yes, definitely.

4         Q.    And you weren't aware of any type of

5    disciplinary action or anything as a result of this

6    meeting?

7         A.    No.  I believe even during the meeting, we

8    discussed that.  And I believe the conclusion was that

9    nothing was going to appear in his personnel record.

10        Q.    Okay.  Now, up to the time of the March 11th

11   meeting, all of your information had been verbal -- is

12   that fair to say -- to Mr. Hugg?

13        A.    That's correct.

14        Q.    Nothing had been put in writing?

15        A.    That's correct.

16        Q.    How did it come about that this affidavit

17   was developed?

18        A.    I believe -- I'm not sure whose

19   recommendation it was.  But after the meeting, it was

20   decided that they should get these affidavits from James

21   and I.  I can't remember who made the recommendation, if

22   it was our attorney or -- I remember the council member,

23   Mrs. Hensley.  I'm not sure who requested that they get

24   this in writing, but it was after the meeting.

1          A.    I can't honestly remember that.

2          Q.    Okay.  And what I'm asking is I mean it's

3    notarized March 22nd.  Did all of that occur on

4    March 22nd, or just the signing of it?

5          A.    I can't remember if it occurred on the 22nd

6    or not.  I mean if there was a time delay, it was not

7    more than a day.  So if it was on the 21st or the 22nd,

8    it wasn't like we gave the affidavit and then a week

9    later she came to us and said:  Here, sign this.

10         Q.    So it was probably within 24 hours of

11   whenever you gave it to her?  Would that be a fair

12   estimate?

13         A.    As far as I know, I have no idea where these

14   went to.  I know they didn't go back to my area, though,

15   because they weren't in his personnel file.  So I have

16   no idea, actually, where the originals are.

17         Q.    Now, do you have an understanding of why

18   these were being prepared?  I know you made mention that

19   you thought someone brought it up at the meeting or

20   maybe after the meeting.  But did you know what it was

21   for?  What it was going to be used for?

22         A.    No.

23         Q.    And it appeared that the meeting had

24   resolved this issue anyway.  Would you agree?

B-114

1      A.     Yes, because at the meeting, I believe even

2  Dave and Jim shook hands and -- well, they struck it up

3  as a misunderstanding, something to that effect.  And it

4  seemed to me these affidavits are just as far as a

5  formality, not necessarily meant for future action or

6  anything like that.

7      Q.     Now, when Ms. McKinney came to you, it would

8  have been about a week or more after the meeting, even

9  if it weren't March 22nd.  Did you have any question as

10  to why she was now asking for these?

11      A.     No.  I knew she was going to be coming to

12  me, so I --

13      Q.     Where did the two of you discuss what would

14  be in the affidavit?

15      A.     In this building, in the town hall.

16      Q.     Were you in your office?

17      A.     I can't remember the exact place.  I'm

18  thinking of one of three places, but I can't decide

19  which of the three.

20      Q.     What are the three places?

21      A.     The three places I was thinking is either my

22  office, her office,.

23            Or down here in this conference room.  But I

24  just can't remember.  We would have chosen someplace

Stulir - Herron                              22

1       A.    No.

2       Q.    Did she tell you where it was going to be

3    placed?

4       A.    No.

5       Q.    Did you ask?

6       A.    No.

7       Q.    And was that the last that you heard of the

8    document until the election time?

9       A.    Yes.

10       Q.    No one ever brought it to your attention

11    again?

12       A.    No, not that I recall.

13       Q.    Okay.  Fair enough.

14       A.    It's fair someone could have, and I just

15    don't recall.

16       Q.    I'm just asking for your best recollection.

17    That is fine.  And the meeting, the minutes of the

18    meeting that I have been referring to does not indicate

19    this, but I just want to confirm it with your

20    recollection.  Was Janet Vinc at that meeting, that

21    March 11th meeting?

22       A.    I don't recall her being at that meeting,

23    no.

24       Q.    Do you recall her ever requesting of you to

1    prepare the affidavit that Ms. McKinney had you sign on

2    March 22nd?

3         A.    No.

4         Q.    As far as you know, she had no involvement

5    in that?

6         A.    As far as I know, that would be a correct

7    statement.

8         Q.    Were you in the presence of Mr. Markow when

9    he prepared his affidavit?

10        A.    No.

11        Q.    Were you in the same room when he wrote up

12   his?

13        A.    No.

14        Q.    Do you know how his was developed?

15        A.    No.  I can assume, but I mean --

16        Q.    You can assume.

17        A.    But no, I don't know just definitively, no.

18        Q.    Did you learn at some point that

19   Mr. Markow's affidavit appeared on a blog?

20        A.    Yes.

21        Q.    Okay.  How did you come to learn that?

22        A.    I saw it on the blog.

23        Q.    Where were you when you saw it on the blog?

24        A.    At work.

B-117

Stulir - Herron                                24

1      Q.     Okay.  Here at town hall?

2      A.     In my office, yes.

3      Q.     Do you recall what blog it was?

4      A.     NewsZap.

5      Q.     Is that something that you would

6  occasionally check?

7      A.     Yes.

8      Q.     And one day, I guess, during the election

9  period, you were checking that blog and the affidavit

10  came up?

11     A.     By affidavit, you mean James's, correct?

12     Q.     Yes, James Markow.

13     A.     Yes.  Mr. Markow's affidavit was up there.

14  The reason why I was checking was there were other

15  documents that appeared maybe two weeks before that,

16  too, that were on the blog.  So I was -- I wanted to

17  make sure --

18     Q.     What were the documents that appeared two

19  weeks earlier?

20     A.     I'm trying to remember accurately the date.

21  But I believe they were some kind of -- there was a

22  letter or something to a Ms. Kimberly Schlichting or

23  something.  She was the acting town manager or the

24  assistant town manager or something at the time when

1    Mr. Jacobs had left.  And there was something to the

2    town manager from the former mayor, Mark Schaeffer,

3    directing her to hire Mr. Fox.

4              Q.    Okay.  Like a memo?

5              A.    Yes.

6              Q.    A memo from one to the other?

7              A.    Yes.

8              Q.    Was that --

9              A.    It was probably two weeks or a month or so

10   before --

11             Q.    The affidavit was --

12             A.    The affidavit was put on.

13             Q.    So let me take you back to that memo for a

14   moment.  Did someone bring that to your attention, or

15   did you actually see the -- What is her name again?  I'm

16   sorry.

17             A.    Kimberly.

18             Q.    Kimberly.  That is fine.

19             A.    It will be safer to go with Kimberly.

20             Q.    How did you learn of the document related to

21   her appearing on this blog?

22             A.    Probably someone told me.  I don't think I

23   saw it first.  Somebody told me it was out there.

24             Q.    Did you actually see the memo itself, the

B-119

1    since also James is -- I mean the election committee

2    runs the election, but James is the staff person in

3    charge of the election.  It could tend to compromise his

4    integrity if it looks like he's making accusatory

5    comments about a member or a candidate.  So that's the

6    reason I was concerned.

7         Q.    Do you have any idea who placed that

8    information, Mr. Markow's affidavit, on the NewsZap

9    Blog?

10        A.    No, I don't.

11        Q.    Did you do any investigation to try and

12   determine that?

13        A.    No, I did not.  It generally would not

14   follow me to investigate that.

15        Q.    Okay.  Do you know if Mr. Hugg did any

16   investigation?

17        A.    I did not, so I don't know if he did or not.

18        Q.    Do you know of any change or heightened

19   sensitivity, so to speak, generated by this occurrence

20   on behalf of the town to keep its papers private and

21   outside of the public domain?

22        A.    Well, future meetings and even future

23   conversations with Mr. Fox himself, that document --

24   none of these documents, even the memo from Kimberly, he

B- 120

1   even admitted to us, to me, did come from that personnel

2   file.

3       Q.    Did he know where it came from?

4       A.    He didn't tell me, but it didn't come from

5   my office.  The personnel committee questioned me on it,

6   and it didn't come from -- because at one point, I was

7   even going to change all of the locks for fear that

8   someone else had the key, but after having conversations

9   with him and him telling me it didn't come from that

10  file.

11      Q.    Do you think with the people who are

12  identified in the memo -- that is, Mr. Schaeffer and

13  Kimberly -- would they have copies of that

14  communication, since it was set up to be between the two

15  of them?

16      A.    It was before I was employed with the town.

17      Q.    So you don't know?

18      A.    If I wrote a memo, I generally keep a copy

19  of it at least on my hard drive.  If you still have the

20  computer, you probably still have it.

21      Q.    Who would have access to your hard drive?

22      A.    To the hard drive?  It depends on how it's

23  stored.  If it's stored on your hard drive on your

24  computer, generally, you would have to have the password

B- 121

Stulir - Herron                              32

1    to get into it.

2           Q.    Do each of you have a separate password?

3           A.    Yes.  You need passwords.  James is the IT

4    person, so he could probably give you more of an

5    explanation of it.  I don't know what kind of system

6    they were using then in 2002.  I'm guessing that he did

7    not use a town computer.

8           Q.    Who did not use a town computer?

9           A.    Mr. Schaeffer.

10          Q.    The affidavit, did anyone determine how the

11   affidavit got on the NewsZap Blog?

12          A.    You are talking about Mr. Markow's?

13          Q.    Yes, Mr. Markow's.

14          A.    As far as I said before, I don't know if

15   anybody ever found out or even tried to find out.

16          Q.    Okay.  Did Ms. McKinney tell you where your

17   affidavit was going to be kept?

18          A.    No.

19          Q.    Where did you assume it was going to be

20   kept?

21          A.    I didn't have any idea where it was going to

22   be kept.

23          Q.    Okay.  Would this type of information

24   normally be kept in a personnel file?

Stulir - Herron                              33

1      A.    I would think so, but I didn't know where it

2   was going to go.

3      Q.    Okay.  Were you ever directed to put it in

4   Mr. Fox's personnel file?

5      A.    No.  No, I'm sorry.  He was a current

6   employee.  No, I wasn't directed to put it in there.

7      Q.    Okay.  Do you have any information to

8   indicate that Meloney Torres was directed to put it in

9   there?

10     A.    No.  It's my understanding it never reached

11  my office.

12     Q.    Okay.  And how do you have that

13  understanding?

14     A.    By talking to Meloney.

15     Q.    What did she tell you?

16     A.    She never got it.

17     Q.    All right.  Up to the present time, do you

18  have any idea where your affidavit was being kept?

19     A.    I still have no idea where it is.

20     Q.    Is it fair to say that once your affidavit

21  was signed and notarized on March 22nd, Ms. McKinney

22  took it?  She was the last person you would know to have

23  possession of it?

24     A.    By the original, you mean, correct?

B-123

1        Q.    Yes.

2        A.    That would be my -- yes, since there are two

3   people, her and I, and I didn't go away with it, she

4   would have to.

5        Q.    And she didn't make a copy for you?

6        A.    If she did it, I don't recall.

7        Q.    Well, let me put it this way then.  You

8   never had a copy of it?

9        A.    I don't believe I ever had a copy of it, no.

10       Q.    So as far as you know, there was just an

11  original?

12       A.    Yes.

13       Q.    And when the two of you were done preparing

14  the document, you believe she left with it?

15       A.    Yes.

16       Q.    Did you ever ask her about the Markow

17  affidavit, since she had notarized it?

18       A.    No.

19       Q.    Regarding the Markow affidavit, can you

20  think of anyone who would have had access to it to put

21  it on this NewsZap Blog other than an employee of the

22  Town of Smyrna?

23       A.    I'll put it this way:  I have no idea who

24  put it out there.

1    Q.    But you didn't know that?

2    A.    No, I didn't.  I mean he teaches planning.

3    There aren't any planning places around here to go

4    except the U of D.  So he was former executive of

5    planning for the state.  So he created the department.

6    So it's like who else would you go to?

7    Q.    And again, as a result of the March 11th

8    meeting -- that is, the very next day -- you thought

9    this matter had been amicably resolved, and you even

10   mentioned that Hugg and Fox shook hands?

11   A.    Yes.  I mean if anything, I thought if

12   Ms. Vinc might have issue of how it was resolved, that

13   nothing was done to him.  I thought she really should be

14   bringing this lawsuit.  But frankly, I don't think his

15   is without merit.

16   Q.    Did you ever tell Ms. Vinc what was said?

17   A.    I don't recall ever telling her.

18   Q.    About that?

19   A.    No.

20   Q.    But you have talked to her?

21   A.    Yeah.  I talk to her, but I don't talk to

22   her about this.

23   Q.    That is what I want to know.

24   A.    No.

B-125

Stulir – Herron                                46

1          Q.    Do you have any recollection of ever telling

2    her about this conversation?

3          A.    No, no.

4          Q.    And I don't want to go over everything,

5    because I think we have established it.  But just to be

6    clear, Ms. Vinc did not ask you to write this affidavit?

7          A.    No.  I've never talked to her about this

8    instance.

9               MR. FLETCHER:  All right.  Thank you.

10

                    INDEX TO TESTIMONY

11

DEPONENT                                       PAGE

12   GARY STULIR
          Examination by Mr. Fletcher            2
13        Examination by Mr. Herron             82
          Further Examination by Mr. Fletcher   85

14

15

16

17

18

19

20

21

22

23

24

B- 126

ORIGINAL    1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,                )
    Plaintiff,                        )
                                )
          v.                        ) C.A. No.
                                ) 07-488 (GMS)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
individually and in his official   )
capacity as Town Manager of the    )
Town of Smyrna, and                )
VALERIE HERITAGE, individually and )
in her official capacity as        )
Administrative Clerk of the        )
Town of Smyrna,                    )
    Defendants.                       )

        Deposition of **JAMES MARKOW**, taken
before Cheryl A. Anthony, Court Reporter, in the Smyrna
Town Hall, 27 South Market Street, Smyrna, Delaware, on
Tuesday, April 1, 2008, beginning at 10:00 a.m.

APPEARANCES:

        WILLIAM D. FLETCHER, JR., ESQUIRE
        SCHMITTINGER & RODRIGUEZ, P.A.
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        BRUCE HERRON, ESQUIRE
        AKIN & HERRON, P.A.
        1220 North Market Street
        Suite 300
        PO Box 25047
        Wilmington, Delaware  19899
        Attorney for Defendants.

**ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

1    think that might have overheard it?

2          A.     I don't think so, no.

3          Q.     Not to your recollection, anyway?

4          A.     No.

5          Q.     Now, after that conversation ended, what did

6    you do?  All right.  Did you do anything that related to

7    that conversation?  Did you take any action that --

8          A.     Something happened, because I had to write

9    something down on paper and verify it, yes.  But --

10         Q.     Okay.  Well, what happened?

11         A.     I can't remember if Gary said something to

12   Dave or if Gary said something to Dave and Dave asked me

13   did this happen.  I said yes.  Let's get it in writing.

14         Q.     Gary said something to Dave.  That would be

15   Dave Hugg?

16         A.     Yes.

17         Q.     And how do you know Gary said something to

18   Dave?

19         A.     I'm guessing.  I'm trying to recall what

20   really happened.  I mean that's --

21         Q.     Did you go to Mr. Hugg?

22         A.     I don't think I did.  But Gary thought that

23   what was said was important.  But I can't recall

24   everything to that particular day.  Sorry.

1         Q.    That's all right.  Now, after what you are
2    speculating about, that Gary went to Mr. Hugg, who came
3    to you?
4         A.    I want to say Mr. Hugg.
5         Q.    Okay.  And what did Mr. Hugg request of you
6    or tell you?
7         A.    I think that whatever was said, he said:  We
8    want to get it in writing.  And I remember it being
9    typed up, and I signed it.  And I was like:  Yes, that
10   was what was said.
11        Q.    Now, was that the very next day that you and
12   Mr. Hugg had this conversation?
13        A.    It could have been.
14        Q.    All right.  Could it have been two days
15   after March 10th?
16        A.    I don't think it was two days --
17        Q.    All right.
18        A.    -- because it seemed hot.  And I think the
19   conversation was after work, I think, or closer to four,
20   closer to the time we all get off.  But it could have
21   been the next day.  But I definitely don't think it was
22   two days.
23        Q.    The conversation that you did have with
24   Mr. Fox that you were told to write down, was that

Markow - Fletcher                    13

 1   during the workday or after work?

 2          A.    I don't know.

 3          Q.    Now, when Mr. Hugg came to you and told you

 4   that he wanted you to write this down, did you do it

 5   then and there?

 6          A.    I believe it was Mr. Hugg that came to me.

 7   And when I was asked, I believe I wrote it down right

 8   then and there.  And then it was typed.  And then I

 9   verified it, and then I signed it.

10          Q.    So the request to write it down, the writing

11   of it and then the signing of it all occurred on the

12   same day?

13          A.    Yes.

14          Q.    Did Mr. Hugg explain to you why he wanted it

15   written down?

16          A.    He might have.

17          Q.    Well, do you have any recollection of why he

18   did?

19          A.    No, sorry.

20          Q.    Did you ask him:  Why do you want this?

21          A.    No.  He's my boss.

22          Q.    I understand.  But you didn't ask him?

23          A.    No.

24          Q.    Now, had you been asked by Mr. Fox,

1   BY MR. FLETCHER:

2        Q.    Do you recognize this document?

3        A.    Yeah.

4        Q.    And is that an accurate copy of a document

5   that you signed?

6        A.    I believe it's accurate, yeah.

7        Q.    Is that your signature?

8        A.    Yep.

9        Q.    Now, who typed this up?

10       A.    I believe Carol did, Carol McKinney.

11       Q.    She's also the one that apparently notarized

12   it?

13       A.    Okay.

14       Q.    Did she notarize it in your presence?

15       A.    Uh-huh.

16       Q.    Okay.  So you knew she notarized it?

17       A.    Uh-huh.

18       Q.    And you knew that you were making this

19   statement under oath?

20       A.    Yes.

21       Q.    Did anyone tell you why you were making a

22   statement under oath?  Do you do that very often for the

23   town?

24       A.    No.

1          Q.    Have you ever done it for the town?

2          A.    I don't think I have.

3          Q.    All right.  Did anyone tell you why they

4    wanted this under oath?

5          A.    I don't believe so.

6          Q.    So when you had your conversation with

7    Mr. Hugg, were you in his office?

8          A.    I don't know.  I could have been in the

9    hallway.

10         Q.    And then did he direct you to his office?

11         A.    I'm not sure.

12         Q.    Did you write this statement down, or did

13   you just verbally give it to somebody?

14         A.    I believe I initially wrote it, and then she

15   typed it for me.

16         Q.    So you wrote it handwritten?

17         A.    I believe so.

18         Q.    Now, on the statement, which I would like to

19   have marked as Exhibit 1 of the Markow -- Is it Markow?

20         A.    Markow.

21         Q.    -- the Markow deposition.

22               (Markow Exhibit Number 1 was marked for

23   identification and attached to the record.)

24

B-132

1   BY MR. FLETCHER:

2        Q.    It says, among other things, that Mr. Fox

3   was upset because the duties of planning and inspections

4   were divided between him and Janet.  Did he say that?

5        A.    Yeah, I believe so.

6        Q.    Did he say he was upset, or is that your

7   observation of how he was talking to you?

8        A.    Probably.

9        Q.    Probably what?

10       A.    Probably the way he was talking to me.

11  Sorry.  This was not an important day in my life to

12  remember, so I'm not going to be too much help.

13       Q.    Well, I understand that.  On the other hand,

14  apparently, this is one of the few days of your life

15  where you have been asked to sign something under oath.

16       A.    Right.

17       Q.    What was your understanding about these

18  duties of planning and inspections being divided between

19  Mr. Fox and Janet Vinc?

20       A.    You got me there.  I know that they do so

21  much work upstairs.  And to tell you the truth, I

22  couldn't tell you what they really do.

23       Q.    How did this conversation even come up?

24       A.    I think maybe he was letting off steam.  I

 1   don't know.

 2        Q.    All right.  The first statement or the first

 3   lines say that you were in Gary Stulir's office.

 4        A.    Right.

 5        Q.    And it says it was after work?

 6        A.    Okay.  Then it was after work.

 7        Q.    And it says it was on the evening of

 8   March 10th.

 9        A.    Okay.

10        Q.    Do you know what you meant by evening?

11        A.    Well, it couldn't be much after 4:30,

12   because I don't like to stay late.

13        Q.    Okay.  Is 4:30 the end of the workday?

14        A.    Yes.

15        Q.    Were the three of you then what you would

16   consider to be off the clock?

17        A.    I guess.

18        Q.    Okay.  I mean in other words, had your work

19   day ended?

20        A.    Yeah.  But I'm salaried, so yeah, I guess

21   so.

22        Q.    I understand.  And salaried means that there

23   are occasions when you will be expected to work beyond

24   the normal working hours?

B-134

1          A.      Correct.

2          Q.      Okay.  And the normal working hours are 8:30

3     to 4:30?

4          A.      Eight to 4:30.

5          Q.      Eight to 4:30, with some time off for lunch,

6     obviously?

7          A.      Sometimes.

8          Q.      But when you say that you are sometimes

9     expected to work beyond 4:30, what I'm asking is was

10    this conversation that you were having with Mr. Fox a

11    work-related conversation?

12         A.      Probably not.

13         Q.      So would it be fair to say that the workday

14    had officially ended at 4:30?

15         A.      Yes.

16         Q.      And this discussion after that time had

17    nothing to do with your work responsibilities?

18         A.      Yeah.  I would say that is fair to say.

19         Q.      And so it was just three guys kind of

20    jawing?

21         A.      Yeah.

22         Q.      And would it be fair to say that the

23    conversation was considered to be a private conversation

24    between the three of you?

Markow - Fletcher                    24

```
 1    conversation that you, Mr. Stulir, and Mr. Fox were

 2    having after work on March 10th?

 3         A.    Probably so, because that is why I could

 4    only remember part of the sentence.

 5         Q.    Did Mr. Hugg tell you what was going to be

 6    done with this statement after you signed it?

 7         A.    I believe he put it in his personnel record,

 8    I believe; I'm not sure.

 9         Q.    All right.  Your best recollection is you

10    believe Mr. Hugg indicated this was going in Mr. Fox's

11    personnel record?

12         A.    I believe so, but I'm not -- I believe.

13         Q.    All right.  And he would have told you that

14    the day you were writing it up?

15         A.    I believe so.

16         Q.    Did you have any conversation with anyone

17    else about the need to put this in writing?

18         A.    I don't think so.

19         Q.    For instance, did Janet Vinc ever come to

20    you and say:  I've heard some comments about Mr. Fox.  I

21    need you to put them in writing?

22         A.    She could have.

23         Q.    Well, I understand she could have.  Do you

24    have a recollection of her doing that?
```

Markow - Fletcher                               25

1          A.     No.   Sorry.

2          Q.     Other than this written document, do you

3    have any recollection of any comments that Mr. Fox made

4    in your presence about Ms. Vinc that you would consider

5    to be inappropriate?

6          A.     I don't believe so.

7          Q.     Did you continue to have regular contact

8    with Mr. Fox from March 10th of '05 up until the time

9    that he left the Town of Smyrna's employment?

10         A.     Yeah, I believe so.

11         Q.     I accidentally handed you a moment ago a

12   statement that you didn't recognize, which was signed by

13   Mr. Stulir, who was also present during this

14   conversation that you identified in Exhibit 1.  I just

15   want you to take a look at his statement for a moment.

16   Have you ever seen it before?

17         A.     I don't think so.

18         Q.     In looking at it, do you have any

19   recollection that Mr. Fox said any of the comments that

20   are in the second paragraph of Mr. Stulir's statement?

21         A.     The 60 days, that doesn't sound -- I don't

22   remember the 60 days.  You know, I -- no, it doesn't.

23   The 60 days, I don't remember that.

24         Q.     All right.  What about the rest of that

B- 137

 1          Q.    Do you remember signing yours in front of

 2     Ms. McKinney?

 3          A.    Right.

 4          Q.    And was Mr. Stulir there to sign his?

 5          A.    I don't think so.

 6          Q.    Has Mr. Hugg ever brought this statement to

 7     your attention again?

 8          A.    This particular one?

 9          Q.    Yours, yes.

10          A.    Okay.  Mine?

11          Q.    Exhibit 1.

12          A.    Am I looking at the right one?

13          Q.    I'm sorry.  I don't mean to --

14          A.    I think I might have brought it to his

15     attention one time, because it was on the web.

16          Q.    Can you explain how that came about?

17          A.    It was during election time.  I think -- I

18     believe my name was out of it, but my signature was

19     there.  So I was a little upset about how it got on the

20     web.

21          Q.    So help me out.  Did you actually see it on

22     the web?

23          A.    Oh, yeah.

24          Q.    Are we talking about a workday?

Markow - Fletcher                                28

1          A.    A workday.

2          Q.    All right.  You are at your station in the

3     building here?

4          A.    Uh-huh.

5          Q.    And you have a computer terminal, obviously?

6          A.    Uh-huh.

7          Q.    We are talking about being on the Town of

8     Smyrna website?

9          A.    No.

10         Q.    I'm sorry.  What are we talking about?  What

11    is the website?

12         A.    It's a blog.

13         Q.    A blog?

14         A.    I think it's called NewsZap Blog.  It's the

15    NewsZap Blog.

16         Q.    Okay.  Now, why were you on that?

17         A.    Because I read it every day.

18         Q.    Okay.  So you are reading this NewsZap Blog,

19    and what comes up on it?

20         A.    It's a different blog of everything that is

21    going on.

22         Q.    Comments people write in?

23         A.    Exactly.  And I think it was during the

24    election.  He was running for election.  And one of the

B- 139

 1    things or one of the captions you can click on and see

 2    what everybody is writing -- because I read them all --

 3    and I seen this, because Gary brought it to my attention

 4    that this was on the blog.  So I quickly looked it up

 5    and seen it.  And then I was upset, because now

 6    everybody knows that I wrote this.

 7        Q.    Right.

 8        A.    My name is off it, but everybody knows my

 9    signature.

10        Q.    Okay.  First of all, I think you have told

11    me a little bit.  Gary -- and I assume that is Gary

12    Stulir --

13        A.    Right.

14        Q.    -- he's the one that brought it to your

15    attention that it's on the blog?

16        A.    Yeah, in the morning.

17        Q.    In the morning.  And what did he say?  Hey,

18    there is a statement of yours on the blog, did he say?

19        A.    He said:  You need to check the blog.

20        Q.    He was being a little discreet and didn't

21    want to get into it?

22        A.    Yes.  I was a little PO'd.

23        Q.    And you followed his advice and checked the

24    blog.  And tell me then, looking at your exhibit, what

B-140

Markow - Fletcher                              30

```
 1   of it appeared on the blog?
 2        A.    Everything -- okay.  I don't know about the
 3   Carol McKinney part here.  But exactly what was said,
 4   these quotes and my signature, my name was removed, but
 5   my signature was there.
 6        Q.    Okay.  Now, when you say your name was
 7   removed, do you mean your name under the signature line?
 8        A.    Correct.
 9        Q.    But it was your signature?
10        A.    Oh, yeah.  Everybody knows my signature, if
11   I have ever signed anything.
12        Q.    Okay.  All right.  So that got you very
13   upset?
14        A.    Oh, yeah.
15        Q.    I assume you were upset, not only because it
16   identified you -- which this blog is designed really not
17   to identify people, I guess, isn't it?  I mean people
18   make all sorts of statements on it.
19        A.    It's anonymous, right.
20        Q.    It's anonymous.  But were you also upset
21   because you felt that this was a private statement that
22   you had been required to document and did your duty,
23   correct?
24        A.    Correct.
```

B-141

Markow - Fletcher                                    32

1        of you go to Mr. Hugg or just you?

2               A.      Maybe both of us went.

3               Q.      Okay.  Where did you find him?

4               A.      I think in his office.

5               Q.      Was Carol McKinney out front or --

6               A.      She might have been in her office or

7        something.  It was first thing in the morning.

8               Q.      Okay.  So you went to his office, and what

9        did you tell him?

10              A.      Something to the effect that this is on the

11       blog.

12              Q.      What was his reaction?

13              A.      I think he was shocked.  I don't know.  I'm

14       really trying to remember.  I can remember certain

15       things, this being on the blog and I remember it being

16       removed quickly.

17              Q.      So once you told him, what did he say?

18              A.      I can't quote verbatim what he said, but

19       generally maybe?

20              Q.      Yes, generally.

21              A.      I think he was shocked how it got out there,

22       period.

23              Q.      Did he tell you where the original was?

24              A.      You know what?  I assumed it was still in

B- 142

Markow - Fletcher                                    33

1   his folder.

2        Q.    And his being Mr. Fox's folder?

3        A.    Correct.

4        Q.    Okay.  Did Mr. Hugg tell you that?

5        A.    No.  I think I assumed it was still in the

6   folder.  That's where it should be.

7        Q.    Okay.  Did Mr. Hugg tell you that:  I've had

8   it under lock and key in my own desk drawer?

9        A.    No, I don't remember that.

10       Q.    Did he call Carol McKinney into his office

11  while you were there?

12       A.    She might have come in while we were talking

13  about it.

14       Q.    All right.  Did he then address her with

15  this information?

16       A.    I don't know.

17       Q.    Do you remember him asking how could this be

18  or this needs to be looked into?

19       A.    I think so, because I remember Gary trying

20  to quickly sum up where it went.

21       Q.    Help me out.  What do you mean Gary was

22  trying to sum up where it went?

23       A.    I think it's supposed to be -- I assume it's

24  supposed to be in the folder, in Jim's folder, under

B-143

Markow - Fletcher                    38

1   yeah, yeah.

2        Q.    Now, because of the publication of your

3   affidavit, the contents of your affidavit, did Mr. Hugg

4   ever tell you where that affidavit had been kept?

5        A.    No.  I don't think I asked.

6        Q.    Well, I understand you may not have asked.

7   But did it ever come out?

8        A.    No.

9        Q.    Okay.  And after the blog publication, did

10  he discuss with you or did you overhear or become aware

11  of his intent to get rid of the affidavits?

12       A.    To get rid of my affidavit?

13       Q.    Yes.

14       A.    No.

15             MR. FLETCHER:  All right.  Thank you.  That

16  is all the questions I have.

17  BY MR. HERRON:

18       Q.    I just have one or two, just to follow up.

19       A.    Sure.

20       Q.    Mr. Markow, you don't have any firsthand

21  knowledge as to whether or not your affidavit and

22  Mr. Stulir's affidavit were ever actually placed in

23  Mr. Fox's personnel file?

24       A.    No, I don't know.

B- 144

**ORIGINAL**  1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,               )
    Plaintiff,                       )
                       )
          v.                       ) C.A. No.
                       ) 07-488 (GMS)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
individually and in his official     )
capacity as Town Manager of the      )
Town of Smyrna, and                  )
VALERIE HERITAGE, individually and )
in her official capacity as          )
Administrative Clerk of the          )
Town of Smyrna,                      )
    Defendants.                      )

        Deposition of **CAROL C. McKINNEY**, taken
before Cheryl A. Anthony, Court Reporter, in the Smyrna
Town Hall, 27 South Market Street, Smyrna, Delaware, on
Tuesday, April 1, 2008, beginning at 11:45 a.m.

APPEARANCES:

        WILLIAM D. FLETCHER, JR., ESQUIRE
        and BRIAN BRITTINGHAM, ESQUIRE
        SCHMITTINGER & RODRIGUEZ, P.A.
        414 South State Street
        Dover, Delaware  19901
        Attorney for Plaintiff.

        BRUCE HERRON, ESQUIRE
        AKIN & HERRON, P.A.
        1220 North Market Street
        Suite 300
        PO Box 25047
        Wilmington, Delaware  19899
        Attorney for Defendants.

**ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B-145

McKinney - Fletcher                    3

1    manager, mayor, and council, any committees who need

2    help.  I do minutes of town council meetings and other

3    meetings as requested.  I also keep all the official

4    files on town ordinances, resolutions, proclamations,

5    those kinds of things.

6         Q.    And is your immediate supervisor the town

7    manager, Mr. Hugg?

8         A.    Yes.

9         Q.    Are any of the other department heads a

10   supervisor of yours?

11        A.    No.

12        Q.    What, if any, involvement do you have as far

13   as maintaining personnel records of the town employees?

14        A.    None.

15        Q.    We have been supplied the minutes of a

16   meeting of March 11, 2005.  I think your attorney has a

17   copy of those.  Did you prepare those minutes?

18        A.    I did.

19        Q.    And it lists at the very top of it that you

20   were present for that meeting?

21        A.    Yes.

22        Q.    Besides keeping the minutes, do you keep a

23   recollection of what occurs at some of these meetings?

24        A.    Some of them, yes.

B-146

McKinney - Fletcher                    4

1      Q.    Do you recall this meeting at all?

2      A.    I recall being at it, yes.

3      Q.    Do you recall anyone at that meeting who is

4   not identified in the first paragraph?

5      A.    I don't remember.

6      Q.    This meeting, is it fair to say, dealt

7   primarily with a Ms. Dunn and a Mr. Fox?

8      A.    If that's what the minutes say; that's been

9   years ago.  But primarily, I would have to go back to

10  read them.  For the most part --

11     Q.    Putting aside what is in the minutes

12  themselves as it relates to Mr. Fox, do you have a

13  recollection of anyone specifically stating that he made

14  an inappropriate sexual remark about a town employee,

15  specifically Janet Vinc?

16     A.    Not to me, not when I was present.

17     Q.    In front of you, as a result of the earlier

18  depositions, there are two copies of affidavits.  They

19  have been marked as Exhibits 1 and 2 to Mr. Markow's

20  deposition.  But one of those affidavits is

21  Mr. Markow's, and the other one is Mr. Stulir's.  Do you

22  see them?

23     A.    Yes.

24     Q.    Do you recognize them?

B-147

McKinney - Fletcher                    5

1      A.    Yes.

2      Q.    You are the Carol C. McKinney who is the

3    notary public signing these affidavits; is that fair to

4    say?

5      A.    Yes.

6      Q.    And did you prepare these affidavits?

7      A.    Yes.

8      Q.    Okay.  They are sworn to on March 22nd of

9    '05.

10     A.    Okay.

11     Q.    Well, you can see that.

12     A.    Yes, yes.

13     Q.    Did you prepare them on March 22nd of '05?

14     A.    That's the day they were notarized.

15     Q.    I understand.

16     A.    I don't know what day they were prepared.

17     Q.    Who, first of all, requested you to prepare

18    these documents?

19     A.    Mr. Hugg.

20     Q.    And when did he request you to do that?

21     A.    I don't remember.

22     Q.    The minutes don't reflect that in the

23    meeting you were asked to do that, the minutes of

24    March 11th?

McKinney - Fletcher                          9

| 1 | A. | I do not. |

Q.    Did he tell you what he did with them?

A.    He did not.

Q.    Did he direct you to send them to personnel?

A.    No.

Q.    To the human resources people?

A.    No.

Q.    Back then, in March of '05, is it Meloney Torres?  Would she have been the HR person?

A.    I don't remember.  I assume, but I don't remember.

Q.    All right.  Well, do you have any recollection of who else would have been in charge of HR for the town besides her?

A.    No.

Q.    Okay.

A.    That is just not my department.

Q.    Well, if Mr. Hugg were to tell you, I need to talk to the head of HR, in March of '05, who would you contact?

A.    Today, it would be Meloney, because she has all those records, today.

Q.    I am talking about in March of '05.

A.    I don't remember.

McKinney - Fletcher                    10

1       Q.    Who you would have contacted?

2       A.    I don't know.

3       Q.    Well, who would it have been?

4       A.    I have no idea.

5       Q.    How long has Meloney Torres held the

6    position?

7       A.    I don't know.  The personnel records here

8    would tell that.  I don't know.

9       Q.    After you gave them to Mr. Hugg, is that the

10   last time you saw the affidavits?

11      A.    Yes.

12      Q.    Ever?

13      A.    Yes.

14      Q.    Until today?

15      A.    Mr. Herron and I discussed them.

16      Q.    I don't want to know what you and Mr. Herron

17   discussed, but I appreciate you telling me that you had

18   a conversation with him.  But did you see the

19   affidavits --

20      A.    No.

21      Q.    -- at that time?

22      A.    No.

23      Q.    So today is the first time?

24      A.    I don't remember.  I just don't know.  These

1    went to Mr. Hugg way back when.

2         Q.    March 22nd of '05?

3         A.    Thereabouts, yes.

4         Q.    Well, did they stay with you for any period

5    of time?

6         A.    No.

7         Q.    I mean overnight?

8         A.    No, no.

9         Q.    So as soon as they were done, you gave them

10   to Mr. Hugg?

11        A.    (The witness nodded head up and down.)

12        Q.    Yes?

13        A.    Yes.  Sorry.

14        Q.    That is all right.  Now, did you learn that

15   at least one of them apparently ended up on an internet

16   blog site?

17        A.    I heard that at some point, yes.

18        Q.    And how did you hear of it?  Who told you?

19        A.    Local -- I have no idea, local gossip.

20        Q.    Did Mr. Hugg ever tell you?

21        A.    I don't remember who told me.

22        Q.    All right.  Did Mr. Hugg ever ask you to

23   look into it?

24        A.    Not that I remember.

McKinney - Fletcher                    12

1      Q.    Did you ever look into it?

2      A.    Not that I remember.

3      Q.    Does Mr. Hugg have any areas in his office

4  that you know of that are kept under lock and key, so to

5  speak, so that access is limited to it?

6      A.    I don't know.

7      Q.    All right.  So you are not aware of any such

8  location in his office?

9      A.    I don't know.

10     Q.    So you could not tell me where, in

11  Mr. Hugg's office, he might put something that would be

12  kept under lock?

13     A.    No.

14     Q.    As far as you know, was a copy of these

15  affidavits ever given to Janet Vinc?

16     A.    I didn't give a copy to anyone but Mr. Hugg.

17     Q.    Do you know if Ms. Vinc and Mr. Hugg ever

18  discussed these affidavits?

19     A.    I don't know.

20     Q.    Did you ever see the affidavit on the

21  internet website?

22     A.    No.

23     Q.    Did you ever see any other memorandum that

24  would appear to be city or town memoranda on any town

McKinney - Fletcher                15

1       Q.    Okay.  And did you know or had you been told

2    by someone else that Ms. Heritage had indicated that

3    Mr. Fox's work relationship with Mrs. Masten was in any

4    way inappropriate?

5       A.    No.

6       Q.    Are you aware of anything that Mr. Hugg did

7    once it was discovered that the contents of at least one

8    of these affidavits was on a website?

9       A.    No.

10       Q.    Are you aware of him issuing any type of

11   directive, any type of other communication dealing with

12   these issues of private town papers getting on a public

13   website?

14       A.    At one point I signed a memo -- and I can't

15   remember now -- asking if I had any connection to -- and

16   I can't remember now what memo it was.  And I had

17   prepared that memo, but that was all.

18       Q.    And this memo --

19       A.    I don't remember what it was about.

20       Q.    The memo that you prepared, what did it deal

21   with?

22       A.    I don't know.

23       Q.    Well, what do you remember about the memo?

24       A.    That it disappeared from my personnel file

B- 153

McKinney - Fletcher                    16

1    at some point.

2         Q.    A memo that you prepared?

3         A.    That I signed, yes.

4         Q.    Oh, you signed it.  And it had disappeared

5    from your personnel file?

6         A.    (The witness nodded head up and down.)

7         Q.    Was it a memo dealing with your job then?

8         A.    It was a memo dealing with maybe these.

9         Q.    Affidavits?

10        A.    Possibly; like I don't remember.

11        Q.    Was it a memo that had something to do with

12   explaining how you had no involvement in --

13        A.    Beyond the preparation of those particular

14   papers or paper.

15        Q.    And that memo, where is that?

16        A.    I don't know.

17        Q.    That is --

18        A.    I don't have the personnel files.  I have no

19   contact with personnel files.

20        Q.    Who did you give the memo to?

21        A.    Mr. Hugg.

22        Q.    Do you know if anyone else had to prepare

23   such a memo besides yourself?

24        A.    I don't know.

McKinney - Fletcher                    17

1       Q.    Did Mr. Hugg ever indicate in your presence

2   or did you become aware of him indicating to anyone else

3   that those affidavits had been misappropriated from his

4   possession?

5       A.    No.

6       Q.    There is a memo to Valerie Heritage and

7   Aimee Masten from David Hugg, June 23, 2005.  The

8   subject is personnel matter.

9             MR. FLETCHER:  Do you have a ready reference

10  to that?

11            MR. HERRON:  I may not.  Let me check.

12  June 23rd, you said?

13            MR. FLETCHER:  Yes.

14            MR. HERRON:  I do have it.  Is that it?

15            MR. FLETCHER:  Yes.

16  BY MR. FLETCHER:

17      Q.    Who typed this memo?

18      A.    I didn't.

19      Q.    Who types Mr. Hugg's memos?

20      A.    He does some of them.  I do some of them.

21      Q.    Anyone else?

22      A.    Not that I am aware of.  Meloney may have.

23  I don't know.  But it was not me.

24      Q.    Okay.  Well, let me just ask this:  In the

B-155

Jim Fox, Gary Stulir and I were in Gary's office after work on Thursday evening, March 10th.

Jim Fox was upset because the duties of Planning & Inspections were divided between him and Janet Vinc.

Jim said that the "way she got the job was laying on her back" and he added that he didn't want to go down with her.

_James Markow_

Sworn and subscribed before me this 22nd day of March, 2005.

_Carol C. McKinney_
Carol C. McKinney, Notary Public
CAROL C. McKINNEY
Notary Public - State of Delaware
My Comm. Expires Sept. 25, 2006

B-156

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,            )
                                  )
              Plaintiff,          )
                                  )
      v.                          )      C.A. No. 07-488-GMS
                                  )
TOWN OF SMYRNA, DAVID S.          )
HUGG, III, individually and      )
in his official capacity as      )
Town Manager of the Town of      )
Smyrna and VALERIE HERITAGE,     )
individually and in her          )
official capacity as             )
Administrative Clerk of the      )
Town of Smyrna,                  )
                                  )
              Defendants.         )

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES

1. Defendants are without knowledge or information sufficient to admit or deny the averments in paragraph 1.

2.-4. Admitted.

5.-7. The averments in paragraphs 5-7 state legal conclusions to which no response is required.

8.-9. Admitted.

1

B-157

10. Admitted that plaintiff was never the subject of formal disciplinary action during the period of his employment. Denied that plaintiff was never counseled by defendant Town or its agents. Defendants are unable to respond to the remainder of the averments in paragraph 10 because the phrase "until the time of the events leading to his employment termination as set forth herein below" is vague and confusing.

11. Admitted.

12. Denied as stated. Admitted, however, that plaintiff generally performed his job duties satisfactorily.

13. Admitted that in March, 2005 Town employee Jeri Dunn, who worked with plaintiff in the Building and Inspection Department, was terminated for making defamatory comments. Admitted that Ms. Vinc is younger than Ms. Dunn. The remainder of the allegations in paragraph 13 are denied.

14. Defendants are without knowledge or information sufficient to admit or deny the averments in paragraph 14.

15. Admitted that two Town employees approached defendant Hugg and told him they were upset about comments made in their presence by plaintiff regarding Ms. Vinc. Admitted that these two individuals signed affidavits regarding the statements made by plaintiff. Denied that the affidavits were acquired by defendant Hugg for pretextual reasons adverse to plaintiff's employment interests. Denied that the affidavits were not

2

B-158

obtained in compliance by procedural guidelines or the Town's
internal investigatory procedures.  Defendants are without
knowledge or information sufficient to admit or deny the
remainder of the averments in paragraph 15.

16. Admitted that in January of 2006, following plaintiff's
resignation, defendant Hugg sent an e-mail regarding plaintiff to
a Town Councilman.  Denied that the e-mail falsely accused
plaintiff of making sexual harassing comments.  Denied that
defendant Hugg obtained false statements.  Denied that the
affidavits referred to in the Answer to paragraph 15 above were
false and or fabricated.  Denied that only two people had access
to these documents and could have given them to the individuals
who maintain the website.  Defendants are without knowledge or
information sufficient to admit or deny the remainder of the
allegations in paragraph 16.

17. Denied, upon information and belief, that the Mayor and
Town Council in 2005 recommended to defendant Hugg that plaintiff
be promoted to Assistant Town Manager.  Denied that defendant
Hugg refused to promote plaintiff.  Upon information and belief,
Ms. Vinc may have told defendant Hugg that she would not work for
defendant Town if plaintiff was promoted to another open position
(not Assistant Town Manager).  Defendants are without knowledge
or information sufficient to admit or deny the remaining
averments in paragraph 17.

18. Answering defendants are without knowledge or information sufficient to admit or deny the averments in paragraph 18. By way of further answer, admitted that plaintiff received a satisfactory performance review on May 15, 2005.

19. Denied.

20. Denied.

21. Admitted that subsequent to the Town's reorganization and promotion of Ms. Vinc to the position of Manager of Planning and Zoning and promotion of plaintiff to Manager of the Building and Inspection Department, some job responsibilities of the former Director of Planning and Inspections position became plaintiff's responsibilities. Admitted that plaintiff requested that an assistant be hired to aid him with his management and planning duties. Defendants are without knowledge or information sufficient to admit or deny the remaining averments in paragraph 21. By way of further answer, no person was ever hired to the position referred to by plaintiff in paragraph 21.

22. Denied.

23.-24. Answering defendants are without knowledge or information sufficient to admit or deny the averments in paragraphs 23-24.

25. Denied.

26. Defendants restate and incorporate herein their responses to paragraphs 1-25.

27.-28. Denied.

29. Defendants restate and incorporate herein their responses to paragraphs 1-28.

30.-31 Denied.

32. Defendants restate and incorporate herein their responses to paragraphs 1-31.

33.-34. Denied.

35. Defendants restate and incorporate herein their responses to paragraphs 1-34.

36.-38. Denied.

39. Defendants restate and incorporate herein their responses to paragraphs 1-38.

40.-46. Denied.

47. The averments in paragraph 47 state legal conclusions to which no response is required.

### AFFIRMATIVE DEFENSES

48. Defendants are entitled to qualified immunity because no action or conduct of defendants violated any established statutory or constitutional right of which a reasonable person would have known. Harlow v. Fitzgerald, 57 U.S. 800 (1982).

49. Defendants are immune from suit pursuant to the County and Municipal Tort Claims Act, 10 Del. C. § 4010, et. seq.

5

B-161

Memo To:   Personnel Committee Members

            Mr. David Hugg, Town Manager


     Date:   November 8, 2005


     From:   Jim Fox, Capital Projects Coordinator


       Re:   Resignation as Manager of Building & Inspections


Please accept this letter as my request to have a meeting with the
Personnel Committee.


The purpose of this meeting is to discuss my resignation as the Manager
of Building & Inspections, and I request that this meeting be an
Executive Session.


During this meeting I would like to discuss the conduct of another member
of the Building Department.   This person is solely responsible for my
resignation for the Building Department.


B- 164

Samuel J. Fox III
9 White Rabbit Dr.
Smyrna, DE 19977

January 4, 2006

Mr. David S. Hugg
Town Manager, Town of Smyrna
27 S. Market St. Plaza
Smyrna, DE 19977

Re: Notice to Terminate Employment

Dear Mr. Hugg:

Please accept this letter as my notice to terminate my employment with the Town of Smyrna. I have spent the last five and one half years working for the town and it's citizens, and I have enjoyed my time here immensely.

My decision to leave the town has been one of the most difficult decisions I have ever had to make, but I feel that it is time for me to pursue other opportunities. During my tenure with the town, I have gotten to know a great many people, and I will miss them a lot. I hope that I have served the citizens well and wish nothing but the best for the town in the upcoming year.

I have scheduled my departure from the town for Thursday, January 12, 2006. I will be in my office until then finishing up on projects and getting as many projects recorded as I can so the next person will not have to figure out where those projects stand. I will put a status report in each remaining file and have them up to date by the time I leave. Aimee knows where every thing is so she will be able to help with the completion of the projects still not recorded. I would like to use the remainder of my comp time on Friday the 13th, Monday, Tuesday, and Wednesday of next week to correspond with the payroll schedule.

Sincerely,

Samuel J. Fox III

A-100
B-165

**EXHIBIT**

Fox 14
1-9-08    LH

BLANK PAGE

## 20. Sexual Harassment.

### 20.1 Policy.

Sexual harassment is a form of employee misconduct which undermines the integrity of the employment relationship. Each employee of the Town of Smyrna, regardless of gender, is entitled to a working environment which is free from intimidation and sexual harassment. The Town shall not tolerate any form of sexual harassment by any employee of either gender.

### 20.2 Prohibited Practices.

Sexual harassment does not refer to behavior or occasional compliments of a socially acceptable nature. It refers to behavior that is not welcome, that is personally offensive, that fails to respect the rights of others, that debilitates morale and that, therefore, interferes with the work effectiveness of its victims and their co-workers. The following practices are prohibited:

20.2.1 Making an unwelcome sexual advance, a request for sexual favors, or other verbal or physical conduct of a sexual nature a condition of employment for any applicant.

20.2.2 Making the submission to or the rejection of such conduct the basis for an employment decision affecting an applicant or employee.

20.2.3 Creating an intimidating, hostile or offensive working environment by such conduct.

20.2.4 Sexual harassment may be manifested in different ways. One of these is the demand for sexual favors. Other forms of sexual harassment which are also prohibited include:

a) Verbal

- sexual innuendos

- suggestive comments

- jokes of a sexual nature

## William D. Pressley

| | |
|---|---|
| **From:** | Dave Hugg [dhugg@smyrnadelaware.com] |
| **Sent:** | Monday, January 30, 2006 8:34 AM |
| **To:** | 'William D. Pressley' |
| **Cc:** | 'Janet Vinc' |
| **Subject:** | RE: Meeting |

You really ought to be much more concerned about Jim Fox's sexist and derogatory comments to James Markow and Gary Stulir (for which there are signed statements regarding his comments) that are grounds for a sexual harassment suit against the town and Jim personally. Jim's comments at Jeri's dismissal and thereafter are very serious, and are a matter of record – Janet chose not to pursue them but if pressed we'd all be looking at a major law suit.

-----Original Message-----
**From:** William D. Pressley [mailto:WDPressley@worldnet.att.net]
**Sent:** Monday, January 30, 2006 7:41 AM
**To:** Dave Hugg
**Subject:** Meeting


Outgoing Mail is virus checked by Norton 2006


Dave.

Would you please have copies for all Committee members (tonight).

The Time clock sheets for the last 60 days for MS. Janet Vinc.

Thank You.
See you tonight.

Bill Pressley

B-170

ORIGINAL          1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMUEL JAMES FOX, III,                )
    Plaintiff,                        )
                                      )
            v.                        )  C.A. No.
                                      )  07-488 (GMS)
TOWN OF SMYRNA, DAVID S. HUGG, III,)
individually and in his official   )
capacity as Town Manager of the    )
Town of Smyrna, and                )
VALERIE HERITAGE, individually and )
in her official capacity as        )
Administrative Clerk of the        )
Town of Smyrna,                    )
    Defendants.                       )

Deposition of **VALERIE LYNN HERITAGE**, taken before Cheryl A. Anthony, Court Reporter, in the Smyrna Town Hall, 27 South Market Street, Smyrna, Delaware, on Tuesday, March 18, 2008, beginning at 10:00 a.m.

APPEARANCES:

    WILLIAM D. FLETCHER, JR., ESQUIRE
    and BRIAN BRITTINGHAM, ESQUIRE
    SCHMITTINGER & RODRIGUEZ, P.A.
    414 South State Street
    Dover, Delaware  19901
    Attorney for Plaintiff.

    BRUCE HERRON, ESQUIRE
    AKIN & HERRON, P.A.
    1220 North Market Street
    Suite 300
    PO Box 25047
    Wilmington, Delaware  19899
    Attorney for Defendants.

**ORIGINAL RETAINED BY WILLIAM D. FLETCHER, JR., ESQUIRE**

---

**ANTHONY REPORTING**
**PO Box 234**
**Dover, Delaware  19903**
**(302)674-8884**

B-171

22

1      Q.    And because of this e-mail, he directed you

2  to write a memo.  But did he tell you what the memo was

3  to deal with?

4      A.    Just to deal with my recollections of any

5  discussions with Mrs. Fox.

6      Q.    Does the memo contain a complete record of

7  your recollection of your discussions with Mrs. Fox, or

8  have you had other discussions that aren't in the memo?

9           MR. HERRON:  With Mrs. Fox?

10          MR. FLETCHER:  Yes.

11          THE WITNESS:  This is all that I ever

12 remember.

13 BY MR. FLETCHER:

14     Q.    Okay.  And if your recollection, as we go

15 along changes, please tell me.  But before this memo was

16 drafted, had you and Mrs. Fox had communication?  I'm

17 sorry.  Before the contents of this memo occurred, did

18 you have conversations with Mrs. Fox?

19     A.    She may have called once or twice asking for

20 him; no conversation per se.

21     Q.    All right.  You may have taken a call, so to

22 speak?

23     A.    Correct.

24     Q.    And it was an incoming call from Mrs. Fox

23

1   asking for Mr. Fox?

2        A.   Correct.

3        Q.   And you would have either passed it on to

4   him, or you would have told her he's not available.  And

5   that was pretty much it?

6        A.   Yes, sir.  That's correct.

7        Q.   So is it fair to say that before the

8   occurrences that are set forth in this memo, you and

9   Mrs. Fox didn't have any type of social relationship.

10  Is that fair to say?

11       A.   Not since high school.

12       Q.   And I take it the two of you were in high

13  school at about the same time?

14       A.   Yes, sir.

15       Q.   Well, what high school was that?  Smyrna

16  High School?

17       A.   Smyrna High School.

18       Q.   All right.  And that would have been, what?

19  20 years before 2005 or thereabouts --

20       A.   Yes, sir.

21       Q.   -- without getting too definitive?  All

22  right.  So you really didn't consider yourself social

23  friends?  By the year 2005, your network of friends had

24  changed since high school?

24

1        A.      Correct.

2        Q.      For instance, there is mention in here that

3   Mrs. Fox talked about her first husband.  I mean you

4   didn't have a social relationship with her and her first

5   husband, did you?

6        A.      No, sir.

7        Q.      Okay.  Now, apparently, according to your

8   memo, Mrs. Fox called you on May 24th of 2005?

9        A.      Yes, sir.

10       Q.      And you said that she had called to ask you

11  confidentially.  What did she say to you?  How did this

12  conversation begin?

13       A.      She began -- I mean basically, she wanted to

14  know, just between the two of us, confidentially, if

15  anything was going on.  She said she had heard rumors.

16       Q.      She said she had heard rumors and if

17  anything was going on about what?

18       A.      Mr. Fox and his direct assistant,

19  Mrs. Masten.

20       Q.      Did Mrs. Fox tell you any specifics as to

21  what she heard?

22       A.      Inappropriate behavior between the two of

23  them.

24       Q.      Is that what she said?

1    didn't think was appropriate?

2         A.    Correct.

3         Q.    But no words were exchanged?

4         A.    No.

5         Q.    Okay.  Do you know what purpose Mrs. Masten

6    was in the office for at that time?

7         A.    She was his direct assistant.

8         Q.    Right.  How is that different from you as

9    his secretary?

10        A.    She was hired part-time as a direct

11   assistant.  One of his titles also was special projects

12   coordinator.  And I believe that she helped him with

13   those projects, assisted in keeping them in order.

14        Q.    When you say she was part-time, how many

15   hours a week did she generally work?

16        A.    I believe around 30.

17        Q.    Had she been with the Town before Mr. Fox

18   became the head of building and inspections?

19        A.    No, sir, not that I'm aware of.

20        Q.    Do you know who hired her?

21        A.    Mr. Fox, I believe.

22        Q.    All right.  What else besides -- and for the

23   record, would you agree that the curling up in the chair

24   that you showed us today was demonstrated by sitting in

38

1   motivated you to say that to her?

2      A.    I don't know.

3      Q.    But you obviously thought it was something

4   that you wanted to convey to her.  You wanted to give

5   her that information?

6      A.    If it were me asking somebody about my

7   husband, I would appreciate them to let me know.

8      Q.    Do you know if anything inappropriate

9   occurred behind his closed office door?

10     A.    No, sir.

11     Q.    Is it inappropriate to have conversations

12  with a door closed?

13     A.    No, sir.

14     Q.    Do other supervisors or managerial personnel

15  on occasion meet with people behind closed office doors?

16     A.    Occasionally, yes.

17     Q.    That you are aware of, correct?  Is that

18  what you mean by that?

19     A.    Uh-huh.

20     Q.    Yes?

21     A.    Yes, sir.

22     Q.    At the time that this was going on in '05,

23  were you aware of any town policy that indicated that it

24  was inappropriate to have meetings behind closed doors

55

1    prepare a memo, was anything discussed between the two

2    of you on June 20th?

3        A.    Just that there was an e-mail.

4        Q.    Right.  Anything else?

5        A.    No.

6        Q.    Okay.  And then you prepared the memo --

7        A.    Uh-huh.

8        Q.    -- which you dated the next day?

9        A.    Uh-huh.

10       Q.    And you handed it to him personally?

11       A.    Uh-huh.

12       Q.    Yes?

13       A.    Uh-huh.

14       Q.    You have to say yes.

15       A.    Yes.  I'm sorry.

16       Q.    And then you never heard about the memo

17   again from Mr. Hugg?

18       A.    I was counseled.

19       Q.    Oh, okay.

20       A.    I apologize.  I was counseled.  It's on my

21   personnel record that I was counseled by Mr. Hugg that

22   we cannot speak about other employees.

23       Q.    Was that a verbal counseling?

24       A.    I believe it was a written counsel.

60

1          A.     I believe that was Mr. Hugg.

2          Q.     And present there was Mr. Hugg, yourself,

3     Mrs. Masten, and Mr. Fox?

4          A.     I believe so.

5          Q.     And did you say anything other than what you

6     have just told us, for the record?

7          A.     Not that I remember, no, sir.

8          Q.     All right.  Thank you.  Now, I asked you a

9     moment ago whether or not any of this resulted in any

10    other discipline other than the written reprimand, and

11    you indicated no.  Is that fair to say?

12         A.     Not that I'm aware of.

13         Q.     That is fine.  In other words, you didn't

14    lose a day's pay?  You weren't suspended?  No promotions

15    or raises were withheld from you or any of that type of

16    thing because of this incident; is that fair to say?

17         A.     That is correct.

18         Q.     Do you recall an incident that you had with

19    Mr. Fox, as your superior, where you were addressing him

20    unprofessionally or, at least from his perspective, he

21    thought it was unprofessionally?

22         A.     I believe I understand -- know what you are

23    speaking of.

24         Q.     Do you know about when that occurred?

69

 1   make in your position?

 2         A.     They were -- It would have been an issue

 3   that Mr. Fox would make as the manager of building and

 4   inspections, and I needed clarification on what was

 5   going on, whether we were still issuing the building

 6   permit.  And as I said, the issue was raised to me by

 7   Mr. Antonio, and I was relaying that to Mr. Fox.

 8         Q.     So what transpired?  What was actually said?

 9         A.     I let Mr. Fox know that -- I told him that

10   Mr. Antonio said that they were missing, that the

11   columns were missing and that the contractor -- I

12   believe his name was Mr. Diehl -- had said that -- per a

13   conversation with Mr. Fox the day before, that they were

14   allowed to go ahead and begin removing those without the

15   issuance of the building permit itself.

16         And that is when I went in, and I asked

17   Mr. Fox -- I said -- I let him know that those had

18   transpired and that I was upset that we weren't

19   following procedure.

20         Q.     Did you tell him you were upset that the

21   procedure was not being followed?

22         A.     Yes.

23         Q.     What else did you tell him?

24         A.     I felt that since he was in charge of the

70

1    department, a lot of procedures were being not followed.

2         Q.    Okay.  So you then proceeded to tell him

3    about issues you had, maybe not in particular.  But you

4    indicated to him that this was not an isolated incident,

5    that you felt that other similar violations had been

6    going on?

7         A.    That is correct.

8         Q.    And did you give him any particulars about

9    other violations or failure to follow procedure?

10        A.    I may have.

11        Q.    Do you have any recollection of what they

12   were?

13        A.    No, sir.  I'm sorry.

14        Q.    So you told him all of that.  And what else

15   did you tell him before he responded to you?

16        A.    I don't -- That's the gist of the

17   conversation that I recall.  I apologize.  I was in a

18   very upset state of mind.

19        Q.    I'm sorry.  Do you mean now or then?

20        A.    Then.  I was in an upset state of mind.

21        Q.    All right.  So I mean were you yelling?

22   Just trying to be objective, if someone were just

23   listening to this conversation, would it appear that you

24   were emotional and yelling at him?

71

   1       A.    I raised my voice.  I would not go to the

   2   point of saying that I was yelling at him, no.  And it

   3   was the same as he raised his voice at me.  No, he did

   4   not yell at me.

   5       Q.    All right.  Have you had these types of

   6   raised voice conversations before with Mr. Fox?

   7       A.    No.

   8       Q.    Do you raise your voice with your superiors

   9   in other instances?

  10       A.    No.

  11       Q.    What was said by Mr. Fox then?

  12       A.    Basically, that he did not like being

  13   questioned, and it was his decision.  And I said that

  14   that -- I believe I recall saying that that was okay,

  15   but we need to know what procedure we are following with

  16   these.

  17       Q.    Okay.  Was anything else said?

  18       A.    I don't recall.  I apologize.  It's been a

  19   while since then.

  20       Q.    Were you satisfied with his explanation?

  21       A.    I wasn't happy, but he's the boss.

  22       Q.    Did you express your unhappiness in any way,

  23   physically or verbally?

  24       A.    I cried.

73

1    Q.    Did Mr. Hugg ever discuss it with you?

2    A.    Mr. Hugg, I don't believe, was in that

3    morning.

4    Q.    No.  I mean did he ever -- I don't want to

5    call it a confrontation, but this meeting that you and

6    Mr. Fox had about this procedure issue.

7    A.    Actually, he did, so he must have been made

8    aware of it.  He asked me later that afternoon what

9    happened.

10    Q.    Mr. Hugg did?

11    A.    Yes.

12    Q.    And what did you tell him?

13    A.    Exactly what I just told you, yes.

14    Q.    And what did Mr. Hugg tell you?

15    A.    He said that we have procedures that we have

16    to follow.  And if I recall properly, that was also the

17    day that Mr. Fox was upset and moved his office

18    downstairs and said that if we had any questions, we

19    were to refer them downstairs.

20    Q.    Okay.  Do you know if you were ever

21    disciplined for your conduct that day?

22    A.    No.

23    Q.    Were you ever written up for your conduct

24    that day?

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF DELAWARE

 3    SAMUEL FOX,                        :

 4                    Plaintiff,         :

 5               vs.                     :      Civil Action
                                                No. 07-488
 6    TOWN OF SMYRNA, DAVID S. HUGG,     :
      III, individually and in his
 7    official capacity as Town          :
      Manager of the Town of Smyrna,
 8    and VALERIE HERITAGE,              :
      individually and in her
 9    official capacity as              :
      Adminstrative Clerk of the
10    Town of Smyrna,                    :

11                    Defendants.   :

12                            -  -  -

13              Deposition of CATHERINE A. FOX, taken

14    pursuant to notice in the law offices of

15    Schmittinger & Rodriguez, Suite 203, 220 Continental

16    Drive, Newark, Delaware, on Wednesday, February 6,

17    2008, at 2:27 p.m., before Lorraine B. Marino,

18    Registered Diplomate Reporter and Notary Public.

19                            -  -  -

20

21

22

23

24
```

COPY

2

1

2   APPEARANCES:

3              B. BRIAN BRITTINGHAM, ESQ.
               Schmittinger & Rodriguez
4              414 South State Street
               Dover, DE  19901
5                for Plaintiff

6              BRUCE C. HERRON, ESQ.
               Akin & Herron
7              1500 Shallcross Avenue - Suite 1-A
               Wilmington, DE  19806
8                for Defendants

9                     - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

7

```
1        Q.          What is her position with the town?

2        A.          I don't know the official title, but I

3   know she does the billing for the electric and I know

4   she does the -- I believe the payroll and is their

5   benefits coordinator.  So I don't know her exact

6   title.

7        Q.          So did you know Ms. Heritage in

8   school?

9        A.          I remember seeing Valerie in school.

10  I was a senior that year.  My sister was a freshman.

11  I believe Valerie was a freshman then as well, so I

12  think, you know, that was when.

13       Q.          Did you consider her to be a friend?

14       A.          I didn't.  I knew her from afar, not

15  to associate with in school.

16       Q.          How about after school?

17       A.          Coming in to visit my sister at the

18  Town Hall or to pay a utility bill, she worked in the

19  same office with my sister.  That's how I became

20  acquainted with Valerie.

21       Q.          Okay.  How did the first conversation

22  between you and Ms. Heritage regarding your husband

23  and Ms. Masten come about?

24       A.          I initiated the phone call to Valerie
```

8

1  at the Town Hall.

2      Q.        Okay.  And what was the purpose of

3  your call?

4      A.        The purpose of the call, I had sent in

5  flower arrangements and plant arrangements for all

6  three secretaries:  One for Valerie, one for Kim, and

7  one for Aimee.  And I did not get introduced to Aimee,

8  Jim's new secretary.

9          And Ms. Masten would occasionally call

10  Jim on his cellphone at home or sometimes call the

11  house phone if she had questions.  Aimee did the

12  minutes for the meetings, so she was in contact with

13  Jim.

14          And so I had inquired, you know, about

15  Aimee, because I didn't get to know her.  She was a

16  stranger to me.  And it took me back a little that she

17  was calling Jim's cellphone or the house phone,

18  because I now know why she called, but at that time I

19  didn't know why the calls were initiated.

20      Q.        Do you remember how long before the

21  call Ms. Masten had been working with your husband?

22      A.        No, I don't remember how long.  I knew

23  she was newly appointed as secretary.

24      Q.        As best you can remember, can you tell

9

1  me what you said during that initial phone call and

2  what Ms. Heritage said?

3        A.        Yes.  I had called Valerie and I

4  had -- I was curious about Aimee, so, you know, I told

5  Valerie that there were times when Aimee was calling

6  the house.  It had made me uncomfortable.  Could she

7  tell me a little bit about Aimee so I could get to

8  know her or know what to expect, you know.  I didn't

9  know, honestly know why she was calling the house.

10              And Aimee -- Valerie went on to say,

11 you know, that she started -- I said, "Well, how are

12 you girls getting along with Aimee?"  You know, I was

13 trying to feel her out to see if everything was okay

14 at work.

15              And Valerie, you know, I guess she was

16 not alone at the desk.  I guess Kim was beside her,

17 because I could hear another female in the background.

18 And, you know, I expressed me being uncomfortable

19 about the phone calls, and I wanted to know if

20 everything was okay at work.

21              And she had indicated that, you know,

22 there was some funny behavior going on at work, that

23 Aimee seemed to be in Jim's office a lot, that the

24 door was closed quite often, and that they, quite

10

1   frankly, didn't know what her job duties were there

2   because it seemed like there was more socializing

3   between Jim and Aimee going on than there was

4   productivity in the office.

5           And so then I think I had -- I don't

6   know what else transpired in the phone call.  I don't

7   remember.  But I do remember calling back and asking

8   for birthday information, because prior to Aimee

9   coming there I would bring in baked goods.  I bake

10  cakes, you know, for people.  Even at my own job, I

11  bring everyone a birthday cake.  I did that for one

12  year.

13          Q.       Okay.  So I don't mean to stop you --

14          A.       I am sorry.

15          Q.       That's all right.  So this is --

16          A.       The second phone call.

17          Q.       To Ms. Heritage?

18          A.       Yes.

19          Q.       At the town?

20          A.       Yes.

21          Q.       That same day?

22          A.       At her desk, yes.  I believe it was

23  the same day.  And I asked Valerie to please fax me

24  the list of birthdays and so that I could come into

16

1          But each time I called, she, you know,

2  would answer the phone and talk to me.  At no time did

3  she say that she didn't want to talk to me or that I

4  was bothering her.  And she talked to me.  She could

5  have just as well said, you know, "I am sorry.  I

6  can't help you, and, you know, you are way off base

7  here" and end the conversation.  She just talked to me

8  for as long as the conversation ended.

9          Q.          Do you remember if she told you that

10  there was no proof of anything going on?

11          A.          She said that, yes, that there was no

12  proof of anything going on.  She said but they are

13  behind those -- behind closed doors a lot and that

14  they leave at lunch at the same time and they come

15  back at the same time, and if I, you know, wanted to

16  find out if there was really something going on, that

17  I should follow them.

18          Q.          Okay.  And she never told you that

19  they were having an affair; is that correct?

20          A.          No.  She just said that their behavior

21  was inappropriate between a supervisor and a

22  secretary.

23          Q.          Okay.  And that was the -- what

24  specifically did she say was inappropriate?  The

17

1  behind closed doors?

2      A.      Behind closed doors and the way that

3  they acted when they were in a meeting.  I don't know

4  if maybe Aimee took minutes to a meeting.  She said

5  they would just -- you know, how did she say?  The way

6  they stared at each other or the way that they talked

7  to each other.

8      Q.      Do you recall if Ms. Heritage

9  suggested that you talk to Mr. Fox about the

10 situation?

11     A.      Well, I had -- now I remember a part.

12 I told her I was going to talk to him about it, and

13 that was the evening prior to the morning phone call,

14 that I was going to at some time approach him with it.

15             And that's when I called her the next

16 morning and told her that I was not going to talk to

17 him about it, that I had made a mistake in even

18 contacting her, that I was not even going to press the

19 issue and I just wanted to forget the whole thing, and

20 that I asked her please don't say anything to anybody

21 at work about it because it would cause problems for

22 Jim.

23     Q.      Okay.  Do you remember if you told

24 Ms. Heritage that your husband had taken Ms. Masten to

29

1      A.      No.  She didn't reiterate anything

2 again, because, you know, I wasn't constantly probing

3 her for anything.  It was just, you know, it was girl

4 talk and it was -- I didn't constantly probe Valerie

5 for, you know -- to try to get her to say something

6 that wasn't happening.

7      Q.      Okay.  Do you remember; is your

8 testimony that she didn't say that or that you can't

9 remember whether or not she said that?

10     A.      No.  I can say that I remember that

11 she did not say that to me because the conversation

12 went into other areas.  It wasn't always about Jim and

13 Aimee.  It was about personal experiences.  It was not

14 solely focused on the two of them.

15     Q.      Let's go to the fourth paragraph,

16 which describes the evening conversation between you

17 and Ms. Heritage.  Can you tell me -- can you read

18 that and tell me if there is anything inaccurate there

19 about Ms. Heritage's summary?

20     A.      Are you on this paragraph here

21 (indicating)?

22     Q.      Right; which I think begins on the

23 prior page.  I think it starts with "My next

24 conversation."

40

1                (Recess taken.)

2  BY MR. BRITTINGHAM:

3        Q.        Cathy, I am Brian Brittingham.  I am

4  here today on behalf of your husband, Jim Fox, as the

5  plaintiff in this action.  I would like to ask you a

6  couple questions, and I appreciate your time so far.

7        A.        Okay.

8        Q.        I would like to reference you back to

9  what has been labeled as Cathy Fox Exhibit 1.  If you

10 could, if I could, please.  I would like to call your

11 attention to the second paragraph, beginning with "My

12 first conversation with Mrs. Fox."  Did you state to

13 Ms. Heritage during this conversation that you had

14 called to ask her confidentially if she knew of

15 anything going on between Mr. Fox and Mrs. Masten?

16       A.        No, I didn't start the conversation

17 off as if I insinuated -- I called because, like I

18 said earlier, I had sent the girls in arrangements for

19 Secretary's Day and asked if they liked their

20 arrangements.  And then I asked them, you know, what

21 her opinion was of Jim's secretary, Aimee.

22       Q.        Let me ask you about that.  When you

23 asked her what was her opinion of Jim's secretary --

24       A.        I mean --

41

1    Q.        -- Aimee, is that specifically what

2 you stated or did you phrase it in a different manner?

3    A.        Like, what she thought of Jim's new

4 secretary, Aimee.

5    Q.        And what was your intent in asking

6 that question?

7    A.        Like, if basically -- if she knew

8 Aimee and, you know -- gosh, what else can I -- how

9 was she? Was she nice? How are things working out

10 between her and Jim? I mean, secretary-wise, was she

11 fitting in well with the office? She was new.

12    Q.        Very good. The third sentence of the

13 second paragraph starts, "I told her that I knew of

14 nothing going on." When you had asked Ms. Heritage

15 what she thought about Ms. Masten, was that her

16 initial response, the beginning of this third

17 sentence, or did she actually answer that question --

18    A.        I don't remember. I know that when I

19 called, I called about their arrangements. I called

20 about what -- like I said, what did they think of

21 Jim's new secretary. And then I mentioned that Aimee

22 had called the house a couple times and that I wished

23 she wouldn't, and I made the statement that I wished

24 she wouldn't call Jim's cellphone if she has work

42

1   questions; would she please talk to him at work, not

2   call him at home.

3           Q.        What was Ms. Heritage's statement to

4   that?

5           A.        And Kim -- there was a female sitting

6   beside her, and I said, "Is anybody there with you in

7   the office?"  She said, "Oh, just Kim."  And what else

8   was it?  You know, because I expressed to her that I

9   was not happy about Aimee calling Jim's cellphone and

10  kind of left it at that because I didn't want to tie

11  up, you know, my phone line too long.

12          And so I don't exactly remember what

13  else was said, but I didn't start the conversation out

14  as if I was insinuating there was something going on

15  between Jim and Aimee.

16          Q.        At what point in the conversation did

17  Ms. Heritage begin to insinuate that the appearance of

18  Mr. Fox and Ms. Masten's actions were inappropriate?

19          A.        It was later that evening, when I

20  called her at her house.

21          Q.        So are you stating that she did not

22  mention inappropriateness of conduct regarding your

23  husband and Mrs. Masten on your first phone call to

24  the Town Hall?

43

1    A.        Yes.  We didn't talk about that at the

2 first phone conversation.  Only second, when I was

3 home and not in my office environment did we go -- did

4 I go into detail as to why I called her the first

5 time.

6    Q.        Let me focus on that.  If she did not

7 mention anything regarding inappropriate actions in

8 your first phone call, what prompted you to call later

9 that same day?

10    A.        That was me to call, you know, because

11 I didn't want to call her in a work environment and

12 ask her personal questions.  That's what prompted me

13 to call her, because, you know, I wanted to go into

14 further detail and explain to her why I felt the way

15 that I did, why I was asking her the questions, and --

16 but there was another phone call after this one at

17 work.  I called her again at work and asked her for

18 everybody's birthday.  So the first call was to ask

19 how Aimee was making out in the office being Jim's new

20 secretary.

21    Q.        And I would represent, as Mr. Herron

22 did, that the third paragraph here of Cathy Fox 1 is

23 what you are referring to when you called later in the

24 day.

45

1  that the purpose of you coming back into the office

2  and/or making your presence known was that so a

3  certain individual would realize that you were married

4  to Mr. Fox?

5      A.      No.  I said that so that I could get

6  to know Aimee and maybe I wouldn't feel threatened by

7  the phone calls.

8      Q.      And in addition, in that conversation,

9  did you ask Mrs. Heritage confidentially, in private,

10  et cetera, if she knew of anything happening

11  inappropriate between Mr. Fox and Mrs. Masten?

12      A.      I had asked about their behavior in

13  the office, was everything okay.  And that's when she

14  said that, you know, there were -- they would look at

15  each other funny.  People thought their conduct

16  between each other was inappropriate, that everyone in

17  the office had noticed it, that they were behind doors

18  a lot.

19      Q.      Ms. Fox, let me ask you, when

20  Ms. Heritage made these statements to you regarding

21  possible inappropriate actions, did you feel that that

22  statement was outside of the context of your phone

23  call or was that certainly within the purview of your

24  conversation?

1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF DELAWARE

3  SAMUEL JAMES FOX, III,      :   C.A. No. 07-488

                        :

4        Plaintiff,     :

                        :

5         v.          :

                        :

6  TOWN OF SMYRNA, DAVID S. HUGG, :

  III, individually and in his  :

7  official capacity as Town Manager:

  of the Town of Smyrna, and    :

8  VALERIE HERITAGE, individually  :

  and in her official capacity as :

9  Administrative Clerk of the    :

  Town of Smyrna,          :

10                     :

        Defendants.       :

11          .. .. .. .. .. ..

COPY

12         Deposition of SAMUEL JAMES FOX, III, taken

  pursuant to notice, on Wednesday, January 9, 2008 at 1:00

13  p.m. at 414 S. State Street, Dover, Delaware, reported by

  Lorena J. Hartnett, a Registered Professional Reporter and

14  Notary Public.

15          .. .. .. .. .. ..

16  APPEARANCES:

17       B. BRIAN BRITTINGHAM, ESQUIRE

        Schmittinger & Rodriguez

18      414 S. State St.

        Dover, DE  19901

19        Attorney for the Plaintiff

20      BRUCE HERRON, ESQUIRE

        Akin & Herron, P.A.

21      1500 Shallcross Avenue

        Suite 1A

22      Wilmington, DE  19806

        Attorney for the Defendants

23

24

B-197

111

1   here?  Because I mean I already had Aimee working with

2   me.

3       Q     Well, do you know what meeting that sentence

4   refers to?

5       A     Oh, yes, I'm sorry, yes, I do.  There was a

6   meeting, a special meeting of mayor and Council where Mr.

7   Hugg, according to several members of Council, that was

8   told to me by them, that Mr. Hugg said at that meeting

9   that he would hire someone to assist me, which was to

10  fill Jeri's, Jeri Dunn's position.

11          Mr. Hugg was directed by them to tell me about

12  it, and he didn't.  That was three weeks prior to me

13  turning in my resignation.

14      Q     Who were the members of Council who told you

15  that?

16      A     Mayor Schaeffer, William D. Pressley, and

17  Memphis Evans, Councilman Memphis Evans.  And I waited

18  three weeks.  No one -- He never talked to me.  He never

19  came to me.  I saw him morning, noon and night, you know,

20  every day for three weeks.

21      Q     In November or December of 2005, did you or

22  anyone on your behalf request an increase in your pay or

23  compensation package from the town?

24      A     I heard about it after this meeting.  I

116

1    to normal for whatever job duties you incur.

2              I was present at those meetings.  I knew that

3    they were doing a study, so I knew that at some point in

4    time when they did my review of my job duties, that, you

5    know, maybe possibly there would be a raise anyway, so

6    why would I demand money that I felt would probably be

7    coming to me anyway?

8              I was frozen, because I think at that step I

9    didn't, I wasn't, I think for maybe the next two years I

10   wasn't able to get an increase, but with this evaluation

11   of everybody's job duties, they could have changed it and

12   gave everybody a raise whenever this, you know, this was

13   done, so I made no threats to the town to leave over

14   money, because if they reviewed my job, I would have got

15   a raise anyway, I felt, so I feel that this memo to mayor

16   and Council is inaccurate with what actually happened.

17   It's very misleading to them.

18              But what he doesn't have in here is where the

19   discussion was where he admitted to them that he would

20   hire someone in my spot, and that is not in these

21   minutes.

22       Q    And it's your understanding that that

23   discussion took place during this meeting?

24       A    Yes, sir.

126

1    BY MR. HERRON:

2        Q    What we have marked as Fox 14 is the January 4,

3    2006 letter from you to Mr. Hugg, which, as you say, is

4    your letter of resignation from town employment?

5        A    Uh-huh, yes.

6        Q    You sent this letter to Mr. Hugg on that date?

7        A    Yes.

8        Q    Were all the statements that you made in the

9    January 4, 2006 letter to Mr. Hugg accurate and truthful?

10       A    Yes.

11       Q    In the second paragraph it says that, it says,

12   "I feel that it is time for me to pursue other

13   opportunities."

14       A    Uh-huh.

15       Q    What other opportunities were you referring to?

16       A    Well, basically this was a polite letter to

17   terminate my employment with the town.  I had requested

18   an exit interview to give the personnel committee the

19   real reason why I left the town.

20       Q    Alright, well, before January 4, 2006 had you

21   had any contact with Stover Builders about a position

22   there?

23       A    Before January 6?

24       Q    Before January 4?

130

1     Q    Do you know if that request was made in

2  writing?

3     A   I don't think so.  I don't think so.  I don't

4  recall writing anything about it.  I know that they --

5  There was also another employee, Mr. Sam Fletcher, who

6  was the electric superintendent, was retiring too, and he

7  had requested an exit interview, so they just did both of

8  them the same day.

9     Q   That's my next question, is did you have an

10  exit interview?

11     A   Yes, sir, I did.

12     Q   And who conducted it?

13     A   The personnel committee.

14     Q   Who did that consist of?

15     A   Chairman William D. Pressley, member Sue

16  Hensley, Joan McKnight, William Hill, Memphis Evans, and

17  I believe Mr. Rich was on there too.  I believe he was.

18  I don't know what Mr. Rich's first name was, but -- And

19  Mr. Hugg was present, and I was present at my exit

20  interview.

21     Q   Do you know when the exit interview occurred?

22     A   January 18th at 5:30.

23     Q   So was that your last official day with the

24  town?

131

1    A    Yes, it was, my last day of employment.

2    Q    How long did that interview last?

3    A    Probably 45 minutes to an hour.

4    Q    Tell me what you recall about what you said at

5    that interview.

6    A    I told the committee that I felt that my

7    treatment upstairs, the Valerie Heritage incident,

8    nothing being done.

9        I recommended at that meeting that Valerie be

10   discharged again, as well as through my memo to Mr. Hugg

11   for her unprofessional conduct.

12       I told Mr. Hugg that I felt that the morale of

13   the town was very poor. He disagreed with me, but that's

14   okay.

15       I also thanked Mr. Hugg for all the help that

16   he gave me, everything he taught me.

17       And I didn't want to leave the town. But,

18   sorry, you would think after two years you would get over

19   it a little bit, but that I just felt that there was

20   changes that needed to be made, that they needed to get

21   rid of people that were driving good people away.

22       And there was questions from the members to Mr.

23   Hugg about these things. He didn't really go in any

24   detail. He never -- He never stated really what his

132

1  actions would be.

2         They asked him at that meeting about, you know,

3  why he did not come to me and talk to me about hiring

4  someone for Jeri's spot, and he wouldn't give them an

5  answer.

6         Sue Hensley, Joan McKnight, Mr. Pressley, all

7  three asked him and asked him and asked him, and he just

8  sat there and looked at us and would not answer that

9  question.  So, when it was all over, I thanked them for

10 my job, and I left.

11     Q    Do you know if there are any minutes that were

12 taken?

13     A    Mr. Hugg was taking minutes of that meeting,

14 but nobody ever received a copy of them.

15     Q    Do you know whether any minutes were ever

16 prepared?

17     A    No, there were not, that I know of.  No one

18 ever -- I asked Mr. Pressley.  I asked other members.

19 They never got any minutes.  Well, I take that back.

20 There was a little half-page thing about what consisted

21 that Sam and I gave our exit interviews, and that was it.

22 No substance whatsoever in the minutes.  Nothing.

23     Q    I am going to ask you, Mr. Fox, about, let's

24 see, Paragraph 22 of the complaint.  The second sentence,

133

1    it says, "During his employment with the Defendant Town,

2    Plaintiff suffered discrimination on the basis of his age

3    and sex by Defendant Town's agents."

4        A    Uh-huh.

5        Q    In what way do you believe you suffered

6    discrimination on the basis of your age?

7        A    My age?  Well, I feel that I was discriminated

8    against because Mr. Hugg wanted to promote Janet Vinc

9    over me, because of the comment made where she wanted to

10   be assistant town manager.

11       Q    And, just to be clear, Ms. Vinc was never

12   promoted to, was never actually promoted to a position

13   over you; is that right?

14       A    No, sir, not while I was there.

15       Q    And how do you feel you were discriminated

16   against on the basis of your sex?

17       A    Because I feel that Mr. Hugg, because she was a

18   female and her being his student prior, that he wanted to

19   promote her ahead of me.

20       Q    The first sentence there, in Paragraph 22,

21   talks about an untenable work environment.  In what way

22   do you believe your work environment was untenable?

23       A    Definition of untenable?   (Laughter)

24       Q    Unbearable.

178

1      state law on the grounds that it calls for a

2      legal opinion and the documents speak for

3      themselves.

4  BY MR. BRITTINGHAM:

5      Q      Let me just skip the next question.  Did you at

6  anytime during your course of employment have occasion to

7  discuss with anyone, either the Town Council or a town

8  employee, your desire for a financial pay raise and/or

9  compensation raise?

10      A      No.

11      Q      Were you ever promised by anyone associated

12  with Town Council or the town employees or any agent of

13  the town a financial increase in either pay or

14  compensation?

15      A      No.

16      Q      Regarding the alleged statements that are

17  alleged to be made by you regarding Ms. Janet Vinc, and

18  referencing Fox 13, Mr. Hugg makes a statement in there

19  that there is potential liability against the town

20  because of your alleged actions.

21      A      Uh-huh.

22      Q      I just want to expound on this a little bit.

23  To your knowledge, no, not to your knowledge, but have

24  you ever -- To your knowledge, has Janet Vinc ever filed

179

1    a sexual harassment lawsuit against the Town of Smyrna?

2        A    No, but if I knew about them, I would have.

3        Q    Has Janet Vinc ever filed a sexual harassment

4    suit against you?

5        A    No.

6        Q    Has anyone in the course of your life ever

7    filed a sexual harassment suit against you?

8        A    No.

9        Q    To the best of your knowledge, has the Town of

10   Smyrna, by anyone, been served with a sexual harassment

11   suit?

12       A    You mean by other than me?

13       Q    By anyone.

14       A    I don't know.

15       Q    During the course of your employment with the

16   Town of Smyrna, were you ever brought up for

17   investigation for anything regarding alleged comments

18   made by you that were of a sexual or derogatory nature?

19       A    No.

20       Q    If I may, can I please see Fox 14?  Fox 14 is

21   your resignation letter of January 4, '06 to Mr. Hugg; is

22   that correct?

23       A    Yes.

24       Q    Does this letter contain your entire feelings

180

1  about your employment with the Town of Smyrna?

2      A    No, it does not.

3      Q    Does it address the entirety of your issues or

4  concerns with your employment with the Town of Smyrna?

5      A    No, it does not.

6      Q    Did you have an occasion to fully express

7  yourself regarding your employment with the Town of

8  Smyrna in addition to this letter?

9      A    Yes, I did.

10     Q    And you testified earlier you did so in a

11 personnel --

12     A    A personnel committee meeting under executive

13 session on January 18, my last day of employment.

14     Q    Was that meeting recorded in any manner?

15     A    Mr. Hugg was taking minutes of the meeting.

16     Q    Have you ever been provided minutes of this

17 meeting?

18     A    I got a -- Of the substance of the meeting, no.

19     Q    Have you ever requested a substantive recording

20 of the meeting?

21     A    Yes, I have.  Yes, I have.  And all I got was a

22 generalization that I had requested an exit interview,

23 kind of a two-liner, three-liner.  It did not address any

24 substance to my exit interview at all.